No. 21-2683

# In the United States Court of Appeals for the Seventh Circuit

JANAY E. GARRICK,

*Plaintiff-Appellee,*

v.

MOODY BIBLE INSTITUTE,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
Case No. 1:18-cv-00573 – Judge John Lee, Magistrate Judge Young Kim

## APPELLANT'S BRIEF

Christian M. Poland
BRYAN CAVE LEIGHTON
  PAISNER LLP
161 N. Clark St.,
  Ste. 4300
Chicago, IL 60601-3315
(312) 602-5085
christian.poland@bclplaw.com

Daniel H. Blomberg
Luke W. Goodrich
Laura Wolk Slavis
Colten L. Stanberry
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. N.W.,
  Ste. 400
Washington, DC 20006
(202) 955-0095
dblomberg@becketlaw.org

*Counsel for Defendant-Appellant*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2683

Short Caption: Janay Garrick v. Moody Bible Institute

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Moody Bible Institute of Chicago

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Becket Fund for Religious Liberty

Bryan Cave Leighton Paisner LLP

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Christian M. Poland     Date: 07/31/2023

Attorney's Printed Name: Christian M. Poland

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑   No ☐

Address: 161 N. Clark Street, Suite 4300, Chicago, IL 60601

Phone Number: 312-602-5085     Fax Number: 312-698-7485

E-Mail Address: christian.poland@bclplaw.com

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-2683

Short Caption: Janay Garrick v. Moody Bible Institute

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Moody Bible Institute of Chicago

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Becket Fund for Religious Liberty

Bryan Cave Leighton Paisner LLP

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　N/A

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　N/A

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Daniel H. Blomberg　　　　Date: 07/31/2023

Attorney's Printed Name: Daniel H. Blomberg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　　Yes ☐　No ☑

Address: 1919 Pennsylvania Ave. NW, Suite 400, Washington, DC 20006

Phone Number: 202-955-0095　　　　　　Fax Number: 202-955-0090

E-Mail Address: dblomberg@becketlaw.org

rev. 12/19 AK

Save As      Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-2683

Short Caption: Janay Garrick v. Moody Bible Institute

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  The Moody Bible Institute of Chicago

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  The Becket Fund for Religious Liberty

  Bryan Cave Leighton Paisner LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

      N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

Attorney's Signature: /s/ Luke W. Goodrich    Date: 07/31/2023

Attorney's Printed Name: Luke W. Goodrich

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 1919 Pennsylvania Ave. NW, Suite 400, Washington, DC 20006

Phone Number: 202-955-0095    Fax Number: 202-955-0090

E-Mail Address: lgoodrich@becketlaw.org

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-2683

Short Caption: Janay Garrick v. Moody Bible Institute

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  The Moody Bible Institute of Chicago

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  The Becket Fund for Religious Liberty

  Bryan Cave Leighton Paisner LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

      N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

Attorney's Signature: /s/ Laura W. Slavis    Date: 07/31/2023

Attorney's Printed Name:  Laura W. Slavis

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address:  1919 Pennsylvania Ave. NW, Suite 400, Washington, DC 20006

Phone Number: 202-955-0095    Fax Number:  202-955-0090

E-Mail Address: lslavis@becketlaw.org

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-2683

Short Caption: Janay Garrick v. Moody Bible Institute

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The Moody Bible Institute of Chicago

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    The Becket Fund for Religious Liberty

    Bryan Cave Leighton Paisner LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Colten L. Stanberry    Date: 07/31/2023

Attorney's Printed Name: Colten L. Stanberry

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ] No [✓]

Address: 1919 Pennsylvania Ave. NW, Suite 400, Washington, DC 20006

Phone Number: 202-955-0095    Fax Number: 202-955-0090

E-Mail Address: cstanberry@becketlaw.org

rev. 12/19 AK

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT CONCERNING ORAL ARGUMENT ................................... 1

JURISDICTIONAL STATEMENT .............................................................. 1

STATEMENT OF ISSUES ........................................................................... 2

INTRODUCTION ......................................................................................... 3

STATEMENT OF THE CASE ...................................................................... 5

    I.  The Parties ......................................................................................... 5

       A.  Moody Bible Institute .................................................................. 5

       B.  Janay Garrick .............................................................................. 6

    II.  Procedural Background .................................................................... 8

       A.  The EEOC Charge ....................................................................... 8

       B.  The First Amended Complaint .................................................... 9

       C.  The District Court's Dismissal ................................................. 10

       D.  The Second Amended Complaint .............................................. 11

       E.  The District Court's Denial of Dismissal ................................. 12

       F.  Subsequent Proceedings ........................................................... 13

SUMMARY OF ARGUMENT ................................................................... 13

ARGUMENT .............................................................................................. 15

    I.  This Court has jurisdiction under the collateral order doctrine. .................. 15

       A.  This interlocutory appeal falls within *McCarthy*. ..................... 15

       B.  The Religion Clauses limit judicial interference, not just liability. .......... 18

          1.  Precedent confirms the Religion Clauses protect against litigation itself. ........................................................ 19

          2.  Other courts and scholars agree that the Religion Clauses bar intrusive and entangling litigation, not just liability. ........................... 21

    C. Contrary cases are distinguishable or wrong. ............................................ 24

II. The First Amendment bars Garrick's claims. ................................................. 26

    A. The Religion Clauses bar employment claims that entangle
       courts in matters of religious belief, doctrine, and governance. ............... 27

    B. Garrick's Title VII claims are barred by the Religion Clauses. ................. 30

    C. The district court's contrary holding is erroneous. .................................. 34

III. Title VII's religious exemption bars Garrick's claims. .................................. 37

    A. Title VII allows religious organizations to make employment decisions
       based on religious "belief," "observance," or "practice." ............................ 37

    B. The district court's contrary holding is mistaken. .................................... 44

CONCLUSION ................................................................................................... 45

CERTIFICATE OF COMPLIANCE .................................................................. 47

CERTIFICATE OF SERVICE .......................................................................... 47

CIRCUIT RULE 30(D) STATEMENT ............................................................. 47

STATUTORY ADDENDUM ............................................................................ 48

SHORT APPENDIX ......................................................................................... 49

Minute Entry Order Denying Motion to Dismiss Second
    Amended Complaint (Dkt.125) .................................................................. SA.01

Opinion & Order Denying Motion to Dismiss Second Amended
    Complaint (Dkt.126) .................................................................................. SA.02

Opinion & Order Denying Motion to Reconsider Motion to
    Dismiss Second Amended Complaint (Dkt.134) ....................................... SA.19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abney v. United States*,
  431 U.S. 651 (1977) ................................................................... 19

*Aparicio v. Christian Union*,
  No. 18-cv-0592, 2019 WL 1437618 (S.D.N.Y. March 29, 2019) ..................... 29, 33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................... 25

*Axon Enter. v. FTC*,
  143 S.Ct. 890 (2023) .................................................................. 19

*Barrados-Zarate v. Barr*,
  981 F.3d 603 (7th Cir. 2020) ......................................................... 24

*Bear Creek Bible Church v. EEOC*,
  571 F.Supp.3d 571 (N.D. Tex. 2021) .................................................. 43

*Belya v. Kapral*,
  45 F.4th 621 (2d Cir. 2022) .......................................................... 25

*Belya v. Kapral*,
  59 F.4th 570 (2d Cir. 2023) .......................................................... 26

*Bostock v. Clayton County*,
  140 S.Ct. 1731 (2020) ............................................................. 43, 45

*Bouldin v. Alexander*,
  82 U.S. (15 Wall.) 131 (1872) ........................................................ 28

*Boy Scouts v. Dale*,
  *Boy Scouts v. Dale*, 530 U.S. 640 (2000) ............................................ 28

*Boyd v. Harding Acad. of Memphis*,
  88 F.3d 410 (6th Cir. 1996) .......................................................... 45

*Brazauskas v. Fort Wayne-S. Bend Diocese*,
  796 N.E.2d 286 (Ind. 2003) ....................................................... 28-29, 33

*Bryce v. Episcopal Church*,
  289 F.3d 648 (10th Cir. 2002) ................................................ 18, 28, 33, 35

*Butler v. St. Stanislaus Kostka Catholic Acad.,*
    609 F.Supp.3d 184 (E.D.N.Y. 2022) ...................................... 29

*Carson v. Makin,*
    142 S.Ct. 1987 (2022) .......................................................... 32

*Catholic Bishop v. NLRB,*
    559 F.2d 1112 (7th Cir. 1977) ........................................*passim*

*CLS v. Walker,*
    453 F.3d 853 (7th Cir. 2006) .............................................. 28

*Cohen v. Beneficial Indus. Loan Corp.,*
    337 U.S. 541 (1949) .............................................................. 1

*Conlon v. InterVarsity Christian Fellowship,*
    777 F.3d 829 (6th Cir. 2015) .............................................. 22

*Corp. of Presiding Bishop v. Amos,*
    483 U.S. 327 (1987) ............................................................ 28

*Curay-Cramer v. Ursuline Acad. of Wilmington,*
    450 F.3d 130 (3d Cir. 2006) .......................................... 37, 42

*Dayner v. Archdiocese of Hartford,*
    23 A.3d 1192 (Conn. 2011) ................................................. 23

*Demkovich v. St. Andrew the Apostle Parish,*
    3 F.4th 968 (7th Cir. 2021) ............................................*passim*

*Digital Equip. Corp. v. Desktop Direct,*
    511 U.S. 863 (1994) ............................................................ 19

*Digital Realty Tr. v. Somers,*
    138 S.Ct. 767 (2018) ........................................................... 39

*In re Diocese of Lubbock,*
    624 S.W.3d 506 (Tex. 2021) ............................................... 23

*Doe v. Vill. of Deerfield,*
    819 F.3d 372 (7th Cir. 2016) .......................................... 18, 26

*Duquesne Univ. of the Holy Spirit v. NLRB,*
    947 F.3d 824 (D.C. Cir. 2020) ............................................ 29

*EEOC v. Arabian Am. Oil,*
    499 U.S. 244 (1991) ........................................................ 40-41

*EEOC v. Catholic Univ. of Am.*,
   83 F.3d 455 (D.C. Cir. 1996) ................................................................. 22

*EEOC v. Miss. Coll.*,
   626 F.2d 477 (5th Cir. 1980) ................................................................. 43

*Elbaz v. Congregation Beth Judea*,
   812 F.Supp. 802 (N.D. Ill. 1992) .......................................................... 45

*Fitzgerald v. Roncalli High Sch.*,
   ---F.4th---, 2023 WL 4528081 (7th Cir. July 13, 2023)...................*passim*

*Garcia v. Salvation Army*,
   918 F.3d 997 (9th Cir. 2019) ................................................................. 45

*Grussgott v. Milwaukee Jewish Day Sch.*,
   882 F.3d 655 (7th Cir. 2018) ......................................................... 15, 25

*Harrell v. Cook*,
   169 F.3d 428 (7th Cir. 1999) ................................................................. 15

*Heard v. Johnson*,
   810 A.2d 871 (D.C. 2002)..................................................................... 23

*Helstoski v. Meanor*,
   442 U.S. 500 (1979) .............................................................................. 19

*Herx v. Diocese of Ft. Wayne-S. Bend*,
   48 F.Supp.3d 1168 (N.D. Ind. 2014) .................................................... 45

*Herx v. Diocese of Ft. Wayne-S. Bend*,
   772 F.3d 1085 (7th Cir. 2014) ......................................................... 24, 25

*Hively v. Ivy Tech Cmty. Coll. of Ind.*,
   853 F.3d 339 (7th Cir. 2017) ................................................................. 15

*Hosanna-Tabor v. EEOC*,
   565 U.S. 171 (2012) .......................................................................*passim*

*Jackson v. Blitt & Gaines*,
   833 F.3d 860 (7th Cir. 2016) ................................................................. 38

*Kedroff v. St. Nicholas Cathedral*,
   344 U.S. 94 (1952) .................................................................................. 3

*Kennedy v. St. Joseph's Ministries*,
   657 F.3d 189 (4th Cir. 2011) ................................................................. 45

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ...................................................................... 4, 10, 27

*Lee v. Sixth Mount Zion Baptist Church,*
    903 F.3d 113 (3d Cir. 2018) ............................................................................. 22

*Little v. Wuerl,*
    929 F.2d 944 (3d Cir. 1991) .................................................................. 21, 40, 42

*Logan v. City of Chicago,*
    4 F.4th 529 (7th Cir. 2021) ............................................................................. 36

*Maguire v. Marquette Univ.,*
    627 F.Supp. 1499 (E.D. Wis. 1986) ................................................................ 43

*Massey v. Merrill Lynch,*
    464 F.3d 642 (7th Cir. 2006) ........................................................................... 35

*McCarthy v. Fuller,*
    714 F.3d 971 (7th Cir. 2013) .....................................................................*passim*

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ................................................................................... 19, 26

*Montano v. City of Chicago,*
    375 F.3d 593 (7th Cir. 2004) ........................................................................... 18

*N. Ind. Gun & Outdoor Shows v. City of S. Bend,*
    163 F.3d 449 (7th Cir. 1998) ........................................................................... 35

*Nielen-Thomas v. Concorde Inv. Servs.,*
    914 F.3d 524 (7th Cir. 2019) ........................................................................... 41

*NLRB v. Catholic Bishop,*
    440 U.S. 490 (1979) ....................................................................... 19, 20, 22 29

*O'Leary v. Accretive Health,*
    657 F.3d 625 (7th Cir. 2011) ........................................................................... 35

*Osborn v. Haley,*
    549 U.S. 225 (2007) ........................................................................... 1, 15, 18

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S.Ct. 2049 (2020) ............................................................. 17, 18, 20, 27, 28

*Payne-Elliott v. Roman Catholic Archdiocese of Indianapolis,*
    193 N.E.3d 1009 (Ind. 2022) ........................................................................... 29

*Presbyterian Church (U.S.A.) v. Edwards*,
   566 S.W.3d 175 (Ky. 2018) ................................................................ 23

*Rabé v. United Air Lines*,
   636 F.3d 866 (7th Cir. 2011) ............................................................ 40

*Rayburn v. General Conf. of Seventh-Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) .......................................................... 22

*Rubin v. The Islamic Republic of Iran*,
   637 F3d 783 (7th Cir. 2011) ....................................................... 15, 26

*SEC v. Wealth Mgmt. LLC*,
   628 F.3d 323 (7th Cir. 2010) ...................................................... 15, 18

*Serbian E. Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) ........................................................ 19, 20, 25, 26

*Smith v. Supple*,
   293 A.3d 851 (Conn. 2023) ............................................................... 23

*St. Joseph Catholic Orphan Soc'y v. Edwards*,
   449 S.W.3d 727 (Ky. 2014) .............................................................. 23

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
   41 F.4th 931 (7th Cir. 2022) ....................................................*passim*

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
   No. 20-3265, 2021 WL 9181051 (7th Cir. July 22, 2021) .................... 25

*Sterlinski v. Catholic Bishop of Chicago*,
   934 F.3d 568 (7th Cir. 2019) ............................................................ 21

*Tilton v. Marshall*,
   925 S.W.2d 672 (Tex. 1996) ............................................................. 23

*Tomic v. Catholic Diocese of Peoria*,
   442 F.3d 1036 (7th Cir. 2006) ................................................ 18, 21, 34

*Tucker v. Faith Bible Chapel*,
   36 F.4th 1021 (10th Cir. 2022) ......................................................... 25

*Tucker v. Faith Bible Chapel*,
   53 F.4th 620 (10th Cir. 2022) ........................................................... 25

*United Methodist Church v. White*,
   571 A.2d 790 (D.C. 1990) ................................................................. 23

*United States v. Melvin,*
   948 F.3d 848 (7th Cir. 2020) .................................................. 38

*United States v. Worthen,*
   60 F.4th 1066 (7th Cir. 2023) ................................................ 41

*Util. Air Reg. Grp. v. EPA,*
   573 U.S. 302 (2014) ............................................................. 40

*Watson v. Jones,*
   80 U.S. (13 Wall.) 679 (1871) .............................................. 17

*Whole Woman's Health v. Smith,*
   896 F.3d 362 (5th Cir. 2018) .......................................... 21, 22

*Young v. N. Ill. Conf. of United Methodist Church,*
   21 F.3d 184 (7th Cir. 1994) ........................................... 20-21

## Statutes

28 U.S.C. § 1291 ........................................................................ 1

28 U.S.C. § 1292 ...................................................................... 13

28 U.S.C. § 1331 ........................................................................ 1

42 U.S.C. § 2000e ............................................................ *passim*

42 U.S.C. § 2000e-1 ......................................................... *passim*

42 U.S.C. § 2000e-2 ................................................................ 38

42 U.S.C. § 12112 .................................................................... 41

42 U.S.C. § 12113 .................................................................... 41

Civil Rights Act of 1964, Pub. L. No. 88-352, § 702, 78 Stat. 241 ............................ 38

## Other Authorities

Baptist Faith and Message 2000, Section VI (2000) ................. 34

Mark E. Chopko & Marissa Parker, *Still a Threshold Question:*
   *Refining the Ministerial Exception Post-Hosanna-Tabor,*
   10 First Amend. L. Rev. 233 (2012) ..................................... 23

Gary Dorrien, *Modernisms in Theology: Interpreting American Liberal Theology, 1805-1950*, 23 Am. J. Theology & Phil. 200 (2002) ............................ 32

Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination*, 4 Oxford J. L. & Relig. 368 (2015) ............................... 39

Carl H. Esbeck, Thomas C. Berg, Richard W. Garnett, et al., *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 Nw. U. L. Rev. Colloquy 175 (2011) ................................................ 23

Fed. R. Civ. P. 10 .................................................................................. 5

J. Gresham Machen, *Christianity and Liberalism* (1923) ......................... 32

David Masci, *The divide over ordaining women*, Pew Research (Sept. 9, 2014) ..................................................................................... 33

*Matthew* 12:25 .................................................................................. 28

Michael McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ............................. 27

Moody Bible Inst., *2016 Employee Information Guide* ............................. 6

Moody Bible Inst., *Doctrinal Statement* ............................................. 6

Moody Bible Inst., *Educational Distinctives* ....................................... 5

Moody Bible Inst., *Gender Roles in Ministry* ...................................... 6

Muhammad ibn Idris ash-Shafi'i, 1 *Al-Umm* (Dar al-Fikr 1983) ............... 34

Stephanie Phillips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295 (2016) ...................... 39

Pope John Paul II, *Ordinatio Sacerdotalis* (1994) ............................. 33-34

U.S. EEOC, Section 12: Religious Discrimination (Jan. 15, 2021) ............ 43, 44

Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471 (2023) ........................................................ 23

## STATEMENT CONCERNING ORAL ARGUMENT

Moody respectfully requests oral argument. This appeal presents important questions about the scope of the collateral order doctrine, the First Amendment, and Title VII. Oral argument will aid the Court in considering those questions.

