No. 21-2683

# United States Court of Appeals for the Seventh Circuit

JANAY E. GARRICK,

*Plaintiff-Appellee,*

v.

MOODY BIBLE INSTITUTE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:18-cv-00573
The Honorable Judge John Z. Lee

**BRIEF FOR *AMICI CURIAE* JEWISH COALITION FOR RELIGIOUS LIBERTY, MUSLIM PUBLIC AFFAIRS COUNCIL, AND THE SERBIAN ORTHODOX DIOCESE OF NEW GRACANICA—MIDWESTERN AMERICA IN SUPPORT OF DEFENDANT-APPELLANT**

Alexander G. Siemers
Roman Martinez
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

August 7, 2023

*Counsel for* Amici Curiae

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __21-2683__

Short Caption: __Garrick v. Moody Bible Institute__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Jewish Coalition for Religious Liberty; Muslim Public Affairs Council; The Serbian Orthodox Diocese of New Gracanica-Midwestern America

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Latham & Watkins LLP

(3)    If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

---

Attorney's Signature: __/s/ Alexander G. Siemers__      Date: __August 7, 2023__

Attorney's Printed Name: __Alexander G. Siemers__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes _X_ No ___**

Address: __555 Eleventh St., NW, Suite 1000__

        __Washington, DC 20004__

Phone Number: __202-637-2200__      Fax Number: __202-637-2201__

E-Mail Address: __alex.siemers@lw.com__

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No:  21-2683

Short Caption:  Garrick v. Moody Bible Institute

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Jewish Coalition for Religious Liberty; Muslim Public Affairs Council; The Serbian Orthodox Diocese of New Gracanica-Midwestern America

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Latham & Watkins LLP

(3)    If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

Attorney's Signature:  /s/ Roman Martinez          Date:   August 7, 2023

Attorney's Printed Name:   Roman Martinez

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ___   **No** _X_

Address:          555 Eleventh St., NW, Suite 1000

           Washington, DC 20004

Phone Number:          202-637-3377          Fax Number:          202-637-2201

E-Mail Address:   roman.martinez@lw.com

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ...........................................i

TABLE OF AUTHORITIES ...............................................................................iv

INTEREST OF *AMICI CURIAE* ......................................................................1

INTRODUCTION ..............................................................................................3

ARGUMENT ......................................................................................................6

I.    DENIALS OF RELIGION CLAUSE DEFENSES ARE
      IMMEDIATELY APPEALABLE .................................................................6

      A.    Religion Clause Defenses Satisfy The Requirements Of The
            Collateral-Order Doctrine ....................................................................6

      B.    The Erroneous Decision Below Highlights The Importance Of
            Immediate Appeals ............................................................................14

II.   MINORITY FAITHS ARE ESPECIALLY HARMED WHEN
      COURTS SUBJECT RELIGIOUS ORGANIZATIONS TO THE
      BURDENS OF LITIGATION AND TRIAL ................................................19

CONCLUSION ................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ackerman v. Washington*,
16 F.4th 170 (6th Cir. 2021) .................................................................27

*Alicea-Hernandez v. Catholic Bishop of Chicago*,
320 F.3d 698 (7th Cir. 2003) .................................................................16

*Arlan's Department Store of Louisville, Inc. v. Kentucky*,
371 U.S. 218 (1962)...............................................................................27

*Braunfeld v. Brown*,
366 U.S. 599 (1961)...............................................................................28

*Bryce v. Episcopal Church in the Diocese of Colorado*,
289 F.3d 648 (10th Cir. 2002) .................................................................9

*Cannata v. Catholic Diocese of Austin*,
700 F.3d 169 (5th Cir. 2012) .................................................................18

*Catholic Bishop of Chicago v. NLRB*,
559 F.2d 1112 (7th Cir. 1977), *aff'd*, 440 U.S. 490 (1979)................17

*Cohen v. Beneficial Industrial Loan Corp.*,
337 U.S. 541 (1949).................................................................................7

*Conlon v. InterVarsity Christian Fellowship/USA*,
777 F.3d 829 (6th Cir. 2015) ...........................................................5, 11

*Corporation of the Presiding Bishop of the Church of Jesus Christ of
Latter-Day Saints v. Amos*,
483 U.S. 327 (1987)...............................................................................15

*Demkovich v. St. Andrew the Apostle Parish*,
3 F.4th 968 (7th Cir. 2021) ...........................................10, 11, 15, 18

*Doe v. Village of Deerfield*,
819 F.3d 372 (7th Cir. 2016) ...................................................................7

**Page(s)**

*Dr. A v. Hochul*,
142 S. Ct. 552 (2021) ............................................................. 28

*EEOC v. Catholic University of America*,
83 F.3d 455 (D.C. Cir. 1996) ................................................. 18

*EEOC v. Roman Catholic Diocese of Raleigh*,
213 F.3d 795 (4th Cir. 2000) ................................................. 18

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................... 13

*Garrick v. Moody Bible Institute*,
412 F. Supp. 3d 859 (N.D. Ill. 2019) ..................................... 25

*Grussgott v. Milwaukee Jewish Day School, Inc.*,
882 F.3d 655 (7th Cir. 2018) ................................................. 15

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ................................................................. 9

*Heard v. Johnson*,
810 A.2d 871 (D.C. 2002) ..................................................... 11

*Herx v. Diocese of Fort Wayne-South Bend, Inc.*,
772 F.3d 1085 (7th Cir. 2014) ............................................... 13

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
565 U.S. 171 (2012) ........................................................*passim*

*Illinois ex rel. McCollum v. Board of Education of School District
No. 71*,
333 U.S. 203 (1948) ............................................................... 19

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church
in North America*,
344 U.S. 94 (1952) ................................................................... 3

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) ............................................. 8, 13

**Page(s)**

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*,
    903 F.3d 113 (3d Cir. 2018) .................................................................18

*McCarthy v. Fuller*,
    714 F.3d 971 (7th Cir. 2013) ...........................................8, 9, 12, 13

*Middleton v. United Church of Christ Board*,
    No. 20-4141, 2021 WL 5447040 (6th Cir. Nov. 22, 2021)................18

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985).............................................................9, 12, 13

*Nevada v. Hicks*,
    533 U.S. 353 (2001)................................................................9

*NLRB v. Catholic Bishop of Chicago*,
    440 U.S. 490 (1979)............................................................9, 16

