APPEAL No. 21-2683

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

JANAY E. GARRICK,

*Plaintiff-Appellee,*

v.

MOODY BIBLE INSTITUTE,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:18-cv-00573 / Honorable John Z. Lee

## BRIEF OF ALLIANCE DEFENDING FREEDOM AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT FOR REVERSAL

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@adflegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

*Attorneys for Amicus Curiae*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2683

Short Caption: Garrick v. Moody Bible Institute

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Alliance Defending Freedom

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alliance Defending Freedom

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Cody S. Barnett    Date: August 7, 2023

Attorney's Printed Name: Cody S. Barnett

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address: 44180 Riverside Pkwy

Lansdowne, VA 20176

Phone Number: 571-707-4655    Fax Number:

E-Mail Address: cbarnett@adflegal.org

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2683

Short Caption: Garrick v. Moody Bible Institute

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Alliance Defending Freedom

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Alliance Defending Freedom

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and
N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: s/ John J. Bursch     Date: August 7, 2023

Attorney's Printed Name:   John J. Bursch

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address:   440 First Street NW, Suite 600

Washington, DC 20001

Phone Number: 616-450-4235     Fax Number:

E-Mail Address: jbursch@adflegal.org

rev. 12/19 AK

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES .................................................... iii

INTEREST OF AMICUS CURIAE ........................................1

SUMMARY OF ARGUMENT .................................................2

ARGUMENT ...................................................................5

I.   Title VII's plain text protects all religiously motivated employment actions.........................................................5

     A.   Title VII's text and purpose support a broad exemption for all religiously motivated employment actions. .................5

     B.   Moody's actions here easily fit within Title VII's exemption. ..................................................................9

II.  Constitutional avoidance compels reading Title VII's religious exemption broadly to protect all religiously motivated employment actions.........................................................12

     A.   This country has long protected religious groups' autonomy to decide questions of faith, doctrine, and internal governance. ..........................................................13

     B.   Religious groups have an absolute right to employ only those people who follow their religious precepts and further their religious mission..............................................14

     C.   Because religiously motivated employment decisions are protected by the First Amendment, the constitutional avoidance canon compels reading Title VII's exemption broadly. ......................................................18

CONCLUSION ...................................................................20

CERTIFICATE OF COMPLIANCE.......................................21

CERTIFICATE OF SERVICE.................................................22

# TABLE OF AUTHORITIES

## Cases

*Alabama v. Bozeman,*
    533 U.S. 146 (2001) ....................................................................... 7, 11

*Arizona Christian School Tuition Organization v. Winn,*
    563 U.S. 125 (2011) ........................................................................... 13

*Bouldin v. Alexander,*
    82 U.S. (15 Wall.) 131 (1872) ......................................................... 16

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ........................................................................... 15

*BP PLC v. Mayor & City Council of Baltimore,*
    141 S. Ct. 1532 (2021) ............................................................... 5, 6, 7

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ........................................................................... 18

*Christian Legal Society v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ............................................................. 9

*Corporation of the Presiding Bishop v. Amos,*
    483 U.S. 327 (1987) ...................................................... 6, 9, 15, 16

*Culbertson v. Berryhill,*
    139 S. Ct. 517 (2019) ....................................................................... 12

*Curay-Cramer v. Ursuline Academy of Wilmington,*
    450 F.3d 130 (3d Cir. 2006) ............................................................. 19

*Demkovich v. St. Andrew the Apostle Parish, Calumet City,*
    3 F.4th 968 (7th Cir. 2021) ...................................................... 11, 17

*EEOC v. Fremont Christian School,*
    781 F.2d 1362 (9th Cir. 1986) ........................................................... 7

*EEOC v. Mississippi College,*
    626 F.2d 477 (5th Cir. 1980) ..................................................... 18, 19

*EEOC v. Roman Catholic Diocese of Raleigh*,
  213 F.3d 795 (4th Cir. 2000) ........................................ 17

*Everson v. Board of Education of Ewing Township*,
  330 U.S. 1 (1947) ...................................................... 13

*Fitzgerald v. Roncalli High School, Inc.*,
  73 F.4th 529 (7th Cir. 2023).............................. 3, 4, 7, 11

