No. 21-2683

# In the United States Court of Appeals for the Seventh Circuit

JANAY E. GARRICK, ET AL.,

*Plaintiffs-Appellees,*

v.

MOODY BIBLE INSTITUTE, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Illinois
No. 1:18-cv-00573; The Honorable John Z. Lee, Judge

## BRIEF OF AMICI CURIAE COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, NATIONAL ASSOCIATION OF EVANGELICALS, BIOLA UNIVERSITY, LIBERTY UNIVERSITY, & WHEATON COLLEGE

Gene C. Schaerr
Annika Boone Barkdull
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1 and 7th Cir. R. 26.1, *Amici Curiae* Council for Christian Colleges & Universities, National Association of Evangelicals, Biola University, Liberty University, and Wheaton College state that they are nonprofit organizations, have no parent corporations, and do not issue stock.

Dated: August 7, 2023

> Respectfully submitted,
>
> */s/ Gene C. Schaerr*
> Gene C. Schaerr
> *Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT............................................i

TABLE OF AUTHORITIES.................................................... iii

INTEREST OF *AMICI* AND SUMMARY OF ARGUMENT...................1

STATEMENT.........................................................................6

ARGUMENT..........................................................................7

I.   Even When a Party Claims That a Religious Organization's Proffered Religious Reasons Are Pretextual, the Church Autonomy Doctrine Is a Bar to Suit, Not Just a Defense to Liability. ..........................................................................7

II.  Religious Schools Will Suffer If Courts Fail to Treat the Church Autonomy Doctrine as a Bar to Suit. ...............................18

    A.   In the United States, There Are Hundreds of Religious Schools, Colleges, and Universities with Employees Critical to Their Religious Missions. ......................................19

    B.   Those Religious Schools Are Often the Targets of Litigation Brought by Their Employees. ..................................26

    C.   The Resulting Litigation Costs and the Specter of Government Entanglement Not Only Threaten Religious Schools' Financial Viability, But Also Chill the Exercise of Those Schools' Right to Religious Autonomy. ..........................29

CONCLUSION ...................................................................34

APPENDIX ........................................................................1a

CERTIFICATE OF COMPLIANCE ........................................... I

CERTIFICATE OF SERVICE.................................................II

# TABLE OF AUTHORITIES

## Cases

*Alicea-Hernandez v. Cath. Bishop of Chi.*,
  320 F.3d 698 (7th Cir. 2003) .................................................. 15

*Anderson v. Creighton*, 483 U.S. 635 (1987) ............................. 32

*Bouldin v. Alexander*, 82 U.S. (15 Wall) 131 (1872) .................. 9

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (2002) .................................................. 14, 15, 33

*Butler v. Saint Stanislaus Kostka Cath. Acad.*,
  609 F. Supp. 3d 184 (2022) ................................................... 28

*Carson v. Makin,* 142 S. Ct. 1987 (2022) ................................. 10

*Cath. Diocese of Jackson v. De Lange*, 341 So. 3d 887 (Miss. 2022) ....... 10

*Clapper v. Chesapeake Conf. of Seventh-Day Adventists*,
  166 F.3d 1208 (4th Cir. 1998) .............................................. 28

*Conlon v. InterVarsity Christian Fellowship/USA*,
  777 F.3d 829 (6th Cir. 2015) ........................................... 11, 14

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day
  Saints v. Amos*, 483 U.S. 327 (1987) ..................................... 34

*Demkovich v. St. Andrew the Apostle Par., Calumet City*,
  3 F.4th 968 (7th Cir. 2021) ........................................... 2, 9, 31

*EEOC v. Cath. Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996) ............. 28, 32

*Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529 (7th Cir. 2023) ..... 27

*Garrick v. Moody Bible Inst.*,
  412 F. Supp. 3d 859 (N.D. Ill. 2019) ..................................... 16

*Garrick v. Moody Bible Inst.*,
  494 F. Supp. 3d 570 (N.D. Ill. 2020) ........................... 6, 7, 16, 17, 24

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................... 13

*Heard v. Johnson*, 810 A.2d 871 (D.C. 2002) ......................................... 12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
   565 U.S. 171 (2012) ................................................. 1, 3, 7, 11

*Kirby v. Lexington Theological Seminary,*
   426 S.W.3d 597 (Ky. 2014) ...................................................... 28

*Konchar v. Pins*, 989 N.W.2d 150 (Iowa 2023) ........................................ 33

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh,*
   903 F.3d 113 (3d Cir. 2018) ...................................................... 14

*Markowski v. Brigham Young Univ.,*
   575 F. Supp. 3d 1377 (D. Utah 2022) ...................................... 28

*McCarthy v. Fuller,* 714 F.3d 971 (7th Cir. 2013) .................................. 12

*McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) ..................... 34

*McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.,*
   980 F.3d 1066 (5th Cir. 2020) ................................................ 24

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .............................................. 15

*Mitchell v. Helms*, 530 U.S. 793 (2000) ................................................. 10

*Natal v. Christian Missionary All.*, 878 F.2d 1575 (1st Cir. 1989) ......... 2

*NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490 (1979) .............. 5, 10, 20

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   140 S. Ct. 2049 (2020) .................................. 2, 7, 8, 13, 20, 26

*Payne-Elliott v. Roman Cath. Archdiocese of Indianapolis, Inc.,*
   193 N.E.3d 1009 (Ind. 2022) ............................................... 27

*Petruska v. Gannon Univ.*, 462 F.3d 294 (3d Cir. 2006) ................. 12, 28

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
   772 F.2d 1164 (4th Cir. 1985) ........................................ 4, 32

iv

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v.*
  *Milivojevich,* 426 U.S. 696 (1976) ...................................... 3, 10

*St. Joseph Cath. Orphan Soc'y v. Edwards*,
  449 S.W.3d 727 (Ky. 2014) .................................................. 13

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
  41 F.4th 931 (7th Cir. 2022) ........................................... 26, 27

*Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568 (7th Cir. 2019) ...... 17, 18

*Temple Emanuel of Newton v. Mass. Comm'n Against*
  *Discrimination*, 975 N.E.2d 433 (Mass. 2012) .................................. 28

*Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) ...... 1, 31

*Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006) ........... 11

*Tucker v. Faith Bible Chapel Int'l*, 53 F.4th 620 (10th Cir. 2022) ......... 15

*Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871) ......................................... 9

*Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018) ............. 11

**Other Authorities**

Baylor Univ., *About Baylor* ...................................................... 23

Biola Univ., *Mission, Vision and Values* ......................................... 23, 25

Brigham Young Univ., *Aims of a BYU Education* ............................. 22, 25

Brigham Young Univ., *BYU Mission Statement* ................................... 22

Mark E. Chopko & Marissa Parker, *Still a Threshold Question:*
  *Refining the Ministerial Exception Post-*Hosanna-Tabor, 10 First
  Amend. L. Rev. 233 (2012) ................................................ 13

EEOC, *What You Can Expect After You File a Charge* .......................... 29

Galatians 5:9 (New International Version) .......................................... 22

Greenville Univ., *Who We Are* ..................................................... 21

Corydon Ireland, *Seal of Approval,*
The Harvard Gazette (May 14, 2015) .................................................. 19

Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Columbia L. Rev. 1373 (1981) ........................... 4

Liberty Univ.,
*Educational Philosophy and Mission Statement* ................................ 22

Philip J. Moss, *The Cost of Employment Discrimination Claims*,
28 Me. Bar J. 24 (2013) ...................................................................... 31

Alan Noble, *A Professor's Perspective: Why Christian Colleges Emphasize Mentorship*, Creative Studio: Christianity Today (Jan. 25, 2018) ...................................................................................... 25

Olivet Nazarene Univ., *Lifestyle Covenant* ........................................... 21

Michael Orey, *Fear of Firing: How the Threat of Litigation is Making Companies Skittish About Axing Problem Workers*,
Bus. Wk. 52 (Apr. 23, 2007) ............................................................... 29

Bobby Ross, Jr., *Closing Doors: Small Religious Colleges Struggle for Survival*, Religion N. Serv. (Nov. 20, 2017) ................................ 30

Roger Schultz, *Christianity and the American University*,
Liberty J. (Feb. 26, 2019) .............................................................. 19, 20

Daniel Silliman, *Gordon College Settles with Professor It Said Was a Minister*, Christianity Today (Dec. 16, 2022) ................................... 31

Lael Weinberger, *Is Church Autonomy Jurisdictional?*,
54 Loy. U. Chi. L.J. 471 (2022) .......................................................... 13

Wheaton Coll., *Spiritual Life* .............................................. 21, 22, 24

Yeshiva Univ., *About Yeshiva College* ................................................. 23

Zaytuna Coll., *Our Mission* ................................................................. 23

## INTEREST OF *AMICI*[1] AND SUMMARY OF ARGUMENT

This case presents a crucial question about the proper application of the guarantee, inherent in the First Amendment's Religion Clauses, that religious organizations must remain free "from secular control or manipulation." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012) (citation omitted). The Supreme Court recognized in *Hosanna-Tabor* that religious organizations—including religious schools such as Appellant Moody Bible Institute—are not merely "social club[s]," but something different and due "special solicitude." *Id.* at 189. The reason is simple: "[I]t is not within the judicial function and judicial competence to inquire" into religious questions. *Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981). Courts are neither "arbiters of scriptural interpretation" nor trained to divine whether a religious organization "correctly perceived the commands of [its] … faith." *Ibid.*

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. Counsel for all parties consent to the filing of this brief.

Recognizing those principles, this Court has applied the ministerial exception numerous times. *E.g.*, *Demkovich v. St. Andrew the Apostle Par., Calumet City,* 3 F.4th 968, 983–84 (7th Cir. 2021) (en banc) (collecting cases). That exception, recognized by the Supreme Court in *Hosanna-Tabor*, rests on a "constitutional foundation" that is rooted in both the Free Exercise and Establishment Clauses, namely, "the general principle of church autonomy." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020). Thus, the ministerial exception is merely one aspect of the broader and even more longstanding church autonomy doctrine.

Moreover, that doctrine of deference to religious organizations on questions of church governance serves similar goals as its subsidiary ministerial exception. It allows religious organizations to operate without fear of judicial or other government interference, and it prevents the excessive entanglement between government and religion that would necessarily follow from discovery and trial "[b]y [their] very nature." *Natal v. Christian Missionary All.*, 878 F.2d 1575, 1578 (1st Cir. 1989). The church autonomy doctrine thus prevents the untenable outcome of

2

courts' plunging into "a maelstrom of Church policy, administration, and governance." *Id.*

Despite its long pedigree, the church autonomy doctrine has, in recent years, been narrowed by some misguided judicial rulings opining that these doctrines can be appealed only after final judgment, or that they can be decided only by the trier of fact, as a defense to liability. One way this minority of courts has evaded the clear commands of the church autonomy doctrine is by allowing plaintiffs to claim that a religious organization's proffered religious reasons are pretextual—and then to allow discovery on the question of the alleged pretext. In ministerial exception cases, the question of pretext is foreclosed completely. *Hosanna-Tabor*, 565 U.S. at 194. And in other church autonomy cases, a plaintiff still may not delay application of the doctrine by asserting pretext where proceeding to discovery and trial cannot be done "without extensive inquiry by civil courts into religious law and polity." *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich,* 426 U.S. 696, 709 (1976). As Appellant Moody Bible Institute explains (at 27), this is one such case. Here, the church autonomy doctrine functions as a bar to suit, not merely a defense to liability.

Because a contrary conclusion would have far-reaching consequences for religious organizations, this case is deeply important to *amici* Council for Christian Colleges & Universities, National Association of Evangelicals, Biola University, Liberty University, and Wheaton College—the latter four of which are described in more detail in the Appendix.

