No. 21-2683

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

JANAY E. GARRICK,

*Plaintiff-Appellee,*

v.

MOODY BIBLE INSTITUTE,

*Defendant-Appellant.*

_____

On Interlocutory Appeal from the
United States District Court for the Northern District of Illinois
Case No. 1:18-cv-573 Hon. John Lee

**BRIEF OF APPELLEE JANAY GARRICK**

JAMIE S. FRANKLIN
Civil Litigation Clinic of the
    Chicago-Kent College of Law
565 W. Adams St.,
Suite 600
Chicago, IL 60661
(312) 906-5048

BRADLEY GIRARD
GABRIELA HYBEL
Americans United for Separation of
    Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-3234
girard@au.org

*Counsel for Appellee*

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __21-2683__

Short Caption: __Garrick v. Moody Bible Inst.__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

__Janay E. Garrick__

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

__Americans United for Separation of Church and State; Civil Litigation Clinic of the Chicago-Kent College of Law__

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

__n/a__

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

__n/a__

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

__n/a__

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

__n/a__

Attorney's Signature: __/s/ Bradley Girard__      Date: __9/1/2023__

Attorney's Printed Name: __Bradley Girard__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑   No ☐

Address: __1310 L Street NW, Suite 200__

__Washington, DC 20005__

Phone Number: __(202) 466-3234__      Fax Number: __(202) 466-3353__

E-Mail Address: __girard@au.org__

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-2683

Short Caption: Garrick v. Moody Bible Inst.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Janay E. Garrick

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Americans United for Separation of Church and State; Civil Litigation Clinic of the Chicago-Kent College of Law

(3)      If the party, amicus or intervenor is a corporation:

    i)        Identify all its parent corporations, if any; and

            n/a

    ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            n/a

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: /s/ Gabriela Hybel                 Date: 9/1/2023

Attorney's Printed Name:  Gabriela Hybel

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [ ]   No [✓]

Address:  1310 L Street NW, Suite 200

        Washington, DC 20005

Phone Number:  (202) 466-3234                 Fax Number:  (202) 466-3353

E-Mail Address:  hybel@au.org

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2683

Short Caption: Garrick v. Moody Bible Inst.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Janay E. Garrick

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Americans United for Separation of Church and State; Civil Litigation Clinic of the Chicago-Kent College of Law

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Jamie S. Franklin    Date: 9/1/2023

Attorney's Printed Name: Jamie S. Franklin

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: 565 W. Adams, Suite 600

Chicago, IL 60661

Phone Number: (312) 906-5048    Fax Number: (773) 696-1478

E-Mail Address: jfranklin5@kentlaw.iit.edu

rev. 12/19 AK

**STATEMENT CONCERNING ORAL ARGUMENT**

Moody did not meet its burden to show why this Court should expand the collateral-order doctrine when it has already rejected the same requests. *See Herx v. Diocese of Fort Wayne-S. Bend, Inc.*, 772 F.3d 1085 (7th Cir. 2014). So we do not believe that oral argument is necessary to decide that this Court cannot hear the case. *See* Fed. R. App. P. 34(a)(2)(B). If, however, the Court finds that oral argument would be helpful in addressing the issues, counsel will, of course, be prepared to present argument on Garrick's behalf.

# TABLE OF CONTENTS

**Page(s)**

Circuit Rule 26.1 Disclosure Statements.................................................. i

Statement Concerning Oral Argument.................................................. iv

Table of Authorities .................................................................... vii

Introduction .............................................................................. 1

Jurisdictional Statement ................................................................ 3

Issues Presented ........................................................................ 3

Statement of the Case .................................................................. 4

    A.  Legal Background ................................................................ 4

        1.  The historical and textual grounding of the final-judgment rule............ 4

        2.  *Cohen* gives the word final a "practical" definition. .................................. 4

        3.  Congress intervenes and the Supreme Court corrects course. ................. 5

    B.  Factual Background.............................................................. 7

    C.  Procedural Background ......................................................... 13

Summary of Argument .................................................................. 17

Standard of Review ..................................................................... 19

Argument ............................................................................... 19

I.  This Court does not have appellate jurisdiction. .................................. 19

    A.  Appellate review would dramatically expand the collateral-order doctrine, contrary to the Supreme Court's directive. ................................. 20

    B.  The church-autonomy doctrine does not satisfy the requirements for a collateral order. ................................................................ 27

        1.  The church-autonomy doctrine can be addressed on appeal from a final judgment. ................................................................ 27

        2.  The church-autonomy defense was not conclusively determined........... 35

        3.  The church-autonomy doctrine, as a class of orders, is not separate from the merits................................................................ 36

    C.  There is no jurisdiction over the Title VII argument. .................................. 38

II.  Moody is wrong on the merits.......................................................... 39

    A.  The district court correctly held that the case can proceed without implicating the church-autonomy doctrine.................................................... 40

    B.  The district court correctly denied Moody's Section 702 defense. ............... 47

**TABLE OF CONTENTS—continued**

**Page(s)**

C.  Adopting Moody's Section 702 interpretation would not change the outcome here. ................................................................. 50

Conclusion ........................................................................................... 51

Certificate of Compliance ..................................................................

Statutory Addendum ...........................................................................

Certificate of Service ..........................................................................

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abelesz v. OTP Bank,*
   692 F.3d 638 (7th Cir. 2012) .................................................................... 21, 22, 37

*Abney v. United States,*
   431 U.S. 651 (1977) ........................................................................................ 35, 38

*Acoustic Sys., Inc. v. Wenger Corp.,*
   207 F.3d 287 (5th Cir. 2000) ................................................................................ 31

*Alvarado v. Litscher,*
   267 F.3d 648 (7th Cir. 2001) ................................................................................ 39

*Arazie v. Mullane,*
   2 F.3d 1456 (7th Cir. 1993) ................................................................................. 39

*Belya v. Kapral,*
   45 F.4th 621 (2d Cir. 2022),
   *cert. denied,* 143 S.Ct. 2609 (2023) ....................................25, 26, 30, 31, 35, 36, 40

*Bostock v. Clayton Cnty.,*
   140 S.Ct. 1731 (2020) .......................................................................................... 47

*Boyd v. Harding Acad. of Memphis, Inc.,*
   88 F.3d 410 (6th Cir. 1996) ................................................................................. 49

*Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.,*
   796 N.E.2d 286 (Ind. 2003) ................................................................................ 44

*Bryce v. Episcopal Church,*
   289 F.3d 648 (10th Cir. 2002) ....................................................... 28, 36, 40, 44, 45

*Burlington N. & Santa Fe Ry. Co. v. Vaughn,*
   509 F.3d 1085 (9th Cir. 2007) .............................................................................. 28

*Calderon-Ramirez v. McCament,*
   877 F.3d 272 (7th Cir. 2017) ........................................................................... 19, 39

*Castro v. DeVry Univ. Inc.,*
   786 F.3d 559 (7th Cir. 2015) ............................................................................... 50

*Cath. Bishop of Chi. v. NLRB,*
   559 F.2d 1112 (7th Cir. 1977) ............................................................................. 45

*Catlin v. United States,*
   324 U.S. 229 (1945) ............................................................................................... 4

*Cherry v. Univ. of Wis. Sys. Bd. of Regents,*
   265 F.3d 541 (7th Cir. 2001) ............................................................................... 19

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Cline v. Cath. Diocese of Toledo,*
206 F.3d 651 (6th Cir. 2000) .................................................. 49

*Cohen v. Beneficial Indus. Loan Corp.,*
337 U.S. 541 (1949) ............................................................. 5, 19

*Coleman v. Donahoe,*
667 F.3d 835 (7th Cir. 2012) ............................................. 37, 39

*Coopers & Lybrand v. Livesay,*
437 U.S. 463 (1978) ........................................................... 20, 36

*Curay-Cramer v. Ursuline Acad. of Wilmington,*
450 F.3d 130 (3d Cir. 2006) ............................................... 49, 50

*Curtiss-Wright Corp. v. Gen. Elec. Co.,*
446 U.S. 1 (1980) .......................................................... 4, 21, 22

*Dalton v. Teva N. Am.,*
891 F.3d 687 (7th Cir. 2018) .................................................. 38

*Delgado v. Jones,*
282 F.3d 511 (7th Cir. 2002) .................................................. 34

*DeMarco v. Holy Cross High Sch.,*
4 F.3d 166 (2d Cir. 1993) ....................................................... 49

*Demkovich v. St. Andrew the Apostle Par.,*
3 F.4th 968 (7th Cir. 2021) (en banc) .......................... 21, 33, 46

*Digit. Equip. Corp. v. Desktop Direct, Inc.,*
511 U.S. 863 (1994) ................................................ 5, 19, 20, 21

*EEOC v. Pac. Press Publ'g Ass'n,*
676 F.2d 1272 (9th Cir. 1982) ................................................ 49

*Ernst v. Carrigan,*
814 F.3d 116 (2d Cir. 2016) ................................................... 35

*Firestone Tire & Rubber Co. v. Risjord,*
449 U.S. 368 (1981) ....................................................... 4, 22, 37

*Fitzgerald v. Roncalli High Sch. Inc.,*
73 F.4th 529 (7th Cir. 2023) .............................................. 48, 50

*Forgay v. Conrad,*
47 U.S. 201 (1848) ................................................................... 4

*Gordon Coll. v. DeWeese-Boyd,*
142 S.Ct. 952 (2022) .............................................................. 33

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
485 U.S. 271 (1988) .................................................................. 6, 35, 39

*Haines v. Kerner*,
404 U.S. 519 (1972) (per curiam) .......................................... 39

*Harmon v. Dreher*,
17 S.C. Eq. (Speers Eq.) 87 (S.C. Ct. App. Eq. 1843) ........... 30

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ................................................................. 28

*Herx v. Diocese of Fort Wayne-S. Bend, Inc.*,
772 F.3d 1085 (7th Cir. 2014) ...................iv, 2, 20, 23, 24, 28, 32, 38, 39

*Hinshaw v. Smith*,
436 F.3d 997 (8th Cir. 2006) ................................................. 31

*Holt-Orsted v. City of Dickson*,
641 F.3d 230 (6th Cir. 2011) ............................................... 22, 23

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ................................................................. 46

*Jenkins v. Prime Ins. Co.*,
32 F.4th 1343 (11th Cir. 2022) .............................................. 22

*Johnson v. Fankell*,
520 U.S. 911 (1997) ................................................................. 33

*Jones v. Wolf*,
443 U.S. 595 (1979) ................................................................. 28

*JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*,
707 F.3d 853 (7th Cir. 2013) ................................................. 27

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
344 U.S. 94 (1952) ................................................................... 40

*Kell v. Benzon*,
925 F.3d 448 (10th Cir. 2019) ............................................... 22

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014) .............................................. 22

*Kennedy v. Bremerton Sch. Dist.*,
142 S.Ct. 2407 (2022) ............................................................. 32

*Kennedy v. St. Joseph's Ministries, Inc.*,
657 F.3d 189 (4th Cir. 2011) ................................................. 49

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ................................................................ 32

*Leonard v. Martin,*
    38 F.4th 481 (5th Cir. 2022) ................................................................ 25

*Living Faith, Inc. v. Commissioner,*
    950 F.2d 365 (7th Cir. 1991) ................................................................ 41

*Malinowski v. DeLuca,*
    177 F.3d 623 (7th Cir. 1999) ................................................................ 34

*McCarthy v. Fuller,*
    714 F.3d 971 (7th Cir. 2013) ............................................. 25, 28, 30, 40

*McClendon v. City of Albuquerque,*
    630 F.3d 1288 (10th Cir. 2011) ...................................................... 20, 22

*McClure v. Salvation Army,*
    460 F.2d 553 (5th Cir. 1972) ................................................................ 49

*McLish v. Roff,*
    141 U.S. 661 (1891) ................................................................................ 4

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention,*
    966 F.3d 346 (5th Cir. 2020),
    *cert. denied,* 141 S.Ct. 2852 (2021) ............................... 34, 35, 36, 40, 41

*Microsoft Corp. v. Baker,*
    582 U.S. 23 (2017) .......................................................................... 19, 20