## JURISDICTIONAL STATEMENT

Because Plaintiff brought claims under Title VII, the district court had jurisdiction under 28 U.S.C. § 1331. The district court denied Moody's motion to dismiss Garrick's Second Amended Complaint on October 13, 2020, and denied Moody's timely motion for reconsideration on August 12, 2021. SA.02-03, 19. On September 13, 2021, Moody timely filed its notice of appeal seeking review of both orders. A.012.

As further explained in Section I, this Court has jurisdiction under 28 U.S.C. § 1291 pursuant to the collateral order doctrine. The doctrine applies when (1) a district court order has "conclusively decided a contested issue," (2) "the issue decided is important and separate from the merits of the action," and (3) the order "would be effectively unreviewable later in the litigation." *Osborn v. Haley*, 549 U.S. 225, 238 (2007) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)).

In *McCarthy v. Fuller*, this Court held that a pretrial order denying the Religion Clauses' protection for church autonomy is appealable under the collateral order doctrine. 714 F.3d 971 (7th Cir. 2013). Such an order is "closely akin to a denial of official immunity," the archetype of an appealable interlocutory order. *Id.* at 975-76. Like an official immunity, allowing a claim barred by the Religion Clauses to proceed to discovery and trial conclusively forecloses constitutional protections against "commingling of religious and secular justice." *Id.* This immunity against "governmental intrusion in religious affairs" is "'conceptually distinct' from the merits" of the underlying claim. *Id.* And the Religion Clauses prevent not just "an adverse judgment," but also the "irreparable" harm caused by judicial proceedings where a "secular court [will] take sides on issues of religious doctrine." *Id. McCarthy* controls here.

1

## STATEMENT OF ISSUES

1. Whether the district court's orders, which threaten the immunity from judicial interference and entanglement that the First Amendment's church autonomy doctrine guarantees, are subject to interlocutory appeal.

2. Whether Garrick's claims are barred by the church autonomy doctrine.

3. Whether Garrick's claims are barred by Title VII's religious exemption.

## INTRODUCTION

At the heart of this case is a religious dispute over the composition of the clergy. That kind of dispute is no business of civil courts. It is not the proper subject of depositions, discovery, or jury deliberations. The Free Exercise Clause and the Establishment Clause categorically bar judicial inquiry and interference in such religious questions. Once the religious subject of this suit became clear, the duty of a civil court was to announce the fact and dismiss the case. And that's exactly what the district court did—initially. But then it backtracked, requiring this interlocutory appeal.

Defendant Moody Bible Institute is a Bible college that trains Christians for ministry. It believes that while all Christians—women and men—can serve in ministerial capacities, only men may hold the church office of pastor. This belief is among a core group of doctrines that faculty are required to affirm as a condition of employment.

Plaintiff Janay Garrick joined the faculty knowing Moody held this belief and required faculty to affirm it. But, despite signing a contract making that affirmation, she rejected the belief and began publicly advocating against it. When Moody approached Garrick and confirmed she did not sincerely affirm its belief, Moody declined to renew her teaching contract.

Garrick then sued under Title VII, using the federal judiciary as leverage in her doctrinal dispute. That is barred by the First Amendment, which allows religious organizations "to decide for themselves, free from state interference, matters of church government." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). This "doctrine of 'church autonomy'" stops civil lawsuits at the threshold when they interfere with religious groups' independence in "matters of faith and doctrine and in closely linked matters of internal government." *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc).

Garrick's suit is likewise barred by Title VII itself. In a "legislative application[] of the church-autonomy doctrine," *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013), Congress included a religious exemption in Title VII which "permits a religious employer" to require staff to agree with its religious beliefs and "to abide by religious rules"—including "a rule against female clergy," *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 946-47 (7th Cir. 2022) (Easterbrook, J., concurring). That is what Moody requires here.

The district court initially agreed, dismissing Garrick's suit because resolving her claims "would impermissibly inject the auspices of government into religious doctrine and governance." A.088. But after Garrick filed an amended complaint omitting some of the more obvious theological references, the district court allowed the case to proceed. In so doing, it committed two fundamental errors.

First, although the court recognized the theological dispute at the heart of the case, it said Garrick's claims could proceed because she alleged the dispute was "a *pretext* for gender discrimination." SA.11. But such a pretext analysis is triply foreclosed in this case—by Garrick's own EEOC charge attached to the amended complaint, which admits under penalty of perjury the genuineness of Moody's religious reason for her termination; by the complaint itself, which fails to make allegations of pretext distinct from the doctrinal dispute; and by the First Amendment's bar on entanglement in religious questions, which would be violated by assessing pretext here.

Second, the district court misinterpreted Title VII's religious exemption, concluding that it applies only when a plaintiff styles her claim as one of religious discrimination, not sex discrimination. SA.09. Judge Brennan recently described the district court's ruling as an "atextual reading" of the exemption and called on courts to "correct course." *Fitzgerald v. Roncalli High Sch.*, ---F.4th---, 2023 WL 4528081, at *4 (7th Cir. July 13, 2023) (Brennan, J., concurring). On its face, Title VII's religious exemption applies to the entirety of Title VII—not just claims of religious discrimination—

4

and it expressly authorizes religious organizations to employ individuals who agree with "all aspects" of their religious "belief," "observance," and "practice." *Id.* This exemption forecloses Garrick's claims.

All that being so, the time to dismiss the claims is now. As this Court's *McCarthy* decision and other courts have held, the First Amendment's protection for church autonomy provides a kind of immunity that protects from not just liability but also the travails of litigation concerning religious matters. Further proceedings would irreparably harm Moody's autonomy and impermissibly entangle courts in religion. As in *McCarthy*, this Court should take jurisdiction and reverse.

## STATEMENT OF THE CASE[1]

### I. The Parties

#### A. Moody Bible Institute

Moody Bible Institute is a Bible college in Chicago. A.091 ¶¶1-2. Founded by evangelist and teacher Dwight L. Moody in 1886, Moody publicly holds itself out as "exist[ing] to Proclaim the Gospel, and equip people to be Biblically grounded, practically trained, and to engage the world through Gospel-centered living." Moody Bible Inst., *Educational Distinctives*, https://perma.cc/KH6T-YXZ6. In short, its mission is "training Christian students for the ministry." A.124.

To that end, Moody offers a host of undergraduate and seminary degrees designed to train the next generation of Christian leaders. And whichever degree students choose, Moody promises they will "spend more time studying the Bible than any other book." *Educational Distinctives*, *supra.*

Moody holds core beliefs it deems essential to biblical orthodoxy, publicly

---

[1]   This statement assumes the truth of the well-pleaded allegations in Garrick's operative pleading and its attached EEOC charge. Fed. R. Civ. P. 10(c) (attachments are "part of the pleadings for all purposes"). "SA." denotes the Short Appendix; "A." denotes the additional appendix; "Dkt." denotes district-court docket entries.

identified in a doctrinal statement and accompanying institutional positional state-
ments. Moody Bible Inst., *Doctrinal Statement*, https://perma.cc/3SWF-CASS (collect-
ing Moody's statements of belief); *see also* A.108-09, 112 ¶¶80, 84, 85, 96 (citing state-
ments); A.124-28 (same). These beliefs include tenets regarding the nature of God,
authority of Scripture, process of salvation, second-coming of Christ, and purpose of
the Church. As relevant here, the beliefs also concern the composition of the clergy:
only qualified men are eligible to hold the biblical church office of pastor (or "elder").
*See* Moody Bible Inst., *Gender Roles in Ministry*, https://perma.cc/3CRZ-ZZNH; *see
also* A.112 ¶96; A.124. Moody traces this belief back almost two millennia to the early
church, and holds that Christian women are eligible to serve in all other ministry
roles. *Gender Roles in Ministry*. The belief is commonly known as "complementarian-
ism." A.112 ¶96; A.124.

To protect its religious mission, Moody requires its faculty to agree with its core
beliefs as a condition of employment. *See, e.g.*, A.124; A.062 (requirement is "essential
to demonstrate" Moody's faith "to fellow employees, to MBI students, and to the out-
side world"); Moody Bible Inst., *2016 Employee Information Guide*,
https://perma.cc/R7S9-ZVKM (same). Faculty members must annually sign contracts
affirming that he or she "agrees with, personally adheres to, and supports each and
every statement" in Moody's doctrinal statement and positional statements—includ-
ing its complementarian beliefs. A.045; A.124; A.112 ¶96.

### B. Janay Garrick

Plaintiff Janay Garrick began serving as a faculty member in Moody's communi-
cations department on December 1, 2014, under an annual contract. A.123-24,
A.092 ¶5, A.110 ¶88. Each year, Garrick was required to sign an affirmation of
Moody's doctrinal statement, including its complementarian beliefs. A.124. Garrick
alleges that she "informed [Moody] during the interview process that she was an

'egalitarian Christian" who "believed in gender equality in the ministry." A.093 ¶20. But Garrick represented on the faculty contracts she signed annually that she fully agreed with and adhered to Moody's doctrines, including the belief that only men could serve in the church office of pastor. *See, e.g.*, A.124, A.045.

About a year after she was hired, Garrick began advocating against Moody's complementarian beliefs. In October 2015, Garrick started advocating for women to be admitted into the Pastoral Ministry program, which is designed to prepare students for the pastorate. A.100 ¶¶40-42. In accordance with Moody's beliefs, since its creation in the 1920s this program had been for male students only, but Garrick viewed these religious beliefs as gender discrimination violating Title IX. A.100 ¶¶40-45. She accordingly assisted a female student with filing an internal Title IX complaint over the program. A.100-02 ¶¶40-44, 47-52.

Garrick also started a group for Moody faculty called "Respect for Women Personally and Ministerially." A.095 ¶27, A.106 ¶75; A.125. At the first meeting, she argued "that denying women access to the [Pastoral M]inistry program" was illegal discrimination, and announced that she had helped a student file a Title IX complaint. A.125; A.095 ¶27. At that point, "the meeting ended abruptly," Garrick's co-leader cancelled the next meeting, and the group never met again. A.095 ¶27; A.101 ¶46.

In response to Garrick's advocacy at the meeting, her faculty mentor met with her privately, "admonished [her] by reading [her] the section of MBI's doctrinal statement on gender roles" and questioned her "integrity" given that she had signed the annual doctrinal affirmation. A.100-01 ¶45, A.125.

Instead of reconsidering her views or seeking employment from a ministry she agreed with, Garrick "decided to stay and fight." A.125. Garrick admits that she was "open and active in [her] opposition" to Moody's beliefs, A.125, and that it was "only after" this open advocacy that Moody started engaging with her over whether she would need to leave due to her religious disagreement, A.110 ¶88.

In early April 2017, Larry Davidhizar, Moody's Vice Present and Associate Provost of Faculty, asked to meet with Garrick "to discuss [Garrick's] vocal non-alignment with the Institute's doctrinal statement as it relates to 'Gender Roles in Ministry.'" A.108 ¶80. On April 12, 2017, Davidhizar discussed with Garrick his concerns that she was "not aligned with [Moody's] doctrinal statement." A.109 ¶85. Five days later, Garrick was given a letter that explained Moody's decision not to renew her contract. *See* A.110 ¶86; A.069. In the letter, Davidhizar stated "[t]he purpose of the [April 12] meeting was to gain clarification as to your position on 'Gender Roles in Ministry,'" and that in the meeting Garrick stated "that [she] hold[s] to the egalitarian view" of ministry. A.069; *see* A.109 ¶85. Because faculty members must "annually confirm the doctrinal statement which includes the complementarian view of gender roles," and because "[Garrick's] view is different from that of Moody," Moody could not "give [Garrick] a contract for the next academic year." A.069; *see* A.112 ¶96; A.126.

## II. Procedural Background

### A. The EEOC Charge

Garrick filed an EEOC charge on January 5, 2018, asserting claims of unlawful retaliation and discrimination on the basis of her religion and sex under Title VII. Under penalty of perjury, she admitted that "all faculty members are required to sign" a "doctrinal statement" including Moody's complementarian beliefs, but that she "did not agree with this view" and fought against it at the school. A.124-25. Garrick further admitted that Moody didn't renew her contract because her "form of Christianity" as an "egalitarian Christian" was "not aligned with the doctrinal statement." A.123, 126. She contended that the nonrenewal was also because of her "gender" and in "retaliation for [her] complaints about [her] own treatment and [her] complaints on behalf of female students." A.123, 126.

**B. The First Amended Complaint**

Garrick sued on January 25, 2018. Her initial complaint did not allege discrimination or retaliation under Title VII; rather it alleged retaliation under Title IX, retaliatory discharge under Illinois law, and breach of her faculty contract, which she attached to her complaint. Dkt.1 & Ex. A. After Moody moved to dismiss Garrick's complaint, Dkt.19, but before the district court ruled on the motion, Garrick filed a first amended complaint (FAC) on January 7, 2019, adding Title VII claims for religious and gender discrimination, retaliation, and hostile work environment. *See generally* A.027-41 ¶¶76-140. She attached her EEOC charge to her FAC. A.048.

Garrick's FAC mirrored the allegations levied in her EEOC charge. She detailed the various instances in which her beliefs conflicted with Moody's doctrine. These included her advocacy to open the Pastoral Ministry Program to women, A.021-23 ¶¶31-46, and her organization of the Respect for Women Personally and Ministerially group, A.020-21 ¶¶28, 36. Garrick further alleged additional instances of purported discrimination, including being directed to remove the title "ordained minister" from her resume, A.019 ¶25, and Moody's decision to reserve certain speaking engagements at chapel and other key events for men, A.027 ¶67(a)-(c), A.031 ¶¶95(a), 96. Garrick also took issue with the all-male faculty in the Bible and Theology departments. A.027 ¶67(e)-(f), A.031 ¶95(b).

And as in her EEOC charge, the FAC asserted that Moody decided not to renew her contract because of Garrick's "stated position/disagreement with Moody's 'Gender Roles in Ministry' addendum included in its doctrinal statement." A.040 ¶136. The FAC also alleged that, in Garrick's view, this was "pretext for its true motives—discrimination and retaliation." A.026 ¶64.

## C. The District Court's Dismissal

Moody moved to dismiss on several grounds. First, it sought dismissal under Title VII's religious exemption, which provides that Title VII "shall not apply" to a religious organization when it makes an employment decision based on religious "belief," "observance," or "practice." 42 U.S.C. §§ 2000e-1(a), 2000e(j). Alternatively, Moody argued that the doctrine of church autonomy protected its freedom to dismiss a teacher who rejected core elements of its religious beliefs and practices.

The district court dismissed the FAC in full. The court began by interpreting Title VII's religious exemption narrowly to cover only claims of religious discrimination. A.083. Thus, the court dismissed Garrick's religious discrimination claim with prejudice but held that the exemption did not bar her gender-discrimination, retaliation, and hostile-work-environment claims. A.083-84.

The court then turned to the "overarching" principle of church autonomy, which "respects the authority of churches to 'select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions' free from governmental interference." A.080-81, A.086 (quoting *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013)). As the court explained, Garrick's complaint ran headlong into these protections, since "Garrick's disagreement with Moody's beliefs on the role of women in the ministry underlies the majority of Garrick's allegations." A.087. Thus, the court held that delving into the controversy "would impermissibly inject the auspices of government into religious doctrine and governance." A.088.

Lastly, the court rejected the notion that Garrick's claims survived dismissal merely because she alleged that the stated reason for her dismissal—her disagreement with Moody's theological views—was a "pretext" for sex discrimination. A.087. The allegation of pretext could not prevent dismissal, the court said, because "[e]ither way, Moody's alleged reasons for firing Garrick were rooted firmly in its religious

beliefs." A.087. Accordingly, the court dismissed Garrick's gender-discrimination, retaliation, and hostile work environment claims. But it did so without prejudice to allow Garrick a chance to replead them "in a way that is untethered from her disagreements with Moody's religious views." A.088.

### D. The Second Amended Complaint

On November 5, 2019, Garrick filed her Second Amended Complaint (SAC), again attaching her EEOC charge. A.121. The SAC raised the same two counts of gender discrimination and one count of retaliation, all under Title VII. In addition to damages and attorneys' fees, Garrick sought injunctive relief against Moody's "discriminatory policies," payment of costs necessary for "implementing and monitoring such relief," and "[p]unitive damages sufficient to punish [Moody] for its unlawful behavior and to deter future discriminatory conduct." A.117.

Although the SAC dropped some allegations and relocated others, the gist of Garrick's claims, as pleaded in the FAC, remained the same. Garrick alleged no new material facts. In some instances, she simply deleted the overtly doctrinal words like "Bible" and "Theology" that she had previously pleaded. *Compare, e.g.*, A.020 ¶27 with A.094 ¶26 ("Female instructors were confined to certain programs, like the one in which Ms. Garrick was hired, while the more prestigious ~~Bible and Theology~~ programs were staffed exclusively by men.").