*Our Lady of Guadalupe School v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020)..............................................................*passim*

*Penn v. New York Methodist Hospital*,
    884 F.3d 416 (2d Cir. 2018) ................................................18

*Petruska v. Gannon University*,
    462 F.3d 294 (3d Cir. 2006) .................................................9

*Plumhoff v. Rickard*,
    572 U.S. 765 (2014).............................................................7

*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull
    Memorial Presbyterian Church*,
    393 U.S. 440 (1969).............................................................3

*Rayburn v. General Conference of Seventh-Day Adventists*,
    772 F.2d 1164 (4th Cir. 1985) ..............................................10

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020)............................................................12

*SEC v. Wealth Management LLC*,
    628 F.3d 323 (7th Cir. 2010) ...............................................7

vi

**Page(s)**

*Spencer v. World Vision, Inc.*,
    633 F.3d 723 (9th Cir. 2011) ...............................................................20

*Starkman v. Evans*,
    198 F.3d 173 (5th Cir. 1999) ...............................................................11

*Sterlinski v. Catholic Bishop of Chicago*,
    934 F.3d 568 (7th Cir. 2019) ...............................................................18

*Swint v. Chambers County Commission*,
    514 U.S. 35 (1995)...................................................................................7

*Thomas v. Review Board of the Indiana Employment Security
    Division*,
    450 U.S. 707 (1981).............................................................................15

*Tomic v. Catholic Diocese of Peoria*,
    442 F.3d 1036 (7th Cir. 2006), *abrogated in part on other grounds
    by Hosanna-Tabor Evangelical Lutheran Church & School v.
    EEOC*, 565 U.S. 171 (2012) .........................................................10, 17

*Tucker v. Faith Bible Chapel International*,
    36 F.4th 1021 (10th Cir. 2022), *cert. denied*, No. 22-741, 2023 WL
    3937608 (June 12, 2023) ......................................................................12

*United States v. Sinovel Wind Group Co.*,
    794 F.3d 787 (7th Cir. 2015) ...............................................................12

*Universidad Central de Bayamon v. NLRB*,
    793 F.2d 383 (1st Cir. 1985).................................................................9

*Watson v. Jones*,
    80 U.S. 679 (1872)..........................................................................11, 19

*Will v. Hallock*,
    546 U.S. 345 (2006)............................................................................7, 9

*Young v. Northern Illinois Conference of United Methodist Church*,
    21 F.3d 184 (7th Cir. 1994) ...........................................................10, 17

vii

**Page(s)**

**STATUTES**

28 U.S.C. § 1291 ....................................................................................6

**OTHER AUTHORITIES**

Al Ihsan School of Excellence, *2022-2023 Uniform Guidelines*,
    https://www.alihsanschool.net/school-uniform (last visited
    Aug. 2, 2023) ................................................................................22

Thomas C. Berg, *Minority Religions and the Religion Clauses*, 82
    Wash. U. L.Q. 919, 938 (2004) ....................................................19

Jordanna Birnbaum, *Shomer Negiah, the Prohibition on Touching*,
    My Jewish Learning,
    https://www.myjewishlearning.com/article/shomer-negiah/ (last
    visited Aug. 2, 2023) ....................................................................23

Chabad-Lubavitch Media Center, *Tznius: Modesty*,
    https://www.chabad.org/library/article_cdo/aid/1317275/jewish/
    Tznius-Modesty.htm (last visited Aug. 2, 2023) ...........................21

John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review*
    94 (1980) .........................................................................................5

FEMA, *Engagement Guidelines: Jewish Leaders*,
    https://www.fema.gov/sites/default/files/2020-03/fema_faith-
    communities_jewish-leaders_1.pdf (last visited Aug. 2, 2023) .........21

FEMA, *Engagement Guidelines: Muslim Leaders*,
    https://www.fema.gov/sites/default/files/2020-03/fema_faith-
    communities_muslim-leaders_1.pdf (last visited Aug. 2, 2023)........22, 23

FEMA, *Engagement Guidelines: Orthodox Christian Leaders*,
    https://www.fema.gov/sites/default/files/2020-03/fema_faith-
    communities_orthodox-christian-leaders_1.pdf (last visited
    Aug. 2, 2023) ................................................................................22

**Page(s)**

Luke W. Goodrich & Rachel N. Busick, *Sex, Drugs, and Eagle Feathers: An Empirical Study of Federal Religious Freedom Cases*, 48 Seton Hall L. Rev. 353 (2018) ...........................................................19

Kelly Grindrod & Wasem Aslabbagh, *Managing medications during Ramadan fasting*, 150 Can. Pharm. J. 146 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5415064/ ...............................28

Tasmiha Khan, *For Some Muslim Couples, Gender-Separate Weddings Are the Norm*, N.Y. Times (Sept. 24, 2020), https://www.nytimes.com/2020/09/23/fashion/weddings/for-some-muslim-couples-gender-separate-weddings-are-the-norm.html........................24

Seren Morris, *What breaks your fast during Ramadan? Rules around chewing gum and smoking*, Evening Standard (Mar. 28, 2023), https://www.standard.co.uk/news/uk/ramadan-breaking-fast-rules-chewing-gum-smoking-toothpaste-b1069438.html ..................................28

My Jewish Learning, *Electricity on Shabbat*, https://www.myjewishlearning.com/article/electricity-on-shabbat/ (last visited Aug. 2, 2023)....................................................................................27

Rabbi Doniel Neustadt, *Hilchos Yichud: Rulings Of Harav Moshe Feinstein* (2006), https://torah.org/torah-portion/weekly-halacha-5766-beshalach/ ...................................................................................23

Asma T. Uddin, *When Islam Is Not A Religion: Inside America's Fight For Religious Freedom* 132 (2019) ...........................................................20

Yeshivat Noam, *Middle School Tzniut Guidelines*, https://www.yeshivatnoam.org/apps/pages/index.jsp?uREC_ID=1394935&type=d&pREC_ID=1573154 (last visited Aug. 2, 2023)..................22

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are organizations representing minority faith traditions.  The **Jewish Coalition for Religious Liberty** is an association of American Jews concerned with the current state of religious-liberty jurisprudence.  The Coalition aims to protect the ability of all Americans to practice their faith freely and to foster cooperation between Jews and other faith communities.  Its founders have filed amicus briefs in the Supreme Court of the United States and federal courts of appeals, published op-eds in prominent news outlets, and established a volunteer network to promote support for religious liberty within the Jewish community.