*Garrick v. Moody Bible Institute*,
  412 F. Supp. 3d 859 (N.D. Ill. 2019) ........................... 3, 8

*Garrick v. Moody Bible Institute*,
  494 F. Supp. 3d 570 (N.D. Ill. 2020) ............................ 12

*Gordon College v. DeWeese-Boyd*,
  142 S. Ct. 952 (2022) ............................................. 1, 12

*Hall v. Baptist Memorial Health Care Corp.*,
  215 F.3d 618 (6th Cir. 2000) ........................................ 19

*Hernandez v. Commissioner of Internal Revenue*,
  490 U.S. 680 (1989) .................................................. 10

*Hosanna-Tabor Evangelical Lutheran Church &
  School v. EEOC*,
  565 U.S. 171 (2012) .......................................... 13, 15, 16

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in
  North America*,
  344 U.S. 94 (1952) .................................................... 14

*Kennedy v. St. Joseph's Ministries, Inc.*,
  657 F.3d 189 (4th Cir. 2011) ......................................... 9

*Killinger v. Samford University*,
  113 F.3d 196 (11th Cir. 1997) ....................................... 19

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) .......................................... 4

*Little v. Wuerl*,
  929 F.2d 944 (3d Cir. 1991) ........................................................ 8, 18

*Mangine v. Withers*,
  39 F.4th 443 (7th Cir. 2022) .......................................................... 5

*NAACP v. Button*,
  371 U.S. 415 (1963) ....................................................................... 4

*New York v. Cathedral Academy*,
  434 U.S. 125 (1977) ..................................................................... 14

*NLRB v. Catholic Bishop of Chicago*,
  440 U.S. 490 (1979) ..................................................................... 12

*Our Lady of Guadalupe School v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) ...................................................... 8, 14, 17

*Presbyterian Church in United States v. Mary Elizabeth Blue Hull
  Memorial Presbyterian Church*,
  393 U.S. 440 (1969) ..................................................................... 14

*Rabé v. United Air Lines, Inc.*,
  636 F.3d 866 (7th Cir. 2011) .......................................................... 8

*Rayburn v. General Conference of Seventh-Day Adventists*,
  772 F.2d 1164 (4th Cir. 1985) ...................................................... 17

*Seattle's Union Gospel Mission v. Woods*,
  142 S. Ct. 1094 (2022) ......................................................... 1, 9, 16

*Starkey v. Roman Catholic Archdiocese of Indianapolis,*
  41 F.4th 931 (7th Cir. 2022) .................................................. passim

*United States v. Davis*,
  139 S. Ct. 2319 (2019) ................................................................... 8

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) ................................................................... 8

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1871) ............................................ 2, 14, 15

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) .......................................................................5

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ...........................................................................3

*Young v. Northern Illinois Conference of United Methodist Church*,
    21 F.3d 184 (7th Cir. 1994) .............................................................6

## **Statutes**

42 U.S.C. § 2000e ...................................................................... 2, 5, 8

42 U.S.C. § 2000e-1 ................................................................. 5, 6, 7, 8

42 U.S.C. § 2000e-2 .............................................................................8

Pub. L. No. 88-352, § 702, 78 Stat. 241 (1964) ..........................................2

Pub. L. No. 92-261, 86 Stat. 103 (1972) ...................................................2

## **Other Authorities**

Tim Challies, *Why I Am Not Egalitarian* (June 30, 2016) ......................10

## INTEREST OF AMICUS CURIAE[1]

Alliance Defending Freedom is the world's largest law firm dedicated to protecting religious freedom, free speech, the sanctity of life, parental rights, and marriage and family. ADF regularly defends religious organizations in employment actions. *E.g.*, *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094 (2022) (*SUGM*); *Gordon Coll. v. DeWeese-Boyd*, 142 S. Ct. 952 (2022). ADF relies on Title VII's religious exemption and the First Amendment to protect religious groups' autonomy to govern themselves free of government interference. ADF has a strong interest in ensuring that these organizations retain the strongest protections guaranteed them by both Title VII and the Constitution.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief. Counsel were timely notified of this brief as required by Fed. R. App. P. 29, and all parties consented to its filing.