*Amicus* CCCU represents hundreds of religious colleges, universities, and schools across the United States. Its member institutions provide faith-infused, high-quality education based on a religious belief that, through such efforts, their students will be better prepared to live their faith in all aspects of life. CCCU's member institutions have a variety of nuanced religious views on the ordination question that led to this case, and imposing a Title VII rule on their internal affairs will hamper their "legitimate claim to autonomy in the elaboration and pursuit of [their separate] goal[s]." *See Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 & n.9 (4th Cir. 1985) (quoting Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Columbia L. Rev. 1373, 1399 (1981)).

*Amicus* National Association of Evangelicals is the largest network of evangelical churches, denominations, independent ministries and colleges in the United States. It serves 40 member denominations, as well as numerous evangelical missions, social-service providers, colleges, and seminaries.

Those institutions, CCCU and NAE member schools, and the individual religious college *amici* will all be hindered in their ability to achieve their missions free from government interference if the government can force them to undergo intrusive and expensive merits discovery and—potentially—a trial before they can vindicate their rights under the Religion Clauses. By that point, significant damage will already have been done, in keeping with the Supreme Court's recognition that the "very process of inquiry" can often "impinge on rights guaranteed by the Religion Clauses." *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979).

*Amici* thus agree with Moody that the church autonomy doctrine provides immunity from judicial interference, not merely a defense to liability, even though Garrick claims that the offered religious reasons for her firing were pretextual. *Amici* write to explain why a contrary

conclusion that precludes interlocutory appeals before discovery would seriously harm religious colleges and universities and, relatedly, why this Court should reject any invitation to embrace that conclusion.

## STATEMENT

Moody Bible Institute is a religious college with a sincere religious belief (which it shares with many faith traditions) that forbids women from serving in the office of pastor. *Garrick v. Moody Bible Inst.*, 494 F. Supp. 3d 570, 573 (N.D. Ill. 2020).  After signing a statement affirming that she shared that belief, Appellee Janay Garrick—a teacher at Moody—began openly advocating against it within the Moody community. Appellant's Br. at 5–7. Moody subsequently opted not to renew her contract because she was "not aligned with its doctrinal statement as it related to gender roles in ministry." *Garrick v. Moody Bible Inst.*, 494 F. Supp. 3d 570, 574 (N.D. Ill. 2020) (brackets omitted). After an initial attempt to sue Moody failed—because the district court concluded the church autonomy doctrine blocked her claims—the district court allowed her to amend her complaint. Despite acknowledging in her Second Amended Complaint that her own beliefs conflict with Moody's beliefs, she now claims that Moody's asserted reasons for not renewing

6

her contract were pretextual and that she was actually fired "because she is a woman who raised concerns about gender discrimination." *Id.*

Finding that her new complaint "crafted her Title VII claims to steer clear of the religious freedoms guaranteed by the First Amendment," the district court allowed certain claims to proceed and allowed discovery into "whether Moody['s] invocation of its religious beliefs was, in fact, a cover to discriminate against Garrick because of her gender." *Id.* at 577.

## ARGUMENT

### I.     Even When a Party Claims That a Religious Organization's Proffered Religious Reasons Are Pretextual, the Church Autonomy Doctrine Is a Bar to Suit, Not Just a Defense to Liability.

The district court fundamentally misunderstood the church autonomy doctrine—and as a result, misapplied it. Properly understood, even if a plaintiff claims that a religious organization's proffered religious reasons for her termination were pretextual, that doctrine and the ministerial exception subsumed within it "bars such a suit" against the religious organization. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012); *see also Our Lady of Guadalupe*,

140 S. Ct. at 2061 ("[T]he Religion Clauses foreclose certain employment discrimination claims brought against religious organizations.").

1. The clearest reason why the church autonomy doctrine does not allow cases brought against religious employers to continue to discovery or even trial even when pretext is asserted is that, if the doctrine did allow that, it would be unable to avert the very harms it is designed to prevent.

One way the doctrine operates is by ensuring the government does not interfere with—among other things—a religious organization's internal employment decisions "involving those holding certain important positions with churches and other religious institutions," *Our Lady of Guadalupe*, 140 S. Ct. at 2060, or that would entangle courts in the religious reasons for employment decisions concerning non-ministerial employees. The doctrine bars such suits to protect religious organizations' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.* at 2061. Quoting that very language, this Court later explained that the "well-established" church autonomy doctrine—together with the ministerial exception that "follows naturally" from it—"means what it says." *Demkovich v. St.*

*Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc).

This "well-established" doctrine has also expressly protected religious organizations for more than 150 years. As early as 1871, the Supreme Court explained that courts cannot decide a "matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871). It further emphasized that the Religion Clauses forbid courts from "decid[ing] who ought to be members of the church, []or whether the excommunicated have been justly or unjustly, regularly or irregularly cut off." *Id.* at 730; *accord Bouldin v. Alexander*, 82 U.S. (15 Wall) 131, 139–40 (1872).

Nowhere in those cases is there any suggestion that the church autonomy doctrine's protections kick in only when the facts are tried, that they apply only after final judgment, or that they can be disregarded whenever a plaintiff claims pretext. To the contrary, as the Supreme Court has explained, looking to pretext usually "misses the point." *Hosanna-Tabor*, 565 U.S. at 194. After all, under the Court's decisions,

even looking into a religious organization's internal workings can be a First Amendment harm. *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979). And this applies even before trial because a court's—or by extension, an adverse party's—"detailed review of the evidence" of internal church procedures and decisions is itself "impermissible" under the First Amendment. See *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 718 (1976).

In short, "[i]t is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality op.); *accord Carson v. Makin,* 142 S. Ct. 1987, 2001 (2022) ("Any attempt to … scrutiniz[e] whether and how a religious school pursues its educational mission would also raise serious concerns about state entanglement with religion and denominational favoritism."). Thus, even when a plaintiff asserts pretext, the church autonomy doctrine bars suit when, as here, resolution of a plaintiff's claims would require a Court "to impermissibly wade into ecclesiastical polity, in violation of the First Amendment." *Cath. Diocese of Jackson v. De Lange*, 341 So. 3d 887, 894–95 (Miss. 2022).