*Midland Asphalt Corp. v. United States,*
    489 U.S. 794 (1989) ................................................................... 27, 28, 29

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) .............................................................................. 28

*Mohawk Indus., Inc. v. Carpenter,*
    558 U.S. 100 (2009) .............................2, 4, 6, 20, 21, 22, 24, 26, 27

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983) ................................................................................. 35

*In re Motor Fuel Temperature Sales Pracs. Litig.,*
    641 F.3d 470 (10th Cir. 2011) .............................................................. 23

*NAACP v. Alabama,*
    357 U.S. 449 (1958) .............................................................................. 31

# TABLE OF AUTHORITIES—continued

**Page(s)**

*N.Y. Times Co. v. Sullivan,*
　376 U.S. 254 (1964) ................................ 31

*NLRB v. Cath. Bishop of Chi.,*
　440 U.S. 490 (1979) ................................ 45

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.,*
　711 F.3d 1136 (9th Cir. 2013) ................ 31

*Ohio Civ. Rts. Comm'n v. Dayton Christian Schs.,*
　477 U.S. 619 (1986) ............................ 30, 31

*Osborn v. Haley,*
　549 U.S. 225 (2007) .................................. 7

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
　140 S.Ct. 2049 (2020) ......................... 45, 46

*P.H. Glatfelter Co. v. Windward Prospects Ltd.,*
　847 F.3d 452 (7th Cir. 2017) ................ 37

*Payne-Elliott v. Roman Cath. Archdiocese of Indianapolis, Inc.,*
　193 N.E.3d 1009 (Ind. 2022) ................ 45

*Perry v. Schwarzenegger,*
　591 F.3d 1147 (9th Cir. 2010) ................ 23

*Pullman Const. Indus., Inc. v. United States,*
　23 F.3d 1166 (7th Cir. 1994) ................ 29

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
　772 F.2d 1164 (4th Cir. 1985) ................ 40

*Ritzen Grp., Inc. v. Jackson Masonry, LLC,*
　140 S.Ct. 582 (2020) .............................. 19

*Rosner v. United States,*
　958 F.3d 163 (2d Cir. 2020) .................... 22

*Sanders v. Casa View Baptist Church,*
　134 F.3d 331 (5th Cir. 1998) ................ 40

*Segni v. Com. Off. of Spain,*
　816 F.2d 344 (7th Cir. 1987) ................ 32

*Sell v. United States,*
　539 U.S. 166 (2003) .................................. 7

*Serbian E. Orthodox Diocese v. Milivojevich,*
　426 U.S. 696 (1976) ................................ 30

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Seshadri v. Kasraian*,
　130 F.3d 798 (7th Cir. 1997) .................................................. 41

*Shoop v. Twyford*,
　142 S.Ct. 2037 (2022) ........................................................ 6, 7

*SmileDirectClub v. Battle*,
　4 F.4th 1274 (11th Cir. 2021) (en banc) ............................... 22

*Smith v. Finkley*,
　10 F.4th 725 (7th Cir. 2021) ................................................ 34

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
　No. 20-3265, 2021 WL 9181051 (7th Cir. July 22, 2021) ...................................................... 33

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
　41 F.4th 931 (7th Cir. 2022) ................................................. 48

*Sterlinski v. Cath. Bishop of Chi.*,
　934 F.3d 568 (7th Cir. 2019) ........................................... 42, 50

*Swint v. Chambers Cnty. Comm'n*,
　514 U.S. 35 (1995) ..................................................... 4, 6, 27

*Tony & Susan Alamo Found. v. Sec'y of Lab.*,
　471 U.S. 290 (1985) ....................................................... 40, 41

*Tucker v. Faith Bible Chapel International*,
　36 F.4th 1021 (10th Cir. 2022),
　*cert. denied,* 143 S.Ct. 2608 (2023) ..................................... 26

*United States v. Acad. Mortg. Corp.*,
　968 F.3d 996 (9th Cir. 2020) ............................................... 22

*United States v. Emakoji*,
　990 F.3d 885 (5th Cir. 2021) ............................................... 22

*United States v. Gorski*,
　807 F.3d 451 (1st Cir. 2015) ................................................ 22

*United States v. MacDonald*,
　435 U.S. 850 (1978) ....................................................... 27, 28

*United States v. Wampler*,
　624 F.3d 1330 (10th Cir. 2010) ............................................ 38

*Van Cauwenberghe v. Biard*,
　486 U.S. 517 (1988) ............................................................ 5

## TABLE OF AUTHORITIES—continued

Page(s)

*Watson v. Jones,*
  80 U.S. 679 (1871) ............................................................... 28, 30, 36, 40

*Whole Woman's Health v. Smith,*
  896 F.3d 362 (5th Cir. 2018) ............................................................ 25

*Widmar v. Sun Chem. Corp.,*
  772 F.3d 457 (7th Cir. 2014) ............................................................ 35

*Will v. Hallock,*
  546 U.S. 345 (2006) ............................................................. 20, 23, 37, 38

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. art. I, § 6, cl. 1 ...................................................... 29

U.S. Const. amend. I ............................................................. 29

U.S. Const. amend. V ............................................................ 29

U.S. Const. amend. XI ........................................................... 29

1 Stat. 73 § 22 (1789) ............................................................. 4

20 U.S.C. § 1681 ............................................................... 46, 47

22 U.S.C. § 254d .............................................................. 29

28 U.S.C. § 1291 ............................................................ 3, 4, 17, 19

28 U.S.C. § 1292 ........................................................... 6, 17, 21, 26

28 U.S.C. § 1604 .............................................................. 29

28 U.S.C. § 1651 .............................................................. 21

28 U.S.C. § 2072 ............................................................... 6

42 U.S.C. § 1983 .............................................................. 33

42 U.S.C. § 2000e ............................................................. 48

42 U.S.C. § 2000e-1 ..................................................... 18, 38, 39, 47

42 U.S.C. § 2000e-2 ........................................................... 47

42 U.S.C. § 3607 .............................................................. 47

7th Cir. R. 28(a)(3)(ii) ......................................................... 38

## TABLE OF AUTHORITIES—continued

**Page(s)**

Fed. R. App. P. 34(a)(2)(B) ........................................................... iv

Fed. R. Civ. P. 23(f) ...................................................................... 21

Fed. R. Civ. P. 54(b) ..................................................................... 21

**Other Authorities**

H.R. Rep. No. 101-734 (1990) ......................................................... 6

S. Rep. No. 102-342 (1992) ............................................................ 6

Sarah Barringer Gordon, *The First Disestablishment: Limits on
Church Power and Property Before the Civil War*,
162 U. Pa. L. Rev. 307 (2014) ................................................. 29, 30

Andrew Oldham, *Official Immunity at the Founding*
(manuscript available at https://ssrn.com/abstract=3824983) ............. 34

Adam N. Steinman, *Reinventing Appellate Jurisdiction*,
48 B.C. L. Rev. 1237 (2007) .......................................................... 5

## INTRODUCTION

This Court lacks jurisdiction over this appeal.

Janay Garrick was a teacher in the communications department at Moody Bible Institute, where she suffered persistent sex discrimination. But when she went to her supervisor for help, Moody piled on, eventually trying to force Garrick out. At first, Moody gave inconsistent, confusing, and contradictory reasons for its retaliation. But finally it settled on one: When she was hired three years prior, Garrick explicitly stated that—like several other employees—she maintained some personal religious beliefs that differed from Moody's. Citing the difference in beliefs, Moody fired her.

As a pro se litigant, Garrick used her complaint to chronicle three years of harassment, mistreatment, and bullying. She also listed every reason Moody gave to justify its actions. Read all together, Garrick's complaint showed straightforward sex discrimination, religiously based mistreatment, and allegations that the religious explanation for her firing was pretextual.

The district court did exactly what it was supposed to do: It parsed Garrick's complaint at the motion-to-dismiss stage and dismissed any claim addressing religious disputes. With those allegations out of the picture, the court held that Garrick's claims of sex-based discrimination and retaliation could proceed without implicating religious issues. Likewise, the district court correctly held that on the face of the complaint, Title VII's religious exemption did not apply. The district court assured Moody that it would not resolve any religious disputes, should they arise. That ruling was the beginning of this litigation, not the end. Moody appealed anyway.

Courts of appeals generally have jurisdiction to review only final decisions of district courts—those that end a case on the merits. And the denial of a motion to dismiss is in no way a final decision. To be sure, the Supreme Court has created a limited exception to that finality rule—the collateral-order doctrine—which makes classes of nonfinal decisions immediately appealable. But in recent years, the Supreme Court has "criticized" the "judicial policy" of the collateral-order doctrine. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 115 (2009) (Thomas, J., concurring in part and concurring in judgment). So the Court has warned courts of appeals time and again against creating new categories of immediately appealable orders.

This Court has already heeded the Supreme Court's directive and refused to expand the collateral-order doctrine to the two categories of orders that Moody now seeks to appeal. *See Herx v. Diocese of Fort Wayne-S. Bend, Inc.*, 772 F.3d 1085 (7th Cir. 2014). Like the plaintiff in *Herx*, Garrick challenges sex discrimination she suffered at the hands of her employer. Like the defendant in *Herx*, Moody argues that the church-autonomy doctrine and Title VII's religious exemption bar her claims. As in *Herx*, the district court declined the employer's request and allowed litigation to proceed. And now, like in *Herx*, Moody asks this Court to use the narrow collateral-order doctrine to make denials of both its defenses immediately appealable as of right. Just as in *Herx*, that request should be denied.

Even if *Herx* did not preclude appellate review here, Moody fails to meet any of the criteria for interlocutory review of the church-autonomy ruling. And worse yet, it doesn't even attempt to show that Title VII's religious exemption satisfies the

collateral-order doctrine. The appeal should be dismissed. And Garrick should have the chance to prove her secular claims.

## JURISDICTIONAL STATEMENT

As explained in Part I, this Court lacks appellate jurisdiction. The district court's denial of the motion to dismiss on church-autonomy and Title VII grounds is not an appealable collateral order under 28 U.S.C. § 1291.

## ISSUES PRESENTED

**I.** The dispositive question is whether this Court can or should create two new categories of interlocutory appeals despite binding Circuit precedent already foreclosing them.

**II.** If this Court did somehow have jurisdiction, the questions would be whether the district court (1) erred in concluding that the Complaint on its face did not raise church-autonomy problems; (2) erred in concluding that Section 702 of Title VII does not grant a religious employer the right to discriminate on the basis of sex; and (3) erred in concluding that, even if Section 702 does permit sex discrimination, district courts can determine whether an employer's religious justification is pretextual.

## STATEMENT OF THE CASE

### A.  Legal Background

#### 1.  The historical and textual grounding of the final-judgment rule

"From the very foundation of our judicial system," beginning with the Judiciary Act of 1789, Congress has limited appellate jurisdiction to review of only final judgments. *McLish v. Roff*, 141 U.S. 661, 665-66 (1891); *see* 1 Stat. 73 § 22 (1789). Final judgments are those "by which a district court disassociates itself from a case," *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995), ending the litigation on the merits and leaving "nothing for the court to do but execute the judgment," *Catlin v. United States*, 324 U.S. 229, 233 (1945).

This "historic federal policy against piecemeal appeals" preserves judicial and party resources and ensures the orderly, efficient administration of justice. *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980). It "save[s] the expense and delays of repeated appeals in the same suit" by having "the whole case and every matter in controversy in it decided in a single appeal." *McLish*, 141 U.S. at 665-66 (citing *Forgay v. Conrad*, 47 U.S. 201, 205 (1848)). And it respects district court judges, "who play a 'special role' in managing ongoing litigation." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981)).

#### 2.  *Cohen* gives the word final a "practical" definition.

The Judiciary Act's successor, Section 1291, limits the jurisdiction of the courts of appeals to "final decisions." 28 U.S.C. § 1291.