The SAC again alleged that Moody required all faculty members to affirm its Doctrinal Statements as a part of their employment contract, A.099 ¶38(i), A.125, and that Garrick openly rejected the Doctrinal Statement's position on the role of women in the ministry, A.109-12 ¶¶85, 89, 96, A.125. The SAC also left unchanged the numerous allegations demonstrating how Garrick advocated against Moody's beliefs and practices related to gender roles in pastoral ministry. A.100-02 ¶¶40-44, 47-55. Further, the SAC continued to allege that Moody told Garrick verbally and in writing

11

that her contract was not renewed because she "was not aligned with [Moody's] doctrinal statement as it related to gender roles in ministry." A.108-10 ¶¶80, 85-86, A.126, A.069. Finally, the SAC repeated verbatim the allegation that the stated reason for termination—that she "held an egalitarian view"—was "pretext for [Moody's] true motives—discrimination and retaliation." *Compare* A.026 ¶64 *with* A.110 ¶89 (same language in both complaints); A.038 ¶122 *with* A.108 ¶80 (identical accusations of pretext).

### E. The District Court's Denial of Dismissal

Moody again moved to dismiss. The district court dismissed with prejudice the hostile work environment claim, concluding that Garrick had not "plausibly alleged that she encountered a hostile work environment." SA.15. But this time, the district court allowed her disparate treatment and retaliation claims to proceed.

The court again rejected Moody's defense under Title VII's religious exemption, repeating its conclusion that the exemption covers only claims styled as religious discrimination, not those a plaintiff labels as another form of discrimination. SA.09.

With respect to church autonomy, the court acknowledged that "the religious autonomy doctrine turns on the substance of a plaintiff's claims, not the label she chooses to attach to them," and that much of Garrick's complaint continued to revolve around her disagreement with "Moody's complementarian creed." SA.13-14.

Nevertheless, the court stated that Garrick's sex discrimination claim could proceed because, whereas the FAC alleged "she was actually fired because of her advocacy in favor of female students joining the Pastoral Ministry Program," "the present complaint portrays Moody's religious justification as a *pretext* for gender discrimination." SA.11. Thus, according to the court, the case could proceed without it "sit[ting] in judgment as to what Moody's complementarian doctrine entails or whether it represents a reasonable basis for firing Garrick." SA.12-13. Rather, "the Court will need

only determine … whether Moody terminated her because of its religious beliefs or whether its invocation of its religious beliefs was, in fact, a cover to discriminate against Garrick because of her gender." SA.13. In so concluding, the court did not acknowledge that both complaints contained identical language regarding pretext. *Compare* A.026 ¶64 *with* A.110 ¶89; A.038 ¶122 *with* A.108 ¶80. Nor did the Court address Garrick's EEOC charge, which was attached to both complaints and contained the sworn admission that Moody declined to renew Garrick's contract because she rejected Moody's beliefs.

### F. Subsequent Proceedings

Moody moved for reconsideration or, alternatively, for certification to appeal under 28 U.S.C. § 1292(b). On August 12, 2021, the district court denied the motion and declined to certify an interlocutory appeal. SA.19.

On September 13, 2021, Moody timely filed an interlocutory appeal of the orders denying its motion to dismiss the SAC and its motion for reconsideration. Dkt.142. Shortly thereafter, this Court ordered Moody to submit a jurisdictional memorandum, and then ordered Garrick to respond. In the meantime, the district court granted Moody's motion to stay bifurcated discovery pending resolution of the appeal, in part because Garrick was seeking the merits-related discovery that Moody's appeal sought to prevent. Dkt.161. On October 18, 2022, this Court agreed to consider the jurisdictional questions along with the merits of Moody's appeal.

## SUMMARY OF ARGUMENT

**I.** This Court has appellate jurisdiction through the collateral order doctrine. Under that doctrine, the Court has jurisdiction over orders resolving important matters that are separate from the merits and effectively unreviewable on appeal—such as the denial of a litigation immunity. In *McCarthy*, this Court held that the denial of a First Amendment church autonomy defense is "closely akin to a denial of official

13

immunity"—and therefore reviewable as a collateral order—because the church autonomy doctrine protects not merely against "an adverse judgment," but also against the "government intrusion in religious affairs" that results from discovery and trial. 714 F.3d at 975-76. Numerous other courts and scholars agree. The district court's contrary ruling invites a civil court to probe and second-guess Moody's decision not to retain a teacher who condemned and subverted its doctrines about the composition of the clergy. That holding conclusively denies Moody's claim to immunity from discovery and trial. And absent interlocutory review, the ensuing process of adjudication would irreparably injure Moody's First Amendment right against—and the judiciary's corresponding structural duty to avoid—government entanglement in internal religious matters.

**II.** Garrick's claims are barred by the church autonomy doctrine. That doctrine prohibits courts from entangling themselves in religious organizations' personnel decisions based on matters of faith or doctrine. Garrick alleged that Moody openly held one religious belief about who could serve in the church office of pastor, Garrick held one inapposite, and Moody decided not to renew her contract because she began openly opposing its belief and confirmed her disbelief. In other words, Garrick alleged that Moody made a personnel decision based on doctrine—a decision the First Amendment fully protects.

**III.** Title VII also bars Garrick's claims. By its own terms, Title VII does not apply to a religious organization's decisions respecting "employment of individuals of a particular religion." It defines "religion" to include "all aspects of religious observance and practice, as well as belief." Per Garrick's allegations, Moody terminated her because of their differences in religious "belief," "observance," and "practice."

14

## ARGUMENT

Whether the Religion Clauses preclude a Title VII claim is a question of law. *See Grussgott v. Milwaukee Jewish Day Sch.*, 882 F.3d 655, 657, 662 (7th Cir. 2018); *Demkovich*, 3 F.4th at 974, 979. The meaning and application of Title VII to the facts alleged in a complaint are likewise "pure issues of law." *See Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 351-52 (7th Cir. 2017). Such questions are reviewed de novo. *Id.*; *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999).

## I. This Court has jurisdiction under the collateral order doctrine.

Under the collateral order doctrine, this Court has jurisdiction over pre-trial orders resolving claims of right "too important to be denied review and too independent" of the underlying action to wait until "the whole case is adjudicated." *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 330 (7th Cir. 2010) (quoting *Cohen*, 337 U.S. at 546). The doctrine applies when (1) a pre-trial order has "conclusively decided a contested issue," (2) "the issue decided is important and separate from the merits of the action," and (3) the order "would be effectively unreviewable later." *Osborn*, 549 U.S. at 238.

It is "well-established" that "orders denying claims of immunity" meet all three elements. *Rubin v. The Islamic Republic of Iran*, 637 F3d 783, 789 (7th Cir. 2011). In *McCarthy v. Fuller*, this Court held orders denying church autonomy defenses like the one here passed the test because they are "closely akin to a denial of official immunity." 714 F.3d 971, 974-76 (7th Cir. 2013). Like an immunity, the Religion Clauses protect against not just "adverse judgment" but also the intrusion and entanglement of suit. *Id.* This right is "conceptually distinct" from the merits of the action, and it suffers "irreparable" harm when a "secular court … take[s] sides on issues of religious doctrine." *Id.* Accordingly, this Court has jurisdiction.

### A. This interlocutory appeal falls within *McCarthy*.

As explained in Section II below, the church autonomy doctrine protects religious groups from judicial interference in "matters of faith and doctrine and in closely

linked matters of internal government." *Demkovich*, 3 F.4th at 975, 977. In *McCarthy*, this Court applied that doctrine to a defamation claim over a woman being called a "fake nun." 714 F.3d at 974. The district court had denied a motion to take judicial notice of an Archbishop's determination that the woman in question was not a nun in good standing, holding instead that a jury would decide that disputed factual question. *Id.* But this Court found the ruling immediately appealable and reversed—not because the ruling resolved liability via an "adverse judgment," but because the First Amendment "forbids the government to make religious judgments" at all. *Id.* at 975-76. Regardless of the case's ultimate outcome, allowing the "commingling of religious and secular justice" through litigation itself would be an irreversible "governmental intrusion into religious affairs." *Id.* Because the district court's order conclusively resolved the right against government intrusion into religious affairs, was distinct from the underlying suit, and threatened "irreparable" harm to religious autonomy absent prompt review, it was appealable. *Id.*

*McCarthy* governs here on all three collateral-order criteria. Moody is not merely claiming a right against liability, but a structural constitutional autonomy from "civil intrusion into, and excessive entanglement with" its faith, doctrine, and internal religious management—"harms" that the church autonomy doctrine exists to "prevent[]." *Demkovich*, 3 F.4th at 977-78.

*First*, the district court's order conclusively denied that autonomy. Like *McCarthy*, the district court has ordered that the judiciary must second-guess Moody's determination that Garrick was not in doctrinal good standing and thus could not remain a representative of Moody. Garrick's pleadings confirm that Moody requires its faculty to agree with its doctrinal statement; that Garrick rejected this doctrinal statement and was subverting it in the school; and that Moody consequently ended her association with its ministry. A.091 ¶96; A.125; A.045. Yet the district court ruled that it may probe and reject Moody's determination.

That ruling conclusively rejects Moody's claim to religious autonomy. Resolving Garrick's sex discrimination claims will subject Moody to invasive civil adjudication—including depositions of key ministerial leaders about sensitive religious matters. Garrick is asking a jury to attribute secular, sex-based motivations to Moody even while admitting Moody had religious motivations—and in the context of an admitted religious dispute about sex-based religious distinctions for religious leadership roles. Her claims will thus entangle the courts (and a jury) in questions over the development, meaning, and strength of Moody's church-leadership doctrines; its internal religious deliberations regarding Garrick's rejection of its doctrine; and its internal religious decisions involving other professors and students that violated its doctrine. Likewise, to persuade a jury of the credibility of its religious motivations, Moody will have to show the importance of its religious doctrine—and the importance of all teachers agreeing with it—as it relates to Moody's religious mission. *See Catholic Bishop v. NLRB*, 559 F.2d 1112, 1120, 1124 (7th Cir. 1977) ("*NLRB*"), *aff'd* 440 U.S. 490 (1979). Thus, a "civil factfinder" will "sit[] in ultimate judgment of … how important that belief is to the church's overall mission." *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 206 (2012) (Alito, J., concurring). Whatever the factfinder's judgment might be, this "commingling of religious and secular justice" required by the district court's order, *McCarthy*, 714 F.3d at 976, conclusively rejects Moody's claim of autonomy in shaping its own religious doctrine and internal governance.

*Second*, Moody's claimed First Amendment right is both important and conceptually distinct from Garrick's claims. *McCarthy*, 714 F.3d at 974. Church autonomy "lies at the foundation of our political principles" and safeguards the "relations of church and state under our system of laws." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727-28 (1871). It is a "broad principle" that both guarantees a religious group's "independence in matters of faith and doctrine and in closely linked matters of internal government," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060-61

(2020), and sets the federal judiciary's "independent" obligation to avoid entanglement in "religious controversy," *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006). It is at least as important as others which receive interlocutory review. *Wealth Mgmt.*, 628 F.3d at 330 (distribution plan); *Doe v. Vill. of Deerfield*, 819 F.3d 372, 376 (7th Cir. 2016) (anonymous litigation). Moreover, as in *McCarthy*, the First Amendment right against government intrusion and entanglement is "conceptually distinct" from Garrick's Title VII claims. Not only is the right "capable of review without extensive examination of the underlying merits of the case," *Montano v. City of Chicago*, 375 F.3d 593, 598-99 (7th Cir. 2004), it seeks to *prevent* such entangling merits examination.

*Third*, the claimed right will be lost forever if review is postponed. Moody is claiming a constitutional autonomy from Garrick's use of the judiciary to probe and second-guess its doctrine and internal management. As in the official immunity context, the judicial process itself causes the harm. Avoiding that harm is why "[i]mmunity-related issues" must be "decided at the earliest opportunity," *Osborn*, 549 U.S. at 253, including in the church autonomy context, *Bryce v. Episcopal Church*, 289 F.3d 648, 654 n.1 (10th Cir. 2002) (as with immunity, courts should "resolv[e] the question of the doctrine's applicability early in litigation" to "avoid excessive entanglement"). Judicial "intrusion into religious affairs" is "irreparable," "just as in the other types of case in which the collateral order doctrine allows interlocutory appeals." *McCarthy*, 714 F.3d at 976.

Thus, *McCarthy* alone requires immediate review to ensure that continued proceedings in the district court do not themselves violate the Constitution.

**B. The Religion Clauses limit judicial interference, not just liability.**

But *McCarthy* is not alone. Precedent from the Supreme Court, this Court, and other federal circuits and state high courts confirm that church autonomy protects from both liability and judicial interference in internal religious matters. And that is

what much of collateral order analysis turns on: whether the claimed right bars only liability or also the process of litigation itself. *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) (identifying this as a "major" consideration). Defenses to liability can be adequately addressed after final judgment, and thus their denial generally is not sufficiently final, collateral, or irreparable to require immediate review.

But where, as here, the appellant "contest[s] the very authority of the Government to hale [the appellant] into court," the "full protection" of the right "would be lost" if the appellant were "forced to 'run the gauntlet'" of litigation. *Abney v. United States*, 431 U.S. 651, 659, 662 (1977) (Double Jeopardy Clause); *Helstoski v. Meanor*, 442 U.S. 500, 507 (1979) (Speech or Debate Clause); *see also Axon Enter. v. FTC*, 143 S.Ct. 890, 903-04 (2023) (appeal cannot remedy "an illegitimate proceeding" after it has taken place). In cases like this one where "constitutional rights are concerned" and could be impinged by the judicial process itself, allowing interlocutory review "reflect[s] the familiar principle of statutory construction" that courts "should construe statutes (here, § 1291) to foster harmony with … constitutional law." *Digital Equip. Corp. v. Desktop Direct*, 511 U.S. 863, 879 (1994).

### 1. *Precedent confirms the Religion Clauses protect against litigation itself.*

The Supreme Court has long and repeatedly explained that the Religion Clauses limit the process of litigation, not merely liability. This is because "[i]t is not only the *conclusions* that may be reached by [the government] which may impinge on rights guaranteed by the Religion Clauses, but also *the very process of inquiry* leading to findings and conclusions." *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979) ("*Catholic Bishop*") (emphasis added). Thus, for instance, the constitutional problems in *Serbian Eastern Orthodox Diocese v. Milivojevich*—which, as here, involved civil review of a religious dispute over the composition of the clergy—were not just the ultimate judicial determinations, but that even reaching such determinations required "civil courts to analyze" internal "ecclesiastical actions of a church," which itself was

19

an "inquiry that the First Amendment prohibits." 426 U.S. 696, 713 (1976). Indeed, the Religion Clauses bar "any attempt" by courts "even to influence" matters of faith, doctrine, or governance, *Our Lady*, 140 S.Ct. at 2060—including by "inquiring into" certain sensitive religious decisions, *Hosanna-Tabor*, 565 U.S. at 187. Regardless of a case's outcome, "the mere adjudication of such questions would pose grave problems for religious autonomy." *Id.* at 205-06 (Alito, J., concurring).

This Court has also stressed that the Religion Clauses protect from "the travails of a trial and not just from an adverse judgment." *McCarthy*, 714 F.3d at 975. Sitting en banc, this Court recently echoed the Supreme Court's admonition that "'the very process of inquiry'" can "impinge on rights guaranteed by the Religion Clauses," warning those rights can be harmed by the "protracted legal process" of Title VII adjudication and the ensuing "prejudicial effects of incremental litigation." *Demkovich*, 3 F.4th at 982-83 (quoting *Catholic Bishop*, 440 U.S. at 502). *Demkovich* explained that "the doctrine of 'church autonomy'" is a "well-established principle" that rejects "civil intrusion into the religious sphere" and "means what it says: churches must have 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" *Id.* at 975 (quoting *Our Lady*, 140 S.Ct. at 2061).

Thus, almost a half-century ago, this Court rejected the NLRB's attempt to exercise jurisdiction over Catholic schools in part because of the "chilling aspect" that a "protracted and expensive unfair labor practice *proceeding*" would have on the schools' religious freedom, explaining that *Milivojevich* requires "a positive 'hands off' stricture" on "'matters of discipline, faith, internal organization, or ecclesiastical rule.'" *NLRB*, 559 F.2d at 1120, 1124 (emphasis added) (quoting *Milivojevich*, 426 U.S. at 713). Later, this Court explained that *Milivojevich* instructs "that civil court review of ecclesiastical decisions of church tribunals ... are *in themselves* an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." *Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 187 (7th Cir.

1994). Similarly, *Sterlinski v. Catholic Bishop of Chicago* ruled that a purpose of the church autonomy doctrine is "to avoid such judicial entanglement" as "subjecting religious doctrine to discovery and, if necessary, jury trial." 934 F.3d 568, 570 (7th Cir. 2019). In sum, where "the course of adjudication" will cause religious entanglement, judicial involvement is barred. *Tomic*, 442 F.3d at 1039.

### 2. Other courts and scholars agree that the Religion Clauses bar intrusive and entangling litigation, not just liability.

Other courts and scholars have agreed. As they explain, "[e]ven if the employer ultimately prevails" against a Title VII claim, its rights under the Religion Clauses can still be violated by the "excessive entanglement" arising from "the process of review" itself, since "churches have a constitutionally protected interest in managing their own institutions free of government interference." *Little v. Wuerl*, 929 F.2d 944, 949 (3d Cir. 1991).