The **Muslim Public Affairs Council** ("MPAC") is a nonprofit 501(c)(3) public-affairs organization that has worked since its founding in 1988 to enhance American pluralism, improve understanding, and speak out on policies that affect American Muslims.  Through engaging government, media, and communities, MPAC leads the way in bolstering more nuanced portrayals of Muslims in American society and partnering with diverse communities to encourage civic responsibility.

---

[1]    Both parties to this appeal have consented to the filing of this *amici* brief.  *See* Fed. R. App. P. 29(a)(2).  This brief was prepared in whole by undersigned counsel in consultation with *amici curiae*.  No party's counsel authored this brief in whole or in part.  No party, party's counsel, or any person other than *amici* or their counsel contributed money intended to fund preparing or submitting this brief.  *See* Fed. R. App. P. 29(a)(4)(E).

The **Serbian Orthodox Diocese of New Gracanica-Midwestern America** is an integral part of the Serbian Orthodox Church, which is one of the fourteen autocephalous/self-governing, hierarchical/episcopal churches which comprise the Orthodox Christian Church, commonly referred to as the Eastern Orthodox Church. The Ruling Bishop of the Serbian Orthodox Diocese of New Gracanica-Midwestern America is the Right Reverend Bishop Longin Krco.  His See is at New Gracanica Monastery in Third Lake, Illinois and he has territorial jurisdiction over all Serbian Orthodox monasteries, parishes, church-school congregations, etc. in the States of Illinois, Indiana, Wisconsin, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, South Dakota, Oklahoma, Arkansas, Louisiana, Texas, Alabama, Mississippi, Kentucky and Tennessee.  This diocese comprises over 45 parishes, five monasteries and sketes, a School of Theology in Libertyville, Illinois, and other institutions which administer the Holy Mysteries/Sacraments, educate, and minister to the more than 250,000 persons of Serbian descent who live in these States and to the Orthodox Christians who have chosen to accept the omophorion/jurisdiction of the Serbian Orthodox Patriarchate.

*Amici* have a strong interest in this case because it concerns whether denied Religion Clause defenses may be immediately appealed.  Especially for minority faiths, both the ministerial exception and broader principles of religious autonomy serve as essential buffers against governmental intrusion into religious affairs while

giving religious organizations space to freely practice their faith.  Without the ability to immediately appeal erroneous applications of these doctrines, religious organizations will have their First Amendment rights violated while wrongly subject to time-intensive and invasive litigation.  That load may fall disproportionately on minority faiths, which are likely to be less familiar to, and therefore more easily misunderstood by, judges and juries.  *Amici* urge this Court to hold that denied Religion Clause defenses are immediately appealable under the collateral-order doctrine and then reverse the judgment below.

## INTRODUCTION

The First Amendment "protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'"  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).  Such "independence from secular control or manipulation" is crucial for religious organizations, *Kedroff*, 344 U.S. at 116, because the "hazards" of "inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern" are "ever present" where "civil courts undertake to resolve" disputes over "religious doctrine and practice," *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969).

That "general principle of church autonomy" means that religious organizations must have "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 140 S. Ct. at 2061. And that principle of church autonomy also gives rise to the ministerial exception, under which "courts are bound to stay out of employment disputes involving those holding certain important positions within churches and other religious institutions." *Id.* at 2060-61; *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012) ("ministerial exception bars" an "employment discrimination suit"). Both Religion Clauses work in tandem to reach this result. "[I]mposing an unwanted minister . . . infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Hosanna-Tabor*, 565 U.S. at 188. In addition, "[a]ccording the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 188-89. And if government control over *one* minister is unconstitutional, then government control over *all* ministers within a particular faith is necessarily so. The latter is at stake in this case: Ms. Garrick's request for relief requires a religious organization to alter its policy regarding the composition of the clergy.

The First Amendment gives different religious traditions room to flourish, blocking such government intrusion.  Indeed, the Religion Clauses especially benefit minority faiths by letting adherents practice their faith freely and by shielding them from governmental interference regardless of how well they align with majority culture.  And when courts fail to enforce these constitutional protections, the burdens fall heaviest on minority faiths.  Inviting judges and juries to scrutinize religious beliefs and practices that deviate from the cultural baseline poses significant risks to the religious freedoms protected by the First Amendment.

By protecting *all* religious institutions, the Religion Clauses perform a crucial "structural or separation of powers function."  John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 94 (1980); *see Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 836 (6th Cir. 2015) ("The ministerial exception is a structural limitation imposed on the government by the Religion Clauses . . . .").  And when courts transgress that boundary, religious institutions suffer irreparable harm—namely, governmental intrusion into religious matters. The collateral-order doctrine provides appellate courts an opportunity to prevent that harm by considering an immediate appeal when lower courts deny dispositive Religion Clause defenses.  That doctrine thus safeguards crucial First Amendment liberties.

For the reasons laid out already in Moody's brief, this Court should hold that denials of Religion Clause defenses based on religious autonomy and the ministerial exception are immediately appealable. Orders rejecting Religion Clause defenses clear the collateral-order hurdles: They conclusively deny religious organizations immunity from suit; address an important First Amendment issue which is separate from the merits of a Title VII claim; and irreparably harm religious organizations by sanctioning government meddling in religious affairs. Such orders are particularly harmful when, as here, they rest on erroneous legal principles. And because these orders inevitably invite further inquiry into matters of belief and practice, minority faiths are especially at risk. This Court should protect—as the First Amendment does—the rights of all religious organizations to manage their internal affairs. The decision below must be reversed.

## ARGUMENT

## I. DENIALS OF RELIGION CLAUSE DEFENSES ARE IMMEDIATELY APPEALABLE

### A. Religion Clause Defenses Satisfy The Requirements Of The Collateral-Order Doctrine

The federal courts of appeals have jurisdiction over appeals "from all final decisions of the district courts." 28 U.S.C. § 1291. The collateral-order doctrine is a practical construction of this rule, allowing an interlocutory appeal for claims that are "too important to be denied review and too independent of the cause itself to

require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Appeals are therefore permitted from collateral orders "[1] that are conclusive, [2] that resolve important questions separate from the merits, and [3] that are effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995).