## SUMMARY OF ARGUMENT

This country has long protected religious groups' autonomy to define and express themselves according to the dictates of their faiths. This commitment was born from long experience with the contrary. When Henry VIII ascended to England's throne and declared himself the Church's supreme head, he accrued vast ecclesiastical powers—including the ability to appoint Church officials, prescribe which ministers could preach, and even dictate how congregations could pray. Unfortunately, these abuses transferred from the Old World to the New. The Framers experienced firsthand the problems of secular officials resolving spiritual questions. So the Framers drafted the First Amendment to prevent precisely these abuses, prohibiting government from exercising jurisdiction over matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871).

Congress enacted Title VII with this prohibition in mind. As originally drafted, Title VII did "not apply" to religious entities who wanted to employ "individuals of a particular religion" to "carry[ ] on … religious activities." Pub. L. No. 88-352, § 702, 78 Stat. 241, 255 (1964). Over time, Congress realized that the First Amendment demanded more and expanded Title VII's exemption to include individuals hired to carry out *any* of the religious organizations' "activities"—religious or otherwise. Pub. L. No. 92-261, 86 Stat. 103, 103–04 (1972). To ensure full coverage, Congress defined "religion" broadly to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

As government regulation has become more pervasive, "exerting a hydraulic insistence on conformity to majoritarian standards," Title VII's religious exemption has been critical for faith groups to teach and live out their beliefs. *Wisconsin v. Yoder*, 406 U.S. 205, 217 (1972). Yet some courts, like the district court here, have thought that granting faith groups this autonomy would be excessive. They have restricted Title VII's exemption solely to claims of discrimination premised upon an employee's religious preferences and nothing else.

This interpretation turns Title VII's strong protections into an easily evaded Maginot Line. Moody Bible Institute fired Janay Garrick, by her own admission, over a theologically grounded dispute about gender roles. When Garrick first sued, her complaint made clear that her disagreement was "tied to Moody's religious beliefs." *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 872 (N.D. Ill. 2019) (*Garrick I*). After the district court dismissed those claims—and coached Garrick on how to refile them to evade the court's own ruling—she amended her complaint to shoehorn the same factual allegations about religious discrimination into a sex discrimination claim. To these claims, the district court thought Title VII's religious exemptions did not apply.

That conflicts with Title VII's plain text. The exemption expressly says "[t]his subchapter"—meaning "all of Title VII"—"shall not apply" if triggered, "including the provisions prohibiting discrimination on non-religious bases and providing for mixed-motive liability." *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 534 (7th Cir. 2023) (Brennan, J., concurring). "So, when a covered employer demonstrates that an adverse employment decision was made because the relevant individual's beliefs, observances, or practices did not conform with the employer's religious

expectations," Title VII's exemption applies and "bar[s] a Title VII claim on that employment decision." *Id.* at 536. Full stop.

What Title VII plainly says, the Constitution supports. Since the First Amendment's ratification, this country has long respected religious groups' right to select and supervise employees without government interference. This principle, known as the church autonomy doctrine, "requires civil courts to accept … as binding" religious organizations' decisions on "internal dispute[s]." *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013) (cleaned up). Congress enacted Title VII's religious exemption with the church-autonomy doctrine in mind. *Id.* at 678. To read that exemption narrowly, as the district court did, would frustrate Congress's choice and collide with First Amendment principles, something this Court routinely avoids. It should do so here.

Government "cannot foreclose the exercise of … rights by mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963). That the district court's interpretation would allow just that demands correction. This Court should reverse and affirm the right of religious groups to operate without fear of government punishment simply for living out their missions consistent with their beliefs.

# ARGUMENT

Title VII's plain text protects Moody's decision to part ways with Garrick. So, too, does the First Amendment. Since the statute and Constitution operate in tandem to compel the same conclusion, this Court should reverse the district court's contrary decision.