2. This long and unbroken line of precedent establishes that both the church autonomy doctrine and the ministerial exception that derives from it function differently from most affirmative defenses. Even though they do not serve as *jurisdictional* bars, *Hosanna-Tabor,* 565 U.S. at 195 n.4, they are "structural limitation[s] imposed on the government by the Religion Clauses, [and] can never be waived." *Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 836 (6th Cir. 2015); *accord Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) ("A federal court will not allow itself to get dragged into a religious controversy even if a religious organization wants it dragged in."), *abrogated in part by Hosanna-Tabor,* 565 U.S. at 195 n.4 (rejecting claim that the ministerial exception is jurisdictional); *Whole Woman's Health v. Smith*, 896 F.3d 362, 373–74 (5th Cir. 2018).

Because the church autonomy doctrine and the ministerial exception act as structural limitations, several courts have correctly likened them to qualified immunity—and recognized that, because of the similarity between the two, the collateral order doctrine allows interlocutory appeals when the church autonomy doctrine or the ministerial exception defense are denied. In *McCarthy v. Fuller*, for

11

example, this Court explained that a court's rejection of a church-autonomy defense is "closely akin to a denial of official immunity" because, if a "jury was (wrongly) allowed to rule," then there "would be a final judgment of a secular court resolving a religious issue" and the "harm of such a governmental intrusion into religious affairs would be irreparable." 714 F.3d 971, 975, 976 (7th Cir. 2013). To prevent that harm, this Court thus correctly held that aggrieved religious organizations whose church-autonomy defenses had been denied could seek interlocutory relief. *Id.* at 974–75.

Other courts have likewise recognized the similarities between the protections of the Religion Clauses and qualified immunity. In *Petruska v. Gannon University*, for example, the Third Circuit found that the ministerial exception operated like qualified immunity and concluded that, though the "exception does not act as a jurisdictional bar," it may be raised—at the motion-to-dismiss stage—as a "challenge to the sufficiency of [a plaintiff's] claim[s]" against a religious organization. 462 F.3d 294, 302 (3d Cir. 2006); *accord Heard v. Johnson*, 810 A.2d 871, 877 (D.C. 2002) ("A claim of immunity from suit under the First Amendment is just such an issue of law, and … a defendant church may appeal the

12

denial of a motion to dismiss where the motion was based on First Amendment immunity from suit."); *St. Joseph Cath. Orphan Soc'y v. Edwards*, 449 S.W.3d 727, 736 (Ky. 2014) ("[W]hen religious issues permeate distinct cases of a traditionally-recognized type, such as employment disputes, tort suits, or business-association conflicts, Kentucky courts are without authority to adjudicate that specific case.").[2]

The comparison to qualified immunity is particularly appropriate. Just as qualified immunity recognizes "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties," *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (cleaned up), the church autonomy doctrine and its ministerial exception recognize the harm to religious institutions if they were subject to "judicial intervention into disputes between" religious organizations and their employees in a way that "threatens the [organization's] independence[.]" *Our Lady of*

---

[2] Scholars also recognize the link between qualified immunity and the ministerial exception. *See* Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471, 485–505 (2022); Mark E. Chopko & Marissa Parker, *Still a Threshold Question: Refining the Ministerial Exception Post*-Hosanna-Tabor, 10 First Amend. L. Rev. 233, 293 n.355 (2012).

*Guadalupe*, 140 S. Ct. at 2069. As mentioned above, in cases brought against religious institutions, the First Amendment injury is often the litigation itself.

"In this sense," as the Tenth Circuit has explained, the church autonomy doctrine "is similar to a government official's defense of qualified immunity." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 (2002). Like qualified immunity, the church autonomy doctrine offers significant protection from unfair or malicious lawsuits.

Indeed, if anything, the justification for providing *religious* organizations immunity from suits that would interfere with their autonomy is even stronger than the justifications the Supreme Court has offered for qualified immunity—which applies only when the law is not clearly established. That is because the church autonomy doctrine is itself a clearly established constitutional mandate that protects not only the religious organization's interest in operating free from judicial interference, but also the *government*'s structural duty to avoid religious entanglement. *See, e.g.*, *Conlon*, 777 F.3d at 836 (calling the exception a "structural limitation"); *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (noting that the

14

ministerial exception "is rooted in constitutional limits on judicial authority"); *Alicea-Hernandez v. Cath. Bishop of Chi.*, 320 F.3d 698, 702 (7th Cir. 2003) (recognizing the risk that suits against religious organizations might "contravene the First Amendment prohibition against excessive entanglement").[3] And, just as the benefit to public officials "is effectively lost if a case is erroneously permitted to go to trial," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the benefits provided by the church autonomy doctrine are effectively lost if they can be asserted only at the backend. That is why the church autonomy doctrine "*prohibits* civil court review of internal church disputes," rather than merely allowing the defense to be raised when the facts are tried. *Bryce*, 289 F.3d at 655 (emphasis added).[4]

---

[3] *See also Tucker v. Faith Bible Chapel Int'l*, 53 F.4th 620, 625 (10th Cir. 2022) (Bacharach, J., dissent from denial of rehearing en banc) (recognizing that the Religion Clauses play a "structural role … in limiting governmental power over religious matters").

[4] *See also, e.g., Belya v. Kapral*, 59 F.4th 570, 578 (2d Cir. 2023 (Park, J., dissent from denial of rehearing en banc) ("[A]fter final judgment, the harm from judicial interference in church governance will be complete."); *Tucker,* 53 F.4th at 627 (Bacharach, J., dissent from denial of rehearing en banc) ("The impact of this delay on religious bodies is not difficult to imagine: The majority's approach will often require deferral of an appellate decision while religious bodies endure discovery, pretrial motion practice, trial practice, and even post-judgment litigation.").