4

In 1949, the Supreme Court gave Section 1291's finality requirement a "practical rather than a technical construction." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). As a result, a certain "small class" of nonfinal orders were deemed final under Section 1291 and could be appealed immediately. *Id.*

If a category of orders is appealable under *Cohen*, every order in that category is immediately appealable, regardless of a given order's strengths or the record's completeness. *See Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). In other words, *Cohen* does not allow case-by-case analysis; the Court looks to the "entire category to which a claim belongs, without regard to the chance that the litigation at hand might be speeded, or a 'particular injustice' averted." *Id.* (quoting *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988)) (cleaned up).

The system of interlocutory appeals "has been subject to much criticism: 'hopelessly complicated,' 'legal gymnastics,' 'dazzling in its complexity,' 'unconscionable intricacy' with 'overlapping exceptions, each less lucid than the next,' 'an unacceptable morass,' 'dizzying,' 'tortured,' 'a jurisprudence of unbelievable impenetrability,' 'helter-skelter,' 'a crazy quilt,' 'a near-chaotic state of affairs,' [and] a 'Serbonian Bog.'"[1]

### 3. Congress intervenes and the Supreme Court corrects course.

In 1988, after years of patchwork collateral-order decisions, Justice Scalia diagnosed that "our finality jurisprudence is sorely in need of further limiting

---

[1] Adam N. Steinman, *Reinventing Appellate Jurisdiction*, 48 B.C. L. Rev. 1237, 1238-39 (2007) (collecting sources) (cleaned up).

principles." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 292 (1988) (Scalia, J., concurring).

Congress responded by amending the Rules Enabling Act to empower the Supreme Court to issue rules defining which orders should be considered final and appealable under Section 1291. *See* 28 U.S.C. § 2072(c) (1990). In doing so, Congress sought to address the "continuing spate of procedural litigation" that had resulted from the "[c]onsiderable uncertainty" wrought by the Court's previous decisions. H.R. Rep. No. 101-734, at 18 (1990). And two years later, Congress again addressed the ways that the collateral-order doctrine had "blur[red] the edges of the finality principle, requir[ing] repeated attention from the Supreme Court." S. Rep. No. 102-342, at 24 (1992). It gave the Court power to specify through rulemaking which categories of nonfinal, interlocutory orders should be immediately appealable under Section 1292. *See* 28 U.S.C. § 1292(e) (1992).

Put plainly, Congress determined that any exceptions to the finality rule are to be established through the rulemaking process, not by common-law reasoning. *Swint*, 514 U.S. at 48. Rulemaking "draws on the collective experience of bench and bar, and it facilitates the adoption of measured, practical solutions." *Mohawk*, 558 U.S. at 114 (citation omitted).

Since insisting that Congress's determination of jurisdictional rules "warrants the Judiciary's full respect," *Swint*, 514 U.S. at 48, the Supreme Court has been extraordinarily hesitant to expand *Cohen*. In the last 30 years, it has done so only three times—and each case involved the government. *See Shoop v. Twyford*, 142 S.Ct.

2037, 2043 n.1 (2022); *Osborn v. Haley*, 549 U.S. 225, 238 (2007); *Sell v. United States*, 539 U.S. 166, 176 (2003).

## B.  Factual Background

**1.** Moody Bible Institute is a religious college in Chicago. A.091 ¶¶ 1-2. It offers undergraduate and graduate courses in religious and secular subjects. A.091 ¶ 1, A.093 ¶ 19, A.100 ¶ 40. Moody adheres to a "complementarian" position that excludes women from most religious-leadership positions. A.112 ¶ 96.

Moody hired Janay Garrick in 2014 as an Instructor in the Communications program, where she designed and taught courses on secular topics including the role of words as core communicative tools and grant-writing for NGOs. A.092 ¶ 5, A.093 ¶ 19, A.97 ¶ 33, A.107 ¶ 79(a). She remained in that role until 2017, when she was fired. A.092 ¶ 5, A110 ¶ 86.

Garrick disclosed during the interview process that she is an "egalitarian Christian": She believes in gender equality in the ministry. A.093 ¶ 20. Moody hired her with full knowledge of her beliefs (and twice renewed her contract). A.093 ¶ 20. It simply asked that she sign its doctrinal statement—which it requires of all employees—affirming that she "agree[d] with" the school's complementarian and other religious views. A.065. Moody also asked that Garrick remove from her resume a reference to being an ordained minister. A.094 ¶ 23.

**2.** Moody now paints this case as involving only religious disagreements, but Garrick alleges sex discrimination outside any doctrinal disputes. From the start of her employment, Moody subjected Garrick to unequal treatment compared to her male colleagues. For example, Moody denied Garrick's request for a reduced teaching

load while she completed a terminal degree in her field. A.096-97 ¶ 32. Meanwhile, it reduced the teaching load for male faculty members completing similar terminal degrees. A.096-97 ¶ 32. And while Moody required that Garrick develop five new undergraduate courses—involving work well beyond the scope of her title—recently hired male instructors received no similar demands. A.097 ¶ 33.

Moody also tolerated male employees' demeaning and hostile behavior toward Garrick and other women. Male colleagues often infantilized her: One complained to her that women frequently needed to be "walked through" how to complete required onboarding documents. A.097 ¶ 35(b). One professor asked what she was wearing, commenting that she looked like a student. A.097 ¶ 35(c). And male colleagues regularly ignored Garrick when she spoke to them, went silent or left the room abruptly when she entered, and openly ridiculed her. A.095 ¶ 28, A.097 ¶ 35(a), A.105 ¶ 69(b). These episodes followed a pattern—women on Moody's campus suffered rampant sex-based discrimination, including humiliation, harassment, and assault. A.098-99 ¶¶ 36, 38(a). Moody knew of the problem but failed to respond. A.098-99 ¶¶ 36, 38(a).

In late 2015 and early 2016, two female students sought Garrick's help after Moody refused them entry to its Pastoral Ministry program because of their sex. A.100 ¶¶ 40-41. Believing the categorical exclusion of women from the program to violate Title IX, Garrick helped one of the students file a Title IX complaint. A.100 ¶¶ 43-44. In response, Moody didn't explain that its beliefs demanded the program be open to men only. Instead it insisted that the program was *already* open to women. A.101-02 ¶¶ 50-51. But having previously confirmed that the program was, in fact,

open only to men, A.100-01 ¶¶ 42, 50, Garrick assisted the student in appealing the decision. A.102 ¶ 52. Moody later opened its Pastoral Ministry program to female students. A.102 ¶ 54.

**3.** Beginning in 2015, Garrick and several male faculty complained about sex discrimination at Moody. In each instance, Moody responded by penalizing Garrick, but not her male colleagues.

For example, after hearing from multiple students who felt ostracized by the hostile, anti-LGBTQ+ environment at Moody, A.100 ¶ 39, A.102 ¶ 58, Garrick and a male professor presented a proposal to foster a more inclusive on-campus environment, A.102 ¶ 58. After the meeting, Larry Davidhizar—Vice President and Associate Provost of Faculty—castigated Garrick for her "inflammatory rhetoric" and demanded that she "learn how to speak around here." A.093-94 ¶ 21, A.096 ¶ 31(c), A.103 ¶ 59. But the male faculty member who co-authored and co-presented the proposal was never reprimanded or punished. A.096 ¶ 31(c), A.103 ¶ 59.

Likewise, when Garrick complained of the harassment she suffered personally on campus, she was advised to buy her own printer and avoid shared workspaces, A.095 ¶ 28, A.105 ¶ 72, pressured to quit her job, A.101 ¶ 47, A.105 ¶ 70, A.106 ¶ 73, threatened with demotion, A.105 ¶ 69(b), and ordered to step down from a committee on "Respect for Women Professionally and Ministerially," A.106 ¶ 75.

But men who lodged complaints about sex discrimination on Moody's campus were spared. For example, one male professor remarked at a faculty meeting that Moody needed to "address[] the misogyny and sexism at this institution." A.098-99 ¶ 38(a). Other male faculty joined the committee on "Respect for Women

Professionally and Ministerially" to address these complaints. A.095 ¶ 27. At a meeting in February 2016, they discussed issues including the lack of female speakers at school events; certain male professors' overt discouragement of women; Moody's lack of female leadership; and the cancellation of a radio program with gender-inclusive messaging. A.095 ¶ 27. Men were never subject to the same treatment as Garrick. *See, e.g.*, A.096 ¶¶ 31(a)-(b).

**4.** Garrick met with Dean James Spencer in September 2016 to complain about the increasingly hostile work environment. A.103 ¶ 60. But Moody took no action to protect her, and her mistreatment continued unabated. A.103 ¶ 60.

Indeed, Moody further retaliated against Garrick. In early November 2016, a few weeks after her meeting with Dean Spencer, Garrick applied for a promotion from Instructor to Assistant Professor. A.103 ¶ 61. She met or exceeded every stated requirement for promotion. A.103-04 ¶¶ 63-65. But Davidhizar denied Garrick's application less than an hour after she submitted it. A.104 ¶ 66. The only reason he provided: Garrick needed to "improve her fit within the division." A.104 ¶ 66.

But as evidenced by stellar performance reviews, Garrick "fit within the division" quite nicely. For example, one month after Moody denied Garrick the promotion, she received a glowing review from Terry Strandt, Chair of her Division. A.107 ¶ 79(a). Strandt congratulated Garrick on her "two years of excellent service;" commended her for being "concise, clear and engaging with the students;" and commented that her "enthusiasm is gratifying and contributing in a huge way to [her] Program and the whole Division." A.107 ¶ 79(a). The next month, Brian Kammerzelt, the head of the Communications Program, praised Garrick for "doing everything" she was "hired

to do." A.106 ¶¶ 76, 78. After confirming that Garrick intended to stay at Moody for fall 2017, Kammerzelt requested that she expand her teaching duties with two additional courses. A.106 ¶ 78, A.107 ¶ 79(b).

**5.** Two months after Garrick's rave reviews, Moody sought—for the first time—to justify its mistreatment of her based on alleged deficiencies in her performance. On March 2, 2017, Davidhizar chastised Garrick for missing an already-canceled meeting with Strandt. A.107 ¶ 79(c). Davidhizar then told Garrick that Moody would likely not renew her contract, citing nebulous "performance and interpersonal issues." A.107 ¶ 79(c). The next day, Kammerzelt joined his superiors in attacking Garrick and told her that she had been the subject of peer reviews by other Communications faculty. A.107 ¶ 79(d). Garrick's male colleagues were never subject to peer reviews. A.096 ¶ 31(b).

A few weeks later, Strandt also changed his tune and delivered Garrick's first-ever negative performance review, A.108 ¶ 79(e), A.109 ¶ 84, despite having lauded Garrick's "excellent service" three months earlier, A.107 ¶ 79(a). Strandt explained that the review was based entirely on peer reviews and input from Kammerzelt and Davidhizar. A.108 ¶ 79(e). But when Garrick asked Davidhizar for access to the peer reviews, Davidhizar told her they didn't exist and insisted that Garrick's negative performance was based exclusively on Strandt's own assessment. A.108 ¶ 79(f).

Instead of resolving these contradictory statements or providing Garrick with a straight answer about her poor review, Moody raised Garrick's score. A.108-09 ¶ 81.

Among all the various inconsistent explanations, at no point did any of the negative feedback focus on, or even mention, any religious disagreements.

**6.** Backpedaling on her negative evaluation, Moody turned to Garrick's egalitarian views as a pretense to fire her. A.109-110 ¶¶ 85-86, 89. On April 5, 2017, the same day that Garrick asked to see her mystery peer reviews, Davidhizar asked to discuss her "vocal non-alignment with [Moody's] doctrinal statement as it relates to 'Gender Roles in Ministry.'" A.108 ¶ 80. One week later, Davidhizar and the Vice President of Human Resources met with Garrick and, for the first time, informed her that her disagreement about gender roles in the ministry made her a poor fit for Moody. A.109 ¶ 85. As Davidhizar admitted at the meeting, Moody had been aware of Garrick's views at the time of her hiring in 2014. A.109 ¶ 85. But apparently it had not concluded that they posed a problem until three years later. Meanwhile, Moody did nothing when some male personnel disagreed with Moody's complementarian views. A.096 ¶ 31(a), A.099 ¶ 38(i)-(j), A.103 ¶ 59. Five days later, Moody terminated Garrick. A.110 ¶ 86.