Particularly salient is *Whole Woman's Health v. Smith*, 896 F.3d 362, 366 (5th Cir. 2018), in which the Fifth Circuit permitted interlocutory appeal from the denial of church autonomy defense addressed solely to the issue of further discovery, not liability. There, a district court ordered Catholic bishops to comply with a third-party subpoena and produce internal communications concerning abortion. *Id.* The bishops sought interlocutory review, claiming the order threatened irreparable harm to the "structural protection afforded religious organizations" by the Religion Clauses. *Id.* at 373. The Fifth Circuit agreed those rights faced risk of irreparable harm. The court explained that the bishops' claimed rights "go to the heart of the constitutional protection of religious belief and practice," *id.* at 368, that "Supreme Court decisions have protected religious organizations' internal deliberations and decision-making in numerous ways," *id.* at 374, and that "the importance of securing religious groups' institutional autonomy … cannot be understated," *id.* Accordingly, because "the consequence of forced discovery here is 'effectively unreviewable' on appeal from the final

judgment," the court permitted interlocutory review, relying on cases holding that "interlocutory court orders bearing on First Amendment rights remain subject to appeal pursuant to the collateral order doctrine." *Id.* at 367-68.

Similarly, the Fourth Circuit agrees that, in the church-autonomy context, "[i]t is not only the conclusions that may be reached" but "the very process of inquiry" that can "infringe on rights guaranteed by the Religion Clauses." *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (quoting *Catholic Bishop*, 440 U.S. at 502). Allowing "[c]hurch personnel and records" to "become subject to subpoena, discovery, cross-examination," and the "full panoply of legal process designed to probe the mind of the church" is a distinct injury, since it would inevitably pressure churches to base religious decisions on "avoid[ing] litigation or bureaucratic entanglement" instead of "doctrinal assessments." *Id.* at 1171.

The D.C. Circuit agreed in *EEOC v. Catholic University of America*, 83 F.3d 455 (D.C. Cir. 1996). Relying on *Rayburn*, *Catholic Bishop*, and this Court's decision in *Young*, the D.C. Circuit warned that religious bodies being "deposed, interrogated, and haled into court" over their internal religious employment decisions can alone violate the First Amendment. *Id.* at 466-67.

And the Third and Sixth Circuits have concluded that church autonomy functions not merely as an ordinary defense to liability but as an unwaivable structural check on judicial interference in internal religious matters. In *Conlon v. InterVarsity Christian Fellowship*, the court emphasized that the Religion Clauses are not merely a party's "personal" defense that can be waived based on party preference, but a "structural limitation imposed on the government" that "categorically" bars interference in internal religious disputes. 777 F.3d 829, 836 (6th Cir. 2015). The Third Circuit agreed in *Lee v. Sixth Mount Zion Baptist Church*, stating that the doctrine is "rooted in constitutional limits on judicial authority" and thus cannot be waived. 903 F.3d 113, 118 n.4 (3d Cir. 2018).

22

Several state high courts and the District of Columbia have repeatedly agreed that the Religion Clauses are more than just an ordinary defense to liability:

- *Presbyterian Church (U.S.A.) v. Edwards*, 566 S.W.3d 175, 179 (Ky. 2018) (Religion Clauses protect "against the 'costs of trial' and 'burdens of broad-reaching discovery,'"); *St. Joseph Catholic Orphan Soc'y v. Edwards*, 449 S.W.3d 727, 737 (Ky. 2014) (church autonomy doctrine is an immunity from suit).

- *Dayner v. Archdiocese of Hartford*, 23 A.3d 1192, 1199-1200 (Conn. 2011) ("the very act of litigating a dispute that is subject to the ministerial exception would result in the entanglement of the civil justice system with matters of religious policy, making the discovery and trial process itself a First Amendment violation"); *Smith v. Supple*, 293 A.3d 851 (Conn. 2023) (same).

- *In re Diocese of Lubbock*, 624 S.W.3d 506, 515-16 (Tex. 2021) (church autonomy bars "any investigation" by courts of "the internal decision making of a church judicatory body"); *Tilton v. Marshall*, 925 S.W.2d 672, 682 (Tex. 1996) ("trial itself," not "merely the imposition of an adverse judgment, would violate [a religious defendant's] constitutional rights").

- *United Methodist Church v. White*, 571 A.2d 790, 792-93 (D.C. 1990) (Religion Clauses "grant churches an immunity from civil discovery," and that "once exposed to discovery and trial, the constitutional rights of the church to operate free of judicial scrutiny would be irreparably violated"); *Heard v. Johnson*, 810 A.2d 871 (D.C. 2002) (collecting cases).

Scholars have also concluded that the Religion Clauses provide a form of immunity from discovery and trial, not just liability, and can support interlocutory appeal. *See, e.g.*, Carl H. Esbeck, Thomas C. Berg, Richard W. Garnett, et al., *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 Nw. U. L. Rev. Colloquy 175, 189-90 (2011); Mark E. Chopko & Marissa Parker, *Still a Threshold Question: Refining the Ministerial Exception Post-Hosanna-Tabor*, 10 First Amend. L. Rev. 233, 293-94 (2012); Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471, 503-04 (2023).

Accordingly, it is well established that church autonomy protects against forms of judicial entanglement and intrusion beyond the imposition of damages.

**C. Contrary cases are distinguishable or wrong.**

In response, Garrick pointed to *Herx v. Diocese of Ft. Wayne-South Bend*, 772 F.3d 1085 (7th Cir. 2014), and two cases from the Second and Tenth Circuits. But *Herx* is distinguishable, and the other cases are both distinguishable and wrong.

1. In *Herx*, "only a few sentences" in the appellant Diocese's briefing were even "addressed to the criteria for collateral-order review," and it "cite[d] no authority" for the proposition that its defenses—which, unlike here, primarily sounded in Title VII—"provide an immunity from the burdens of trial rather than an ordinary defense to liability." *Herx*, 772 F.3d at 1090-91; *cf. Barrados-Zarate v. Barr*, 981 F.3d 603, 605 (7th Cir. 2020) (appellate courts are "limited to addressing and resolving the arguments made"). Thus, *Herx* emphasized that it "h[e]ld only that the Diocese ha[d] not made a persuasive case" for interlocutory appeal—not that a church autonomy defense never warrants interlocutory review. 772 F.3d at 1091. That holding does not apply here, where extensive authority—including more recent precedent from the Supreme Court (*Our Lady*), this Court (*Sterlinski*, *Demkovich*), and other courts—confirms that church autonomy is more than just an "ordinary defense to liability." *Id.*

Further, the claims in *Herx* did not require the religious entanglement this case does. Unlike in *Herx*, Garrick's pleadings *admit* that her nonrenewal was in fact motivated by religious belief and arose out of her disagreement with and open advocacy against her religious employer's doctrine. Garrick's case is thus flatly barred by the First Amendment. Even adjudicating it further will require "onerous" burdens on church autonomy rights, including "depositions of fellow ministers and the search for a subjective motive behind the alleged hostility," all of which "impermissibly requires

'intrusion into a religious thicket.'" *Demkovich*, 3 F.4th at 981, 983 (quoting *Milivojevich*, 426 U.S. at 719). *Herx* doesn't sanction such intrusion.[2]

2. The Second and Tenth Circuit cases likewise fail to help Garrick. In *Tucker v. Faith Bible Chapel*, a divided Tenth Circuit panel reconceptualized the ministerial exception as "quintessentially a factual determination for the jury" and found that ministerial exception defenses denied at summary judgment cannot be appealed where the trial court states there are disputes of fact over the exception's application. 36 F.4th 1021, 1035 & n.8 (10th Cir. 2022), *cert. denied*, ---S.Ct.---, 2023 WL 3937608 (2023). That result is inapplicable here since this Rule 12(b)(6) appeal does not involve disputes of fact. *See Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009). The result also conflicts with this Circuit's law. *Grussgott*, 882 F.3d at 657 (ministerial exception is a question of law). And it is wrong. As Judges Bacharach, Tymkovich, and Eid explained in their dissent from denial of en banc rehearing, the Religion Clauses "protect[] a religious body from the suit itself," and the panel's contrary decision "reflects a fundamental misconception" of "important structural issues at the heart of the Religion Clauses" and conflicts with several circuits—including this one. *Tucker v. Faith Bible Chapel*, 53 F.4th 620, 625, 630 (10th Cir. 2022).

Similar errors infect *Belya v. Kapral*, 45 F.4th 621 (2d Cir. 2022), *cert. denied*, ---S.Ct.---, 2023 WL 3937611 (2023). *Belya* denied interlocutory review because it found that there were disputes of fact and that the common-law claims there could be adjudicated by "neutral principles of law." *Id.* at 632-34. But (again) there are no such disputes here; the holding conflicts with this Circuit's law, *Demkovich*, 3 F.4th at 980 (rejecting application of "neutral, secular principles"); and the panel is wrong. As

---

[2] Nor does the unpublished order in *Starkey v. Roman Catholic Archdiocese of Indianapolis*, No. 20-3265, 2021 WL 9181051 (7th Cir. July 22, 2021), which concerned unique conclusiveness issues, not *McCarthy*'s precedent that the Religion Clauses provide immunity against religious entanglement.

Judge Park, joined by Chief Judge Livingston and Judges Sullivan, Nardini, and Menashi, warned in dissent from denial of en banc rehearing, *Belya*'s errors will "eviscerate the church autonomy doctrine." *Belya v. Kapral*, 59 F.4th 570, 580 (2d Cir. 2023). The dissent explained that *Our Lady*, *Hosanna-Tabor*, *Catholic Bishop*, and *Milivojevich* all "lead[] to the same conclusion: that 'the very process of inquiry' into matters of faith and church governance offends the Religion Clauses," and thus justify interlocutory review. *Id.* at 577 n.2. Judge Cabranes also dissented, writing to "underscore that the issues at hand are of 'exceptional importance.'" *Id.* at 573.

\* \* \* \*

Moody has, at a minimum, shown a "substantial claim" to immunity sufficient to justify interlocutory review. *Mitchell*, 472 U.S. at 525; *Rubin*, 637 F.3d at 790. Indeed, even if this Court determines the claimed immunity does not apply here, it nonetheless has jurisdiction to evaluate the claim of right. *See, e.g.*, *Vill. of Deerfield*, 819 F.3d at 377. And, as shown below, the immunity applies.

## II. The First Amendment bars Garrick's claims.

"[C]hurch autonomy 'means what it says: churches must have "independence in matters of faith and doctrine and in closely linked matters of internal government."'" *Starkey*, 41 F.4th at 942 (quoting *Demkovich*, 3 F.4th at 975). This independence safeguards both church and state, protecting religious groups' ability to conduct their internal affairs while keeping the state from "entangle[ment] in essentially religious controversies." *Milivojevich*, 426 U.S. at 709. And this autonomy has been repeatedly applied in the specific context at issue here: a dispute over religious leadership and religious doctrine at a religious school. *Demkovich*, 3 F.4th at 976 (collecting cases).

Garrick's lawsuit about a doctrinal disagreement with a religious college over the composition of the clergy therefore violates the "well-established principle" of church autonomy. *Id.* at 975. Indeed, it has long been taken as a given that the First Amendment bars, for instance, employment discrimination laws from overriding religious

beliefs on "the ordination of women by the Catholic Church or by an Orthodox Jewish seminary." *Hosanna-Tabor*, 565 U.S. at 189 (noting EEOC concession). The district court's contrary ruling was in error because it failed to recognize that Garrick conceded she was dismissed for religious reasons, that her allegations entirely revolve around her religious dispute with Moody, and that adjudicating her claims necessarily entangles courts in matters of religious belief and governance.

### A. The Religion Clauses bar employment claims that entangle courts in matters of religious belief, doctrine, and governance.

Since the founding, the First Amendment's guarantee of church autonomy has policed the "boundary between religious and civil authority," "rejecting civil intrusion into the religious sphere" and ensuring that religious groups can "define their own doctrine, membership, organization, and internal requirements without state interference." *Demkovich*, 3 F.4th at 975 (quoting Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1464-65 (1990)). "[W]here it applies, the church-autonomy principle operates as a complete immunity, or very nearly so," *Korte*, 735 F.3d at 678, barring claims sounding in tort, contract, property law, and—as relevant here—employment discrimination, *Starkey*, 41 F.4th at 942-44. The First Amendment dictates that "avoidance, rather than intervention, should be a court's proper role" when it is asked to "adjudicat[e] … employment disputes involving religious governance." *Demkovich*, 3 F.4th at 975.

As noted above, one "component" of church autonomy is known as the "ministerial exception," which dictates that "courts are bound to stay out of employment disputes involving those holding certain important positions" within religious groups. *Starkey,* 41 F.4th at 939 (quoting *Our Lady*, 140 S.Ct. at 2060-61). This protection applies even if the group did not have a religious reason for its challenged employment actions. *Our Lady*, 140 S.Ct. at 2061.

But as *Our Lady* explained, "the general principle of church autonomy" is not limited to the ministerial exception, but protects "internal management decisions that are essential to [a religious group's] central mission." *Id.* at 2060-61. The protection includes church membership decisions rooted in religious doctrine, which courts cannot "question." *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139 (1872). This is in part because "[f]orcing a [religious] group to accept certain members" who reject its faith undermines its *raison d'etre*: "the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring) (quoting *Boy Scouts v. Dale*, 530 U.S. 640, 648 (2000)).

What is true of members is even more true of employees who are required to be members of their religious employer's faith and represent the employer in carrying out that faith. Determining that "only those committed to [the employer's] mission should conduct" its ministry is a "means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). Indeed, there are few "clearer example[s] of an intrusion into the internal structure or affairs" of a religious group than to require it to retain a representative who openly rejects its religious beliefs. *CLS v. Walker*, 453 F.3d 853, 861-63 (7th Cir. 2006). Or, more briefly: a house divided against itself cannot stand. *Matthew* 12:25.

As a result, multiple courts—including the district court below, A.070—have held that they cannot adjudicate employment claims involving decisions that turn on matters of faith, doctrine, and internal governance, regardless of whether the plaintiff is a "minister." For example, the Tenth Circuit held that the "broader church autonomy doctrine" "extends beyond the specific ministerial exception" to include "personnel decision[s]" "'rooted in religious belief." *Bryce*, 289 F.3d at 656-58 & n.2. It thus rejected a former church employee's Title VII suit arising from a doctrinal dispute without deciding whether she was a "minister" for ministerial-exception purposes. *Id.* at 658 n.2. Other courts are in accord. *See Brazauskas v. Fort Wayne-S. Bend Diocese*,

796 N.E.2d 286, 293-94, 296 (Ind. 2003) (applying *Bryce* to bar non-minister's tortious-interference claim against archdiocese); *Payne-Elliott v. Roman Catholic Archdiocese of Indianapolis*, 193 N.E.3d 1009, 1013-15 (Ind. 2022) (church autonomy barred non-minister's tortious-interference claim); *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F.Supp.3d 184, 198 (E.D.N.Y. 2022) (applying "broader" "church autonomy principle" to bar Title VII sexual-orientation discrimination claim, "[e]ven if [plaintiff] did not qualify as a ministerial employee"); *Aparicio v. Christian Union*, No. 18-cv-0592, 2019 WL 1437618, at *9 (S.D.N.Y. March 29, 2019) (Free Exercise Clause barred non-minister's Title VII sex discrimination claim over the defendant's "complementarian" doctrine that denied senior religious leadership roles to women).

This principle is crucial in the context of religious education, where "the very core of the mission" is inculcating faith. *Starkey*, 41 F.4th at 939. Indeed, given the "critical and unique role" teachers at a religious school play in "fulfilling th[at] mission," the Supreme Court, this Court, and others have broadly barred the NLRB from interfering with teacher-school employment relationships. *Catholic Bishop*, 440 U.S. at 501; *NLRB*, 559 F.2d at 1129; *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824 (D.C. Cir. 2020) (collecting cases). The reasons why are instructive here.

As this Court explained in *NLRB*, such interference can "conflict[] with the Religion Clauses" in at least two ways. 559 F.2d at 1124. First, it can chill religious schools from ensuring teachers represent their faith. For instance, if a pro-union teacher openly "advocate[d]" within a Catholic school for abortion, the "bishop would be confronted with a choice of foregoing his right to discharge the heretical employee" or face the "risk of a protracted and expensive unfair labor practice proceeding" before the NLRB. *Id.* at 1123. That chill on ensuring "a lay teacher" will "carry out a bishop-employer's policy" would "directly interfere with the exercise of religion." *Id.* at 1127.

Second, the adjudication process itself would harm the school's religious autonomy because government would "becom[e] entangled in doctrinal matters." *Id.* at 1125.

After dismissal of a teacher for "teaching a doctrine" that is "at odds with the tenets of the Roman Catholic faith," the NLRB would have to ask if religion was "merely a pretextual reason" for discharge. *Id.* In response, the bishop "would have to eliminate the pretextual aspect," which would require proving up the validity and credibility of "the claimed doctrinal position" for termination. *Id.* at 1129. This would entail the "necessity of explanation and analysis, and probably verification and justification, of the doctrinal precept involved," which "would itself erode the protective wall afforded by the constitutional right." *Id.* That erosion would be severe for unpopular religious beliefs, for which the need for protection is strongest. *Id.*

**B. Garrick's Title VII claims are barred by the Religion Clauses.**

These principles apply here. Moody has a constitutional right to require its teachers to agree with its core religious beliefs—whether its belief in the Trinity or its belief in the all-male pastorate. Garrick's desire to "stay and fight" against Moody's religious beliefs, A.125; A.101 ¶48, only underscores that if church autonomy "means what it says," *Demkovich*, 3 F.4th at 975, her complaint must be dismissed.