The Supreme Court has found orders rejecting qualified immunity, absolute immunity, Eleventh Amendment immunity, and double jeopardy to be immediately appealable. *Will v. Hallock*, 546 U.S. 345, 350 (2006). And this Court has found orders denying leave to proceed anonymously or approving a receiver's plan of distribution to fall within the collateral-order doctrine. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 374 (7th Cir. 2016); *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 330-31 (7th Cir. 2010). Applying the test to orders denying qualified immunity, the Supreme Court has held that "such orders conclusively determine whether the defendant is entitled to immunity from suit; this immunity issue is both important and completely separate from the merits of the action, and this question could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost." *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014).

7

A denied Religion Clause defense likewise passes the collateral-order test. *McCarthy v. Fuller*, 714 F.3d 971, 974-76 (7th Cir. 2013). If anything, the case for immediate appealability is even stronger because the First Amendment "gives special solicitude to the rights of religious organizations." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012). Orders denying Religion Clause defenses conclusively subject religious organizations to litigation over religious matters; the Religion Clause issue is both important and completely separate from the merits of an employment discrimination claim; and this question cannot be effectively reviewed on appeal from a final judgment because by that time faith-based organizations will have suffered the irreparable harm of governmental intrusion into their religious affairs.

1. *Conclusive*. Both church-autonomy principles and the ministerial exception provide religious organizations with an immunity from suit. This Court has recognized that, "where it applies, the church-autonomy principle operates as a *complete immunity*, or very nearly so." *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013) (emphasis added). Likewise, the Supreme Court has determined that when it comes to employment discrimination, "the ministerial exception *bars such a suit*." *Hosanna-Tabor*, 565 U.S. at 196 (emphasis added); *see also id.* at 185 ("[I]t is *impermissible* for the government to contradict a church's determination of who can act as its ministers." (emphasis added)); *Our Lady of Guadalupe Sch. v.*

*Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (*Hosanna-Tabor* held that "First Amendment barred a court from entertaining an employment discrimination claim"). In that way, Religion Clause defenses function like official or qualified immunity. *McCarthy*, 714 F.3d at 975-76 (analogizing religious autonomy to official immunity); *Petruska v. Gannon Univ.*, 462 F.3d 294, 302-03 (3d Cir. 2006) (analogizing ministerial exception to qualified immunity); *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654-56 (10th Cir. 2002) (same); *cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("The entitlement is an *immunity from suit* rather than a mere defense to liability . . . .").[2]

That makes sense:  It is "the very process of inquiry" that "may impinge on rights guaranteed by the Religion Clauses."  *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979); *see also Hosanna-Tabor*, 565 U.S. at 205-06 (Alito, J., concurring) (The "mere adjudication" of religious questions "would pose grave problems for religious autonomy . . . ."); *Universidad Central de Bayamon v. NLRB*,

---

[2]   That the Supreme Court has concluded that "the [ministerial exception] operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar," does not change this conclusion.  *Hosanna-Tabor*, 565 U.S. at 195 n.4.  Jurisdiction and appealability belong in two separate buckets.  So while absolute and qualified immunity are not jurisdictional, *Nevada v. Hicks*, 533 U.S. 353, 373 (2001), and qualified immunity "is an affirmative defense," *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982), these immunities can still be immediately appealed, *Will*, 546 U.S. at 350.  And though Religion Clause defenses are not jurisdictional in the district court, that in no way precludes such defenses from triggering the collateral-order doctrine and creating *appellate* jurisdiction.

793 F.2d 383, 401 (1st Cir. 1985) (Breyer, J.) (noting that entanglement "aris[es] out of the inquiry process itself"). State entanglement in religious matters can result "from a protracted legal process pitting church and state as adversaries," where "[c]hurch personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985); *see also Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 982 (7th Cir. 2021) (en banc) (worrying about "the prejudicial effects of incremental litigation," including "two motions to dismiss, two subsequent decisions and orders," "an interlocutory appeal," and "a panel opinion").

This Court has repeatedly found as much. In *Young v. Northern Illinois Conference of United Methodist Church*, the Court held that "civil court review" of religious decisions "pertaining to the hiring or firing of clergy are *in themselves* an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." 21 F.3d 184, 187 (7th Cir. 1994). In *Tomic v. Catholic Diocese of Peoria*, the Court noted that "investigating employment discrimination claims by ministers against their church" would "necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal." 442 F.3d 1036, 1039 (7th Cir. 2006), *abrogated in part*

10

*on other grounds by Hosanna-Tabor*, 565 U.S. at 195 n.4.  And in *Demkovich*, this Court held that "[a]djudicating" a minister's allegations "would not only undercut a religious organization's constitutionally protected relationship with its ministers, but also cause civil intrusion into, and excessive entanglement with, the religious sphere."  3 F.4th at 977-78.  If this is true for the ministerial exception, it is all the more so for the religious autonomy defense here.

The Religion Clauses relieve religious organizations of the burdens attendant to such inquiry by preventing judicial entanglement at the outset.  Orders denying Religion Clause defenses conclusively determine that a religious organization is not immune from suit and thereby subject such organizations to litigation involving matters of faith and practice.

2.  *Important and Separate From Merits.*  Religious autonomy "lies at the foundation of our political principles."  *Watson v. Jones*, 80 U.S. 679, 728 (1872).  And the "interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission" is "undoubtedly important."  *Hosanna-Tabor*, 565 U.S. at 196; *see supra* at 3-5.  Moreover, the applicability of Religion Clause defenses is a question of law.  *See, e.g.*, *Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999) ("The status of employees as ministers . . . remains a legal conclusion for this court."); *Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 833 (6th Cir. 2015) (similar); *Heard v. Johnson*, 810 A.2d 871, 877 (D.C.

2002) (concluding that "[a] claim of immunity from suit under the First Amendment" entails an issue of law).  So too is qualified immunity.  *Mitchell*, 472 U.S. at 528 ("All [an appellate court] need determine [on interlocutory appeal] is a question of law . . . .").  And the question of immunity remains separate from the merits of the underlying claim, *see id.* at 528-29, because whether the case turns on questions of religious doctrine is simply a different question than whether that employee was discriminated against.

There is thus "no doubt" that orders denying Religion Clause defenses "present[] an important First Amendment issue, and that issue is separate from the merits of an employee's discrimination claims."  *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1036 (10th Cir. 2022), *cert. denied*, No. 22-741, 2023 WL 3937608 (June 12, 2023).