## I. Title VII's plain text protects all religiously motivated employment actions.

### A. Title VII's text and purpose support a broad exemption for all religiously motivated employment actions.

When interpreting Title VII, courts "start, of course, with the statutory text." *Mangine v. Withers*, 39 F.4th 443, 447 (7th Cir. 2022). Each word "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022). That includes exceptions and exemptions. They "are no less part of Congress's work than its rules and standards—and all are worthy of a court's respect." *BP PLC v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1539 (2021). Courts have "no license to give statutory exemptions anything but a fair reading." *Id.* at 1538 (cleaned up).

Title VII generally prohibits employment decisions based on an "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). But Congress categorically exempted religious institutions, saying that Title VII "shall not apply to … a religious [institution] with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [institution] of its activities." *Id.* § 2000e-1(a). Title VII defines religion broadly to include "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j).

Every court accordingly has recognized that Title VII's exemption at least "permits religious associations to discriminate on religious grounds." *Starkey v. Roman Cath. Archdiocese of Indianapolis,* 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring) (citing *Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 329 (1987)). Were it otherwise, Title VII would force the Catholic Church to hire non-Catholics as priests and mosques to hire non-Muslims as imams.

But the statute's plain language does more than "authoriz[e] the employment of co-religionists." *Id.* It protects *any* employment decision that a religious institution makes if that decision is "founded on religious beliefs"—even if the decision implicates Title VII's other concerns, such as sexuality or gender. *Id.* Once the exemption triggers, then the statutory text declares that "[t]his subchapter"—meaning *all* of Title VII—"shall not apply." 42 U.S.C. § 2000e-1(a). "That a law might temper its pursuit of one goal by accommodating others can come as no surprise. … Often lawmakers tread in areas fraught with competing social demands where everyone agrees trade-offs are required." *BP PLC*, 141 S. Ct. at 1539. So, too, with Title VII. As this Court has already held, when a conflict arises, "the free exercise of religion" "prevails over the interest in ending discrimination embodied in Title VII." *Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 185 (7th Cir. 1994).

Nonetheless, some courts have frustrated Congress's statutory design by limiting Title VII's exemption to "permit[] religious discrimi-nation but no other kind." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). For example, without explanation, the Ninth Circuit has held that "religious employers are not immune from liability under Title VII for discrimination based on sex." *EEOC v. Fremont Christian Sch.*,

6

781 F.2d 1362, 1364–66 (9th Cir. 1986) (cleaned up). "Consonant with this view, some district courts in [this] circuit sidestep employers' religious justifications and find that so long as the plaintiff alleges discrimination based on a non-religious protected class, the exemption does not apply." *Fitzgerald*, 73 F.4th at 535 (Brennan, J., concurring) (collecting cases—and specifically citing the district court's interpretation of Title VII in this case as incorrect).

Yet nothing in the text supports this "implicit exception," and this Court should not repeat the mistake other courts have made. *See Alabama v. Bozeman*, 533 U.S. 146, 153 (2001). Congress said that the exemption applies to "this subchapter," which cannot mean anything "less than all of Title VII." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). And in using the command "shall," Congress conveyed an "absolute." *Bozeman*, 533 U.S. at 153. Plaintiffs can bring any number of claims and label them however they like—if the exemption triggers, it bars them all. The statute "does not contain any … language … limiting" the exemption to "*solely*" claims of one type. *BP PLC*, 141 S. Ct. at 1538. "Instead," if a religious institution takes religiously motivated employment actions, "then all of Title VII drops out," *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring)—"without any further qualification," *BP PLC*, 141 S. Ct. at 1538.

That's how courts have interpreted the exact same exemption in a different context. For not only did Congress exempt religious institutions from Title VII's ambit, but in the same breath it also exempted employment decisions related to "aliens outside any State." 42 U.S.C. § 2000e-1(a). "That language has been understood to mean what it says: *none* of Title VII's substantive rules applies to aliens covered by [the

exemption]." *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring) (citing *Rabé v. United Air Lines, Inc.*, 636 F.3d 866, 869 (7th Cir. 2011)). "What is true for the alien exemption must be true for the religious exemption as well." *Id.* The same words in the same statute carry "a consistent meaning." *United States v. Davis*, 139 S. Ct. 2319, 2329 (2019).