To prevent these harms, this Court should emphasize that the structural limitations the Religion Clauses place on the judicial power do not allow courts to compel discovery into pretext where the church autonomy doctrine has been invoked.

3. Applied here, both doctrines should have cautioned the district court against allowing discovery into "whether [Moody's religious beliefs] actually prompted her firing." *Garrick v. Moody Bible Inst.*, 494 F. Supp. 3d 570, 577 (N.D. Ill. 2020) (*Garrick II*). Indeed, the district court correctly recognized the harms that Moody faced the first time around, when it held that litigation of claims that will "pose too much intrusion into the religious employer's Free Exercise and Establishment Clause rights" are governed by the "overarching principle of religious autonomy" and "require dismissal." *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871 (N.D. Ill. 2019) (*Garrick I*). For that reason, the district court properly dismissed Garrick's breach-of-contract claim with prejudice because reviewing it would "involve impermissible government interference into religious matters." *Id.* at 872. But, rather than maintain that correct course, the district court seemed to disregard its prior concerns once Garrick filed her amended complaint by dropping the

religious discrimination claim even as she renewed her assertion that the religious reasons given for her termination were pretextual. *Garrick II*, 494 F. Supp. 3d at 576–77.

If left uncorrected, the district court's decision will allow plaintiffs to postpone application of the church autonomy doctrine through months or years of costly litigation simply by amending their complaints to claim pretext. During that time, this error will deny religious organizations the structural protections to which they are entitled—allowing plaintiffs to conduct the very discovery and engage in the very inquiries into religious tenets that those doctrines were designed to prevent.

This Court's decision in *Sterlinski v. Catholic Bishop of Chicago*, 934 F.3d 568 (7th Cir. 2019)—the case on which the district court's discussion of pretext turned (*Garrick II*, 494 F. Supp. 3d at 577–78) (discussing *Sterlinski*)—is not to the contrary. There, this Court understood that "the rule of *Hosanna-Tabor*" was recognized "precisely to avoid such judicial entanglement in, and second-guessing of, religious matters." *Sterlinski*, 934 F.3d at 570. As the *Sterlinski* Court recognized, there was no allegation in that case of pretext, *id.* at 571, and *Sterlinski*'s limited discussion of pretext was therefore dicta. But, even putting that

17

wrinkle aside, *Sterlinski*'s recognition that the Religion Clauses prevent entanglement in religion is more than enough to prevent a wide-ranging inquiry into specious claims of pretext. As the *Sterlinski* decision emphasized, the church autonomy doctrine exists precisely to prevent "subjecting religious doctrine to discovery and, if necessary, jury trial." *Id.* at 570. Those goals cannot be served—and are, in fact, disserved—by any understanding of the church autonomy doctrine that allows discovery based on a claim of pretext.

*Amici* thus agree with Moody that, to avoid the entanglement that will necessarily follow if Garrick is allowed to challenge Moody's religious decision, this Court should conclude that it has jurisdiction to review this crucial issue and reverse the decision below.

## II. Religious Schools Will Suffer If Courts Fail to Treat the Church Autonomy Doctrine as a Bar to Suit.

The harms that would flow to religious organizations—and particularly to religious colleges and universities—if the decision below stands would be immediate and widespread.

18

### A.  In the United States, There Are Hundreds of Religious Schools, Colleges, and Universities with Employees Critical to Their Religious Missions.

Religious schools and colleges are everywhere in the United States, and they have been from the nation's founding. Indeed, higher education in this country was built on a tradition of developing faith and intellect together. And that tradition would be seriously compromised if plaintiffs challenging the decision of a religious college were allowed to evade the church autonomy doctrine merely by pleading pretext.

1.  The first U.S. colleges reflected this integrated approach to faith and intellect—an approach that would be seriously threatened by a ruling against Moody here. Harvard University's original mission statement, for example, declared that the "end of [a student's] life and studies" is "to know God and Jesus Christ, which is eternal life[,]"[5] and for centuries, its motto proclaimed *In Christi Gloriam*, a Latin phrase meaning "For the glory of Christ."[6] Harvard was not alone—"[a]most all

---

[5] Roger Schultz, *Christianity and the American University*, Liberty J. (Feb. 26, 2019), https://www.liberty.edu/journal/article/christianity-and-the-american-university/.

[6] Corydon Ireland, *Seal of Approval,* The Harvard Gazette (May 14, 2015), https://news.harvard.edu/gazette/story/2015/05/seal-of-approval/.

Ivy League institutions had similar beginnings" and "shared common commitments to the authority of the Word of God, the Gospel of Jesus Christ, and the need for a Christian influence in society."[7]

To be sure, some schools, including Harvard, have departed from their founding religious ties. But many have not. And many of those schools that have maintained their religious affiliations do what they have always done: strengthen their students' intellectual capacity while also instructing them in their various faith traditions. As the Supreme Court has recognized, the *"raison d'être"* of such religious schools is the "propagation of a religious faith." *Cath. Bishop*, 440 U.S. at 503 (citation omitted); *accord Our Lady of Guadalupe*, 140 S. Ct. at 2055 ("The religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission.").

These schools' religious missions are often integrated with other aspects of learning, such as intellectual and professional preparation. For example, Olivet Nazarene University—one of the many expressly

---

[7] *See* Schultz, note 4 *supra.*

religious schools in the Seventh Circuit, is "a place where the integration of faith and learning is sought" and where "students learn to live in harmony with God and others."[8] Another Seventh Circuit school, Greenville University, provides its students a "transforming Christ-centered education" that "empowers students for lives of character and service."[9]

*Amicus* Wheaton College, in suburban Chicago, is a paradigmatic example of this integration of higher education and religious mission.[10] It promotes "a legacy of faculty, coaches, residence life leaders, chaplains, and staff who exemplify spiritual journeys grounded in the truth and grace of the gospel."[11] Wheaton understands those officials to be "integral" not only to its "Christ-centered liberal arts education," but also to its "evangelical witness."[12] And through their efforts, Wheaton is able

---

[8] Olivet Nazarene Univ., *Lifestyle Covenant*, https://www.olivet.edu/lifestyle-covenant#:~:text=Mission%20Statement&text=The%20mission%20of%20Olivet%20is,harmony%20with%20God%20and%20others.