Moody initially told Garrick that she would be required to teach until the end of the Spring 2017 semester and would continue receiving pay as nonteaching faculty until the end of that year. A.110 ¶ 86. But on April 26, after Garrick spoke to students and student-reporters about her termination, Moody demanded that she immediately end her work and leave campus. A.110 ¶ 87.

Garrick filed an internal grievance, alleging that her termination was discriminatory and retaliatory. A.110 ¶ 88. She asserted that Moody's stated reason for firing her—her nonalignment on issues of gender roles in the ministry—was pretextual. A.110 ¶ 89. But Moody did not afford Garrick a fair chance to prove her claims. It gave her only twenty-four hours of notice to call witnesses and prohibited

discussion of much of the discrimination and retaliation underlying her complaint. A.111 ¶ 92. Moody denied her grievance. A.111 ¶ 94.

### C. Procedural Background

Garrick filed an EEOC charge in January 2018. A.123-26. The charge described the hostile work environment and disparate treatment she experienced during her employment at Moody, her complaints about Moody's treatment of her and of female students, and Moody's subsequent retaliation. A.124-26. Garrick asserted that Moody terminated her "because of [her] gender" and "in clear retaliation for" what she perceived as unlawful sex discrimination. A.126. And Garrick reported what Moody had told her: She had been fired because of her "form of Christianity." A.126.

Garrick then brought retaliation claims under Title IX and retaliatory-discharge and breach-of-contract claims under Illinois law. Dkt.1 ¶¶ 59-91. Unable to afford counsel, Garrick filed her First Amended Complaint pro se, alleging all the ways she felt that she had been wronged. A.016-42. The First Amended Complaint added new claims for discrimination based on her gender and her egalitarian religious beliefs under Title VII. A.031-41 ¶¶ 92-140. Both complaints alleged that Moody had used her egalitarian views as "pretext for its true motives—discrimination and retaliation." Dkt.1 ¶ 56, A.026 ¶ 64.

Moody moved to dismiss. Dkt.69. Among other things, Moody argued that Garrick fell within the ministerial exception and that Title VII's religious exemption and the church-autonomy doctrine barred her claims. Dkt.69 at 10-13.

The district court rejected Moody's ministerial-exception defense because it is an affirmative defense subject to a "fact-intensive analysis" and could not be shown to apply from the face of the complaint. A.084-86.

But the court held that Title VII's religious exemption shielded Moody from liability on Garrick's religious-discrimination claim. A.083-84. It dismissed that claim with prejudice. A.084.

It also dismissed Garrick's First Amended Complaint under the church-autonomy doctrine. A.086-88. It held that some of the challenged conduct—including Moody's exclusion of women from certain programs and majors—was rooted in Moody's religious beliefs about the role of women in the ministry. A.087-88. And to adjudicate Moody's religious beliefs would "impermissibly inject the auspices of government into religious doctrine." A.088. Her claim over that policy was dismissed with prejudice. A.088. The district court recognized, however, that "strains of Garrick's Title VII claims . . . may not be tied to Moody's religious beliefs," like her complaints about hostility from male colleagues and disparate treatment "with respect to job duties, employment requirements, and performance reviews." A.088. In other words, Garrick—as a pro se litigant—had intertwined mine-run Title VII issues with religious questions that the district court could not answer. So the court granted Garrick leave to amend her gender-discrimination claims under Title VII "in a way that is untethered from her disagreements with Moody's religious views." A.088.

Continuing to represent herself, Garrick refiled her Title VII gender-discrimination claims in her Second Amended Complaint, alleging a hostile work environment, discrimination, disparate treatment, and retaliation. A.112-17 ¶¶ 98-

132. In drafting her First Amended Complaint, Garrick had conflated her allegations that she was fired due to her advocacy to open Moody's Pastoral Ministry program to female students with her allegations that Moody's reasoning was pretextual. But she clarified in the Second Amended Complaint that Moody independently discriminated against her based on her gender and that any religious rationale for that discrimination was pretextual. A.112 ¶ 97.

Moody moved to dismiss the Second Amended Complaint, again arguing that (1) Garrick's claims fell within Title VII's exemption for religious educational institutions "with respect to the employment of individuals of a particular religion"; and (2) the church-autonomy doctrine barred Garrick's claims. Dkt.103 at 9-15. The motion explicitly disclaimed any reliance on the ministerial exception for the time being. Dkt.103 at 15 n.14.

The district court held that Title VII's religious exemption did not preclude Garrick's gender-discrimination claims because the provision applies only to religious-discrimination claims. SA.09-10. The district court also recognized that church autonomy prohibits courts from determining the validity or plausibility of a religious rationale, not whether the supposed religious rationale was the actual motivation for a decision. SA.11-15. Because Garrick plausibly alleged that Moody's true reason for firing her was gender discrimination, SA.11-12, the church-autonomy doctrine did not "entirely foreclose[] Garrick's claims," SA.15. But to the extent any

aspect of Garrick's renewed allegations challenged Moody's complementarian beliefs, the district court again explicitly rejected them. SA.14.[2]

Moody moved for reconsideration. Dkt.128. Reiterating its motion-to-dismiss arguments, Moody argued that church-autonomy principles barred Garrick's claims. Dkt.128 at 6-14. Though Moody disclaimed the ministerial exception in its motion to dismiss Garrick's Second Amended Complaint, it cited ministerial-exception cases to argue that the district court was categorically barred from determining even whether Moody's proffered religious rationale actually motivated its termination of Garrick. Dkt.128 at 7-13. Moody also argued that if the district court denied its motion to reconsider, the court should certify for interlocutory appeal the question whether the church-autonomy doctrine permits a pretext inquiry where the ministerial exception does not apply. Dkt.128 at 14-15.

The district court denied Moody's motion, finding that Moody "fail[ed] to demonstrate any error in the Court's denial in part of its motion to dismiss . . . let alone [the] manifest error" required to grant a motion to reconsider. SA.27. And the court declined to exercise its discretion to certify an interlocutory appeal under 28 U.S.C. § 1292(b), which narrowly provides for appeals of decisions involving "a controlling question of law as to which there is a substantial ground for difference of opinion." SA.27-28. Moody failed to cite a single case indicating that church-autonomy

---

[2] The district court also held that, because Garrick's termination and the tail-end of the hostile work environment occurred within the limitations period, her claims arising from those events were not time-barred. SA.07-09. The court dismissed Garrick's hostile-work-environment claim for failure to plead sufficiently severe or pervasive harassment, but it allowed her retaliation claim to proceed. SA.15-16. Those decisions are not on appeal.

principles "bar[] any inquiry into whether a religious employer's proffered doctrinal reason for an adverse employment action" against a lay employee "was the actual reason." SA.28. The court thus found that Moody could not demonstrate the "substantial ground for difference" necessary to justify certification. SA.28. Moody filed this appeal anyway.

## SUMMARY OF ARGUMENT

**I.** This Court lacks jurisdiction to hear this appeal. Courts of appeals generally have jurisdiction to review only final decisions. *See* 28 U.S.C. § 1291. Under the collateral-order doctrine, the courts can hear appeals of a narrow group of interlocutory decisions. A class of orders can be collateral only if they are otherwise effectively unreviewable on appeal, are conclusively decided, and raise important questions completely separate from the merits of the claims.

The collateral-order doctrine has always been interpreted narrowly. And in recent years the Supreme Court and this Court have specifically cautioned against expanding it. Instead, the courts have favored certified appeals under 28 U.S.C. § 1292(b) or petitions for writs of mandamus—neither of which create entirely new categories of appeals, unlike the collateral-order doctrine.

Moody did not satisfy Section 1292(b), nor did it seek mandamus. Rather, it appealed two interlocutory district-court holdings, both of which would require this Court to create a new category of collateral-order appeals. But this Court has already declined to expand the collateral-order doctrine to the two categories of orders Moody now appeals. And that binding precedent requires dismissal here.

In any event, each appealed issue must satisfy the doctrine's requirements. Neither does. Moody argues that a smattering of policy considerations support a collateral-order appeal as of right for all church-autonomy rulings. But that argument is unsupported by any caselaw or historical understanding of the church-autonomy doctrine. And if this Court were to adopt Moody's argument, it would create a direct split with the Second and Tenth Circuits.

As for the Title VII ruling, Moody ignores entirely whether this Court has appellate jurisdiction so has forfeited the issue. No matter. Had Moody addressed the issue, it would not have been able to justify expansion of the collateral-order doctrine.

**II.** In all events, the district court's ruling was correct.

The church-autonomy doctrine forbids courts to decide religious questions. It does not provide religious organizations a general right to be free from civil laws or proceedings. Because Garrick's pro se complaint contains allegations that make out gender-discrimination claims, the district court was correct that dismissal based on church autonomy would have been inappropriate at the pleading stage.

Finally, Section 702 of Title VII protects religious institutions' ability to discriminate based on an employee's religion; it does not grant religious institutions a license to discriminate based on race, color, sex, or national origin. But supposing this Court were to ignore overwhelming precedent from sister circuits and disregard Title VII's text and history, Section 702 still would not bar Garrick's claims. Garrick alleges that Moody's religious justification for firing her was pretextual—that issue cannot be resolved on the pleadings.

## STANDARD OF REVIEW

If this Court had jurisdiction, review of the district court's denial of the motion to dismiss would be *de novo*. *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017). The facts of the Complaint would be taken as true and all reasonable inferences would be drawn in Garrick's favor. *Id.*

## ARGUMENT

### I.   This Court does not have appellate jurisdiction.

This Court's jurisdiction is generally limited to reviewing "final decisions" of the district courts. *See* 28 U.S.C. § 1291. A final decision typically "ends the litigation on the merits," leaving the court merely to "execute the judgment." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S.Ct. 582, 586 (2020) (citation omitted). A "denial of a motion to dismiss is not a final decision." *Cherry v. Univ. of Wis. Sys. Bd. of Regents*, 265 F.3d 541, 546 (7th Cir. 2001).

Section 1291 permits immediate appeals of a "small class" of orders that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

But the collateral-order doctrine is narrow and "should stay that way." *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). Otherwise, the doctrine would "swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Id.* If courts expanded the doctrine indiscriminately, "'Congress['s] final decision rule would end up a pretty puny one.'"

*Microsoft Corp. v. Baker*, 582 U.S. 23, 41 (2017) (quoting *Digit. Equip.*, 511 U.S. at 872).

Without even a passing nod to the presumption against creating new categories of appellate jurisdiction (or citations to pivotal collateral-order cases like *Mohawk Industries, Inc. v. Carpenter*), Moody insists that this Court create not one, but two new appeals as of right. But this Court has already refused to expand *Cohen* to the issues raised here. *See Herx v. Diocese of Fort Wayne-S. Bend, Inc.*, 772 F.3d 1085, 1091 (7th Cir. 2014). Even setting aside that precedent, Moody fails to show that the church-autonomy doctrine satisfies *Cohen*. And it forfeits its Title VII argument by failing to mention it.

## A. Appellate review would dramatically expand the collateral-order doctrine, contrary to the Supreme Court's directive.

**1.** While the collateral-order doctrine has historically been narrowly interpreted, *Will v. Hallock*, 546 U.S. 345, 350 (2006), the Supreme Court has recently gone yet further, strongly disfavoring any judicial expansions of the doctrine to new areas of law. *See, e.g.*, *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 114 (2009). Instead, "any further avenue for immediate appeal of such rulings should be furnished, if at all, through rulemaking, with the opportunity for full airing it provides." *Id.*; *see also, e.g.*, *McClendon v. City of Albuquerque*, 630 F.3d 1288, 1296 n.2 (10th Cir. 2011) (Gorsuch, J.) ("[A]ny pleas to expand appellate jurisdiction ought be directed to the Rules Committee," not to courts.).[3]

---

[3] The Supreme Court has used the rulemaking power when appropriate: Having previously held that denials of class certification did not satisfy the collateral-order doctrine's requirements, *see Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978), the Court later concluded through rulemaking that immediate appeals of orders granting

When immediate appeal is warranted in a *particular* case, courts can review those specific issues without creating new appeals as of right. First, district courts can certify questions of law for interlocutory review under 28 U.S.C. § 1292(b). *See Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 974 (7th Cir. 2021) (en banc). Second, when one claim but not an entire action is finally decided, the court may, upon a party's request, "direct entry of a final judgment" as to that claim if the court "determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). And third, a petition for mandamus may be filed to correct an interlocutory decision that risks actual harm to important rights. *See* 28 U.S.C. § 1651(a).