Garrick doesn't dispute that she rejects Moody's core beliefs about the composition of the clergy. And the SAC, like the FAC, confirms this religious dispute lies at the core of her claims. The SAC alleged that all faculty were required to agree and "adhere" to Moody's doctrinal statements as a part of their employment contract, A.099 ¶38(i), and that Garrick openly rejected this doctrine with respect to the role of women in the ministry, A.110 ¶89. It also alleges that Garrick opposed Moody's beliefs by helping a female student file a Title IX complaint based on her exclusion from the "Pastoral Ministry" program, A.105 ¶71; that Moody's actions against her arose "only after she began advocating" publicly against Moody's complementarian beliefs and policies, A.110 ¶88; and that she "was terminated for her stated position/disagreement with Moody's 'Gender Roles in Ministry' addendum included in its doctrinal

statement," A.112 ¶96; A.125. Thus, Garrick's allegations remain squarely focused on "disagreement with Moody's beliefs on the role of women in the ministry," including every instance originally identified by the district court as being barred by the church autonomy doctrine. A.087.[3] And a host of other allegations, which the district court correctly deemed insufficient to overcome the church-autonomy bar, remain the same between the two complaints.[4] Thus, Garrick's complaint remains centered on an undisputed religious disagreement with Moody.

Garrick's amendments to the SAC only underscore that reality. *See* A.099 ¶38(i). In several instances, the attempts to "amend" amounted to nothing more than deleting explicit references to religion, without changing that religion was at the heart of the allegation. So, for example, she merely struck "Bible and Theology" from the allegation that "the more prestigious Bible and Theology Programs were staffed exclusively by men." *Compare* A.020 ¶27 *with* A.094 ¶26; *compare also, e.g.*, A.031 ¶95(b) *with* A.096 ¶29(b) (similar). *See* also A.099 ¶38(e)-(f), A.105 ¶71 *and* A.124 (conceding the relevant programs are "the Bible and Theology Programs"). Similarly, the FAC and EEOC charge recount a specific presentation Garrick made to Moody's faculty

---

[3]   *Compare* A.019-20 ¶¶24-26 *with* A.094 ¶¶22-24 (removing ordained status from resume); A.027 ¶67(e)-(f) *with* A.099 ¶38 (e)-(f) (women prevented from teaching in Bible and Theology departments); A.023 ¶¶48-49 *with* A.102-03 ¶¶58-59 (repercussions for advocating to change Moody's beliefs about sexuality); A.020 ¶28 *with* A.095 ¶27 ("suspicion" toward "Respect for Women Personally and Ministerially " group); A.027 ¶67(a)-(c) *with* A.098-99 ¶38(a)-(c) ("walk-out" on female speaker, no female speakers at pastors' conference, disproportionate male speakers at student chapels); A.031 ¶¶95-96 *with* A.096 ¶¶29(a), 30 (not permitting Garrick and other women to speak at President's chapel).

[4]   *Compare* A.020 ¶29 *with* A.095 ¶28, A.020-21 ¶¶30-36 *with* A.100-01 ¶¶39-45; A.022-23 ¶¶38-47 *with* A.101-02 ¶¶47-57; A.023-24 ¶¶50-53 with A.103 ¶¶61-64; A.025 ¶¶58-59 *with* A.109 ¶¶82-83; A.025-26 ¶¶61-62, 65 *with* A.109-10 ¶¶85-87, 90; A.027 ¶67(g) *with* A.099 ¶38(g); A.032 ¶¶98-99 *with* A.096-97 ¶¶32-33; A.034 ¶110(b)-(d), (f) *with* A.105 ¶69(b)-(d), (f); A.035-36 ¶¶111-12, 115-16 *with* A.105-06 ¶¶70-73; A.036 ¶¶117-19 with A.106 ¶¶75-76, 78; A.036-38 ¶121(b), (d), (g) *with* A.107-08 ¶79(b), (d), (g); A.038 ¶122 *with* A.108 ¶80; A.038-39 ¶¶125-27 *with* A.111 ¶¶91-93.

regarding a "biblically orthodox position [statement] on human sexuality" and whether a homosexual lifestyle is compatible with religious views of salvation, but the SAC chops out this context and labels the same argument as merely about Garrick's proposal for "a more inclusive message" and a student feeling "shunned and excluded." *Compare* A.023 ¶48, A.125, *with* SAC ¶58. Fundamental church-autonomy problems, though, can't be fixed by selectively striking out some references to religion from the allegations. The guarantees of the First Amendment cannot be "reduced to a simple semantic exercise," nor the "the substance of free exercise protections" turn on "the presence or absence of magic words." *Carson v. Makin*, 142 S.Ct. 1987, 1999-2000 (2022); *accord Demkovich*, 3 F.4th at 973, 980 ("repackaged" claim still barred by Religion Clauses because it would "lead to impermissible intrusion into, and excessive entanglement with, the religious sphere").

Garrick's few truly new allegations only reinforce that the central dispute between Moody and Garrick was doctrinal. For instance, the details she adds about the Respect for Women Personally and Ministerially meeting all relate to Garrick's dispute with Moody's complementarian beliefs. A.095 ¶27 (meeting discussed "the lack of female speakers at President's chapel and student chapel," some Bible and Theology professors being "'overtly discouraging' to females," and "the cancellation of a radio program that had gender inclusive messaging"). Similarly, Garrick alleges she and her alma maters were disparaged as "liberal" and "progressive," A.097 ¶35(d), A.101 ¶46, A.106 ¶74, and that she was warned not to "wav[e] the women's rights 'flag,'" A.104 ¶69(a). But these issues, too, are rooted in the theological disagreement.[5] As

---

[5] *See, e.g.*, J. Gresham Machen, *Christianity and Liberalism* 53 (1923) (critiquing liberal theology as the "chief modern rival of Christianity"); Gary Dorrien, *Modernisms in Theology: Interpreting American Liberal Theology, 1805-1950*, 23 Am. J. Theology & Phil. 200, 205 (2002) ("Liberal theology seeks to reinterpret the symbols of traditional Christianity in a way that creates a progressive religious alternative to secular unbelief and to theologies based on external authority.").

Garrick admits, the alleged concern was that her "undergraduate education" and "advanced seminary degree" were received at institutions which "believe anything and everything"; hence the offer from Garrick's supervisor of a corrective "opportunity to take classes at Moody." A.097-98 ¶35(d)-(e).

Thus, Garrick's SAC fails for the same reason her FAC did: "the essence of Garrick's claims derives from her advocacy in favor of women gaining access to ministry positions—taking a stance that, according to Garrick herself, is contrary to Moody's doctrinal views." A.087. Courts simply cannot adjudicate disputes over religious doctrine—particularly when a former teacher seeks to punish (and enjoin) a religious school for dismissing her over her admitted opposition to the school's religious beliefs about the composition of the clergy. To hold otherwise would allow "[a] secular court [to] take sides on issues of religious doctrine," resulting in a "final judgment of a secular court resolving a religious issue," *McCarthy*, 714 F.3d at 975-76.

Other courts have reached similar results. *See Bryce*, 289 F.3d at 651 (dismissing Title VII claims because they "ask this court to insert itself into a theological discussion about the church's doctrine and policy"); *Brazauskas*, 796 N.E.2d at 294 (dismissing tort claim that would "penalize communication and coordination among church officials" "on a matter of internal church policy and administration"); *Aparicio*, 2019 WL 1437618, at *8-10 (barring Title VII sex discrimination claims challenging a religious organization's complementarian policy, because the policy "reflects its right to choose who performs certain religious roles within the organization").

Ruling otherwise would have dramatic consequences. Beliefs about the roles of men and women in ministry have long been the subject of fierce theological debate.[6]

---

[6]    *See* David Masci, *The divide over ordaining women*, Pew Research (Sept. 9, 2014), https://perma.cc/AF94-7KAX. (listing faith groups on either side of the issue); *see also* Pope John Paul II, *Ordinatio Sacerdotalis* ¶1 (1994), https://perma.cc/VL7T-9RD4. ("Priestly ordination … has in the Catholic Church from the beginning always been reserved to men

And it's long been recognized that these precise beliefs are protected from civil intrusion by the First Amendment. *Hosanna-Tabor*, 565 U.S. at 189. But blessing Garrick's gambit here—allowing her to use a gender discrimination claim to gain leverage in a theological dispute—would invite "secular authorities" to replace longstanding religious beliefs with a one-size-fits-all government standard. *Tomic*, 442 F.3d at 1039. Many religious institutions would face unprecedented pressure to reconsider millennia-old religious doctrines and practices to avoid the "risk of a protracted and expensive [civil] proceeding." *NLRB*, 559 F.2d at 1124; *Demkovich,* 3 F.4th at 981. None of this is consistent with the First Amendment's dictates that "[r]eligious questions are to be answered by religious bodies," *McCarthy*, 714 F.3d at 976, and that federal courts cannot allow themselves to be "dragged into a religious controversy." *Tomic*, 442 F.3d at 1042.

## C. The district court's contrary holding is erroneous.

The district court held that these foundational principles of church autonomy did not apply to Garrick's SAC because "[t]his time around," Garrick had "crafted her Title VII claims to steer clear of the religious freedoms guaranteed by the First Amendment." SA.11. In particular, the Court held that "[w]hereas the previous complaint had cast Garrick's objections to Moody's complementarian creed as the real reason for her firing, the present complaint portrays Moody's religious justification as a *pretext* for gender discrimination." *Id.*

This omits the fact that both complaints made the same assertion of pretext verbatim. *Compare* A.026 ¶64 ("decision was pretext for its true motives—discrimination

---

alone."); Baptist Faith and Message 2000, Section VI (2000), https://perma.cc/FFQ7-LARL. ("the office of pastor/elder/overseer is limited to men"); Muhammad ibn Idris ash-Shafi'i, 1 *Al-Umm* 191 (Dar al-Fikr, Beirut 1983) ("it is not permissible for a woman to be the imam of a man in prayer") (translation from original Arabic).

and retaliation") *with* A.110 ¶89 (same). But even setting that aside, the district court was wrong to rest its decision on the assertion of pretext for three reasons.

*First*, Garrick's assertion of pretext is foreclosed by her own admissions. Specifically, her EEOC charge, which is attached to the SAC, states under penalty of perjury that she was terminated because her "form of Christianity" was "not aligned with the doctrinal statement." A.053. Thus, regardless of whether Garrick thinks Moody's reasons were "inaccurate or unfair," the record shows that they were undisputedly not "a lie"—and that ends the pretext inquiry. *O'Leary v. Accretive Health*, 657 F.3d 625, 635 (7th Cir. 2011). "It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Ind. Gun & Outdoor Shows v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998). "Thus, a plaintiff 'may plead himself out of court by attaching documents to the complaint that indicate that he is not entitled to judgment.'" *Massey v. Merrill Lynch*, 464 F.3d 642, 645 (7th Cir. 2006). That is precisely the case here.

*Second*, even if Garrick's assertion of pretext weren't foreclosed by her admissions, she hasn't offered any allegations that would enable a jury to find pretext—much less any that identify a "purely secular dispute" that can be wholly divorced from the admitted theological dispute underlying her complaint. *Bryce*, 289 F.3d at 658. Indeed, though the district court stated that the SAC "catalogs dozens of allegedly discriminatory acts"—such as "barring Garrick from speaking during religious services," or telling her not to hold herself out as "ordained as a minister," SA.04—the allegations that purportedly show pretext strike again and again at the heart of the doctrinal disagreement. *See, e.g.*, A.094-108 ¶¶22-24, 47, 66, 79(f); SA.11. And the SAC is explicit that the relevant adverse actions arose "only *after* she began advocating" against Moody's complementarian policies. A.110 ¶88 (emphasis added). Thus, far from showing that she was terminated because "she is a woman who raised concerns about gender discrimination," SA.05, the SAC simply confirms that the "gender

discrimination" asserted by Garrick and the doctrinal differences proffered by Moody are one and the same.[7]

*Third*, attempting to adjudicate Garrick's claim of pretext in this context—where Garrick admits that she openly opposed a religious doctrine that all faculty were required to support—would run headlong into the First Amendment's prohibition against "excessive entanglement with[] the religious sphere." *Demkovich*, 3 F.4th at 978. Indeed, this Court warned against the same type of entanglement in *NLRB*—noting that if Catholic schools were subject to the NLRA, and a teacher were dismissed "for teaching a doctrine … at odds with the tenets of the Roman Catholic faith," then the NLRB would "have to concern itself with whether the real cause for discharge was that stated or whether this was merely a pretextual reason given to cover a discharge actually directed at union activity." 559 F.2d at 1125. "The scope of this examination," the Court said, "would *necessarily* include the validity as a part of church doctrine of the reason given for the discharge." *Id.* (emphasis added)

Here, the entanglement problem is worse. It is not just a concern about possible future entanglement that might occur "down the line," *id.* at 1115, but active entanglement right now. And while it is conceivable (though still impermissible) to separate a Catholic teacher's pro-union beliefs from his abortion advocacy in ferreting out "the real cause for discharge," *id.* at 1125, Garrick's sex discrimination claims are inextricably intertwined with her doctrinal opposition to Moody's beliefs on women in ministry. As "evidence" for sex discrimination, Garrick alleges, *inter alia*, that male colleagues refused to make eye contact with her and made negative comments about her theological understanding, A.097-98 ¶35, and that administrators reprimanded her for "inflammatory" comments and gave her a negative performance review, A.103-

---

[7]    Moreover, Garrick's references to discrimination against "non-employee" students are "not cognizable under Title VII." *Logan v. City of Chicago*, 4 F.4th 529, 538-39 (7th Cir. 2021).

05 ¶59, 69. But asking a judge or jury to attribute these actions to sex discrimination—rather than to Garrick's admitted advocacy against core theological beliefs that every faculty member was required to hold—asks a "civil factfinder [to] sit[] in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission." *Hosanna-Tabor*, 565 U.S. at 206 (Alito, J., concurring). Thus, here, as in *Demkovich*, "[d]iscerning doctrine from discrimination" is not possible. 3 F.4th at 981; *see also Curay-Cramer v. Ursuline Acad. of Wilmington*, 450 F.3d 130, 141 (3d Cir. 2006) (rejecting pretext claim where "it is impossible to avoid inquiry into a religious employer's religious mission or the plausibility of its religious justification for an employment decision").

## III. Title VII's religious exemption bars Garrick's claims.

Garrick's claims also fail under Title VII. Title VII provides that it "shall not apply" when a religious organization makes an employment decision based on an individual's religious "belief," "observance," or "practice." 42 U.S.C. §§ 2000e-1(a), 2000e(j). Moody did not renew Garrick's contract because she rejected and publicly decried its core beliefs about church leadership. That is an employment decision based on Garrick's religious belief, observance, and practice, and therefore Title VII bars her claims. Citing this very case, Judge Brennan recently explained that the district court's holding—that the religious exemption applies only when a plaintiff brings a claim of "religious discrimination," not "sex discrimination"—cannot be reconciled with Title VII's text, statutory context, or existing precedent. *Fitzgerald*, 2023 WL 4528081, at *1, *4-5 (Brennan, J., concurring).

### A. Title VII allows religious organizations to make employment decisions based on religious "belief," "observance," or "practice."

Title VII contains two relevant religious exemptions. The first provides:

> This subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion.

37

42 U.S.C. § 2000e-1(a). The second, specific to religious "educational institutions," similarly says that, "[n]otwithstanding any other provision of this subchapter, … it shall not be an unlawful employment practice" for such institutions "to hire and employ employees of a particular religion." *Id.* § 2000e-2(e)(2). There is no dispute that Moody is a "religious corporation" and a "religious educational institution," so—if the exemptions are otherwise satisfied—they apply. For simplicity and because of their similar application here, this brief focuses on the first.

As Judge Easterbrook explained in *Starkey*, 41 F.4th at 945-47, and Judge Brennan agreed in *Fitzgerald*, 2023 WL 4528081, at *4, the exemption forecloses claims like Garrick's. That is confirmed by the exemption's text, statutory context, and precedent.

***Text.*** To answer questions of statutory interpretation, this Court starts "with the text of the statute to ascertain its plain meaning." *Jackson v. Blitt & Gaines,* 833 F.3d 860, 863 (7th Cir. 2016). The inquiry immediately ends "[i]f the statutory language's plain meaning is unambiguous." *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020). Here, the language is plain and shows that a religious employer (like Moody) is exempt from Title VII when it dismisses an employee because its belief, observance, or practice is at odds with the employer's (like Garrick's).

1. The exemption's broad language is applicable to all types of discrimination claims under Title VII. It states that, when the exemption's terms are met, "this subchapter shall not apply." 42 U.S.C. § 2000e-1(a). "'This subchapter' refers to Title 42, Chapter 21, Subchapter VI, which comprises all of Title VII." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring); *see also* Civil Rights Act of 1964, Pub. L. No. 88-352, § 702, 78 Stat. 241, 255 ("This title shall not apply … ."). "So when the exemption applies, 'all of Title VII drops out,' including the provisions prohibiting discrimination on non-religious bases and providing for mixed-motive liability." *Fitzgerald*, 2023 WL 4528081, at *4 (Brennan, J., concurring).

38

2. The text also makes plain that the exempted conduct is the employer's "employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). The *conduct* this text exempts is the employer's "employment of individuals of a particular" "belief," "observance," or "practice." *Id.*; 42 U.S.C. § 2000e(j). Nothing about that suggests that the exemption is limited to a subset of claims. Further, any attempt to limit this language to religious discrimination claims "and not any other form of religious selectivity, is squelched by the definitional clause in § 2000e(j)." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). That clause provides an expansive definition of religion, including "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j); *Digital Realty Tr. v. Somers*, 138 S.Ct. 767, 776 (2018) ("When a statute includes an explicit definition, [courts] must follow that definition."). This makes evident that the "focus" of the exemption "is on a religious employer's ability to perform its religious activities." *Fitzgerald*, 2023 WL 4528081, at *4 (Brennan, J., concurring).