3.  *Effectively Unreviewable At End Of Case.*  A collateral order is effectively unreviewable where a doctrine's "purpose is to avert an unauthorized proceeding," *United States v. Sinovel Wind Grp. Co.*, 794 F.3d 787, 791 (7th Cir. 2015), such that irreparable harm is done by proceeding to final judgment, *McCarthy*, 714 F.3d at 974-75.  That is the case for the Religion Clauses, which "forbid[] the government [from] mak[ing] religious judgments" and "resolving a religious issue."  *Id.* at 976; *see supra* at 8-11.  And restrictions on the First Amendment rights of religious institutions undoubtedly cause irreparable harm.  *See*, *e.g.*, *Roman Catholic Diocese*

*of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020); *Korte*, 735 F.3d at 666 (The "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury . . . ." (omission in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). So "just as in the other types of case in which the collateral order doctrine allows interlocutory appeals," the "harm of . . . a governmental intrusion into religious affairs would be irreparable." *McCarthy*, 714 F.3d at 976; *see Mitchell*, 472 U.S. at 526-27 (immunity "lost if a case is erroneously permitted to go to trial" and so order is "effectively unreviewable"). Effective review of denied Religion Clause defenses is therefore not available after a final judgment.

In short, orders denying dispositive Religion Clause defenses pass the three-part collateral order test. *McCarthy*, 714 F.3d at 974-76. To ensure the First Amendment's protections, religious organizations must have the opportunity to appeal determinations which strip their immunity from trial and necessarily intrude upon their internal affairs.[3]

---

[3]  *Herx v. Diocese of Fort Wayne-South Bend, Inc.*, 772 F.3d 1085 (7th Cir. 2014), is not to the contrary. *Herx* relied on the organization's failure to present "a persuasive case" about the collateral-order doctrine. *Id.* at 1091. This Court rested primarily on the fact that the religious body spent "only a few sentences" on "the criteria for collateral-order review." *Id.* at 1090. Here, by contrast, the parties are fully briefing the collateral-order issue.

**B.    The Erroneous Decision Below Highlights The Importance Of Immediate Appeals**

If religious organizations *can* appeal a denied Religion Clause defense immediately, that does not mean they always *will*.  Nor does it mean that such organizations will always prevail on appeal.  After all, whether a defense is meritorious remains distinct from whether the denial of that defense can be appealed.  Yet permitting interlocutory appeals for denials of Religion Clause defenses allows religious organizations to choose to litigate an appeal instead of being subject to discovery and trial.  Giving religious organizations that choice safeguards the First Amendment rights at stake.  And that safeguarding is especially important when district courts go well astray and wrongly subject religious organizations to the burdens of litigation and trial.

Such is the case here.  The district court denied Moody's religious-autonomy defense and allowed Ms. Garrick's Title VII disparate-treatment and retaliation claims to proceed.  Appellant's Short Appendix ("SA") 18.  As Moody ably explains throughout its brief, that creates impermissible government entanglement in a dispute over religious leadership and religious doctrine at a religious school.  In addition, the court assumed that it could easily draw the line between what is religious and secular, finding that "not all of Garrick's allegations 'are inextricably related to Moody's religious beliefs.'"  SA.14 (citation omitted).  And it explicitly invited inquiry into whether Moody's stated religious reason was pretextual.

14

SA.11-13.  Each of these steps was error.  And if Moody must wait to appeal these determinations until after final judgment, Moody's fundamental First Amendment rights will be irreparably harmed in the interim.

1.  Drawing the secular-religious line in the context of a religious employer is both "incredibly difficult" and "impermissibl[e]" because it "entangles the government with religion."  *Grussgott v. Milwaukee Jewish Day School, Inc.*, 882 F.3d 655, 660 (7th Cir. 2018).  As the Supreme Court has often recognized, the "determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task."  *Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).  Because "[t]he line is hardly a bright one," a religious organization "might understandably be concerned that a judge would not understand its religious tenets and sense of mission."  *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336 (1987).  Asking a religious organization "to predict which of its activities a secular court will consider religious" therefore places "a significant burden on" it.  *Id.*  And because "determining whether an activity is religious or secular requires a searching case-by-case analysis," the result is "considerable ongoing government entanglement in religious affairs."  *Id.* at 343 (Brennan, J., concurring in the judgment).

In short, "[d]iscerning doctrine from discrimination is no task for a judge or jury."  *Demkovich*, 3 F.4th at 981.  That is why this Court has rejected pleas to

determine whether a religious organization "had a secular or religious reason for the alleged mistreatment" of a ministerial employee. *Alicea-Hernandez v. Cath. Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir. 2003). And that is why it is a "mistake[]" to "look to the nature of [an employee's] claims and whether the discrimination in question was exclusively secular." *Id.* Ruling otherwise "would enmesh the court in endless inquiries as to whether each discriminatory act was based in [religious] doctrine or simply secular animus." *Id.*

That is particularly true here, where the district court so clearly drew the line incorrectly. As Moody notes, many of Ms. Garrick's allegations remained identical after she amended her complaint; at other points, Ms. Garrick simply crossed out explicitly religious references like "Bible" and "Theology"; and throughout, her complaint revolves around a doctrinal disagreement about whether women can be ordained to the pastoral office. Appellant Br. 11-12, 30-33 & nn.3-4. Claiming that these allegations merely involve a secular dispute blinks reality.

2. Investigating whether an admittedly religious school's religious explanation for an employment decision is pretextual likewise runs headlong into precedent. More than four decades ago, the Supreme Court worried that resolving such issues in this context "will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators," and that "the very process of inquiry" might "impinge on rights guaranteed by the Religion Clauses." *Catholic*

*Bishop*, 440 U.S. at 502.  More recently, *Hosanna-Tabor* specifically rejected the idea that inquiring into pretext was appropriate when it comes to employment-discrimination claims.  There, both the plaintiff and the government "suggest[ed] that Hosanna-Tabor's asserted religious reason for firing [the plaintiff] . . . was pretextual." *Hosanna-Tabor*, 565 U.S. at 194.  The Court swatted that aside:  "That suggestion misses the point of the ministerial exception.  The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason." *Id.*  Justice Alito agreed:  "For civil courts to engage in the pretext inquiry that [the plaintiff] urge[s] . . . would dangerously undermine the religious autonomy that lower court case law has now protected for nearly four decades." *Id.* at 205 (Alito, J., concurring).