The district court resisted this plain meaning because the exemption "speak[s] to a religious organization's hiring of employees of 'a particular religion.'" *Garrick I*, 412 F. Supp. 3d at 870 (quoting 42 U.S.C. §§ 2000e-1(a), 2000e-2(e)(2)). This cramped understanding rips that phrase from its full statutory context. Congress provided an "explicit definition" for "religion," and that definition encompasses more than just a particular denomination. *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (cleaned up). Congress defined religion to include "*all aspects* of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j) (emphasis added). The exemption doesn't confine religious organizations to denominational labels, as the district court thought, but instead frees them to judge whether their employees live "by word and deed … in accordance with the faith." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2066 (2020). Taken as a whole, the exemption allows religious groups to "employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 950–51 (3d Cir. 1991) (rejecting the "denominational" interpretation that the district court adopted here).

This broad, plain reading of Title VII comports with its purpose. "Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Kennedy v. St.*

*Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011) (cleaned up). And employing "only those committed to th[e] mission" is "a means by which a religious community defines itself." *Amos*, 483 U.S. at 342 (Brennan, J., concurring). So reading the exemption narrowly "undermine[s] not only the autonomy of many religious organizations but also their continued viability." *SUGM*, 142 S. Ct. at 1096 (Alito, J., respecting the denial of certiorari). "If States could compel religious organizations to hire employees who fundamentally disagree with them, many religious non-profits would be extinguished from participation in public life—perhaps by those who disagree with their theological views most vigorously." *Id.*; *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) ("When the government forces a group to accept for membership someone the group does not welcome and the presence of the unwelcome person affects in a significant way the group's ability to advocate its viewpoint, the government has infringed on the group's freedom of expressive association."). That's why Congress broadly, not narrowly, defined the exemption.

**B.    Moody's actions here easily fit within Title VII's exemption.**

Properly understood, Title VII's plain text protects Moody's decision to part ways with Garrick. The dispute between Moody and Garrick centers around the Bible's teachings on gender and sexuality. Moody subscribes to the "complementarian" view that "although men and women are created equal in their being and personhood, they are created to complement each other via different roles in life and in the church."

Tim Challies, *Why I Am Not Egalitarian* (June 30, 2016).[2] By contrast, Garrick subscribes to an "egalitarian" theological view that teaches that "there are *no* gender-based limitations of what functions or roles each can fulfill in the home, the church, and the society." *Id.* (emphasis added). The differences between these theological positions ultimately led Moody to part ways with Garrick. It is "not within the judicial ken" to second-guess the sincerity or centrality of Moody's decision, and Title VII's plain text acknowledges that. *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

Throughout this litigation, Garrick has acknowledged that her dispute is primarily theological. In her first complaint, Garrick claimed that she:

> was terminated for her stated position/disagreement with Moody's 'Gender roles in Ministry' addendum included in its doctrinal statement, Defendant stating that she could not sign the doctrinal statement based on her holding to an egalitarian position (Moody holds to a complementarian position that excludes women from certain roles within the church due to their gender).

She said the same, under penalty of perjury, in a signed EEOC Charge of Discrimination. There, she made clear that Moody terminated her based on her "form of Christianity" and her misalignment with Moody's "doctrinal statement." Only the district court's coaching brought Garrick to say that her dispute with Moody was not theological.

That the theological dispute here involves sexuality and gender does not make it any less religious. In firing Garrick, Moody was "carrying out its theological views; that its adherence to [that] doctrine produces a form of sex discrimination does not make the action less

---

[2] https://perma.cc/9J33-NGLW.

religiously based." *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring). Indeed, the text of the religious exemption "makes no distinction among different kinds of" decisions. *Bozeman*, 533 U.S. at 154. So courts "must assume that *every*" religious employment action "triggers" the exemption, even if it overlaps with other motives. *Id.*; *Fitzgerald*, 73 F.4th at 534 (Brennan, J., concurring) (noting that "all of Title VII drops out" even "for mixed-motive liability").