[9] Greenville Univ., *Who We Are*, https://www.greenville.edu/welcome.

[10] Wheaton's prominently displays this motto on its campus: "For Christ and His Kingdom."

[11] Wheaton Coll., *Spiritual Life*, https://www.wheaton.edu/life-at-wheaton/spiritual-life/.

[12] *Id.*

to "invite the entire Wheaton community into a shared rule of life, creating space for [all] to be formed in [a] love for God, love for the Church, and love for the world."[13] All of these employees are critical to Wheaton's religious mission because, for Wheaton as for most religious communities, a "little yeast works through the whole batch of dough."[14]

Schools with similar missions are located around the country. For example, Brigham Young University's mission "is to assist individuals in their quest for perfection and eternal life[,]"[15] and "the common purpose of all education at BYU" is "to build testimonies of the restored gospel of Jesus Christ."[16] *Amicus* Liberty University "develops Christ-centered men and women with the values, knowledge, and skills essential to impact the world."[17] And *amicus* Biola University's mission is "biblically centered education, scholarship and service—equipping men and women

---

[13] *Id.*

[14] Galatians 5:9 (New International Version).

[15] Brigham Young Univ., *BYU Mission Statement*, https://aims.byu. edu/byu-mission-statement.

[16] Brigham Young Univ., *Aims of a BYU Education*, https://aims.byu. edu/aims-of-a-byu-education.

[17] Liberty Univ., *Educational Philosophy and Mission Statement*, https://www.liberty.edu/about/purpose-and-mission-statement/.

in mind and character to impact the world for the Lord Jesus Christ."[18] Similarly, Zaytuna College strives to create "leaders who are grounded in the Islamic scholarly tradition" by "educat[ing] and prepar[ing] morally committed professional, intellectual, and spiritual leaders."[19] Baylor University seeks to prepare its students "for worldwide leadership and service by integrating academic excellence and Christian commitment within a caring community."[20] And Yeshiva University's educational endeavors are "[r]ooted in Jewish thought and tradition" and are "dedicated to advancing the moral and material betterment of the Jewish community and broader society, in the service of God."[21] Put simply, religious schools, with religious missions, are everywhere.

2.    Often, the inherently religious goals of these schools can be achieved only if they can rely on their employees to further the schools' faith-based missions. As Judge Ho explained in a recent church-autonomy case, for religious institutions, "personnel *is* policy." *McRaney*

---

[18] Biola Univ., *Mission Vision and Values*, https://www.biola.edu/about/mission.

[19] Zaytuna Coll., *Our Mission*, https://zaytuna.edu/#mission.

[20] Baylor Univ., *About Baylor*, https://www.baylor.edu/about/.

[21] Yeshiva Univ., *About Yeshiva College*, https://www.yu.edu/yeshiva-college/about.

*v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 980 F.3d 1066, 1067 (5th Cir. 2020) (Ho, J., dissent from denial of rehearing en banc) (emphasis in original). It requires no stretch of the imagination to see how an employee like Ms. Garrick could harm a religious organization's mission if she were to advocate beliefs contrary to the school's own. *See Garrick II*, 494 F. Supp. 3d at 573 (explaining that, although Moody Bible Institute "subscribes" to one doctrine, Garrick rejected that doctrine).

At religious schools, then, employees can be expected to help express and teach the faith by mentoring students. At most religious schools, employees—regardless of their status—are expected to be guided in these activities by the school's spiritual principles and beliefs. As already noted, at *amicus* Wheaton, the "faculty, coaches, residence life leaders, chaplains, and staff" are all expected to "exemplify spiritual journeys grounded in the truth and grace of the gospel."[22] As a professor at one religious college explained, "even when students come in for help with an assignment, they are being mentored as Christian thinkers."[23]

---

[22] Wheaton Coll., *Spiritual Life*, https://www.wheaton.edu/life-at-wheaton/spiritual-life/.

[23] Alan Noble, *A Professor's Perspective: Why Christian Colleges Emphasize Mentorship*, Creative Studio: Christianity Today

He was correct—faculty members of all stripes play a special role in expressing and teaching what it means to be both a scholar and a member of that school's faith.

Faculty members at religious institutions are also generally expected to help students apply religious principles in their academic and other life decisions. At Biola, for example, the University proclaims that "truth exists, is found in the person of Jesus Christ," and "must be pursued," and thus all Biola faculty are expected to "teach and model this pursuit in order to develop in our students patterns of thought that are rigorous, intellectually coherent and thoroughly biblical."[24] At BYU, each faculty member is charged "to teach every subject with the [Holy] Spirit" and to "keep [the] subject matter bathed in the light and color of the restored gospel," with a shared desire to "seek learning, even by study and also by faith."[25] And Liberty recognizes that "[e]ducation as the process of teaching and learning involves the whole person," and thus "it

---

(Jan. 25, 2018), https://www.christianitytoday.com/partners/higher-education/professors-perspective-mentorship.html.

[24] Biola Univ., *Mission, Vision and Values*, https://www.biola.edu/about/mission.

[25] Brigham Young Univ., *Aims of a BYU Education*, https://aims.byu.edu/aims-of-a-byu-education.

occurs most effectively when both instructor and student are properly related to God and each other through Christ."[26]

Given the direct and critical role that faculty members and other staff at religious colleges play in furthering their religious missions, religious institutions must be able to depend on such personnel to help achieve those missions. Indeed, the Supreme Court has already recognized this interest, emphasizing that religious organizations need "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadelupe*, 140 S. Ct. at 2060.