Preference for those methods makes sense because the collateral-order doctrine was never meant to be an individualized, case-by-case inquiry. *Digit. Equip.*, 511 U.S. at 868. The doctrine is a "blunt, categorical instrument," that, when applied, makes an entire class of orders immediately appealable regardless of an individual order's strength or weakness. *Id.* at 883. So "[a]s long as the class of claims, taken as a whole, can be adequately vindicated by other means, the chance that the litigation at hand might be speeded, or a particular injustice averted, does not provide a basis for jurisdiction under § 1291." *Mohawk*, 558 U.S. at 107 (citation omitted).

The doctrine's "modest scope reflects a 'healthy respect' for the virtues of the final-judgment rule." *Abelesz v. OTP Bank*, 692 F.3d 638, 649 (7th Cir. 2012) (quoting *Mohawk*, 558 U.S. at 106). The "historic federal policy against piecemeal appeals" preserves judicial and party resources. *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446

---

or denying class certification should be allowed, and Federal Rule of Civil Procedure 23(f) was born.

U.S. 1, 8 (1980). And it maintains respect for "district court judges, who play a 'special role' in managing ongoing litigation." *Mohawk*, 558 U.S. at 106 (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981)).

So compelling is this logic that Justice Thomas has urged courts to cease relying on *Cohen* and the collateral-order doctrine altogether. *Mohawk*, 558 U.S. at 115 (Thomas, J., concurring in part and in the judgment). Though the Court stopped short of abolishing the collateral-order doctrine entirely, it clarified that the courts should be extraordinarily hesitant to apply it to new situations. *Id.* at 113-14 (majority op.).

This Court has listened. *See, e.g.*, *Abelesz*, 692 F.3d at 647. Other circuits have heeded that warning too and avoided creating new categories of collateral orders.[4] Instead, they have followed the Supreme Court's strong preference for case-specific ways to appeal.[5]

---

[4] *See, e.g.*, *SmileDirectClub v. Battle*, 4 F.4th 1274, 1280-82 (11th Cir. 2021) (en banc); *United States v. Emakoji*, 990 F.3d 885, 888-89 (5th Cir. 2021); *Rosner v. United States*, 958 F.3d 163, 166 (2d Cir. 2020); *United States v. Acad. Mortg. Corp.*, 968 F.3d 996, 1004-05 (9th Cir. 2020); *Kell v. Benzon*, 925 F.3d 448, 452 (10th Cir. 2019).

[5] *E.g.*, *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014) (Kavanaugh, J.) (Mandamus, rather than the collateral-order doctrine, is the proper method to appeal attorney-client-privilege orders.); *McClendon*, 630 F.3d at 1297-98 (Gorsuch, J.) ("Congress has already provided a way for parties to challenge a district court's erroneous assertion of jurisdiction before the entry of a final judgment. That path is paved by 28 U.S.C. § 1651(a) and its approval of writs of mandamus."); *see also Jenkins v. Prime Ins. Co.*, 32 F.4th 1343, 1347 (11th Cir. 2022) (refusing to create a new collateral order when appellant failed to seek other, "available pathway to appellate jurisdiction"); *Acad. Mortg. Corp.*, 968 F.3d at 1009 ("Safety valves" including writs of mandamus "are more than adequate to address denials of motions to dismiss that implicate interests more important than run-of-the-mill litigation burdens.") (cleaned up); *Kell*, 925 F.3d at 465 n.17 ("Rather than await a final judgment, the government could have sought a writ of mandamus."); *United States v. Gorski*, 807 F.3d 451, 458 (1st Cir. 2015) ("[I]mmediate review of serious errors is available through a writ of mandamus . . . ."); *Holt-Orsted v. City of Dickson*, 641 F.3d

**2.** Despite these repeated directives, Moody asks this Court to create an interlocutory appeal as of right any time a district court denies a church-autonomy defense. And it tacks on its Title VII religious-exemption defense without explaining why that defense justifies another category of interlocutory appeal.

But this Court already refused the exact same requests in *Herx*. 772 F.3d at 1091-92. There, a former teacher at a Catholic school sued under Title VII after she was fired for undergoing in vitro fertilization. *Id.* at 1086. The Diocese argued that it should prevail under Title VII's religious exemption as well as church autonomy. *Id.* at 1087-88. When the district court denied summary judgment as to both defenses, the Diocese immediately appealed. *Id.* at 1088.

This Court held that it did not have jurisdiction to review either order. *Id.* at 1090-91. It followed the Supreme Court's "blunt reminder" that it meant what it has consistently said: "[A]lthough the Court has been asked many times to expand the small class of collaterally appealable orders, we have instead kept it narrow and selective in its membership." *Id.* at 1089 (quoting *Hallock*, 546 U.S. at 350). And despite "the importance of the interests the Diocese has asserted," they did not satisfy the collateral-order doctrine because they would "not be irreparably harmed by enforcement of the final-judgment rule." *Id.* at 1091-92. So too here.

---

230, 236 (6th Cir. 2011) ("This court . . . favors mandamus as the appropriate method of review" of discovery orders.); *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 484 (10th Cir. 2011) ("The availability of these alternatives counsels strongly against permitting immediate collateral order review of all discovery orders adverse to a claimed First Amendment privilege."); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010) (assuming without deciding that "discovery orders denying claims of First Amendment privilege are not reviewable under the collateral order doctrine," and instead relying on mandamus to hear the appeal).

Instead of addressing the holding or reasoning of *Herx*, Moody (at 24) latches onto the panel's passing criticism that the Diocese devoted "only a few sentences" to the *Cohen* factors, *Herx*, 772 F.3d at 1090. But the Diocese's brief in *Herx* spent considerably more than a few sentences making the precise arguments that Moody makes here. *See* Defs.' Resp. to Mot. to Dismiss, No. 14-3057 (ECF 13-1). For example, outside of addressing *Cohen*, *id.* at 4-5, the Diocese's brief argued that because the church-autonomy doctrine and Title VII's religious exemption are "complete immunit[ies]," *id.* at 7, 11, immediate appeal was "necessary to protect the Diocese's constitutional rights from being violated," *id.* at 13. *Compare* Moody Br. 18-26. Those arguments didn't carry the day in *Herx*, nor can they here.

Moody then selectively quotes *Herx* to portray the panel's refusal to rule on the *merits* as limiting its *jurisdictional* holding. *Compare Herx*, 772 F.3d at 1091 ("We express no opinion on the merits of the district court's summary-judgment decision. We hold only that the Diocese has not made a persuasive case for expanding the scope of the collateral-order doctrine.") *with* Br. 24 ("*Herx* emphasized that it 'h[e]ld only that the Diocese ha[d] not made a persuasive case' for interlocutory appeal—not that a church autonomy defense never warrants interlocutory review.").

Finally, Moody argues that *Herx* isn't controlling because the facts of each case are different. Br. 24. But "whether the requirements for a collateral-order appeal are met" is not "'an individualized jurisdictional inquiry'"—it is about entire classes of cases. *Herx*, 772 F.3d at 1089 (quoting *Mohawk,* 558 U.S. at 107). The classes of cases addressed in *Herx* were the same as here—denials of a church-autonomy defense and denials of Title VII's religious exemption.

Despite *Herx* squarely precluding review here, Moody insists that narrow decisions of this Court and the Fifth Circuit mean that church-autonomy orders are always immediately appealable. Not so.

In *McCarthy v. Fuller*, this Court found collateral-order jurisdiction to review a district court's order that sent an explicitly religious question to the jury. 714 F.3d 971, 974 (7th Cir. 2013). But as *Herx* made clear, church-autonomy and Title VII defenses "are not comparable" to asking a jury to answer a specific religious question. 772 F.3d at 1091. *McCarthy* is confined to that rare circumstance. *Id.*

Although the Fifth Circuit granted a collateral-order appeal in a case involving church-autonomy issues, it did so to protect the rights of the third-party appellant in the case who could not adequately appeal a discovery order after final judgment. *See Whole Woman's Health v. Smith*, 896 F.3d 362, 367-68 (5th Cir. 2018). And the Fifth Circuit has since made clear that *Whole Woman's Health* was limited to collateral-order review of First Amendment issues in the unique context of court-ordered "discovery against a *nonparty.*" *Leonard v. Martin*, 38 F.4th 481, 487 (5th Cir. 2022) (emphasis added).

**3.** In contrast, in the last year, both the Second and Tenth Circuits relied on *Herx* and held that denials of Religion Clause defenses were not immediately appealable. In both cases, the courts rejected the arguments Moody makes here. Now Moody asks this Court to create a direct split with both.

In *Belya v. Kapral*, the Second Circuit held that "the church autonomy doctrine provides religious associations neither an immunity from discovery nor an immunity from trial on secular matters." 45 F.4th 621, 633 (2d Cir. 2022), *cert. denied*, 143 S.Ct.

2609 (2023). And it supported its decision by recognizing "clear parallels" to *Herx*. *Id.* at 631. Likewise, in *Tucker v. Faith Bible Chapel International*, the Tenth Circuit held that denial of summary judgment under the ministerial exception is not immediately appealable. 36 F.4th 1021, 1039 (10th Cir. 2022), *cert. denied,* 143 S.Ct. 2608 (2023). The court described *Herx* as "an analogous situation" that supported the conclusions that the Religion Clauses create neither an immunity nor a justification for an interlocutory appeal. *Id.* at 1039.

The defendants in *Belya* and *Tucker* urged the Supreme Court to review the decisions, making many of the same arguments Moody makes here. *See generally* Petition for Cert., *Belya*, No. 22-824; Petition for Cert., *Tucker*, No. 22-741. The Court denied review of both without comment. *See* 143 S.Ct. 2609; 143 S.Ct. 2608.

**4.** This Court should be especially reluctant to create a direct circuit split because Moody has not shown that the alternative routes for appeal are insufficient.

Moody sought discretionary interlocutory appeal under 28 U.S.C. § 1292(b), which requires "a controlling question of law as to which there is substantial ground for difference of opinion." The district court denied the motion because when a religious employer offers a doctrinal reason for discriminating against a lay employee, courts can examine whether that reason is pretextual. SA.25-28. Moody failed "to cite a single decision indicating" otherwise. SA.28.

And Moody did not bother to seek a writ of mandamus, despite the Supreme Court's instructions that mandamus is the proper procedure to correct errors in an individual case. *See Mohawk*, 558 U.S. at 111; *see also supra* p. 22 n.5.

If the challenged orders in this case are collaterally appealable as of right, the Supreme Court's preferred statute- and rule-based appeal methods would become superfluous. *See Mohawk*, 558 U.S. at 110-11; *see also JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 869 (7th Cir. 2013) (Because "adequate alternatives for review," including Section 1292(b) certification and mandamus, are available, "the collateral-order doctrine does not extend to the district court's order."). Moody gives no reason to cast aside the Supreme Court's strong admonition against expanding the collateral-order doctrine.

## B. The church-autonomy doctrine does not satisfy the requirements for a collateral order.

Even if this Court had not already denied the same request Moody makes, and even setting aside the Supreme Court's warnings against creating new categories of interlocutory appeal, there still would be no jurisdiction here.

An immediately appealable collateral order must: (i) be effectively unreviewable on an appeal from a final judgment, (ii) conclusively determine a disputed question, and (iii) resolve an important issue completely separate from the merits. *Mohawk*, 558 U.S. at 106 (citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)). Moody fails to show that the church-autonomy doctrine meets *any* of *Cohen*'s requirements, much less all three.