Taken in toto, the statute reads: "[Title VII] shall not apply to" a religious employer "with respect to the employment of individuals of a particular [religious 'belief,' 'observance,' or 'practice']." 42 U.S.C. §§ 2000e-1(a), 2000e(j). Again, the *law* that shall not apply is "[t]his subchapter"—i.e., all of Title VII, not just the ban on religious discrimination. *Id.* This does not mean religious employers are *always* exempt from Title VII. Rather, they are exempt only when making employment decisions based on an employee's alignment with the employer's religious belief, observance, or practice. *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring) ("This means, for example, that sex discrimination unrelated to religious doctrine falls outside the scope of § 702(a). But when the decision is founded on religious beliefs, then all of Title VII drops out.").[8]

---

[8] *Accord* Stephanie Phillips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295 (2016) (offering same textual analysis); Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination*, 4 Oxford J. L. & Relig. 368, 376 (2015), https://perma.cc/D94R-R5MF (same).

Moody made such a decision here. It took an employment action after Garrick publicly rejected Moody's religious "belief" and "practice" of complementarianism. Under the exemption, Title VII does not apply to that action. Rather, Moody is free to "employ only persons whose beliefs and conduct are consistent with [its] religious precepts." *Little*, 929 F.2d at 951.

Had Congress intended to limit the exemption to religious discrimination claims, it could have easily done so. It could have said, "This subchapter's prohibition on religious discrimination shall not apply…," or "This subchapter shall not apply to claims of religious discrimination against…." But it didn't, and the text it chose controls.

**Statutory Context.** It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 320 (2014). The larger statutory context here confirms that the religious exemption applies to all of Title VII, not just religious discrimination claims.

Section 2000e-1 actually includes two exemptions, the religious exemption and the "alien" exemption: "This subchapter shall not apply *to an employer with respect to the employment of aliens outside any State*, or to a religious [employer] with respect to the employment of individuals of a particular religion … ." (emphasis added). The two exemptions—contained in the same provision and relying on the same language—should carry analogous meanings. For example, if the alien exemption was limited to certain types of claims (such as those involving race or national origin discrimination), the religious exemption would be limited too. But the alien exemption "has been understood to mean what it says: *none* of Title VII's substantive rules applies to aliens covered by § 702(a)." *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring) (citing *Rabé v. United Air Lines*, 636 F.3d 866, 869 (7th Cir. 2011)). Indeed, the Supreme Court has described the alien exemption as an exemption from "*the statute*," not just

from certain claims. *EEOC v. Arabian Am. Oil*, 499 U.S. 244, 253 (1991) (emphasis added). The religious exemption that uses the same language in the same sentence should have the same reading.

It should also read the same as the parallel provision in the Americans with Disabilities Act (ADA). The ADA does not prohibit religious discrimination, but *only* disability discrimination. 42 U.S.C. § 12112(a). Yet it has a religious exemption nearly identical to Title VII's: "*This subchapter* shall not prohibit a religious corporation, association, educational institution, or society from giving preference in employment to *individuals of a particular religion*." *Id.* § 12113(d)(1) (emphasis added). And just as Title VII explains that "religion" extends beyond mere co-belief to "all aspects of religious observance and practice," *id.* § 2000e(j), the ADA also clarifies that the religious exemption permits exempt employers to select co-religionist or otherwise "require that all applicants and employees conform to the religious tenets of such organization," *id.* § 12113(d)(2).

If the language "individuals of a particular religion" exempts only religious discrimination, it would make no sense for the ADA—a statute that does not prohibit religious discrimination—to contain it. It would be entirely superfluous, and courts "do not read statutes in [such] ways." *See Nielen-Thomas v. Concorde Inv. Servs.*, 914 F.3d 524, 533 (7th Cir. 2019). Instead, the only way to give the ADA's religious exemption meaning is to construe it to allow religious employers to make employment decisions based on religious alignment—even when that decision could serve as a basis for a disability discrimination claim. And if that is what an exemption for employing "individuals of a particular religion" means under the ADA, the identical language must have a similar impact on Title VII. *See United States v. Worthen*, 60 F.4th 1066, 1071 (7th Cir. 2023) ("different acts which address the same subject matter … should be read together").

41

**Precedent.** Caselaw confirms this straightforward reading. Judge Easterbrook recently provided thorough guidance on the matter. In *Starkey*, a guidance counselor at a Catholic high school was dismissed after she entered a same-sex union; she then sued for sex discrimination. 41 F.4th at 945. The majority found that the First Amendment barred her claims, but Judge Easterbrook explained that they were also barred by "[a] straightforward reading of § 2000e-1(a), coupled with § 2000e(j)." *Id.* at 946. Per that reading, "when the [employment] decision is founded on religious belief," the exemption provides religious organizations relief from "all of Title VII." *Id.* A year later, Judge Brennan's concurrence in *Fitzgerald* agreed with Judge Easterbrook's analysis. 2023 WL 4528081, at *4.

Applying consistent interpretations of the religious exemption, other courts have barred sex-discrimination claims. The Third Circuit's decision in *Curay-Cramer* is illustrative. In that case, a Catholic school dismissed a female teacher for engaging in pro-choice advocacy inconsistent with Catholic teaching. She sued and alleged she was treated worse than similarly situated male teachers. 450 F.3d at 132-3. Applying the religious exemption, the Third Circuit rejected her Title VII sex discrimination claim. *Id.* at 141-42. In its view, "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices"—not just members of their faith tradition. *Id.* at 141 (quoting *Little*, 929 F.2d at 951). Because the school "offer[ed] a religious justification" for its decision—the teacher's rejection of Catholic teaching on abortion—her claim was barred, even though she complained of sex (rather than religious) discrimination. *Id.* at 141-42.

Other courts have reached similar outcomes:

- *EEOC v. Miss. Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980) (religious exemption bars sex-discrimination investigation where college "applied its policy of preferring Baptists over non-Baptists");

- *Bear Creek Bible Church v. EEOC*, 571 F.Supp.3d 571, 591 (N.D. Tex. 2021) ("The plain text of [the religious] exemption" bars sex-discrimination claims "when [a religious employer] refuses to employ an individual because of sexual orientation or gender expression, based on religious observance, practice, or belief");

- *Maguire v. Marquette Univ.*, 627 F.Supp. 1499, 1502-04 (E.D. Wis. 1986) (religious exemption barred sex-discrimination claim where Catholic university declined to hire professor based on her "views on abortion"), *aff'd in part, vacated in part on other grounds*, 814 F.2d 1213 (7th Cir. 1987).

*Bostock v. Clayton County* also supports the exemption's application to sex-discrimination claims. 140 S.Ct. 1731, 1754 (2020). In holding that Title VII's ban on sex discrimination includes claims of sexual-orientation and gender-identity discrimination, the Court highlighted several "doctrines protecting religious liberty" available in "future cases" asserting sex discrimination—including Title VII's "express statutory exception for religious organizations." *Id.* (citing 42 U.S.C. § 2000e-1(a)). It would make no sense for the Supreme Court to highlight Title VII's religious exemption in a sex-discrimination case unless the exemption could bar sex-discrimination claims.

Finally, based on these cases, the EEOC has promulgated guidance indicating that this is exactly how the religious exemption applies. *See* U.S. EEOC, Section 12: Religious Discrimination (Jan. 15, 2021), https://perma.cc/S7S4-4B2Q. In that guidance, the EEOC notes that "the exemption allows religious organizations to prefer to employ individuals who share their religion, defined not by the self-identified religious affiliation of the employee, but broadly by the employer's religious observances, practices, and beliefs." *Id.* And it opined that Title VII's religious organization

exemption "bars adjudication of the sex discrimination claim" in a case like *Curay-Cramer* because it "preserves the religious school's ability to maintain a community composed of individuals faithful to its doctrinal practices." *Id.* Thus, the EEOC's guidance confirms this straightforward reading of the exemption's text.

### B. The district court's contrary holding is mistaken.

The district court missed the mark here because it failed to consider the full statutory language. It said that because the exemption addresses the "hiring of employees of 'a particular religion,'" it must be "limited specifically to *claims* of discrimination *premised upon religious preferences*." A.083; SA.09 (emphasis added). Based on this analysis, the court refused to dismiss any claims beyond Garrick's religious discrimination claims. A.084; SA.10.

But this analysis failed to grasp two prominent features of the statute's plain text discussed above. First, it disregards language defining the exemption's scope, which exempts covered organizations from "[t]his subchapter," 42 U.S.C. § 2000e-1(a)—*i.e.*, "all of Title VII," *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). That language encompasses "the provisions prohibiting discrimination on non-religious bases and providing for mixed-motive liability"—not just religious discrimination. *Fitzgerald*, 2023 WL 4528081, at *4.

Second, the district court's analysis improperly changes the focus of the exemption from the *employer's conduct* to the *employee's claim*. But the exemption's text says nothing about the employee's claim; instead, it says Title VII "shall not apply" when a religious employer engages in specific conduct: "employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Thus, "when [an employment] decision is founded on religious beliefs, then all of Title VII drops out." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring); *supra* Section III(A). Here, even following amendment, Garrick's complaint makes plain that Moody's decision to terminate her employment

44

was founded on differences between Garrick's and Moody's religious beliefs. Nor, as explained above, do Garrick's pretext allegations change the analysis.

The cases the district court relied on to support its holding are inapposite, ill-reasoned, or outdated. *Boyd v. Harding Academy of Memphis*, for instance, commits the same error as the district court—failing to grapple with the exemption's text or Title VII's definitions. *See* 88 F.3d 410, 413 (6th Cir. 1996); *see also Elbaz v. Congregation Beth Judea*, 812 F.Supp. 802, 807-08 (N.D. Ill. 1992) (same). Another deferred to legislative history over the exemption's text, *see Herx v. Diocese of Ft. Wayne-S. Bend*, 48 F.Supp.3d 1168, 1175-76 (N.D. Ind. 2014), in violation of the Supreme Court's recent directive that Title VII's clear language prevails, *Bostock*, 140 S.Ct. at 1737.

Other cases the district court cited actually support Moody's position. In *Kennedy v. St. Joseph's Ministries*, the Fourth Circuit rejected the plaintiff's argument that the religious exemption was limited to one category of claims and instead held that the exemption grants "permission to employ only persons whose *beliefs and conduct* are consistent with the employer's religious precepts"—a permission Moody exercised here. 657 F.3d 189, 194 (4th Cir. 2011) (emphasis added). And in *Garcia v. Salvation Army*, the Ninth Circuit rejected the plaintiff's argument that the absence of a religious discrimination claim rendered the exemption inapplicable because, even without such a claim, the complaint's allegations—much like the allegations here—made clear that it "center[ed] around religious discrimination." 918 F.3d 997, 1005 (9th Cir. 2019).

In short, structure, statutory context, and precedent all confirm what Title VII's religious exemption's plain text already show: Garrick's claims are barred.

## CONCLUSION

This Court has jurisdiction and should reverse.

Respectfully submitted.

/s/ Daniel H. Blomberg

Christian M. Poland
BRYAN CAVE LEIGHTON
  PAISNER LLP
161 N. Clark St.,
  Ste. 4300
Chicago, IL 60601-3315
(312) 602-5085
christian.poland@bclplaw.com

Daniel H. Blomberg
Luke W. Goodrich
Laura Wolk Slavis
Colten L. Stanberry
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. N.W.,
  Ste. 400
Washington, DC 20006
(202) 955-0095
dblomberg@becketlaw.org

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This brief complies with the length limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,952 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the requirements of Fed. R. App. P. 32(a) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook font.

/s/ Daniel H. Blomberg
Daniel H. Blomberg

Dated: July 31, 2023

## CERTIFICATE OF SERVICE

I certify that on July 31, 2023, the foregoing brief was served on counsel for all parties by means of the Court's ECF system.

/s/ Daniel H. Blomberg
Daniel H. Blomberg

## CIRCUIT RULE 30(D) STATEMENT

I certify that pursuant to Circuit Rule 30(d), all materials required by Circuit Rule 30(a) are included in the appendix.

/s/ Daniel H. Blomberg
Daniel H. Blomberg

# STATUTORY ADDENDUM

**Title VII of the Civil Rights Act of 1964 (42 U.S.C.):**

***

SEC. 2000e. DEFINITIONS

***

**(j)** The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

***

SEC. 2000e-1. EXEMPTION

**(a) Inapplicability of subchapter to certain aliens and employees of religious entities.**— This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

# Short Appendix

# TABLE OF CONTENTS

**Document Name**                                                              **Page**

Minute Entry Order Denying Motion to Dismiss Second Amended
  Complaint (Dkt.125) ............................................................SA.01

Opinion & Order Denying Motion to Dismiss Second Amended
  Complaint (Dkt.126) ............................................................SA.02

Opinion & Order Denying Motion to Reconsider Motion to Dismiss
  Second Amended Complaint (Dkt.134) ...........................................SA.19

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.3.3**
**Eastern Division**

Janay E Garrick

                                        Plaintiff,

v.                                                        Case No.: 1:18−cv−00573
                                                          Honorable John Z. Lee

Moody Bible Institute, et al.

                                        Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, October 13, 2020:

　　MINUTE entry before the Honorable John Z. Lee:For the reasons stated in the
memorandum opinion and order, Moody's motion to dismiss [101] is granted in part and
denied in part. Garrick's disparate treatment and retaliation claims (Counts II to IV) may
proceed, but her hostile work environment (Count I) and class claims (to the extent that
Garrick intended to raise such claims) cannot. A telephone status hearing is set for
10/22/20 at 9:15 a.m. to discuss the scope and timing of discovery. In light of the
COVID−19 pandemic and the related General Orders, the Court finds that it is necessary
to conduct the status hearing via telephone conference. The call−in number is
888−273−3658 and the access code is 1637578. Counsel of record will receive a separate
email at least 12 hours prior to the start of the telephonic hearing with instructions on how
to join the call. All persons granted remote access to proceedings are reminded of the
general prohibition against photographing, recording, and rebroadcasting of court
proceedings. Violation of these prohibitions may result in court−imposed sanctions,
including removal of court issued media credentials, restricted entry to future hearings,
denial of entry to future hearings, or any other sanctions deemed necessary by the Court.
All participants should review the Court's standing order regarding telephone conferences
that is on Judge Lee's website, which can be found at:
https://www.ilnd.uscourts.gov/judge−info.aspx?4Qf5 zc8loCI5U7rfMP9DHw==. [For
further details see memorandum opinion and order]. Mailed notice(ca, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

**SA.01**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JANAY E. GARRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 573 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| MOODY BIBLE INSTITUTE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Moody Bible Institute ("Moody"), a religious educational institution, hired Janay Garrick to teach courses in secular subjects. During her tenure at Moody, Garrick encountered what she viewed as rampant gender discrimination and harassment. When Garrick complained, Moody fired her, claiming that she was a bad fit because she disagreed with certain aspects of its faith.

Believing that Moody invoked religious differences as a pretext for terminating her, Garrick brought this *pro se* action under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. 2000e *et seq.* In particular, Garrick accuses Moody of nurturing a hostile work environment (Count I), engaging in gender discrimination (Counts II and III), and retaliating against her (Count IV). Moody has moved to dismiss, relying upon the applicable statute of limitations as well the rights to religious autonomy enshrined in the First Amendment. For the reasons below, the Court concludes that the statute of limitations does not bar Garrick's claims at this stage. As for the First Amendment, the Court holds that Garrick's claims—which turn, in

large part, on whether the religious reasons that Moody gave for Garrick's termination were pretextual—do not impermissibly intrude upon Moody's religious rights.   Even so, the Court also finds that Garrick fails to plead a hostile work environment.   Accordingly, Moody's motion is granted in part and denied in part.

## I.     Background[1]

This factual and procedural summary assumes familiarity with the Court's prior orders, especially the September 25, 2019, Memorandum Opinion and Order dismissing Garrick's first amended complaint.   *See* ECF No. 91 (the "September 25 Order").   To review, Moody is a post-secondary religious educational institution that accepts federal aid.   2d Am. Compl. ("SAC") ¶¶ 1, 3, ECF No. 98.   Moody subscribes to a "complementarian" doctrine that forbids women from acting as religious leaders. *Id*. ¶¶ 80, 85.

Garrick holds a Master's degree in cross-cultural studies and a Bachelor's degree in creative writing and speech communications.   *Id*. ¶ 18.   She identifies as an "egalitarian Christian" and believes in gender equality in the ministry.   *Id*. ¶ 20. Between 2014 and 2017, Garrick worked at Moody as an Instructor of Communications.   *Id*. ¶ 19.   Garrick advised Moody about her egalitarian beliefs before it hired her.   *Id*. ¶ 20.

Throughout her time at Moody, Garrick experienced what she characterizes as

---

[1]     In analyzing a motion to dismiss, the court "accept[s] as true all well-pleaded factual allegations and draw[s] all reasonable inferences in favor of the plaintiff."   *Heredia v. Capital Mgmt. Servs., L.P.*, 942 F.3d 811, 814 (7th Cir. 2019).

pervasive gender discrimination.   Garrick's thirty-page complaint catalogs dozens of allegedly discriminatory acts.   For example, Moody adhered to its complementarian creed by barring Garrick from speaking during religious services.   *Id.* ¶ 30.   And, although Garrick has been ordained as a minister, Moody instructed her to remove that designation from her resume because "the office of pastor is reserved exclusively for male candidates."   *Id.* ¶ 25.

Garrick also reports that Moody subjected women who taught secular courses to worse treatment than their male counterparts.   For one thing, Moody staffed prestigious academic departments with men, leaving women to fill less valued roles. *Id.* ¶ 26.   For another, Moody expected Garrick to teach more courses and undergo more searching performance reviews than similarly-situated men.   *Id.* ¶¶ 31(b)–(c), 33.