This Court has reached the same conclusion.  *Catholic Bishop of Chicago v. NLRB* concluded that inquiring into pretext for a religious-autonomy defense would be impermissible.  559 F.2d 1112, 1125 (7th Cir. 1977), *aff'd*, 440 U.S. 490 (1979).  *Young* held that "religious bodies may make apparently arbitrary decisions" because "'religious controversies are not the proper subject of civil court inquiry.'" 21 F.3d at 187 (citation omitted). *Tomic* refused to engage in a pretext inquiry because "[t]he court would be asked to resolve a theological dispute."  442 F.3d at 1040.  And *Demkovich* noted that "the depositions of fellow ministers and the search for a subjective motive behind the alleged hostility" would be "onerous" and "in part why

[courts] must 'stay out of employment disputes involving those holding certain important positions with churches and other religious institutions.'" 3 F.4th at 983 (quoting *Our Lady*, 140 S. Ct. at 2060).[4] Other circuits agree, finding that courts are "neither permitted nor equipped to evaluate" whether a religious reason for an employment decision is pretextual. *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 427 (2d Cir. 2018).[5]

Indeed, allowing a pretext inquiry in this case is flagrantly wrong. Moody rightly points out that examining pretext here not only flouts the First Amendment, but also contradicts Ms. Garrick's own EEOC charge and the allegations in her complaint. Appellant Br. 34-37.

---

[4]    While other recent cases from this Court have endorsed inquiring into whether a religious organization's reasons are pretextual, *see, e.g.*, *Sterlinski v. Cath. Bishop of Chicago*, 934 F.3d 568, 571 (7th Cir. 2019), those cases wholly fail to reckon with both *Hosanna-Tabor*'s foreclosure of pretext inquiries in the employment context and this Court's earlier case law in *Catholic Bishop*, *Young*, and *Tomic*.

[5]    *See also, e.g.*, *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 121 (3d Cir. 2018) (inquiring into "pretext" is "forbidden"); *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000) ("The exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision."); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 174 (5th Cir. 2012) (finding it "immaterial if the reason for termination is not religious, but rather pretextual"); *Middleton v. United Church of Christ Bd.*, No. 20-4141, 2021 WL 5447040, at *3 (6th Cir. Nov. 22, 2021) (finding "pretext inquiry" to be "precisely the kind of state inquiry into church employment decisions that the First Amendment forbids"); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 466 (D.C. Cir. 1996) (noting "pretext inquiry" might require judges to "'choose between'" "competing religious visions'" (citation omitted)).

## II.    MINORITY FAITHS ARE ESPECIALLY HARMED WHEN COURTS SUBJECT RELIGIOUS ORGANIZATIONS TO THE BURDENS OF LITIGATION AND TRIAL

Robustly protecting "the free exercise rights of adherents" is "especially important for minority faiths," Thomas C. Berg, *Minority Religions and the Religion Clauses*, 82 Wash. U. L.Q. 919, 938 (2004), and the Establishment Clause is "primarily concerned with the protection of minority groups," *Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71*, 333 U.S. 203, 217 (1948) (Frankfurter, J.).    Indeed, empirical evidence suggests that religious liberty jurisprudence is "disproportionality important" for protecting religious minorities. Luke W. Goodrich & Rachel N. Busick, *Sex, Drugs, and Eagle Feathers: An Empirical Study of Federal Religious Freedom Cases*, 48 Seton Hall L. Rev. 353, 375 (2018).

On the other side of the coin, erroneously ignoring these constitutional protections disproportionately harms religious minorities.  The Supreme Court's admonition that it would be "unwise" for courts to judge "matters of faith, discipline, and doctrine" because they would "involve themselves in a sea of uncertainty and doubt" rings especially true for minority faiths. *Watson*, 80 U.S. at 732.  Judicial involvement in this sphere thus "risk[s] disadvantaging those religious groups whose beliefs, practices, and membership are outside of the 'mainstream' or unpalatable to

some." *Hosanna-Tabor*, 565 U.S. at 197 (Thomas, J., concurring). Less familiarity is more likely to lead to misunderstanding.

Denying the possibility of interlocutory appeals for Religion Clause defenses means that smaller and more unfamiliar religious organizations will be subject to the burdens of litigation and trial. With fewer adherents and more limited resources, minority faiths are particularly vulnerable. Because judges are less familiar with minority faiths in general, they are more likely to wrongly subject minority religious organizations to those burdens. And decisions like the district court's pose special risks to minority faiths, since judges and juries are also more likely to conclude that beliefs or practices that they perceive as strange (due to their own ignorance) are either secular or pretextual. The end result is that "religious practices that conform to [majority] culture w[ill] be protected more often than practices that don't." Asma T. Uddin, *When Islam Is Not A Religion: Inside America's Fight For Religious Freedom* 132 (2019).

1. Having judges and juries determine whether a belief or practice is religious or secular is especially ill-advised when it comes to minority faiths. While determining what is "religious" is "relatively easy in some contexts," asking similar questions "might prove more difficult when dealing with religions whose practices do not fit nicely into traditional categories." *Spencer v. World Vision, Inc.*, 633 F.3d 723, 732 n.8 (9th Cir. 2011) (O'Scannlain, J., concurring). And having courts

answer these questions could lead to the government telling religious adherents that matters they sincerely believe to be religiously significant are actually secular. That result must be avoided.

Set aside the many allegations in this case which clearly involve a religious disagreement. Even still, other allegations underscore the difficulty in drawing the religious/secular line. For example, Ms. Garrick alleged that a male professor criticized her clothes, and that when she entered a faculty workroom, "male professors would avoid making eye contact with her and then leave the room." SA.04. Yet rules about modesty and interactions between the sexes are common in minority faiths, and courts could easily misstep if they concluded that these practices are secular.