To hold otherwise would imperil religious organizations' autonomy over their tenets on gender and sexuality. Take the Catholic Church, which understands the Bible to restrict priesthood to men. Or an Islamic school that understands the Quran to require women but not men to wear a hijab. No one seriously questions whether these decisions are religiously motivated. Nor do they question whether they fit within Title VII's exemption—even though they "produce[ ] a form of sex discrimination," too. *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring). Yet the interpretation that the district court adopted would *not* recognize these religiously motivated decisions as exempted from Title VII's ambit. That can't be correct.

Indeed, adjudicating Garrick's claims would "not only undercut a religious organization's constitutionally protected" autonomy, "but also cause civil intrusion into, and excessive entanglement with, the religious sphere"—the very harms Congress designed Title VII to avoid. *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 977–78 (7th Cir. 2021) (en banc). The district court thought it could avoid such entanglement by defining Moody's religious beliefs for them. To the district court, Moody's complementarianism "focuses on excluding women from serving as *ministers*" and nothing more; Moody's

11

complimentarianism says nothing about "women who work in *secular* roles." *Garrick v. Moody Bible Inst.*, 494 F. Supp. 3d 570, 578 (N.D. Ill. 2020) (*Garrick II*). But the court didn't account for "the critical and unique role of the teacher." *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 501 (1979). Moody, like other religious schools, "ask[s] their teachers to show students how to view the world through a faith-based lens, even when teaching nominally secular subjects." *Gordon Coll.*, 142 S. Ct. at 954 (Alito, J., respecting the denial of certiorari) (cleaned up). Courts cannot neatly divide the secular from the sacred; to do so would only entangle courts in church doctrine.

Title VII's language "is plain," so the Court's "inquiry should end." *Culbertson v. Berryhill*, 139 S. Ct. 517, 521 (2019). The exemption protects all religiously motivated employment actions. Once triggered, Title VII no longer applies.

## II. Constitutional avoidance compels reading Title VII's religious exemption broadly to protect all religiously motivated employment actions.

Title VII's plain text articulates a broad religious exemption. The constitutional avoidance canon requires that reading. That canon instructs courts to interpret statutes to avoid conflicts with the Constitution. Here, the district court's narrow reading of Title VII's religious exemption collides with the First Amendment's long-recognized church autonomy doctrine.

**A.** **This country has long protected religious groups' autonomy to decide questions of faith, doctrine, and internal governance.**

Many early settlers came to America "to escape the bondage of laws which compelled them to support and attend government favored churches." *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947). They wanted the freedom "to elect their own ministers and establish their own modes of worship." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 182 (2012). Yet the New World started to look a lot like the Old; "practices and persecutions" became "so commonplace as to shock the freedom-loving colonials into a feeling of abhorrence" and "indignation." *Everson*, 330 U.S. at 10–11.

These "feelings … found expression in the First Amendment." *Id.* at 11. James Madison, a "leading architect," staunchly defended the rights of conscience from government interference. *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 141 (2011). He believed "that religion … and the manner of discharging it, can be directed only by reason and conviction, not by force or violence," making it "wholly exempt from [government's] cognizance." *Everson*, 330 U.S. at 64. Into the First Amendment, Madison and the other Framers baked protections for religious groups' autonomy to decide questions of faith and internal governance.

After the First Amendment's ratification, courts recognized religious groups' "independence from secular control or manipulation" and the concomitant "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*

*in N. Am.*, 344 U.S. 94, 116 (1952). The Supreme Court held that "civil courts exercise no jurisdiction" over matters involving "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson*, 80 U.S. at 733. Civil authorities, the Court said, are "incompetent judges of matters of faith, discipline, and doctrine," making courts "so unwise" in these matters that any attempt to regulate them "would do anything but improve either religion or good morals." *Id.* at 732 (cleaned up).

Put another way, the government has no business deciding "what does or does not have religious meaning," *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977), or interpreting "church doctrines and the importance of those doctrines to the religion," *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969), or regulating "church administration, the operation of the churches, [or] the appointment of clergy," *Kedroff*, 344 U.S. at 107–08. Religious groups themselves have the power, without the second-guessing of a court, to select who carries out their missions.