## B.    Those Religious Schools Are Often the Targets of Litigation Brought by Their Employees.

Many religious schools also face baseless claims brought by their employees. For example, just last year, this Court considered a case brought against a private Catholic school in Indianapolis that declined to renew the contract of a supervisory guidance counselor. *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022). The counselor was responsible, among other things, for conveying

---

[26] Liberty Univ., *Educational Philosophy and Mission Statement*, https://www.liberty.edu/about/purpose-and-mission-statement/.

the Catholic faith to students by leading prayers, teaching "Catholic traditions," "participat[ing] in religious instruction and Catholic formation, including Christian services," and "modeling a Christ-centered life." *Id.* at 937–938. This Court properly affirmed that the claims were barred by the ministerial exception—but only after the school needed to go all the way to an appeal. The harms of that delay were compounded as other plaintiffs too sued the same religious community. While these issues were being decided, a different case against the same archdiocese went to the Indiana Supreme Court. *Payne-Elliott v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 193 N.E.3d 1009, 1011 (Ind. 2022). And just last month, this Court resolved another case against *the same school* brought by a different employee. *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 533–34 (7th Cir. 2023).

Such cases brought by employees against their employers are commonplace and costly. For example, in *Butler* v. *Saint Stanislaus Kostka Catholic Academy*, three years after an ex-employee sued her former employer, a Catholic school, the court held that the school was entitled to summary judgment under the church autonomy doctrine, whether or not the ministerial exception applied. 609 F. Supp. 3d 184,

204 (2022). In another case, a court applied the ministerial exception subset of the church autonomy doctrine to grant summary judgment against claims brought by a former BYU employee who trained missionaries at the Missionary Training Center of The Church of Jesus Christ of Latter-day Saints. *Markowski v. Brigham Young Univ.*, 575 F. Supp. 3d 1377, 1380–83 (D. Utah 2022). And, in *Kirby* v. *Lexington Theological Seminary*, the Kentucky Supreme Court had no problem recognizing that the ministerial exception precluded certain claims brought by a tenured seminary professor who—among other things— "participated in chapel services, convocations, faculty retreats, and other religious events," "preached on numerous occasions," and "read scripture and served at the communion table." 426 S.W.3d 597, 612 (Ky. 2014).

There have been many more cases brought against religious schools where the school eventually prevailed because of the structural protections of the church autonomy doctrine.[27] But this small subset

---

[27] See, *e.g.*, *Grussgott,* 882 F.3d at 662; *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 470 (D.C. Cir. 1996); *Petruska*, 462 F.3d at 312; *Clapper v. Chesapeake Conf. of Seventh-Day Adventists*, 166 F.3d 1208 (4th Cir. 1998) (per curiam and unpublished); *Temple Emanuel of Newton v. Mass. Comm'n Against Discrimination*, 975 N.E.2d 433, 487 (Mass. 2012).

suffices to show that there is no lack of litigants willing to bring non-meritorious claims against their religious-school employers.

**C.    The Resulting Litigation Costs and the Specter of Government Entanglement Not Only Threaten Religious Schools' Financial Viability, But Also Chill the Exercise of Those Schools' Right to Religious Autonomy.**

For many religious schools, the costs of defending against even meritless claims could be too expensive to bear—particularly if they are forced to proceed all the way through discovery and trial.

1.    The cost of defending an employment suit imposes significant burdens on schools. EEOC investigations alone take an average of 10 months.[28] Even a meritless lawsuit can cost $100,000 or more in attorneys' fees, and a case that makes it to trial can cost hundreds of thousands or even millions.[29] If the case is appealed, costs will naturally be even higher.

---

[28] EEOC, *What You Can Expect After You File a Charge*, https://www.eeoc.gov/what-you-can-expect-after-you-file-charge (last visited Jul. 31, 2023).

[29] Michael Orey, *Fear of Firing: How the Threat of Litigation is Making Companies Skittish About Axing Problem Workers*, Bus. Wk. 52, 54 (Apr. 23, 2007).

Faced with the likelihood that they will never recover costs incurred defending against even meritless lawsuits, many religious schools may feel coerced to settle. After all, many small religious schools are struggling to keep their doors open as it is.[30] Few have a sizable endowment—if they have one at all.[31] And those without an endowment may face additional issues with funding, as around 25 percent of all religious congregations in the United States had less than $100,000 in income from all sources in 2017 and 61 percent reported less than $250,000.[32]

For those schools and the congregations that support them, the intangible harms from having to divert to litigation resources that they would otherwise use to fulfill their religious obligations to their students and religious communities would be devastating. If the church autonomy doctrine allows an employee to needlessly prolong a case by claiming

---

[30] *See* Bobby Ross, Jr., *Closing Doors: Small Religious Colleges Struggle for Survival*, Religion N. Serv. (Nov. 20, 2017), https://religion news.com/2017/11/20/closing-doors-small-religious-colleges-struggle-for-survival/.

[31] *Ibid.*

[32] *See* David P. King et al., *Nat'l Study of Congregations' Econ. Practices*, Lake Inst. on Faith & Giving, 11 (2017).

pretext, then such schools will have to face the expensive process of gathering documents, producing affidavits, attending depositions, testifying in court, and the like.[33] Given those pecuniary costs—and the First Amendment harms stemming from the fact that discovery and depositions in these cases can bring deeply religious activities and decisions "under invasive examination," *Demkovich*, 3 F.4th at 983— religious schools will be unfairly pressured to settle. In just one such recent case, Gordon College settled a suit brought by a professor who advocated against the school's religious policies regarding sexuality after the Massachusetts Supreme Court refused to apply the church autonomy doctrine.[34] Such court-imposed pressure to violate one's religious beliefs is itself a substantial burden on religion. *See, e.g., Thomas*, 450 U.S. at 716.