### 1. The church-autonomy doctrine can be addressed on appeal from a final judgment.

**a.** Collateral-order appeals are appropriate "only where the order at issue involves 'an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial.'" *Midland Asphalt Corp. v. United States*, 489

U.S. 794, 799 (1989) (quoting *United States v. MacDonald*, 435 U.S. 850, 860 (1978)). The asserted right here, church autonomy, is a narrow doctrine that prohibits courts from deciding "strictly and purely ecclesiastical" questions. *Watson v. Jones*, 80 U.S. 679, 733-34 (1871); *see Bryce v. Episcopal Church*, 289 F.3d 648, 657 (10th Cir. 2002). It does not forbid courts to resolve cases just because a religious entity is a party. *See, e.g.*, *Jones v. Wolf*, 443 U.S. 595, 602 (1979).

As explained above (at 23), this Court has already held that church-autonomy defenses are "not effectively unreviewable on an appeal from a final judgment" and "will not be irreparably harmed by enforcement of the final-judgment rule." *Herx*, 772 F.3d at 1091-92 (quoting *McCarthy*, 714 F.3d at 975). That is especially true when— like here, *see* SA.13-14—a district court is aware of its duty "*not* to weigh or evaluate the Church's doctrine." *Herx*, 772 F.3d at 1091-92 (quoting *McCarthy*, 714 F.3d at 975).

**b**. *Herx* aside, this *Cohen* factor will rarely be satisfied unless one of two categories of immunities from suit are implicated. Neither apply here.

First, the need to avoid trials that could be "'peculiarly disruptive of effective government'" may sometimes justify collateral-order appeals. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982)). That includes when a court wrongly denies qualified immunity, *id.*, or tribal sovereign immunity, *see, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1090 (9th Cir. 2007). Moody does not contend that the church-autonomy doctrine implicates the effective functioning of government, nor could it.

Otherwise, "[o]nly an '*explicit* statutory or constitutional guarantee that trial will not occur'" can "create[] the sort of right that supports immediate review." *Pullman Const. Indus., Inc. v. United States*, 23 F.3d 1166, 1169 (7th Cir. 1994) (emphasis added) (quoting *Midland Asphalt,* 489 U.S. at 801).

The text of the First Amendment says nothing about a right to be free from trial. *Cf.* U.S. Const. amend. I. Compare that to the Speech or Debate Clause, the Double Jeopardy Clause, the Eleventh Amendment, foreign sovereign immunity, and diplomatic immunity—all of which show that the Framers and Congress have always been capable of conferring explicit immunities from standing trial. *See, e.g.*, U.S. Const. art. I, § 6, cl. 1 (Members of Congress "shall not be questioned in any other place."); U.S. Const. amend. V ("nor shall any person be subject for the same offense to be twice put in jeopardy"); U.S. Const. amend. XI (prohibiting extension of "[t]he Judicial power" in any respect to suits "commenced or prosecuted against one of the United States by Citizens of another state"); 28 U.S.C. § 1604 ("[F]oreign state[s]" are presumptively "immune from the jurisdiction of the courts of the United States."); 22 U.S.C. § 254d ("Any action or proceeding brought against an individual" with diplomatic immunity "shall be dismissed.").

**c.** The history and tradition of the First Amendment confirms that plain reading.

According to Sarah Barringer Gordon, for example, "during the foundational period of American law, deep government involvement in religious institutions, rather than strict separation or respectful support, was characteristic and widely accepted." Sarah Barringer Gordon, *The First Disestablishment: Limits on Church Power and Property Before the Civil War*, 162 U. Pa. L. Rev. 307, 311 (2014). States

"imposed strict controls on church governance, mandating the election of lay trustees to hold and manage church property," *id.*, and limited how much land a religious corporation could own for secular purposes, *id.* at 323. Whether states could or should exert such control today is beside the point—historically, religious institutions were not granted immunity.

That is because the church-autonomy doctrine has long been understood as a prohibition against courts answering explicitly religious questions. So "'[w]hen a civil right depends upon an ecclesiastical matter, it is the civil court and not the ecclesiastical which is to decide. But the civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them.'" *Watson*, 80 U.S. at 731 (quoting *Harmon v. Dreher*, 17 S.C. Eq. (Speers Eq.) 87, 120-21 (S.C. Ct. App. Eq. 1843)); *see also Belya*, 45 F.4th at 630. That's why when a district court submitted to a jury the question whether a party was a nun, this Court did not dismiss the case; it directed the district court to accept the Church's answer to the question and proceed to resolving the matter. *McCarthy*, 714 F.3d at 979-80; *see also Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724-25 (1976) (Civil courts accept as binding religious answers to religious questions.).

Far from treating the Religion Clauses as an immunity from suit, the Supreme Court has held that religious organizations may be required to undergo state administrative investigations before raising Religion Clause-based challenges to those proceedings. *See Ohio Civ. Rts. Comm'n v. Dayton Christian Schs.*, 477 U.S. 619, 629 (1986). In *Dayton*, that was so even though the investigation could have intruded on sensitive areas, such as sex-discrimination claims against a religious

school, and even if the state agency could not consider the school's First Amendment objections in the administrative proceedings. *Id.* at 624-25, 628-29. If organizations subject to official state investigations "receive an adequate opportunity to raise [their] constitutional claims" on appeal after final judgment, so too will Moody here. *See id.* at 628.[6]

**d.** Accepting Moody's atextual description of the Religion Clauses as an immunity would guarantee "a further expansion of the collateral order doctrine." *Belya*, 59 F.4th at 572 (Lohier, J., concurring in denial of rehearing en banc). After all, the same argument could be made for "virtually every other 'liberty'-based right." *Id.* For example, the Supreme Court has defined the Free Speech Clause as providing "immunity." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 282-83 (1964). So too the right of free association. *NAACP v. Alabama*, 357 U.S. 449, 466 (1958) ("immunity from state scrutiny of membership lists").

Likewise, sister circuits have widely described the *Noerr-Pennington* doctrine, grounded in the Petition Clause, as an "immunity." *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 711 F.3d 1136, 1140 (9th Cir. 2013); *Hinshaw v. Smith*, 436 F.3d 997, 1003 (8th Cir. 2006); *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 295-96 (5th Cir. 2000). Yet they have consistently held that the doctrine does not confer a right to interlocutory appeal. *See, e.g.*, *Nunag-Tanedo*, 711 F.3d at 1141.

---

[6] While part of the rationale for *Dayton*'s holding was comity and federalism concerns, *see* 477 U.S. at 625-28, if the Religion Clause defenses operated as a constitutional bar against any inquiry into internal religious affairs, surely that would have overcome the comity-based justification for allowing the administrative proceedings to go forward.

If this Court were to hold that the Religion Clauses satisfy *Cohen*, by what logic could it deny interlocutory review to a business whose *Noerr-Pennington* defense was denied, to a newspaper that didn't like a ruling under *New York Times v. Sullivan*, or to any organization whose freedom-of-association defenses were rejected (no matter how meritless the arguments or how nascent the litigation)? And how could the Court engage in coherent line drawing when facing "doubly protect[ed] religious speech" covered by the "overlapping protection for expressive religious activities" granted by the Free Speech Clause and the Religion Clauses? *See Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022).

**e.** In attempting to show that denials of church-autonomy defenses are unreviewable on appeal from final judgment, *contra Herx*, 772 F.3d at 1091, Moody points to stray language from Religion Clause cases that aren't about appellate jurisdiction and appellate-jurisdiction cases that aren't about the Religion Clauses.

Moody relies on language describing the church-autonomy doctrine as "a complete immunity, or very nearly so." *See Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013). But using that language as a basis for appellate jurisdiction is "much more than this passage in *Korte* can bear." *Herx*, 772 F.3d at 1091. The opinion in *Herx*—written by Judge Sykes, who also authored *Korte* (and who was on the panel in *McCarthy*)—made clear that "words like 'immunity,' sometimes conjoined with 'absolute,' are often used interchangeably with 'privilege,' without meaning to resolve issues of immediate appealability." *Herx*, 772 F.3d at 1091 (quoting *Segni v. Com. Off. of Spain,* 816 F.2d 344, 346 (7th Cir. 1987)) (cleaned up). Moody does not address, or even acknowledge, this reasoning.

Moody next plucks language from ministerial-exception cases that warn of the dangers of litigating claims against ministers. But the ministerial exception "is fundamentally distinct," *see Demkovich*, 3 F.4th at 978, and is not at issue here—as Moody explicitly acknowledged in its motion to dismiss. Dkt.103 at 15 n.14. In any event, Moody reads too much into the ministerial-exception cases. For example, although *Demkovich* discussed the potential problems with adjudicating disputes between a minister and his employer, 3 F.4th at 981, two members of the *Demkovich* majority acknowledged less than two weeks later that whether the ministerial exception was immediately appealable was an open question, *see Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.,* No. 20-3265, 2021 WL 9181051 (7th Cir. July 22, 2021).

And Moody ignores that just last year the Supreme Court declined interlocutory review of a ministerial-exception case in which a state high court conclusively decided that the respondent was *not* a minister. *See Gordon Coll. v. DeWeese-Boyd*, 142 S.Ct. 952 (2022). In a statement respecting the denial, Justice Alito, joined by three other justices, found the state court's decision "troubling." *Id.* Yet he reasoned that "there is nothing that would preclude" the defendant from appealing "when the decision is actually final." *Id.* at 955 (citation omitted); *see also Tucker*, 143 S.Ct. 2608.[7]

---

[7] Moody also points to a handful of state-court cases. Br. 23. But the jurisdiction of state courts is governed by *state* law. So how a state court describes immunities for state appellate jurisdiction has no bearing on federal appellate jurisdiction. That was true even when a state court denied interlocutory review of qualified immunity (a federal defense) in a suit brought under 42 U.S.C. § 1983 (a federal claim). *Johnson v. Fankell*, 520 U.S. 911, 917-18 (1997). The Supreme Court unanimously held that state courts are free to ignore how federal conceptions of immunities affect finality. *Id.*

Going further astray, Moody draws comparisons to qualified immunity. But qualified immunity serves "to safeguard government and to protect the public at large," *Malinowski v. DeLuca*, 177 F.3d 623, 626 (7th Cir. 1999), by ensuring that "meritless and insubstantial lawsuits" do not deter "district officials from their public duties, inhibit the exercise of independent judgment and discretion and ultimately discourage highly qualified citizens from entering public service," *Delgado v. Jones*, 282 F.3d 511, 516 (7th Cir. 2002). The rationale has no bearing whatever on asserted defenses of private parties, under the Religion Clauses or anything else.

What is more, as one Fifth Circuit judge has recently written, the pretrial procedures through which qualified immunity protects government officials are derived from procedures that date back to English and early American common law.[8] Moody fails to point to a single historical source showing a parallel tradition of immunity from trial under the Religion Clauses. Instead, Moody and its amici argue that some loosely described church-autonomy principles go back to the founding. Perhaps. But language ensuring religious institutions may determine their own religious doctrine does not create an immunity.

Moreover, for denials of qualified immunity, a court's "jurisdiction is confined to questions of law." *Smith v. Finkley*, 10 F.4th 725, 735 (7th Cir. 2021). But motions to dismiss under the church-autonomy doctrine are often denied because, just like the district court determined here, it is unclear early in the litigation whether the facts "will require the court to address purely ecclesiastical questions." *McRaney v. N. Am.*

---

[8] *See* Andrew Oldham, *Official Immunity at the Founding* (manuscript, at 8-22, available at https://ssrn.com/abstract=3824983).

*Mission Bd. of the S. Baptist Convention*, 966 F.3d 346, 349 (5th Cir. 2020), *cert. denied*, 141 S.Ct. 2852 (2021); *see also Belya*, 45 F.4th at 634. And when "fact-based determinations" are essential to establishing whether a defense applies, "[t]he analogy to qualified immunity does not hold together." *Ernst v. Carrigan*, 814 F.3d 116, 121-22 (2d Cir. 2016).

### 2.   The church-autonomy defense was not conclusively determined.

Moody also cannot satisfy *Cohen*'s requirement that the church-autonomy issue has been conclusively determined, because there has been no "complete, formal, and, in the trial court, final rejection" of the defense. *See Abney v. United States*, 431 U.S. 651, 659 (1977).