The administrators were not the only ones who treated women differently at Moody.   When Garrick entered the faculty workroom, male professors would avoid making eye contact with her and then leave the room.   *Id.* ¶ 35(a).   On one occasion, her male colleagues suggested that women are unable to understand basic employment documents.   *Id.* ¶ 35(b).   On another, a male professor criticized Garrick's clothes, saying that she looked like a student.   *Id.* ¶ 35(c).   Based on these and other incidents, Garrick repeatedly complained to her supervisor that she faced a hostile work environment.   *Id.* ¶ 77.

Two years after she was hired, Moody informed Garrick that it was unlikely to

**SA.04**

renew her contract as a result of "performance and interpersonal issues." *Id.* ¶ 79(c). Moody fired Garrick a few weeks later. *Id.* ¶¶ 85, 86. In doing so, it claimed that she was "not aligned with [its] doctrinal statement as it related to gender roles in ministry." *Id.* ¶¶ 85, 96. Garrick believes that this explanation is "pretext," and that Moody actually fired her because she is a woman who raised concerns about gender discrimination. *Id.* ¶¶ 89, 96–97.

Soon after Garrick initiated this lawsuit, her counsel withdrew. *See* 10/3/18 Order, ECF No. 44. Proceeding *pro se*, Garrick filed an amended complaint asserting that Moody's conduct violated Title VII, Title IX, and the parties' employment agreement. *See* Am. Compl., ECF No. 66. Upon motion by Moody, this Court dismissed the Title IX and breach of contract claims with prejudice, but permitted Garrick to replead the Title VII claims. *See* September 25 Order at 21. Now before the Court is Moody's motion to dismiss Garrick's second amended complaint asserting Title VII claims anew.

## II. <u>Legal Standards</u>

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Additionally, when considering motions to dismiss, the Court accepts "all

4

well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013) (citing *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013)).

At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). As such, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Courts also construe *pro se* complaints liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

### III.   Analysis

Moody contends that the complaint should be dismissed in its entirety on three grounds: (1) the statute of limitations, (2) Title VII's exemption for religious organizations, and (3) the First Amendment principles protecting religious autonomy. In the alternative, Moody submits that Garrick has failed to adequately plead her retaliation, hostile work environment, and class action claims.[2] The Court begins by

---

[2]    Although Moody also believes that the ministerial exception requires dismissal of Garrick's claims, the Court previously rejected that argument, *see* September 25 Order at 15–16, and Moody does not repeat it here, *see* Def.'s Mot. Dismiss at 15 n.14, ECF No. 103; Def.'s Opp. Mot. Stay at 2, ECF No. 106 ("[T]he ministerial exception does not affect any issue presently before the Court."). The Supreme Court's recent decision in *Our Lady of Guadalupe School v. Morrissey-Berru*, which interpreted the scope of the ministerial exception, is thus not relevant here. 140 S. Ct. 2049 (2020). Contrary to Moody's suggestion, *Morrissey-Berru* did not introduce a new understanding of any other aspect of the religious autonomy doctrine. Instead, as Moody implicitly acknowledges, the Supreme Court reiterated principles it had previously elaborated in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012). *See* Def.'s Mot. File Supp. Auth. at 3, ECF No. 121.

analyzing Moody's objections to Garrick's Title VII claims as a whole, and then turns to its arguments challenging each of the specific Title VII claims.

## A.    The Statute of Limitations

Moody first argues that all of Garrick's Title VII claims are time-barred.    To pursue a Title VII claim, a plaintiff must file a charge with the Equal Employment Opportunity Commission ("EEOC") soon after the allegedly discriminatory conduct. *See* 42 U.S.C. § 2000e-5(e)(1).    If the employee "initially instituted proceedings with a state or local agency," a 300-day limitations period applies to that charge.    *Id.* Otherwise, the claimant must contact the EEOC within 180 days.    *Id.*

At this stage, the Court cannot determine from the record whether the 180-day or 300-day limit should govern this case.    Because Garrick's complaint and response brief make no mention of proceedings before a state or local agency, Moody says that she has implicitly conceded that the shorter period applies.    But the statute of limitations only justifies dismissal when a complaint "unambiguously establish[es] all elements of th[at] [affirmative] defense."    *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016).    And, especially considering Garrick's *pro se* status, her silence cannot be construed as an unambiguous admission that the 180-day limit controls.    Thus, at the pleading stage, the Court will allow Garrick to raise allegations of discriminatory conduct that occurred after March 11, 2017 (300 days before she filed a charge with the EEOC).    SAC ¶ 6.

That constrains the scope of Garrick's claims, but does not foreclose them

6

altogether.   To be sure, many of the employment actions detailed in the complaint took place before March 11, 2017.   But Garrick's firing took place thereafter, on April 17, and thus well within the 300-day period.[3]   SAC ¶ 86.   Accordingly, to the extent that Garrick wishes to pursue gender discrimination and retaliation claims premised upon her termination, Defendant's motion to dismiss those claims based upon the statute of limitations is denied.[4]

Garrick's hostile work environment claim survives Moody's statute of limitations argument for different reasons.   Unlike other types of Title VII claims, "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)).   So, if "an[y] act contributing to the [hostile work environment] claim occurs within the filing period," then "the entire time period of the hostile environment may be considered." *Id.*

Here, rather than attributing the alleged harassment to a particular event on a particular date, Garrick depicts an ongoing course of conduct.   *See, e.g.*, SAC ¶ 28

---

[3]     Though Moody presented Garrick with a lackluster performance review on March 30, SAC ¶ 84, that does not qualify as an adverse action, see *Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019).

[4]     Moody protests that "the Court has already ruled that all termination-related claims are barred by Moody's religious defenses."   Def.'s Mot. Dismiss at 4 n.5.   But that assertion rests on a misreading of the September 25 Order.   While the Court dismissed with prejudice Garrick's breach of contract and Title IX claims, it allowed her to amend her Title VII claims. *See* September 25 Order at 19–22.

(recounting repeated instances of "ridicule" by male colleagues). Taking that allegation as true, a reasonable inference can be made that at least one act of harassment happened within the filing period. Accordingly, Garrick's hostile work environment claim also survives for the time being.

## B.    Title VII's Religious Organization Exemption

The next question is whether the statutory exemption in Title VII for religious employers shields Moody from Garrick's claims. As a general matter, Title VII does "not apply to . . . a religious . . . educational institution . . . with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). But, as the Court previously recognized, "Title VII's exemptions are limited specifically to claims of discrimination premised upon [an employee's] religious preferences." September 25 Order at 14 (citing *Herx v. Diocese of Ft. Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168, 1175 (N.D. Ind. 2014)). Because Garrick pleads that Moody fired her as a result of her gender, and not her religious beliefs, *see* SAC ¶¶ 97, 101, 111–12, 116–17, her claims falls outside the scope of the religious organization exemption.

None of the authorities Moody cites persuades the Court to depart from its previous reading of Title VII. If anything, those cases confirm that the statute only precludes claims predicated on discrimination based on one's religious beliefs and practices. For example, in *Aparicio v. Christian Union, Inc.*, the court held that the exemption governs "when the basis for the alleged retaliation are an employee's objections to his or her employer's religious discrimination." No. 18-cv-0592, 2019

8

**SA.09**

WL 1437618, at *9 (S.D.N.Y. Mar. 29, 2019).   Along the same lines, in *Garcia v. Salvation Army*, the Ninth Circuit applied the exemption where a plaintiff pleaded that her employer practiced "discrimination based on religion."   918 F.3d 997, 1005 (9th Cir. 2019).   Accordingly, Title VII's religious organization exemption does not justify dismissal of Garrick's claims.

## C.     The First Amendment Right to Religious Autonomy

Turning from statutory exemptions to constitutional entitlements, Moody maintains that permitting Garrick's claims to proceed would interfere with its right to religious autonomy enshrined in the First Amendment.[5]   Under the religious autonomy doctrine, courts "respect[] the authority of churches to select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions."   September 25 Order at 10–11 (citing *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013)); *see Morrissey-Berru*, 140 S. Ct. at *2055 ("The First Amendment protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." (cleaned up)).

That is why this Court dismissed the previous complaint.   What proved fatal

---

[5]     Moody also asserts that Garrick waived opposition to this argument by failing to explicitly address it in her response brief.   But Garrick repeatedly maintains that her Title VII claims center on gender discrimination, not religious differences.   *See, e.g.*, Pl.'s Resp. at 4, 6, 10, ECF No. 111.   That is sufficient to avoid waiver given Garrick's *pro se* status.   *See Erickson*, 551 U.S. at 94 (explaining that *pro se* litigants must be "held to less stringent standards" than parties who are represented by counsel).

to that pleading was Garrick's allegation that "she was actually fired because of her advocacy in favor of female students joining the Pastoral Ministry Program." *Id*. at 18 (citing Am. Compl. ¶¶ 124–29). Since that rationale was "rooted firmly in [Moody]'s religious beliefs," adjudicating Garrick's claims "would [have] impermissibly inject[ed] the auspices of the government into religious doctrine." *Id*. at 19. Even so, this Court recognized that "strains of [Garrick's] Title VII claims" may "not be tied to Moody's religious beliefs" and allowed her to replead on that basis. *Id*.

This time around, Garrick has crafted her Title VII claims to steer clear of the religious freedoms guaranteed by the First Amendment. Whereas the previous complaint had cast Garrick's objections to Moody's complementarian creed as the real reason for her firing, the present complaint portrays Moody's religious justification as a *pretext* for gender discrimination. *See* SAC ¶¶ 107, 127–32. Put differently, rather than questioning the reasonableness or legitimacy of Moody's religious beliefs, Garrick disputes whether those beliefs actually prompted her firing.

That distinction makes the difference. When an employee "challenge[s] the validity or plausibility of the religious doctrine said to support her dismissal," the First Amendment generally bars her Title VII claims. *Curay-Cramer*, 450 F.3d 130, 139 (3d Cir. 2006). But when a plaintiff "only question[s] whether [religion] was the actual motivation" for an adverse action, the employer's religious autonomy is not threatened. *Id*.; *accord DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 172 (2d Cir.

10

**SA.11**

1993); *see also Redhead v. Conference of Seventh-Day Adventists*, 566 F. Supp. 2d 125, 134 (E.D.N.Y. 2008) ("[A]n employer's simple assertion of a religious motive usually will not prevent a reviewing court from asking whether that motive was in fact pretext within the meaning of *McDonnell Douglas*." (cleaned up)).[6]

To see why the current iteration of Garrick's complaint does not imperil religious autonomy, it is helpful to review what she will need to show to survive a motion for summary judgment.   At that point, Garrick will have to demonstrate that a reasonable factfinder could disbelieve Moody's stated reason for firing her.   *See Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013).   For example, Garrick may identify disparaging comments Moody's supervisors made about women or spotlight male instructors who disagreed with Moody's complementarian doctrine yet retained their positions.

In examining that evidence, this Court will ask whether Garrick "raise[es] a genuine issue about the honesty, not the accuracy, of [Moody's] stated reason." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014).   That means the Court will not sit in judgment as to what Moody's complementarian doctrine entails

---

[6]     *Fratello v. Archdiocese of New York* does not suggest otherwise.   863 F.3d 190 (2d Cir. 2017).   According to Moody, that case stands for the proposition that "if [a] religious employer offers a religious reason for an employment decision, courts may not adjudicate the matter."   Mot. Dismiss at 12, ECF No. 103 (citing *Fratello*, 863 F.3d at 190, 197, 202, 203). But *Fratello* says nothing of the kind.   Indeed, "[t]he sole question" *Fratello* analyzed "is whether [the plaintiff] [wa]s a 'minister' within the meaning of the exception."   *Id.* at 192. Here, by contrast, the Court has already concluded that "the allegations of the complaint do not conclusively demonstrate that Garrick falls within the ministerial exception," and Moody does not contest that determination at this stage.   September 25 Order at 16–17.

11

or whether it represents a reasonable basis for firing Garrick.   Rather, the Court will need only determine (and the parties will need only investigate during discovery) whether Moody terminated her because of its religious beliefs or whether its invocation of its religious beliefs was, in fact, a cover to discriminate against Garrick because of her gender.

A recent Seventh Circuit case construing the First Amendment's ministerial exception supports this approach.   In *Sterlinski v. Catholic Bishop of Chicago*, the court sought to chart a middle course between engaging in constitutionally forbidden "judicial resolution of ecclesiastical issues" and taking "a completely hands-off approach" to Title VII claims against religious employers.   934 F.3d 568, 571 (7th Cir. 2019).   "The answer," the court decided, "lies in separating pretextual justifications from honest ones."   *Id*.   "[N]ormal title VII litigation," the court emphasized, hinges on whether an employer's "reason is honest . . . [not] whether the reason is *correct*."   *Id*.   In this way, analyzing pretext preserves religious autonomy without "abnegat[ing]" the judicial role.   *Id*.   The same logic explains why the First Amendment does not dictate dismissal of Garrick's claims here.

Moody counters that while Garrick "styles her legal claims as . . . gender discrimination," she actually describes discrimination based on religious beliefs. Def.'s Reply at 11, ECF No. 11.   It is true that the religious autonomy doctrine turns on the substance of a plaintiff's claims, not the label she chooses to attach to them. *See Curay-Cramer*, 450 F.3d at 139.   And parts of the complaint undoubtedly object

12

**SA.13**

to Moody's complementarian creed. Most notably, Garrick faults Moody for prohibiting women from training as ministers or speaking at chapel. *See* SAC ¶ 23, 27, 29, 38(b), 50. To the extent that Garrick continues to challenge those policies, this Court has rejected her arguments once and reaffirms that conclusion again here. *See* September 25 Order at 18–19.

But not all of Garrick's allegations "are inextricably related to Moody's religious beliefs." Def.'s Reply at 6 n.4, ECF No. 113. By all accounts, the complementarian doctrine focuses on excluding women from serving *as ministers*. *See* SAC ¶ 96; Mot. Dismiss at 5. It does not follow that Moody's faith requires unequal treatment of women who work in *secular* roles. Here, for example, Garrick alleges that Moody expected female teachers of secular subjects to perform more demanding duties and submit to more onerous performance reviews than similarly situated male teachers. *See id.* ¶¶ 31(b)–(c), 33, 38(h)–(j). Under those circumstances, a reasonable inference can be made from the allegations that Moody fired Garrick because it held female teachers to higher standards than their male counterparts, not because it disapproved of her egalitarian religious views.[7]

---

[7] Without saying so explicitly, Moody seems to suggest that because Garrick's breach of contract claim was dismissed with prejudice, her Title VII termination claim should be too. But the former claim presents a greater threat to religious autonomy than the latter. To decide if Moody breached the employment agreement, the Court would need to analyze whether Garrick's rejection of the complementarian doctrine counts as a "serious violation of Institute policy." September 25 Order at 20–21 (citing Am. Compl. ¶ 85). The Court cannot answer that question without defining Moody's beliefs and weighing their importance. By contrast, Garrick's Title VII termination claim hinges on whether Moody "believe[s] its own reason" for firing Garrick, not "whether th[at] reason is *correct.*" *Sterlinski*, 934 F.3d at 571.

Moody's reliance upon *Demkovich v. St. Andrew the Apostle Parish* is especially misplaced in light of the Seventh Circuit's decision on appeal. 343 F. Supp. 3d 772 (N.D. Ill. 2018), *aff'd in part, rev'd in part*, 2020 U.S. App. LEXIS 27653, 973 F.3d 718 (7th Cir. Aug. 31, 2020). There, a gay musician employed by a Catholic organization claimed that his supervisor created a hostile work environment by calling him a "bitch[]" and a "fag." 343 F. Supp. at 776–77 (internal quotation marks omitted). But unlike Garrick, the musician did not allege that the organization's religious justification for the derogatory remarks was pretextual. *See id.* at 786–87. Moreover, while the district court dismissed the claim under the Free Exercise Clause based on distinct, case-specific factors, *see id.*, the Seventh Circuit reversed that decision, holding that the First Amendment does *not* categorically bar hostile work environment claims not premised on tangible employment actions, *see* 2020 U.S. App. LEXIS 27653, at *1–3, *40. *Demkovich* is thus of no help to Moody here.

To sum up, neither the statute of limitations, Title VII's exemption of religious employers, nor the First Amendment entirely forecloses Garrick's claims. The Court now turns to Moody's claim-specific arguments.

## D.    Count I: Hostile Work Environment Claim

Moody first questions whether Garrick has plausibly alleged that she encountered a hostile work environment. To do so, Garrick must show that she faced "objectively" severe or pervasive harassment. *Smith v. Northeastern, Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (cleaned up). "[P]etty workplace slights," by contrast,

14

**SA.15**

"are not actionable." *Duminie v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 17-cv-3030, 2020 WL 1288876, at *6 (N.D. Ill. Mar. 18, 2020) (cleaned up).   In *Adam v. Obama for America*, for instance, the court dismissed a hostile work environment claim when an intern's coworkers repeatedly "laughed at" her, "excluded her from group activities," and "pulled [her] hair."   210 F. Supp. 3d 979, 983–84, 991 (N.D. Ill. 2016).

Measured against that standard, the behavior Garrick recounts does not rise to the level of objectively severe or pervasive harassment.   According to the complaint, Garrick's colleagues "ridiculed her," SAC ¶ 28, disparaged her intelligence, *id.* ¶ 35(b), and once told her that her clothes made her look like a student, *id.* ¶ 35(c). While such comments and actions were undoubtedly callous, ignorant, and unpleasant, "rude or impolite interactions with co-workers," without more, are insufficient to support a hostile work environment claim.   *Adam*, 210 F. Supp. 3d at 991 (citing *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002)). Given that the Court has granted Garrick several chances to amend her complaint, this claim is dismissed with prejudice.