Start with rules about modesty. To an outsider, how one dresses might be a matter of personal choice and individual expression. Yet Jewish law governs everything from paradigmatically religious acts (like prayer) to the minutiae of everyday life (including how to wash one's hands upon waking up in the morning). And under that law, the manner of one's dress carries religious significance (captured in an idea called *tzniut*—roughly, modesty). Chabad-Lubavitch Media Center, *Tznius: Modesty*, https://www.chabad.org/library/article_cdo/aid/1317275/jewish/Tznius-Modesty.htm (last visited Aug. 2, 2023); *see also* FEMA, *Engagement Guidelines: Jewish Leaders* 2, https://www.fema.gov/sites/default/

files/2020-03/fema_faith-communities_jewish-leaders_1.pdf (last visited Aug. 2, 2023) ("Orthodox men and women dress modestly as a sign of respect."). Similar principles apply under Islamic law, as men may wear a thobe and women may wear a hijab, abaya, or burka. FEMA, *Engagement Guidelines: Muslim Leaders* 2 ("*Muslim Leaders*"), https://www.fema.gov/sites/default/files/2020-03/fema_faith-communities_muslim-leaders_1.pdf (last visited Aug. 2, 2023) (noting that "Muslims may dress in clothing that may fall outside of American/Western fashion norms."). And Orthodox Christianity likewise emphasizes modesty. *See* FEMA, *Engagement Guidelines: Orthodox Christian Leaders* 2, https://www.fema.gov/ sites/default/files/2020-03/fema_faith-communities_orthodox-christian-leaders_1.pdf (last visited Aug. 2, 2023) (noting that "head covering at worship for women is the norm in Orthodox Christianity").

It is therefore entirely sensible that a school would expect its teachers to model religiously appropriate attire. In fact, Jewish and Islamic schools often enforce their interpretation of these rules as part of their dress code. *See, e.g.*, Yeshivat Noam, *Middle School Tzniut Guidelines*, https://www.yeshivatnoam.org/apps/pages/ index.jsp?uREC_ID=1394935&type=d&pREC_ID=1573154 (last visited Aug. 2, 2023) ("Just as halacha, Jewish law, guides us in the way that we speak and behave, so too tzniut in clothing has specific guidelines in halacha."); Al Ihsan School of Excellence, *2022-2023 Uniform Guidelines*, https://www.alihsanschool.net/school-

uniform (last visited Aug. 2, 2023) ("Staff and students are expected to model proper examples of Islamic dress . . . [t]o ensure modesty . . . ."). A religious teacher who violates these rules at best fails to act as a proper religious role model and at worst signals disagreement with the school's interpretation of religious law. Though it might appear otherwise to a court unaware of these traditions, actions taken to discipline a teacher who failed to abide by rules about modesty would therefore fall squarely on the religious side of the line.

Turn next to doctrines regarding the interactions between men and women. Again, to those outside the faith, leaving the room when a member of the opposite sex enters or failing to greet such a person might appear rude or misogynistic. Yet certain interpretations of Jewish law may require such behavior. *Yichud* is a Jewish law which limits situations in which Jewish men and women (other than close family members) may be alone with one another. *See* Rabbi Doniel Neustadt, *Hilchos Yichud: Rulings Of Harav Moshe Feinstein* (2006), https://torah.org/torah-portion/weekly-halacha-5766-beshalach/. And the rule of *Shomer Negiah* regulates physical contact between men and women—precluding, in some interpretations, shaking hands across sexes. Jordanna Birnbaum, *Shomer Negiah, the Prohibition on Touching*, My Jewish Learning, https://www.myjewishlearning.com/article/shomer-negiah/ (last visited Aug. 2, 2023). Some strains of Islam regulate interactions between the sexes in analogous ways. *See, e.g.*, *Muslim Leaders* 1

("Muslims do not generally exchange handshakes with, or embrace, people of the opposite sex. . . .  [T]his is not a sign of rudeness, but a cultural and/or religious custom."); Tasmiha Khan, *For Some Muslim Couples, Gender-Separate Weddings Are the Norm*, N.Y. Times (Sept. 24, 2020), https://www.nytimes.com/2020/09/23/fashion/weddings/for-some-muslim-couples-gender-separate-weddings-are-the-norm.html (noting that some Muslim couples opt for gender-separate wedding celebrations because of strict observance of the hijab).

Imagine, then, that a school fires a teacher for failing to dress modestly.  To a court, such a reason might appear antiquated or unnecessary—and perhaps cultural rather than religious.  To prevent that result, the Religion Clauses foreclose scrutinizing whether such beliefs and practices are religious or secular.  In doing so, they provide an essential protection for minority faiths.

Drawing the religious/secular line matters for disputes involving the composition of the clergy, too.  As the Supreme Court has recognized when it comes to the ministerial exception, "many religious traditions do not use the title 'minister,'" and "this problem cannot be solved simply by including positions that are thought to be the counterparts of a 'minister,' such as priests, nuns, rabbis, and imams."  *Our Lady*, 140 S. Ct. at 2064.  "'[T]he term "minister" encompasses an extensive breadth of religious functionaries in Judaism;'" and "'an inquiry into whether imams or other [Muslim] leaders bear a title equivalent to "minister" can

24

present a troubling choice between denying a central pillar of Islam—*i.e.*, the equality of all believers—and risking loss of ministerial exception protections.'" *Id.* (citations omitted). Minority faith traditions, who frequently employ religious leaders with titles and duties unfamiliar to judges and juries (or no title at all) may have a harder time convincing a fact-finder that a leader is undisputedly a religious minister—or that there is an underlying doctrinal dispute. The district court's earlier conclusion in this case that Ms. Garrick's position "has no obvious connection to religion" therefore also poses heightened risks for minority faiths. *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871 (N.D. Ill. 2019).

To be sure, how to define the contours of religious doctrines is frequently the subject of ongoing internal debates within faith traditions. Inside the community, then, all sorts of line-drawing takes place about which beliefs and practices are truly religious. Yet internal religious disputes in no way give courts license to declare that a religious organization's actions or beliefs are actually secular. Religious organizations—not courts—must be the ones drawing those lines.

2. It is similarly precarious to allow judges and juries to ask whether a minority faith organization's reason for dismissing an employee is pretextual. In *Hosanna-Tabor*, both the plaintiff and the government argued that pretext should be a case-specific inquiry, claiming that "a Roman Catholic priest who is dismissed for getting married could not sue the church," but that the Lutheran teacher who was

dismissed for failing to abide by internal dispute resolution in that case could.  565 U.S. at 204-06 (Alito, J., concurring).  Justice Alito rightly recognized that "there is no principled basis" for drawing that line and declared that "popular familiarity with a religious doctrine cannot be the determinative factor."  *Id.* at 206.