### B. Religious groups have an absolute right to employ only those people who follow their religious precepts and further their religious mission.

Given the First Amendment's robust protection of religious groups' internal autonomy, "the Religion Clauses foreclose certain employment discrimination claims" that intrude on those groups' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 140 S. Ct. at 2061. They protect "the freedom of religious groups to select their own" representatives and

reject those who go against the tenets of the faith. *Hosanna-Tabor*, 565 U.S. at 184.

The Religion Clauses' protections are complimented by the First Amendment's free association protections. "[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of … educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up). To force a "group to accept members it does not desire" burdens that group's associational rights by intruding on its "internal structure or affairs," impairing its ability to express certain views—"and only those views." *Id.* at 648. Moreover, it "significantly burden[s] the organization's right to oppose or disfavor [certain] conduct." *Id.* at 659.

Though "religious and secular groups alike" enjoy free-associational rights, the First Amendment gives "special solicitude to the rights of religious organizations." *Hosanna-Tabor*, 565 U.S. at 189. Their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Id.* at 200 (Alito, J., concurring). "[T]o advance religion … is their very purpose." *Amos*, 483 U.S. at 337. Accordingly, "[t]he right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine … [has been] unquestioned." *Watson*, 80 U.S. at 728–29.

That includes religious groups' right to decide that only those people who share the groups' beliefs should help to "define and carry out their religious missions." *Amos*, 483 U.S. at 335. This "membership" principle, an offspring of the church-autonomy doctrine, is *not* limited to hiring someone of a particular religion or domination. *Bouldin v.*

*Alexander*, 82 U.S. (15 Wall.) 131, 139–40 (1872). Instead, it gives religious groups the autonomy to "shape [their] own faith and mission through [their] appointments," ensuring that *all* personnel will contribute to, rather than detract from, the group's shared ideals. *Hosanna-Tabor*, 565 U.S. at 188.

As with the Title VII exemption, the district court nullified this membership principle by employing secular labels that lack constitutional significance. To the district court, the membership principle only prevents Garrick from labeling her dispute with Moody as religious discrimination. If Garrick takes the same facts and calls them sex discrimination instead, then courts have the power to police her dispute with Moody. But the Supreme Court's "precedents suggest that the guarantee of church autonomy is not so narrowly confined"—nor a court's powers so broad. *SUGM*, 142 S. Ct. at 1096 (Alito, J., respecting the denial of certiorari). In fact, precedent teach that courts shouldn't grapple with the question *at all*.

Consider *Amos*. There the Court considered whether a Mormon organization could "discriminate on religious grounds in hiring for nonreligious jobs." 483 U.S. at 331. The Court held that the organization, "to define and carry out [its] religious missions," could. *Id.* at 334–35. "[I]ntrusive" inquiries by courts into whether the jobs were sufficiently religious would create a "significant burden" on the organization by requiring it "to predict which of its activities a secular court will consider religious" and pressuring it to alter "the way [it] carried out … its religious mission" to avoid "potential liability." *Id.* at 336, 339.

The Court's recent ministerial exemption cases confirm this point. Like the membership principle, the ministerial exemption "protects

religious organizations from employment discrimination suits brought by their ministers." *Demkovich*, 3 F.4th at 973. In *Our Lady of Guadalupe*, the Supreme Court affirmed that the exemption protected two Catholic schools' choices to fire teachers at odds with the schools' religious values. The Court emphasized that labels and "titles" weren't important; rather, "[w]hat matters … is what an employee does," and a teacher's job was "loaded with religious significance." 140 S. Ct. at 2064, 2067. Religious schools therefore have the autonomy to decide who best embodies that role, free from government interference. Even the dissent acknowledged religious groups' ability to "make employment decisions … *for religious reasons.*" *Id.* at 2072 (Sotomayor, J., dissenting) (emphasis added).

The ministerial exception and the membership principle thus have the same end point: the First Amendment guarantees religious groups "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.* at 2061. Religiously motivated employment decisions are "*per se* a religious matter," and courts have no say when it comes to "how and by whom churches spread their message." *EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 804–05 (4th Cir. 2000) (cleaned up).