2.     Still other schools will have their religious rights directly chilled by the decision below. Again, the qualified-immunity analogy is

---

[33] *See generally* Philip J. Moss, *The Cost of Employment Discrimination Claims*, 28 Me. Bar J. 24 (2013).

[34] Daniel Silliman, *Gordon College Settles with Professor It Said Was a Minister*, Christianity Today (Dec. 16, 2022), https://www.christianity today.com/news/2022/march/scotus-ministerial-exception-college-gordon-deweese-boyd.html.

apt. The Supreme Court has explained that one reason that doctrine offers immunity to government officials is to prevent the "fear of personal monetary liability and harassing litigation" from "unduly inhibit[ing] officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

Similarly, affirmance of the decision below would inhibit religious organizations in this Circuit from performing their duties and fulfilling their missions. For example, religious organizations that otherwise would not voluntarily produce information about their internal religious deliberations about an employee would be pressured not to have those deliberations at all. Such a decision could even result in a religious school's allowing a nonbelieving teacher or other employee to continue rejecting the school's religious tenets or flouting the school's religious standards, simply to avoid litigation. *See, e.g.*, *Rayburn*, 772 F.2d at 1171 ("There is the danger that churches, wary of EEOC or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members."); *accord Cath. Univ. of Am.*, 83 F.3d at 467

(acknowledging that the "prospect of future investigations and litigation would inevitably affect to some degree the criteria by which future vacancies in the ecclesiastical faculties would be filled"). And it is only "early in litigation" that courts can avoid the "excessive entanglement in church matters" that produces that chilling effect. *Bryce*, 289 F.3d at 654 n.1. Postponing application of the church autonomy doctrine and allowing the case to proceed to trial thus "defeats the purpose" of the doctrine. *Konchar v. Pins*, 989 N.W.2d 150, 166 (Iowa 2023) (Waterman, J., concurring).

The facts here provide ample reason to fear this outcome. As Moody explains (at 7), Ms. Garrick actively and openly rejected its teachings about the propriety of women holding the position of pastor. If Moody had known that its religious discussions would be open to judicial scrutiny, it may not have ever engaged in the discussions necessary to ensure fidelity to those beliefs—the discussions that ultimately led to Ms. Garrick's termination. And, if Moody had been pressured not to take those steps, its religious mission would have been impaired by an employee publicly second-guessing Moody's spiritual beliefs in front of the very students that Moody seeks to instruct in the faith.

Properly understood, the church autonomy doctrine prevents these harms. As Justice Brennan once wrote, the very "prospect of government intrusion raises concern that a religious organization may be chilled in its free exercise activity." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 343 (1987) (Brennan, J., concurring in judgment). Indeed, one of the main justifications for recognizing the protections guaranteed by the Religion Clauses is to prevent the "coercive effect" of litigation from producing "the very opposite of that separation of church and State contemplated by the First Amendment." *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972). The church autonomy doctrine—like the ministerial exception— should thus be understood to prevent any government action that would chill any religious exercise or that would pressure religious organizations to act contrary to their deeply held beliefs—including in cases in which a plaintiff claims pretext.

## CONCLUSION

The district court erred by allowing plaintiff's claim to survive a motion to dismiss. That decision denies Moody's its ability to timely exercise its constitutional rights.  If not corrected, that precedent will

harm not only Moody, but all religious schools in the Seventh Circuit. This Court should find that it has jurisdiction over this appeal and reverse the decision below.

Dated: August 7, 2023                    Respectfully submitted,

                                         */s/ Gene C. Schaerr*
                                         Gene C. Schaerr
                                         Annika Boone Barkdull
                                         SCHAERR | JAFFE LLP
                                         1717 K Street NW, Suite 900
                                         Washington, DC 20006
                                         Telephone: (202) 787-1060
                                         gschaerr@schaerr-jaffe.com

                                         *Counsel for Amici Curiae*

# APPENDIX

## TABLE OF CONTENTS

Statements of Interest.............................................................2a

## STATEMENTS OF INTEREST

***Biola University*** (Biola), located in Southern California, is a fully accredited national University carrying on a tradition of educational excellence that dates back over 100 years. Biola's mission is to provide biblically centered education, scholarship, and service—equipping men and women in mind and character to influence the world for the Lord Jesus Christ. Biola's commitment to academic excellence is firmly rooted in its adherence to an in-depth, knowledgeable, and living Christian faith. Each year, over 5,300 students find Biola's unique blend of faith and learning conducive to their academic and vocational goals.

***Liberty University*** (Liberty) is a distinctively Christian institution of higher education in Lynchburg, Virginia. Liberty maintains the vision of its founder, Dr. Jerry Falwell, by developing Christ-centered men and women with the values, knowledge, and skills essential for impacting tomorrow's world. With its residential and online programs offering more than 600 programs that enroll more than 100,000, Liberty is one of the nation's largest private, nonprofit universities.

***Wheaton College*** is a Christian, academically rigorous, fully residential liberal arts college and graduate school located in Wheaton, Illinois. Established in 1860, Wheaton's educational mission is to build the church and benefit society worldwide through excellence in whole-person education. Wheaton seeks to relate Christian liberal arts education to the needs of contemporary society—to combine faith and learning to produce a biblical perspective needed to relate Christian experience to the demands of those needs. To live out that whole-person education, Wheaton asks all students and employees to both profess a personal faith in Jesus Christ and agree to be bound by the moral standards expressed in its Community Covenant, which sets forth how community members are expected to live out our collective Christian commitments.

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1) and Circuit Rule 32, I certify that this brief:

(i) complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 29 and the Clerk's instructions because it contains 6520 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f), as determined by the word counting feature of Microsoft Office; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32 because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 12 points or larger.

Dated: August 7, 2023

*/s/ Gene C. Schaerr*
Gene C. Schaerr

I

## CERTIFICATE OF SERVICE

I certify that on August 7, 2023, the foregoing Brief of *Amici Curiae* was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

Dated: August 7, 2023

*/s/ Gene C. Schaerr*
Gene C. Schaerr