The district court's ruling, like most denials of motions to dismiss, was "'inherently tentative'" because it was "not 'made with the expectation that [it would] be the final word on the subject addressed,'" *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 278 (1988) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 n.14 (1983)). Garrick's Second Amended Complaint outlined the discrimination she faced, along with Moody's inconsistent responses and justifications. A.093-112 ¶¶ 18-97. And Garrick alleged that the religious justification Moody ultimately settled on was pretextual. A.112 ¶ 97. The district court correctly treated these factual allegations as true and asked whether they raise "a genuine issue about the honesty, not the accuracy, of Moody's stated reason." SA.12 (quoting *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014)) (cleaned up). They do. SA.14. But the court also highlighted that as litigation continues, "Garrick will have to demonstrate that a reasonable factfinder could

disbelieve Moody's stated reason for firing her." SA.12. And if "further proceedings and factual development reveal" that Garrick's "claims cannot be resolved without deciding purely ecclesiastical questions," the district court can dismiss some or all of the claims at that time. *See McRaney*, 966 F.3d at 350. That determination is in no way final. So this Court should not "prematurely jump into the fray." *Belya*, 45 F.4th at 631.

Moody nonetheless asks this Court to determine that denials of motions to dismiss, as a class, conclusively resolve the issue of church autonomy because they reject a religious employer's "claim of autonomy." Br. 17. But as just explained, the church-autonomy doctrine means that civil courts may not decide "strictly and purely ecclesiastical" questions, *Watson*, 80 U.S. at 733, or make religious determinations, *see Bryce*, 289 F.3d at 657. It is not an immunity from proceedings.

### 3. The church-autonomy doctrine, as a class of orders, is not separate from the merits.

Finally, the denial of a motion to dismiss based on church autonomy does not "resolve an important issue completely separate from the merits of the action," *Coopers & Lybrand*, 437 U.S. at 468. "While it is possible that, in some circumstances, the church autonomy doctrine can present questions separable from the merits of a [discrimination] claim, at this pre-discovery juncture we cannot say that is the case here." *Belya*, 45 F.4th at 632. And because the collateral-order doctrine makes entire categories of claims appealable, the key question is whether church-autonomy defenses as a class are severable from the merits in every case in which they are invoked. They are not.

This case illustrates why. Garrick alleged that Moody discriminated against her on the basis of sex, which is prohibited by Title VII. Moody argues in response that the *real* reason it fired her was a disagreement over religious doctrine. Whether an employer's stated reason for firing an employee is pretextual is not separate from the merits of a Title VII claim—it *is* the merits of a Title VII claim. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

Granting Moody's request to expand the collateral-order doctrine would clog this Court's docket and potentially leave cases to languish in the district court for years— exactly what the separate-from-the-merits requirement seeks to avoid. *See, e.g.*, *P.H. Glatfelter Co. v. Windward Prospects Ltd.*, 847 F.3d 452, 458-59 (7th Cir. 2017). Defendants would ultimately be able to appeal interlocutory rulings on church-autonomy defenses at least three times: on motions to dismiss, on summary judgment, and after final judgment. That would "leave the final order requirement of § 1291 in tatters," *Hallock*, 546 U.S. at 351, and impose an inordinate burden on judicial resources.

It would also undermine the finality requirement's respect for "the prerogatives of district court judges, who play a 'special role' in managing ongoing litigation." *Abelesz*, 692 F.3d at 649 (quoting *Risjord*, 449 at 374). The district court's order here allowed a pro se litigant to pursue her claims but made clear that the court would not decide religious issues if they were to arise. SA.14. That cautious approach does not warrant micromanagement.

37

**C.  There is no jurisdiction over the Title VII argument.**

Unlike with the interlocutory church-autonomy ruling, Moody doesn't even attempt to show why this Court has jurisdiction to review the district court's preliminary denial of the Title VII statutory defense. But the burden of showing jurisdiction under the collateral-order doctrine falls on the appellant. 7th Cir. R. 28(a)(3)(ii). And "*[e]very* issue presented in an interlocutory appeal must 'fall within *Cohen's* collateral-order exception' before [a court] may review its merits." *United States v. Wampler*, 624 F.3d 1330, 1335 (10th Cir. 2010) (Gorsuch, J.) (quoting *Abney*, 431 U.S. at 663). Because "inadequately briefed arguments are forfeited," *Dalton v. Teva N. Am.*, 891 F.3d 687, 692 (7th Cir. 2018), that should end the matter.

But had Moody attempted to show why the Court has jurisdiction over the Section 702 decision, it would have been wrong. Setting aside that this Court has already decided that denials of Section 702 defenses do not fall within the narrow category of immediately appealable collateral orders, *see Herx*, 772 F.3d at 1091, the order here fails to meet any of the collateral-order requirements.

First, Title VII arguments can be effectively reviewed on appeal, at the conclusion of litigation. Like the appellants in *Herx*, Moody "cites no authority for the proposition that [Section 702 provides] an immunity from the burdens of trial rather than an ordinary defense to liability." 772 F.3d at 1091. Nor can it: The exception protects a religious employer's interest in avoiding an adverse judgment—it does nothing to shield an employer from litigation altogether. *Id.* at 1090 (citing *Hallock*, 546 U.S. at 352).

Second, like most denials of motions to dismiss, a ruling on a Section 702 defense is "inherently tentative" because it is not a complete, formal, final rejection of the defense. *See Gulfstream Aerospace*, 485 U.S. at 278. The district court denied the application of Section 702 at the motion-to-dismiss stage when the court must accept Garrick's complaint as true and draw all reasonable inferences in her favor, *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017). After discovery, Moody can raise the Section 702 defense again.

Finally, Section 702 defenses are not, as a class, "conceptually separate from the merits" of a Title VII claim. *See Herx*, 772 F.3d at 1089. Application of Section 702 turns on, among other things, the reason for an employer's adverse action. Again, that's the merits of a Title VII claim. *See Coleman*, 667 F.3d at 845.

## II. Moody is wrong on the merits.

If this Court were to expand appellate jurisdiction here, it would then need to "accept all the factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (quoting *Arazie v. Mullane*, 2 F.3d 1456, 1465 (7th Cir. 1993)). And because Garrick was pro se before the trial court, the Court must "liberally construe[]" her complaint, *id.*, holding it "to less stringent standards than formal pleadings drafted by lawyers," *id.* (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam)).

Ignoring that standard, Moody reads Garrick's complaint in its own favor, relies on allegations that the district court said it would not consider, and disregards Garrick's entirely secular allegations. Moody then applies its selective reading to novel interpretations of the church-autonomy doctrine and Title VII.

**A.  The district court correctly held that the case can proceed without implicating the church-autonomy doctrine.**

**1.** The church-autonomy doctrine is a limited exception to the general rule that "[r]eligious organizations come before [civil courts] in the same attitude as other voluntary associations." *Watson*, 80 U.S. at 714. The doctrine protects religious institutions' freedom to make *religious* decisions—the government may not decide "matters of church government" or "those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952). Nor may courts dictate how churches engage in internal discussion of their own religious doctrine. *Bryce*, 289 F.3d at 658.

But because "churches are not—and should not be—above the law," *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985), "secular components of a dispute involving religious parties are not insulated from judicial review," *Belya*, 45 F.4th at 630. "'[F]or to do so would necessarily extend constitutional protection to the secular components of [religious] relationships,' which 'would impermissibly place a religious leader in a preferred position in our society.'" *McRaney*, 966 F.3d at 348 (quoting *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 335-36 (5th Cir. 1998)). So "simply having a religious association on one side of the 'v' does not automatically mean a district court must dismiss the case or limit discovery." *Belya*, 45 F.4th at 630.

Instead, courts leave fundamentally religious questions—like whether someone is a nun, *see McCarthy*, 714 F.3d at 976—to religious bodies, then apply the law just as they do to nonreligious entities. *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 303-05 (1985).

40

In *Tony & Susan Alamo Foundation*, for example, a religious employer challenged Fair Labor Standards Act requirements as "excessive government entanglement in its affairs," and argued that how the employer chose to compensate its employees was part of its religious convictions. *Id.* at 303-04. The Supreme Court accepted as true the Foundation's religious doctrine about employee compensation but held that applying the FLSA did not intrude on church autonomy. *Id.* at 305. Similarly, when reviewing a religious business's denial of a tax exemption, this Court accepted the business's good-faith assertion of its own religious purpose. *Living Faith, Inc. v. Commissioner*, 950 F.2d 365, 372 (7th Cir. 1991). The Court nevertheless applied "objective indicia" to determine that the business's activities "were also motivated by a substantial nonexempt purpose, which thus vitiated the exemption under relevant tax law." *Id.* at 372, 376.

At bottom, courts need not—and cannot—dismiss a case simply because a defendant raises a religious justification for its actions. *Tony & Susan Alamo Found.*, 471 U.S. at 303-06; *see also Seshadri v. Kasraian*, 130 F.3d 798, 800 (7th Cir. 1997). Otherwise, "religious entities could effectively immunize themselves from judicial review of claims brought against them." *McRaney*, 966 F.3d at 351.

**2.** So at the motion-to-dismiss stage, when all plausible allegations have to be viewed as true, "the relevant question is whether it appears certain that resolution of [Garrick's] claims will require the court to address purely ecclesiastical questions." *See id.* at 349. "At this stage, the answer is no." *Id.* Garrick alleges that she was fired because of her gender. Her complaint states Moody assigned her more work than it assigned similarly situated male colleagues, A.096-97 ¶¶ 32-33, punished her—but

not her male colleagues who engaged in the same conduct, A102-03 ¶¶ 58-59, allowed faculty and students to make derogatory comments to women, A.095 ¶ 28, A.097 ¶ 35(a)-(c), A.098 ¶¶ 36, 38(a), and ultimately fired her (on false pretenses) when she complained about her treatment, A.109-110 ¶¶ 85-86, 89. Resolving Moody's motion to dismiss did not require the district court to determine which party has correctly interpreted the Bible or whether women appropriately belong in ministry. Instead, the district court accepted Moody's complementarian convictions and concluded that "Garrick may identify disparaging comments Moody's supervisors made about women or spotlight male instructors who disagreed with Moody's complementarian doctrine yet retained their position." SA.12. That is ordinary litigation on a sex-discrimination claim. And it does not implicate any religious questions.

**3.** Moody's unsupported contention that all its actions were religiously motivated does not change anything. Garrick has consistently alleged that the religious explanation was pretextual. And as with any "normal Title VII litigation," courts adjudicating discrimination claims against a religious employer must sometimes determine whether an employer's "reason is honest . . . [not] whether the reason is *correct*." *Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019). District courts know how to handle this burden-shifting sequence: "The defense bears the burden of articulating the justification, but the plaintiff bears the burden of showing that the justification is pretext." *Id.*

Besides, in prematurely "articulating [its] justification," *id.*, Moody picks and chooses allegations that it likes, ignores those that it doesn't, and draws inferences in its own favor. For example, Moody ignores that Garrick had a heavier teaching

load and was subject to harsher performance reviews than her similarly situated male colleagues. *See* SA.14. It also ignores that she was punished for the content of a presentation but her male *co-presenter* was not. A.102-03 ¶¶ 58-59. And it chalks up her treatment by her colleagues as all being part of a religious disagreement. *See* Br. 36. That kind of selective reading and creative inference-drawing cannot justify dismissing any complaint, especially one filed by a pro se litigant.

Adding legal errors to its factual ones, Moody also argues that Garrick's "assertion of pretext is foreclosed by her own admissions" "that she was terminated because her 'form of Christianity' was 'not aligned with the doctrinal statement.'" Br. 35 (quoting A.053). That reading distorts Garrick's EEOC charge, which explained that the reason *Moody gave* for firing Garrick was the doctrinal disagreement. A.053. But Garrick has maintained throughout this case that Moody's explanation was pretextual. *See, e.g.*, Dkt.1 ¶ 56, A.026 ¶ 64, A.112 ¶ 97.