## E.     Count IV: Retaliation Claim

Garrick's next claim is a different story.   A successful Title VII retaliation claimant must "allege that she engaged in statutorily protected activity and was subjected to an adverse employment action as a result."   *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013).   Although Moody levels two different

15

**SA.16**

attacks on Garrick's retaliation claim, neither prevails.[8]

First, Moody insists that Garrick failed to engage in any form of "statutorily protected activity." *Id.* To qualify as protected, an activity must involve "some step in opposition to a form of discrimination that the statute prohibits." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). That said, "[t]he plaintiff need not show that the practice [s]he opposed was in fact a violation of the statute; [s]he may be mistaken in that regard and still claim protection." *Id.* (cleaned up). Because Garrick repeatedly warned her supervisor about what she perceived as a hostile work environment, the complaint satisfies this element. SAC ¶¶ 77, 128.

Second, Moody posits that too much time passed between Garrick's protected activity and the allegedly retaliatory conduct for the former to be causally related to the latter. *See, e.g.*, *LaRiviere v. Bd. of Trustees of S. Ill. Univ.*, 926 F. 3d 356, 360 (7th Cir. 2019) (finding a ten-month interval "between the protected activity and adverse action too long to suggest a causal nexus"). But Garrick asserts that she repeatedly told her supervisor that she faced a hostile work environment, making it reasonable to infer—at least for now—that Garrick continued to object until shortly before her termination. SAC ¶ 77. Accordingly, Garrick's retaliation claim may proceed at this stage.

---

[8]    Repeating an earlier argument, Moody also maintains that Garrick makes no mention of any retaliatory action that occurred within the limitations period. To the contrary, Garrick alleges that one of the ways Moody retaliated against her was by "terminat[ing] her." SAC ¶¶ 129, 130.

16

**SA.17**

## F.     Class Claims

At times, Garrick describes herself as a "Title VII class member."   SAC

¶¶ 114–22.   Based on that language, Moody construes the complaint as attempting

to initiate a class action.   But the complaint and response brief are bereft of any other

indications that Garrick meant to raise class claims.   In any event, it is well-settled

that a *pro se* litigant "cannot adequately represent [a] putative class." *Fymbo v.

State Farm Fire & Cas. Co.*, 213 F.3d 1320, 1321 (10th Cir. 2000); *see* 7A Wright,

Miller & Kane, Federal Practice and Procedure § 1769.1 (2d ed. 1986) ("[C]lass

representatives cannot appear pro se.").   So, to the extent that Garrick intended to

bring claims on behalf of a putative class, those claims are dismissed with prejudice.

## IV.     <u>Conclusion</u>

For the reasons given above, Moody's motion to dismiss is granted in part and

denied in part.   Garrick's disparate treatment and retaliation claims (Counts II to

IV) may proceed, but her hostile work environment (Count I) and class claims (to the

extent that Garrick intended to raise such claims) cannot.   A telephone status

hearing is set for 10/22/20 at 9:15 a.m. to discuss the scope and timing of discovery.

**IT IS SO ORDERED.**                              **ENTERED: 10/13/20**

**JOHN Z. LEE**
**United States District Judge**

17

**SA.18**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JANAY E. GARRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 573 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| MOODY BIBLE INSTITUTE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons below, Moody Bible Institute's ("Moody") motion to reconsider the Court's denial in part of its motion to dismiss Janay Garrick's second amended complaint, or alternatively to certify an interlocutory appeal, is denied.

## I.    Background

This action arises out of Garrick's employment with Moody, a post-secondary Christian educational institution, as an instructor of secular courses from 2014 to 2017. *See* 10/13/20 Mem. Op. and Order at 2, ECF No. 126. Moody subscribes to a "complementarian" doctrine that forbids women from acting as religious leaders, while Garrick identifies as an "egalitarian Christian" and believes in gender equality in the ministry. *Id.* (quoting 2d Am. Compl. ¶¶ 20, 80, 85, ECF No. 98). Garrick alleges that she experienced pervasive gender discrimination throughout her time at Moody, culminating in her employment being terminated after three years, on the asserted ground that she was "not aligned with [Moody's] doctrinal statement as it related to gender roles in ministry." *Id.* at 4 (quoting 2d Am. Compl. ¶¶ 85, 96).

**SA.19**

Garrick filed her initial complaint with the assistance of counsel, *see* Compl., ECF No. 1, who withdrew shortly thereafter, leaving her to proceed *pro se*, *see* 10/3/18 Min. Entry, ECF No. 44. After Moody moved to dismiss, Garrick obtained leave to file an amended complaint. *See* 12/3/18 Min. Entry, ECF No. 64.

Garrick's amended complaint asserted five federal claims: hostile work environment under Titles VII and IX, as well as gender discrimination, retaliation, and religious discrimination under Title VII. *See* 3d Modified 1st Am. Compl. ¶¶ 68–140, ECF No. 67. Moody again moved to dismiss, relying largely on a variety of principles arising from "the long-standing deference courts have afforded to religious institutions known as the 'church autonomy' doctrine," which finds its roots and the First Amendment's Free Exercise and Establishment Clauses, and makes it way into both Titles VII and IX. 9/25/19 Mem. Op. and Order at 11, ECF No. 91. The Court granted the motion, holding: (1) that Title VII's exemption for religious employers precluded Garrick's religious discrimination claim; (2) that the allegations of the amended complaint did not conclusively demonstrate that Garrick fell within the "ministerial exception" recognized in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012), which is an affirmative defense; and (3) that the overarching principle of religious autonomy nonetheless required dismissal of Garrick's remaining federal claims. *See id.* at 11–19.[1]

As to that overarching principle, the Court explained that claims based on disagreement with church doctrine confront "the First Amendment prohibition

---

[1]     The amended complaint also asserted a state-law claim for breach of contract, which the Court dismissed with prejudice. *See* 9/25/19 Mem. Op. and Order at 19–21.

**SA.20**

against excessive entanglement in matters of church policy." *Alicea-Hernandez v. Cath. Bishop of Chi.*, 320 F.3d 698, 702 (7th Cir. 2003) (citing *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696 (1976)). In other words, "when the religious employer offers a religious justification for the challenged conduct, then—generally speaking—the First Amendment protects against the claim, so long as the employer proves that the religious motive is the *actual* motive." *Demkovich v. St. Andrew the Apostle Par.*, 343 F. Supp. 3d 772, 782 (N.D. Ill. 2018), *aff'd in part, rev'd in part and remanded on other grounds sub nom. Demkovich v. St. Andrew the Apostle Par., Calumet City*, 973 F.3d 718 (7th Cir. 2020), *reh'g en banc granted, opinion vacated* (Dec. 9, 2020). Thus, because there were "strains of Garrick's Title VII claims that may not be tied to Moody's religious beliefs," the Court granted her leave to replead those claims. 9/25/19 Mem. Op. and Order at 19.

Garrick filed a second amended complaint asserting four claims under Title VII: hostile work environment; two counts of gender discrimination, with the first being brought under a disparate treatment theory; and retaliation. *See* 2d Am. Compl. ¶¶ 98–132. Moody moved to dismiss once again, and the Court granted the motion in part and denied it in part. *See* 10/13/20 Mem. Op. and Order at 2. As relevant here, the Court found that "[t]his time around, Garrick has crafted her Title VII claims to steer clear of the religious freedoms guaranteed by the First Amendment" by "portray[ing] Moody's religious justification as a *pretext* for gender discrimination." *Id.* at 10 (citing 2d Am. Compl. ¶¶ 107, 127–32). The Court thus denied Moody's motion to dismiss the second amended complaint on religious

3

**SA.21**

autonomy grounds, although it granted the motion as to Garrick's hostile work environment claim for failure to state a claim. *Id.* at 14–15.

Moody now moves the Court to reconsider that partial denial, or alternatively, to certify it for an interlocutory appeal under 28 U.S.C. § 1292(b). *See* Def.'s Mot. Reconsider, ECF No. 128. The Court will address each request in turn.

## II.    <u>Motion to Reconsider</u>

Moody first moves for reconsideration. It is well established that motions to reconsider "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (cleaned up). Such a motion "performs a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (cleaned up). At the same time, a motion to reconsider is not "an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale*, 90 F.3d at 1270.

Moody raises two arguments for reconsideration. The first is that the allegations of the second amended complaint were not materially different than those of the first amended complaint. But this argument ignores the precise distinction that the Court noted in sustaining the bulk of Garrick's second amended complaint: unlike the prior complaint, the present complaint portrayed Moody's religious

**SA.22**

justification "as a *pretext* for gender discrimination," as opposed to the actual reason for it.  10/13/20 Mem. Op. and Order at 10; *see* 2d Am. Compl. ¶¶ 107, 127–32.  The similarities to which Moody points in its brief do not undermine this distinction, which, as the Court previously stated, "makes the difference."  10/13/20 Mem. Op. and Order at 10.  As for Moody's insistence that the first amended complaint also mentioned pretext, it fails to recognize that, there, the allegation as to Moody's actual reason for firing Garrick still went to a disagreement with church doctrine.  *See* 9/25/19 Order at 18 (citing 3d Modified 1st Am. Compl. ¶¶ 124–29).  The same cannot be said of the second amended complaint.[2]

Moody's second and main argument is that any inquiry into whether a religious reason for an adverse employment action is pretextual runs afoul of the First Amendment's religious freedoms under the Supreme Court's decision in *Hosanna-Tabor*.  But *Hosanna-Tabor* dealt with the ministerial exception, as did the Supreme Court's more recent decision in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020).  *Id.* at 2055, 2061–69.

By contrast, here, the Court found in dismissing Garrick's first amended complaint that the allegations did *not* trigger *Hosanna-Tabor*'s ministerial exception, an affirmative defense that "is 'subject to a fact-intensive analysis,' of a type usually 'left for a jury.'"  9/25/19 Mem. Op. and Order at 15 (quoting *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 657 (7th Cir. 2018)).  Moody did not ask the

---

[2]     To the extent Moody argues that the Court should not have given Garrick leave to file a second amended complaint in the first place, that argument is not properly raised in a motion to reconsider the Court's decision as to the second amended complaint.

**SA.23**

Court to reconsider *that* decision, and did not contest it in moving to dismiss the second amended complaint. *See* 10/13/20 Mem. Op. and Order at 11 n.6. Nor does Moody show why the Supreme Court's reasoning with respect to ministerial employees should apply equally to someone in Garrick's position. *Cf. Our Lady*, 140 S. Ct. at 155 (noting that the ministerial exception governs employment relationships "between a religious institution and *certain key employees*" (emphasis added)). Thus, neither decision warrants reconsideration in this case.

Like *Hosanna-Tabor* and *Our Lady*, most of the lower-court cases on which Moody relies (many of which are rehashed from its motion to dismiss the second amended complaint) hinge on the ministerial exception, rendering them inapposite here. *See Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 122 (3d Cir. 2018) ("Our sister circuit courts have repeatedly dismissed breach of contract claims asserted by terminated religious leaders against their religious institution employers based on the ministerial exception."); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 192 (2d Cir. 2017) ("[W]e conclude that the ministerial exception bars Fratello's employment-discrimination claims because in her role as principal she was a minister within the meaning of the exception."); *Petruska v. Gannon Univ.*, 462 F.3d 294, 307 (3d Cir. 2006) ("We conclude that . . . Counts I, II, IV, and VI . . . . are barred by the ministerial exception.").

The other two cases on which Moody relies demonstrate a related, and equally inapposite, aspect of the general principle that courts may not adjudicate "strictly ecclesiastical" matters. *See Hosanna-Tabor*, 565 U.S. at 195 (cleaned up). This

**SA.24**

doctrine precludes courts from resolving claims that "require an examination of doctrinal beliefs [or] internal church procedures." *See Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 F. App'x 926, 929 (11th Cir. 2018)  (affirming dismissal of claims turning on whether the plaintiff was a "member in good standing" of the Adventist Church); *see also Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657–59 (10th Cir. 2002) (holding that the First Amendment barred claims by a youth minister and her lay partner challenging the church's ecclesiastical discussions about homosexuality).  But the religious autonomy doctrine does not prevent the Court from  adjudicating the narrow issue of pretext where the ministerial exception does not apply.  *Demkovich*, 343 F. Supp. 3d at 782 ("Unlike the ministerial exception, however, whether the employer acted on a religious-based motive *is* examined for challenges brought by non-minister employees."); *Curay-Cramer v. Ursuline Acad.*, 450 F.3d 130, 139 (3d Cir. 2006) ("[A]s long as the plaintiff [does] not challenge the validity or plausibility of the religious doctrine said to support her dismissal, but only question[s] whether it was the actual motivation, excessive entanglement questions [are] not raised." (citing *Geary v. Visitation of Blessed Virgin Mary Par. Sch.*, 7 F.3d 324, 330 (3d Cir. 1993)); *accord DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993); *Redhead v. Conference of Seventh-Day Adventists*, 566 F. Supp. 2d 125, 134 (E.D.N.Y. 2008); *see also Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019), *as amended on denial of reh'g and reh'g en banc* (Oct. 31, 2019) (stating that "[t]he answer" to how to draw the line between judicial abnegation and judicial resolution

of ecclesiastical issues "lies in separating pretextual justifications from honest ones"). After all, "a plaintiff will usually be able to challenge as pretextual the employer's justification without calling into question the value or truthfulness of religious doctrine," *DeMarco*, 4 F.3d at 171, meaning that employment claims based on pretext are "unrelated to any religious belief or doctrine," *Demkovich*, 343 F. Supp. 3d at 782.[3] Thus, when brought by a non-ministerial employee, such claims pose "no First Amendment problem." *Id.*

Moody's efforts to distinguish these cases are unavailing. Moody asserts that *Demkovich* is only relevant to hostile work environment claims, but overlooks that the court's discussion of pretext speaks to "employment claim[s]" generally, and especially those involving "tangible employment action[s]," which *exclude* hostile work environments. *See id.* (collecting cases, including *DeMarco*).[4] As for *DeMarco*, Moody insists that it is outdated and did not involve the religious autonomy doctrine, but ignores the court's extended discussion of that doctrine, *see* 4 F.3d at 168–71, and fails to demonstrate how its treatment of non-ministerial employees is inconsistent with *Hosanna-Tabor*'s treatment of ministerial employees. The same can be said for

---

[3]     That the issue of pretext does not typically implicate the validity of religious doctrine is precisely the point that the Second Circuit reiterated in *Fratello* when it stated that, "even when we permit suits by lay employees, we will not subject to examination the *genuineness* of a proffered religious reason for an employment action." 863 F.3d at 202 n.25 (emphasis added). Thus, this observation, on which Moody hangs its hat, indeed supports the Court's decision, just as it previously explained. *See* 10/13/20 Mem. Op. and Order at 11 n.6.

[4]     As to the ongoing interlocutory appeal in *Demkovich*, which the Seventh Circuit heard *en banc* on February 9, 2021, the Court notes that it does not concern the issue of pretext. *See Demkovich v. St. Andrew the Apostle Par.*, No. 16 C 11576, 2019 WL 8356760, at *2 (N.D. Ill. May 5, 2019) (certifying an interlocutory appeal on the issue of whether "the ministerial exception ban[s] all claims of a hostile work environment brought by a plaintiff who qualified as a minister, even if the claim does not challenge a tangible employment action").

*Curay-Cramer* and *Readhead*, which recognized the same principle as *DeMarco* even while recognizing the ministerial exception that *Hosanna-Tabor* later confirmed. *See Curay-Cramer*, 450 F.3d at 142; *Readhead*, 566 F. Supp. 2d at 131–32.

Finally, Moody asserts that the relevant passage of *Sterlinski* is dictum because the employee did not argue pretext, and that it is irrelevant here because the employee fell under the ministerial exception (a rather ironic observation in light of Moody's reliance on *Hosanna-Tabor*). *See* 934 F.3d at 570–72. But even assuming the passage lacks precedential value, it has persuasive value. And the appellate court's suggestion that even ministerial employees may claim pretext is all the more compelling in the context of non-ministerial employees.

Accordingly, Moody fails to demonstrate any error in the Court's denial in part of its motion to dismiss Garrick's second amended complaint, let alone a manifest error. Thus, the motion to reconsider is denied.

### III.    Motion to Certify Interlocutory Appeal

Lastly, Moody asks the Court to certify an interlocutory appeal of its denial in part of Moody's motion to dismiss Garrick's second amended complaint under 28 U.S.C. § 1292(b), a narrow exception to the general rule that a party may only appeal the final decision of a district court, *see id.* § 1291. Section 1292(b) gives district courts discretion to certify an interlocutory decision for appeal when the court "shall be of the opinion that such order involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal

from the order may materially advance the ultimate termination of the litigation."[5]
*Id.* § 1292(b).

Here, the Court finds that Moody has failed to demonstrate a substantial ground for difference of opinion for all of the reasons provided above. Given Moody's inability to cite a single decision indicating that the First Amendment bars any inquiry into whether a religious employer's proffered doctrinal reason for an adverse employment action was the actual reason, even in the absence of the ministerial exception, the Court does not believe that is much basis to challenge its ruling. As a result, the Court declines to certify an interlocutory appeal.

## IV.  <u>Conclusion</u>

For the reasons above, Moody's motion to reconsider the Court's denial in part of its motion to dismiss Garrick's second amended complaint, or alternatively to certify an interlocutory appeal under 28 U.S.C. § 1292(b), is denied.

**IT IS SO ORDERED.**              **ENTERED:  8/12/21**

_____
**John Z. Lee**
**United States District Judge**

---

[5]      Once a district court certifies an interlocutory for appeal, the appellate court must do the same in order for an appeal to be taken. *See* 28 U.S.C. § 1292(b); *cf. In re Ford Motor Co.*, 344 F.3d 648, 654 (7th Cir. 2003) ("The whole point of § 1292(b) is to create a dual gatekeeper system for interlocutory appeals."). The Seventh Circuit has recognized that district courts enjoy wide discretion over the first gate. *See In re Ford*, 344 F.3d at 654 ("[N]ormally the district court's refusal to certify is the end of the matter in this court.").