To go a step further:  When courts permit pretext inquiries, popular familiarity often becomes the determinative factor—leaving unfamiliar beliefs and practices first on the chopping block.  If the obvious examples (at issue in this case) like "compel[ling] the ordination of women by the Catholic Church or by an Orthodox Jewish seminary," *id.* at 189, are subject to pretext inquiries, minority faiths are in even more trouble.  That is why pretext inquiries must be prohibited when it comes to the relationship between religious organizations and their employees.

A few examples will suffice.  Imagine that a Jewish organization dismisses an employee for failing to "guard the Sabbath."  *Deuteronomy* 5:12.  A judge may well accept that the organization's reason is not pretextual if the employee was working on the Sabbath by chopping down trees or plowing a field.  But if the organization fired the employee for turning on a light switch on the Sabbath, a court might be more inclined to find pretext.  *See, e.g.*, Oral Argument at 1:00:40-1:01:12, *East Texas Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. Apr. 7, 2015), http://www.ca5.uscourts.gov/OralArgRecordings/14/14-20112_4-7-2015.MP3  (judge suggesting that "turn[ing] on a light switch every day" would be unlikely to constitute a

substantial burden on a person's religious exercise). Yet to an Orthodox Jew, turning on a light bulb on the Sabbath might violate *Exodus* 35:3, which explains that lighting a flame violates the command to keep the Sabbath holy. *See* My Jewish Learning, *Electricity on Shabbat*, https://www.myjewishlearning.com/article/electricity-on-shabbat/ (last visited Aug. 2, 2023). A court would therefore be wrong to view this justification as pretextual.

Next suppose that a Jewish organization fires an employee for failing to abide by Jewish dietary laws (*kashrut*). A court may be willing to accept that the Jewish organization's reason is not pretextual if the employee was regularly eating pork. *Cf. Arlan's Dep't Store of Louisville, Inc. v. Kentucky*, 371 U.S. 218, 219-20 (1962) (Douglas, J., dissenting) (describing "religious scruples against eating pork" as "bizarre," though "within the ambit of the First Amendment" (citation omitted)). But if a Jewish organization fired an employee for failing to eat cheesecake (or its equivalent) on *Shavuot* (a Jewish holiday), a court may be less sympathetic. Yet some Jewish adherents believe that eating cheesecake on *Shavuot* is required. *See Ackerman v. Washington*, 16 F.4th 170, 183 (6th Cir. 2021) (crediting testimony that plaintiffs "believe cheesecake is mandatory on Shavuot"). Here, too, a court would err by finding this reason pretextual.

Finally assume that a Muslim organization lets an employee go for breaking the fast during Ramadan. A court may be willing to accept the Muslim

organization's reason if the employee was eating three meals during daylight hours. But if the employee was fired for chewing gum or taking oral medications during Ramadan, it may be more skeptical. Yet those acts are widely acknowledged to break the fast. *See* Seren Morris, *What breaks your fast during Ramadan? Rules around chewing gum and smoking*, Evening Standard (Mar. 28, 2023), https://www.standard.co.uk/news/uk/ramadan-breaking-fast-rules-chewing-gum-smoking-toothpaste-b1069438.html; Kelly Grindrod & Wasem Aslabbagh, *Managing medications during Ramadan fasting*, 150 Can. Pharm. J. 146 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5415064/. So a court would blunder if it adjudged this reason pretextual.

These examples merely scratch the surface. "[V]irtually every religion in the world is represented in the population of the United States." *Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring). And those faith traditions include beliefs that "can seem strange and bewildering" to those outside—especially when they are "unpopular and unorthodox." *Dr. A v. Hochul*, 142 S. Ct. 552, 558 (2021) (Gorsuch, J., dissenting from denial of application for injunctive relief). Yet the Religion Clauses protect "the freedom to believe and to practice" what appear to those outside the faith to be "strange" creeds. *Braunfeld v. Brown*, 366 U.S. 599, 612 (1961) (Brennan, J., concurring and dissenting). Because ignorance is anything but bliss

for those on the receiving end of that ignorance, preventing pretext inquiries is especially important for religious minorities.

When district courts overstep their bounds, intrude upon religious disagreements, and invite improper inquiries into whether a religious organization's reason is secular or pretextual, the immediate review of an appellate court ensures that those organizations will not be irreparably harmed. And since the risks of error increase as comprehension decreases, immediate appeals carry special significance for religious minorities.

*          *          *

For all these reasons, orders rejecting Religion Clause defenses may be immediately appealed under the collateral-order doctrine. These orders (1) conclusively subject religious organizations to the burdens of litigation by denying claims of immunity, (2) address an important constitutional issue which is wholly distinct from the merits of an employment-discrimination claim, and (3) are effectively unreviewable because they greenlight governmental imposition and thereby cause irreparable harm. Immediate appeals function as a safety valve when district courts wrongly deny Religion Clause defenses and incorrectly subject religious organizations to the crucible of civil litigation. And such appeals are especially important for minority faiths, as the relative ignorance of judges and juries regarding minority faith traditions makes it more likely that errors proliferate. To

guard the rights of all religious organizations to govern their internal affairs, this Court should hold that rejected Religion Clause defenses are immediately appealable.

## CONCLUSION

For the foregoing reasons, this Court should hold that it has jurisdiction and then reverse the judgment below.

Dated:  August 7, 2023                    Respectfully submitted,

                                          */s/ Alexander G. Siemers*
                                          Alexander G. Siemers
                                          Roman Martinez
                                          LATHAM & WATKINS LLP
                                          555 Eleventh Street, NW
                                          Suite 1000
                                          Washington, DC 20004
                                          (202) 637-2200

                                          *Counsel for Amici Curiae*
                                          *Jewish Coalition for Religious Liberty,*
                                          *Muslim Public Affairs Council, and the*
                                          *Serbian Orthodox Diocese of New*
                                          *Gracanica-Midwestern America*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of 7th Circuit Rule 29 because it contains 6,731 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).  I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and 7th Circuit Rule 32(b) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Times New Roman font that is 12 point or larger.

*/s/ Alexander G. Siemers*
Alexander G. Siemers

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2023, I caused the foregoing Brief for *Amicus Curiae* Jewish Coalition for Religious Liberty in Support of Defendant-Appellant to be served by electronic means through the Court's CM/ECF system on counsel for all parties who are registered CM/ECF users.


*/s/ Alexander G. Siemers*
Alexander G. Siemers