Religious groups do not have a "general immunity from secular laws." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. But they do get to make decisions that "at times result from preferences wholly impermissible in the secular sphere." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1170–71 (4th Cir. 1985). And "[w]here the values of state and church clash" over "decision[s] of a theological nature, the church is entitled to pursue its own path without concession to the views of" the government. *Id.* at 1171. Civil authorities cannot second-

guess religiously motivated decisions and say that the group's "beliefs are flawed." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014). Yet that's precisely what the district court did here by allowing Garrick to repackage a theological dispute as a sex discrimination claim.

### C. Because religiously motivated employment decisions are protected by the First Amendment, the constitutional avoidance canon compels reading Title VII's exemption broadly.

Though "cases of this kind" have recently "start[ed] with a constitutional question … rather than with the statute," that is not the "proper sequence." *Starkey*, 41 F.4th at 945 (Easterbrook, J., concurring). This Court could avoid the constitutional questions altogether by deciding this case under Title VII's religious exemption. If it does so, the constitutional principles outlined above compel reading the exemption broadly.

Other courts have done exactly that. In *Little*, the Third Circuit upheld a Catholic school's right not to renew a teacher's contract after she divorced and remarried without seeking an annulment. 929 F.2d at 946. To apply Title VII to that action would "arguably violate both [the Religion Clauses]," so the court read Title VII's exemption "broadly" to permit religious groups, like the school, "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Id.* at 947, 951.

Similarly, the Fifth Circuit read Title VII's exemption "broadly to [protect] any employment decision made … on the basis of religious discrimination." *EEOC v. Miss. Coll.*, 626 F.2d 477, 487 (5th Cir. 1980). To avoid "conflicts [with] the religion clauses," the court ruled that if a

school showed that it fired a professor "on the basis of religion," the government couldn't even investigate "whether the religious discrimination was a pretext." *Id.* at 485; *accord Curay-Cramer v. Ursuline Acad. of Wilmington*, 450 F.3d 130, 141 (3d Cir. 2006) (holding that courts should not inquire "into a religious employers' religious mission or the plausibility of its religious justification for an employment decision").

And the Sixth Circuit ruled that a religious college could fire a student-services specialist after she disclosed that she was a lesbian ordained in an LGBT-friendly church. *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 622–23 (6th Cir. 2000). The court recognized that religious groups have a "constitutionally protected interest … in making religiously motivated employment decisions," such that courts cannot "dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices." *Id.* at 623, 626.

Finally, the Eleventh Circuit read Title VII's religious exemption broadly "to avoid the First Amendment concerns." *Killinger v. Samford Univ.*, 113 F.3d 196, 201 (11th Cir. 1997). A Baptist university could demote a professor over theological differences without court interference because the "exemption allows religious institutions to employ only persons whose beliefs are consistent with the employer's when the work is connected with carrying out the institution's activities." *Id.* at 200.

In each of these instances, the court used the concern of unconstitutional religious entanglement as an additional reason to read Title VII's broad religious exemption for the expansive shield against government intrusion that Congress intended. This Court should follow their lead and

hold that the theological dispute between Moody and Garrick does not state a justiciable Title VII claim.

## CONCLUSION

Title VII's plain text protects Moody's decision, motivated by a theological difference, to part ways with Garrick. The First Amendment does, too, which requires reading Title VII's exemption broadly to avoid a collision with the Constitution. This Court should reverse the district court's decision and dismiss this case.

Respectfully submitted,

Dated: August 7, 2023          By:*/s/ Cody S. Barnett*

JOHN J. BURSCH                    CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM        ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600   44180 Riverside Pkwy
Washington, DC 20001              Lansdowne, VA 20176
(616) 450-4235                    (571) 707-4655
jbursch@adflegal.org              cbarnett@ADFlegal.org

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 29 because this brief contains 4,982 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32 because it has been prepared in a proportionally spaced typeface using 12-point Century Schoolbook.

Dated: August 7, 2023

*/s/ Cody S. Barnett*
Cody S. Barnett
Attorney for Amicus Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Cody S. Barnett*
Cody S. Barnett
Attorney for Amicus Curiae