Moody's argument also omits the other reasons Garrick alleged in the EEOC complaint. Specifically, Garrick alleged that she "was officially terminated because of [her] gender, [her] form of Christianity, and in clear retaliation for [her] complaints about [her] own treatment and [her] complaints on behalf of female students who were discriminated against." A.126. Any reasonable reading of Garrick's statement is that she was, to put it in legal terms, pleading in the alternative. She was fired after repeated mistreatment and harassment and was given conflicting, confusing reasons throughout. So she outlined all of it. In response, the district court dismissed the claims that necessarily implicated religious questions and let the others continue.

Moody cannot show why Garrick's claim of (permissible) religious discrimination negates her claims of (impermissible) gender discrimination.

Nor can Moody show that Garrick's continued references to religious disputes in her second amended complaint—reasonable for a pro se litigant unfamiliar with the nuances of constitutional law—create an intractable church-autonomy problem. The district court has already (twice) assured the parties that it "will not sit in judgment as to what Moody's complementarian doctrine entails or whether it represents a reasonable basis for firing Garrick." SA.12-13; *see also* A.088. In short, Moody complains about allegations the district court has already dismissed.[9]

**4.** Unlike here, the cases Moody relies on could not be resolved unless the courts made religious judgments or exerted control over religious governance.

In *Bryce v. Episcopal Church*, for example, the Tenth Circuit dismissed a claim that discussions in private church meetings about "Biblical interpretation" and "Christian sexual ethics" were themselves unlawful harassment. 289 F.3d at 657-58. Likewise, in *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, the Indiana Supreme Court dismissed tortious interference and blacklisting claims that asked the court to "penalize communication and coordination among church officials (all answerable to higher church authority that has directed them to work cooperatively) on a matter of internal church policy and administration." 796 N.E.2d 286, 294 (Ind.

---

[9] Moody also misleadingly quotes the district court's opinion. For example, Moody quotes the district court to argue that the opinion's pretext analysis relied on Garrick's allegations that she was barred from speaking at religious services and forbidden to hold herself out as a minister. Br. 35 (quoting SA.04). But those quotes are from the district court's description of Garrick's allegations. SA.04. Moody ignores that the district court's analysis then *refused* to "fault[] Moody for prohibiting women from training as ministers or speaking at chapel." *See* SA.14.

2003). And in *Payne-Elliott v. Roman Catholic Archdiocese of Indianapolis, Inc.*, the Indiana Supreme Court declined to decide "whether and when the archdiocese would continue to recognize" a Catholic school as Catholic. 193 N.E.3d 1009, 1014-15 (Ind. 2022).

Likewise, in *NLRB v. Catholic Bishop of Chicago*, the Supreme Court explained that Congress could not have given the National Labor Relations Board jurisdiction over religious schools without a clear expression of intent to do so. 440 U.S. 490, 507 (1979). Unlike individual Title VII claims, collective bargaining requires religious leaders to "consult the lay faculty's [union] representative on all matters bearing upon the employment arrangement." *Cath. Bishop of Chi. v. NLRB*, 559 F.2d 1112, 1123 (7th Cir. 1977). That would touch on "nearly everything that goes on in the schools." *NLRB*, 440 U.S. at 503.

Garrick's claims do not require the court to wade into the church's internal "sacred conversations," *Bryce*, 289 F.3d at 657, or oversee church governance. Instead, she asks the court to decide whether Moody discriminated against her based on her sex. At this stage, the court can answer that question without intruding on religious debates. That is more than enough to survive a motion to dismiss.

**5.** Ultimately, Moody seeks to recast the church-autonomy doctrine as a tool to preemptively dismiss cases—before discovery has even begun—anytime a religious institution can come up with a post-hoc religious justification for its actions. But that would lay waste to virtually every constitutional and statutory religious exemption.

Take, for example, the ministerial exception. The First Amendment's Religion Clauses shield religious employers from liability for discrimination against

ministerial employees—*i.e.*, those who play an important role in preaching or teaching the faith. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060-61 (2020). That is because applying antidiscrimination laws to ministers—employees who are "essential to the performance" of religious functions, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring)—would encroach on a religious group's freedom to "shape its own faith and mission," *id.* at 188 (majority op.).

"Because ministers and nonministers are different in kind, the First Amendment requires that their [employment-discrimination] claims be treated differently." *Demkovich*, 3 F.4th at 978. But if religious institutions could defeat employment-discrimination claims from lay and ministerial employees alike by arguing that the discrimination was motivated by religion, then the Supreme Court would not have established the fact-intensive ministerial-exception test. In *Hosanna-Tabor*, for example, the defendant alleged that it terminated a minister's contract not because of the minister's medical condition, but for "a religious reason." 565 U.S. at 180. Despite the defendant's stated religious motivation, the Supreme Court applied the ministerial exception, not the church-autonomy doctrine. The Court had the opportunity to adopt the reasoning Moody proposes here but declined to do so.

Likewise, why would Congress have included a religious exemption in Title VII if the church-autonomy doctrine already shielded any religious employer whose discrimination was motivated by religion? And if stating a religious justification were enough to shield a religious institution from not only liability, but proceedings altogether, why would Congress have enacted religious exemptions to Title IX (20

U.S.C. § 1681(a)(3)), the Fair Housing Act (42 U.S.C. § 3607(a)), or any other civil law? Moody does not and cannot answer that question.

### B. The district court correctly denied Moody's Section 702 defense.

Even assuming this Court could overlook binding precedent and Moody's forfeiture, it would not change the outcome—the district court's preliminary Section 702 ruling was correct.

Section 703 of Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's [1] race, [2] color, [3] religion, [4] sex, or [5] national origin." 42 U.S.C. § 2000e-2(a)(1). Section 702(a) provides a limited exemption: "This subchapter" shall not apply to certain religious employers—meaning it is *not* an unlawful employment practice for those religious employers to discriminate—"with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). The most logical reading is that for certain religious employers, Section 702(a) removes (3) "religion" from the list, leaving the others.

But discrimination based on (1) race, (2) color, (4) sex, or (5) national origin is still prohibited "even though other factors," like an employee's religion, "also motivated the practice." 42 U.S.C. § 2000e-2(m). "So long as the plaintiff's sex" or race, color, or national origin "was one but-for cause of that decision, that is enough to trigger the law." *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1739 (2020). By excusing discrimination only by religious entities and only with respect to the employment of "individuals of a particular religion," 42 U.S.C. § 2000e-1(a), Section 702 permits religious organizations to hire only coreligionists.

Moody argues that treating Section 702 as precluding certain claims overlooks that the exemption's language is about employers, not employees' claims. Br. 44. But *all* of Title VII is written in terms of an employer's conduct; it is a prohibition on what *employers* can do. Section 702 simply mirrors the rest of Title VII.

Moody further urges this court to ignore the straightforward textualist interpretation of Section 702 and instead adopt the reasoning of two judges—writing for themselves in concurrence. *See Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 945-47 (7th Cir. 2022) (Easterbrook, J., concurring); *Fitzgerald v. Roncalli High Sch. Inc.*, 73 F.4th 529, 534-37 (7th Cir. 2023) (Brennan, J., concurring).

Both concurrences rest largely on Section 701's definition of religion. Judge Easterbrook quotes subsection (j) for the definition of religion as including "'all aspects of religious observance and practice, as well as belief.'" *Starkey*, 41 F.4th at 946 (quoting 42 U.S.C. § 2000e(j)). But that ignores the second half of the sentence in subsection (j): "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

The second clause, beginning with "unless," clarifies and limits the first clause. Setting aside statutory interpretation, as a grammatical matter, the two clauses cannot be read separately. Take for example the statement "Everyone is allowed admission, unless the bouncer decides they are being unruly." It would be

unreasonable to read that as saying that everyone is allowed admission. And it would be nonsensical to conclude that it had anything to do with whether the *bouncer* is allowed admission.

But that is precisely how Moody reads subsection (j). It ignores the second clause, which changes the meaning, and then applies the first clause in a way that makes the second irrational. When the complete definition is used, Moody's plug-and-play (at 39-40) falls apart: Title VII does not apply to a religious employer making any decision based on an employee's belief, observance, or practice—but if the religious employer demonstrates that he is unable to reasonably accommodate the employee's religious practice, then Title VII *does* apply. That makes no sense.

Moody must rely on concurrences because no panel of this Court has broken from the uniform conclusion of other circuits: Title VII applies "to a religious institution charged with sex discrimination," even when that discrimination is religiously motivated. *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996); *see also Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173 (2d Cir. 1993); *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982); *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972). Moody tries to overcome this unanimity by citing *Curay-Cramer v. Ursuline Academy of Wilmington*, 450 F.3d 130 (3d Cir. 2006). Br. 42. But there, a teacher argued that the school punished her more harshly for publicly supporting abortion than it punished men who opposed the Iraq war. 450 F.3d at 139. The court

49

held that it would not apply Title VII to compare how the school responded to *different* violations of *different* church doctrine. *Id.* at 141.

### C. Adopting Moody's Section 702 interpretation would not change the outcome here.

Even under a misguided reading of Section 702, "a pretext inquiry—akin to step three of the *McDonnell Douglas Corp. v. Green* framework—should apply to the employer's proffered religious rationale." *Fitzgerald*, 73 F.4th at 536 (Brennan, J., concurring). Garrick can rebut Moody's stated religious justification for its discrimination by showing "'weaknesses, implausibilities, inconsistencies, or contradictions' in [Moody's] proffered reason such that a reasonable person could find it unworthy of credence." *See id.* (quoting *Castro v. DeVry Univ. Inc.*, 786 F.3d 559, 565 (7th Cir. 2015)).

But "complaints need not anticipate defenses." *Sterlinski*, 934 F.3d at 571. So it is too early in the litigation for the court to apply that pretext analysis. *Id.* Moody has not properly raised its religious defenses, nor has Garrick had the chance to rebut those defenses.

Moody, professing to rely on Garrick's complaint, argues that it terminated Garrick "because she rejected and publicly decried its core beliefs about church leadership." Br. 37. But, again, at the motion-to-dismiss stage, the complaint must be read in Garrick's favor, not Moody's. And her Second Amended Complaint alleges implausibilities, inconsistencies, and contradictions that show that Moody's religious justification is pretext. She shows the implausibility of Moody's explanation when she alleges that Moody treated her worse than similarly situated male colleagues, even before she started supporting her female students. A.096-97 ¶¶ 32-33. Garrick

highlights Moody's inconsistencies when she describes how Moody attacked her for speaking in support of women but spared male faculty who did the same thing, at the same time, in the same context. A.096 ¶¶ 31(b)-(c). And Garrick shows Moody's contradiction when she explains that Moody was well aware of her religious beliefs when it hired her (and twice renewed her contract) but then used those beliefs as the pretense for firing her three years later. A.093 ¶ 20.

## CONCLUSION

This Court should dismiss for lack of appellate jurisdiction. If, instead, the Court were to expand the collateral-order doctrine, it should reject Moody's premature arguments about motivation and affirm the district court's denial of the motion to dismiss.

Respectfully submitted,

 /s/ *Bradley Girard*

JAMIE S. FRANKLIN
Civil Litigation Clinic of the
  Chicago-Kent College of Law
565 W. Adams St.,
Suite 600
Chicago, IL 60661
(312) 906-5048

BRADLEY GIRARD
    *Counsel of Record*
GABRIELA HYBEL
Americans United for Separation of
  Church and State
1310 L Street NW, Suite 200
Washington, D.C. 20005
(202) 466-3234
*girard@au.org*

*Counsel for Appellant*

September 1, 2023

**CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rule of Appellate Procedure 32(g)(1) and Circuit Rule 32, I certify that this brief:

(i) complies with the type-volume limitation of Circuit Rule 32 because it contains 13,797 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Circuit Rule 32(b) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 12 points or larger.

*/s/ Bradley Girard*

# STATUTORY ADDENDUM

**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***

*42 U.S.C. § 2000e. Definitions*

For the purposes of this subchapter—

\*     \*     \*

**(j)** The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

\*     \*     \*

*42 U.S.C. § 2000e–1. Exemption*

## (a) Inapplicability of subchapter to certain aliens and employees of religious entities

This subchapter shall not apply to \* \* \* a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

\*     \*     \*

**CERTIFICATE OF SERVICE**

I certify that on September 1, 2023, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

*/s/ Bradley Girard*