In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-2683

JANAY E. GARRICK,

*Plaintiff-Appellee,*

*v.*

MOODY BIBLE INSTITUTE,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-573 — **John F. Kness**, *Judge.*

———————————

ARGUED DECEMBER 5, 2023 — DECIDED MARCH 18, 2024

———————————

Before HAMILTON, BRENNAN, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* For three years, Janay Garrick taught communications courses at Moody Bible Institute. When Moody fired her, she sued, alleging sex discrimination and other Title VII violations. Moody moved to dismiss Garrick's Second Amended Complaint, claiming that her suit was barred by Title VII's religious exemptions and the First Amendment doctrine of church autonomy. When the district court denied the motion in part, Moody appealed that

nonfinal order. Because we find that the district court's order is not subject to interlocutory review under the collateral order doctrine, we dismiss the appeal for lack of jurisdiction.

## I. Background

### A. Factual Background

Appellant Moody Bible Institute ("Moody") seeks review of the district court's denial of a motion to dismiss, so we credit facts pled in the Second Amended Complaint and construe all disputes in favor of Garrick. *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 973 n.2 (7th Cir. 2021) (en banc).

#### 1. The Parties

Located in Chicago, Illinois, Moody is a religious institution of higher education and accepts federal financial aid. It offers graduate and undergraduate degrees and courses in both secular and religious subjects. Among other doctrinal commitments, Moody espouses complementarianism, which it defines as a belief that the clergy should be comprised of men only, though women may serve in all other ministry roles. Moody requires all faculty to subscribe to its core beliefs, including complementarianism, and to sign annual reaffirmations of those beliefs.

In 2014, Moody hired Janay Garrick as a non-tenure instructor in the communications program on an annual contract. In contrast to Moody's complementarian teachings, Garrick identifies as an egalitarian Christian because she believes that qualified people should not be restricted from certain roles on the basis of gender. In her interview, Garrick told Moody that she held to egalitarian beliefs and rejected complementarianism. Moody nevertheless hired her and twice

renewed her teaching contract, although it did ask her to sign its doctrinal statement and affirmation of complementarianism. Moody also required Garrick to remove from her resume the fact that she was an ordained minister.

### 2. Garrick's Employment

Garrick claims that during her employment, other faculty members subjected her to hostile treatment due to her gender, treatment she raised with administrators who ignored or dismissed those complaints. She complained, for example, that male colleagues ignored, avoided, and ridiculed her; in response, the vice president of human resources suggested Garrick get a printer and keep to her faculty office to avoid any unpleasant interactions.

Garrick alleges that Moody never rebuked or sidelined men who publicly disagreed with its culture of sexism as it did her. One incident arose when Garrick co-designed and presented a plan for a more inclusive environment in response to the anti-LGBTQ+ atmosphere at Moody. After that presentation, a supervisor criticized Garrick for "inflammatory rhetoric" and told her she must "learn how to speak around here." In contrast, the male co-presenter was never reprimanded or punished.

Garrick also alleges disparate treatment in her teaching obligations and opportunities. She applied for a reduced teaching load while completing a terminal degree in her field—an accommodation male faculty had received—but Moody denied Garrick's application. She was also asked to develop five new undergraduate courses, labor that Moody did not similarly require of new non-tenure male hires. In 2016, when she applied for a tenure-track assistant-professor

position for which she was apparently qualified, Vice President and Associate Provost of Faculty Larry Davidhizar denied her application within an hour of its submission, explaining that Garrick needed to "improve her fit within the division." Yet Garrick points out that her performance reviews consistently demonstrated that she was an excellent, engaging, enthusiastic instructor.

In 2017, Moody's reactions to Garrick's teaching performance began to change. She was chastised for missing an already-cancelled meeting in March. Also in March, she received her first negative performance review, three months after a performance review crediting her with "excellent service." When Garrick inquired into the basis for the negative review, Terry Strandt, the Chair of the Music and Media Arts Division, explained that it was a product of administrators' evaluations, including Davidhizar's, and "peer reviews." Garrick alleges that Moody never subjected male colleagues to peer reviews. When she asked to see those reviews, Davidhizar told Garrick this negative review was based on the assessment of Strandt himself. Eventually, after Garrick repeatedly asked about the reasons for her negative performance review, Moody raised her score—instead of (Garrick claims) providing her with a "straight answer" about the original review.

### 3. Garrick's Termination

In April 2017, Davidhizar and the vice president of human resources raised the problematic nature of Garrick's egalitarian views with her for the first time. Later that month, Moody informed Garrick that it would not renew her contract. Her termination letter explained that Garrick's non-alignment with Moody's complementarian beliefs made her a poor fit for

the school. After completing her spring semester teaching assignments, she would receive pay for the rest of the year as a nonteaching faculty member. When Garrick discussed her termination with students and student-reporters, however, Moody immediately fired Garrick and expelled her from campus. The internal grievance Garrick filed was denied.

## B. Procedural Background

### 1. EEOC Charge

Garrick filed an EEOC complaint in January 2018, alleging various Title VII violations including retaliation and discrimination on the basis of sex and religion. The complaint stated that she "was officially terminated because of [her] gender, [her] form of Christianity, and in clear retaliation for [her] complaints about [her] own treatment and [her] complaints on behalf of female students who were discriminated against." The EEOC issued Garrick a right to sue letter on September 24, 2018.

### 2. First Amended Complaint

Proceeding pro se, Garrick filed her First Amended Complaint alleging discrimination on the basis of gender and religion.[1] The complaint claimed that Moody's stated reason for firing her—religious disagreement—"was pretext for its true motives—discrimination and retaliation." Ultimately, the complaint tied Garrick's firing to disagreements over doctrine, including Garrick's advocacy on campus for women applying to the Pastoral Ministry Program.

_____

[1] Although Garrick initially retained counsel, her attorney withdrew before Garrick filed her First Amended Complaint.

Moody moved to dismiss Garrick's complaint, arguing that it was protected by the ministerial exception, the church autonomy doctrine, and Title VII's religious exemptions.

The district court[2] granted Moody's motion to dismiss, finding Garrick's claims of discrimination due to disagreements over complementarianism barred by Title VII's religious exemptions and the First Amendment doctrine of church autonomy. *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 869–72 (N.D. Ill. 2019) (*Garrick I*).[3] It noted, however, that it would permit Garrick to amend those claims because "there are strains of Garrick's Title VII claims that may not be tied to Moody's religious beliefs," including inconsistent treatment of male and female faculty members. *Id.* at 872.

### 3. Second Amended Complaint

Still representing herself, Garrick took the district court's invitation and filed her Second Amended Complaint alleging a hostile work environment, retaliation, and discrimination and disparate treatment based on sex. Moody again moved to dismiss Garrick's complaint, this time relying on only two

---

[2] This case was originally assigned to Judge John Z. Lee, who ruled on both motions to dismiss. When Judge Lee was appointed to the Seventh Circuit, the case was reassigned to Judge John F. Kness.

[3] Although Title VII and the church autonomy doctrine protected Moody from Garrick's claims of discrimination, the ministerial exception did not. The district court found that further factual development would be necessary to determine whether the ministerial exception applied. *Garrick I*, 412 F. Supp. 3d at 870–71. The district court also dismissed Title IX and breach-of-contract claims, which Garrick did not replead or raise on appeal. *Id.* at 872–73.

defenses: the church autonomy doctrine and Title VII's religious exemptions.[4]

The district court dismissed Garrick's hostile work environment claim with prejudice, finding that Garrick failed to state a claim. *Garrick v. Moody Bible Inst.*, 494 F. Supp. 3d 570, 579 (N.D. Ill. 2020) (*Garrick II*). Despite that, it denied Moody's motion to dismiss the discrimination, disparate treatment, and retaliation claims, rejecting Moody's argument that it was immune from such employment suits under Title VII and the First Amendment. *Id.* at 576–79.

The district court reasoned that while Title VII's religious exemptions and the church autonomy doctrine apply to religious discrimination, those defenses do not bar claims of other forms of discrimination, including claims that religious justifications for employment decisions are mere pretext. *Id.* at 576–79. The court explained that "Garrick's complaint does not imperil religious autonomy" because she "may identify disparaging comments Moody's supervisors made about women or spotlight male instructors who disagreed with Moody's complementarian doctrine yet retained their positions." *Id.* at 577. Rather than determining "whether [Moody's beliefs] represent[] a reasonable basis for firing Garrick," the court "need only determine (and the parties will need only investigate during discovery) whether Moody terminated her because of its religious beliefs or whether its invocation of its religious beliefs was, in fact, a cover to discriminate against Garrick because of her gender." *Id.*

---

[4] Moody did not reassert the ministerial-exception defense, nor has it raised the defense on appeal.

Further emphasizing the distance between Garrick's claims and questions of doctrine, the court also pointed out that Moody's own representation of complementarianism is that it "exclude[s] women from serving *as ministers*," but "[i]t does not follow that Moody's faith requires unequal treatment of women who work in *secular* roles." *Id.* at 578. The district court found that this distinction protected Garrick's claims from dismissal because, at least at this point in the litigation, the court need not wade into religious doctrine. *Id.*

### 4. Motion to Reconsider and Interlocutory Appeal

Moody then moved for reconsideration and certification for interlocutory appeal under 28 U.S.C. § 1292(b), both of which the district court denied. As to reconsideration, because Garrick's Second Amended Complaint argued that Moody's religious justification was pretextual, the court distinguished between claims of religious discrimination (which it would dismiss as barred by Title VII's religious exemptions and First Amendment principles of church autonomy) and claims that pretextual religious justifications papered over actual reasons including gender discrimination.

As for the interlocutory appeal, the district court denied Moody's request because it failed to present "substantial ground for difference of opinion" as required by § 1292(b) and could not identify a single case holding that Title VII or the religious-autonomy doctrine confers total immunity from suit.

Moody now asks this court to consider its appeal under the collateral order doctrine on the grounds that the doctrine

of church autonomy guarantees immunity from judicial entanglement in religious matters.[5]

## II. Analysis

We must decide whether we have jurisdiction to hear Moody's interlocutory appeal. 28 U.S.C. § 1291 limits our jurisdiction in part to "final decisions of the district courts of the United States." An interlocutory order, which does not conclude all issues in a case, is not usually immediately appealable. *Dupree v. Younger*, 598 U.S. 729, 734 (2023).

Because the denial of a motion to dismiss is an interlocutory order and not a final judgment subject to appeal under § 1291, *see Harer v. Casey*, 962 F.3d 299, 305 (7th Cir. 2020), we first address our jurisdiction to hear Moody's appeal. Our jurisdiction here depends on the interplay between the collateral order doctrine and First Amendment principles of church autonomy.

The collateral order doctrine is one exception to the final judgment rule. That doctrine "confers finality—and thus immediate appealability—on a small category of interlocutory orders 'too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Herx v. Diocese of Fort Wayne–South Bend, Inc.*, 772 F.3d 1085, 1088 (7th Cir. 2014) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

---

[5] Although Moody asserts a defense based on Title VII's religious exemptions, it does not argue that those statutory exemptions guarantee immediate interlocutory review under the collateral order doctrine.

To qualify for interlocutory appeal as a collateral order, an order must satisfy three conditions, or so-called *Cohen* factors: (1) the order must be conclusive; (2) it must "resolve important questions separate from the merits"; and (3) it must be "effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995) (citing *Cohen*, 337 U.S. at 546); *see also Herx*, 772 F.3d at 1088–89. These requirements are "stringent." *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994).

The Supreme Court has repeatedly emphasized that the collateral order doctrine is limited and narrow. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106–07 (2009); *Will v. Hallock*, 546 U.S. 345, 350 (2006); *Digit. Equip.*, 511 U.S. at 868. Its instructions are emphatic: "[W]e have meant what we have said; although the Court has been asked many times to expand the 'small class' of collaterally appealable orders, we have instead kept it narrow and selective in its membership." *Will*, 546 U.S. at 350.

The Court further has explained that its warnings against expansion of the collateral order doctrine derive from Congress's clear intent that any expansion to the list of orders considered "final" for purposes of appellate review must happen through the rule-making process, not by court decision. *Swint*, 514 U.S. at 48. Congress has authorized the Court to "prescribe rules, in accordance with [the Rules Enabling Act], to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under [§ 1292]." 28 U.S.C. § 1292(e); *see also Mohawk*, 558 U.S. at 113–14. "Congress's designation of the rulemaking process as the way to define or refine when a district court ruling is 'final'

and when an interlocutory order is appealable warrants the Judiciary's full respect." *Swint*, 514 U.S. at 48; *see also Microsoft Corp. v. Baker*, 582 U.S. 23, 39 (2017) (noting that expansions to the collateral order doctrine "are to come from rulemaking, however, not judicial decisions in particular controversies or inventive litigation ploys"). We lack the authority to expand our power outside of the specific process established by Congress. *Mohawk*, 558 U.S. at 113–14; *see also id.* at 118–19 (Thomas, J., concurring in part) ("Congress, which holds the constitutional reins in this area, has determined that such value judgments [involved in selecting which issues are immediately appealable] are better left to the [rulemaking process] …. This determination is entitled to our full respect, in deed as well as in word.").

To determine whether an appeal is part of that "small class" and subject to review under the collateral order doctrine, we do not engage in a case-by-case inquiry. *See Herx*, 772 F.3d at 1089. Instead, our inquiry into the conditions for collateral-order review must assess "categories of orders rather than individual orders." *Johnson v. Jones*, 515 U.S. 304, 315 (1995); *see also Mohawk*, 558 U.S. at 107 ("In making this determination, we do not engage in an individualized jurisdictional inquiry. Rather, our focus is on the entire category to which a claim belongs." (internal quotations and citations omitted)).

Accordingly, certain categories of claims or orders are subject to interlocutory review under the collateral order doctrine, while others are not. Those falling within the doctrine include orders denying a criminal defendant's claim of double jeopardy, *Abney v. United States*, 431 U.S. 651, 657 (1977), orders denying a public official's claim of absolute immunity,

*Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982), a state's claim of Eleventh Amendment immunity, *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144–45 (1993), and a foreign government's claim of sovereign immunity, *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 667 (7th Cir. 2012). Denials of qualified immunity, too, are subject to interlocutory review, so long as the denial is based purely on questions of law and not disputes of fact. *Johnson*, 515 U.S. at 317.

## A. The Collateral Order Doctrine and Church Autonomy

The doctrine of church autonomy derives from the Religion Clauses of the First Amendment. *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013) (citing *Hosanna–Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 181 (2012)). The doctrine protects against government interference in "faith and doctrine" and "matters of church government." *Our Lady of Guadalupe Sch. v. Morrissey–Berru*, 140 S. Ct. 2049, 2060 (2020) (cleaned up).

Courts must leave the resolution of "quintessentially religious controversies" to religious organizations, and when the organization resolves a religious controversy or question, "the Constitution requires that civil courts accept their decisions as binding upon them." *Hosanna–Tabor*, 565 U.S. at 187 (quoting *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 720, 725 (1976)). Secular courts may not interpret religious law or wade into religious disputes because "the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity." *Milivojevich*, 426 U.S. at 709. Under the church autonomy doctrine, secular courts must "respect[] [religious institutions'] autonomy to shape their own missions, conduct their own

ministries, and generally govern themselves in accordance with their own doctrines as religious institutions." *Korte*, 735 F.3d at 677.

The church autonomy doctrine does not, however, bar courts from adjudicating *all* disputes involving a religious institution. *See Sterlinski v. Cath. Bishop of Chicago*, 934 F.3d 568, 571 (7th Cir. 2019) (explaining that Title VII and the First Amendment do not protect religious organizations from every suit); *McCarthy v. Fuller*, 714 F.3d 971, 979 (7th Cir. 2013) (noting that the court may adjudicate property disputes that do not require entanglement in religious issues); *see also Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022) ("But secular components of a dispute involving religious parties are not insulated from judicial review; a court may use the 'neutral principles of law' approach."); *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 139 (3d Cir. 2006) ("[W]e note that many claims of discrimination against a religious employer under Title VII will not raise serious constitutional questions."). Courts may exercise authority when the resolution does not require inquiry into doctrinal disputes. *See Hosanna–Tabor*, 565 U.S. at 190 (distinguishing between "outward physical acts" and "an internal church decision that affects the faith and mission of the church itself").

The dissent seeks to expand the collateral order doctrine by creating a new category never recognized by the Supreme Court or any other circuit. *See Belya*, 45 F.4th at 630. Indeed, the Seventh Circuit previously considered a similar question in *Herx v. Diocese of Fort Wayne–South Bend, Inc. Herx* held that district court orders denying church-autonomy and Title VII's religious-exemption defenses cannot be immediately appealed when the merits do not appear to require judicial

entanglement in doctrinal matters. 772 F.3d at 1090–91. That decision controls here.

In *Herx*, the Diocese fired a junior high language arts teacher after she underwent in vitro fertilization, which the Diocese asserted was incompatible with its moral doctrine. *Id.* at 1086–87. Herx sued the Diocese, claiming that her termination violated Title VII by discriminating against her on the basis of her sex. *Id.* at 1087. The district court denied the Diocese's motion for summary judgment asserting Title VII's religious exemptions and the church autonomy doctrine's prohibition against judicial entanglement in matters of religious doctrine. *Id.*

On the Diocese's interlocutory appeal, we considered both Title VII's exemptions, which we described as "legislative applications of the church-autonomy defense," and First Amendment religious-autonomy principles to determine whether we had jurisdiction under the collateral-review doctrine. *Id.* at 1090–91 (quoting *Korte*, 735 F.3d at 678). We rejected the Diocese's argument and dismissed the appeal, holding that the district court's denial of summary judgment did not satisfy the *Cohen* factors. *Id.* at 1090.

The similarities between *Herx* and the case before us are inescapable. Both Garrick and Herx claimed their religious employers discriminated against them on the basis of sex by firing them, as prohibited by Title VII. Both the Diocese and Moody have asserted that the plaintiffs were fired due to religious disagreement, claiming Title VII's religious exemptions and the First Amendment as defenses against suit. Both district courts found that a jury could conclude that, all other things being equal, male employees would be or had been treated differently. *See id.* at 1088 (quoting the district court's

conclusion that a jury "could infer that Mrs. Herx's contract could have been renewed had she been male and everything else remained the same"); *Garrick*, 494 F. Supp. 3d at 578 (explaining that "a reasonable inference can be made from the allegations that Moody fired Garrick because it held female teachers to higher standards than their male counterparts, not because it disapproved of her egalitarian religious views").[6]

As in *Herx*, because the question of disparate treatment between men and women can be evaluated apart from doctrinal differences, discovery and even trial will not necessarily result in judicial encroachment on ecclesiastical matters. *See Herx*, 772 F.3d at 1091–92. While certain distinctions between men and women will be off-limits because they implicate complementarianism—for example, opportunities to speak at chapel and the removal of Garrick's ministerial title from her resume—many distinctions will not. Discovery into certain areas including whether male employees were subject to peer reviews, rebuked for speaking out against perceived sexism on campus, denied reduced teaching loads while completing terminal degrees, or asked to create new courses, will not subject Moody's doctrine to judicial second-guessing.

The dissent misunderstands the holding in *Herx* when it interprets that case to hold "only" that the appellant failed to

---

[6] Moody argues that the First and Second Amended Complaints are essentially the same and therefore the district court erred when it did not dismiss the Second Amended Complaint as it did the first. But the district court rightly noted that while the First Amended Complaint still tied Garrick's termination to disagreements over whether women should be admitted to the clergy, the Second Amended Complaint alleged that gender discrimination was the cause of her termination, apart from any doctrinal disagreements.

carry its burden in that particular instance. On the contrary, by holding "only that the Diocese has not made a persuasive case for expanding the scope of the collateral-order doctrine," we restricted the holding to the jurisdictional question, declining to weigh in on the merits of the Diocese's arguments. *See id.* at 1091. Context makes that clear. That holding immediately followed a statement that "[w]e express no opinion on the merits of the district court's summary-judgment decision." *Id.*[7] *Herx* did not leave open the possibility that we might have the authority to consider the merits of the nonfinal order at issue if a party simply made more persuasive arguments.

Moody argues that *McCarthy v. Fuller* instead of *Herx* directs the outcome here. In *McCarthy*, a United States representative of the Holy See, the central governing body of the Roman Catholic Church, had issued a declaration that Fuller was not a nun or religious sister. 714 F.3d at 973–74; *see also McCarthy v. Fuller*, No. 08-cv-994, 2012 WL 1898858, at *2 (S.D. Ind. May 23, 2012). Despite this statement, the district court planned to instruct the jury to determine whether Fuller was a nun in good standing with the Catholic Church to resolve her claim of defamation against McCarthy, who called her a "fake nun." *McCarthy*, 714 F.3d at 974. *McCarthy* held that the

---

[7] Nor does the fact that the Diocese addressed appellate jurisdiction in only "a few sentences" limit *Herx*'s authority. *See Herx*, 772 F.3d at 1090. We considered the issue fully in *Herx*, explaining the conditions that must be met for interlocutory review and noting the Supreme Court's careful limitation of the claims that are subject to immediate appeal under the collateral order doctrine. Federal courts have an independent obligation to consider our jurisdiction, and we are confident the court fulfilled that obligation in *Herx*.

order "requir[ing] a jury to answer a religious question" was immediately appealable on the facts in that case. *Id.* at 976. The circumstances were remarkably extreme—the judge had determined that the jury's judgment could preempt that of the Holy See on a decidedly doctrinal question, in clear violation of church autonomy.

Whether the category of order subject to immediate interlocutory review created in *McCarthy* is in tension with the Supreme Court's instructions against expanding that "small class" is not a question we must answer at this time. For now, it is enough to say that *McCarthy* did not create a new category subjecting denials of a church autonomy defense to immediate appeal. *Herx* makes that clear. In fact, *McCarthy* explicitly noted that disputes not requiring a district court to entangle itself in doctrinal questions are "premature," implicitly limiting its holding to its quite extreme facts. 714 F.3d at 979. In contrast, we are not faced with such a clear usurpation—or any usurpation—of church autonomy. Moody's appeal falls outside *McCarthy*'s scope and squarely within that of *Herx*. At this point in the litigation of Garrick's claims, it is not conclusively apparent that adjudication of her claims of pretextual firing requires the district court to entangle itself in questions of religious doctrine.

This is not to say that denials of a church autonomy defense, right or wrong, are *never* reviewable before a final judgment. The Supreme Court addressed this concern in the context of orders related to attorney–client privilege, stating that even without interlocutory review under the collateral order doctrine, a writ of mandamus, along with other procedural tools, "will continue to provide adequate protection to litigants." *Mohawk*, 558 U.S. at 114; *see also JPMorgan Chase Bank,*

*N.A. v. Asia Pulp & Paper Co., Ltd.*, 707 F.3d 853, 869 (7th Cir. 2013) (declining to extend the collateral order doctrine and noting that *Mohawk's* alternatives for review are adequate to vindicate rights). When its exacting standards are met, the extraordinary remedy of a writ of mandamus affords protection for religious-institution litigants challenging district court orders that reject First Amendment defenses. Indeed, the extreme facts of *McCarthy* might be best understood as satisfying those exacting requirements for a writ of mandamus.

**B. *Cohen* Factors**

Even if *Herx* did not govern the outcome in this case, Moody's appeal does not satisfy the stringent *Cohen* factors to gain interlocutory review. This category of order—a denial of a church-autonomy defense raised against claims capable of resolution without implicating doctrine—is not conclusive, is not separate from the merits, and is not effectively unreviewable from a final judgment. *See Mohawk*, 558 U.S. at 106.

**1. Conclusiveness**

The district court has not issued a conclusive decision on Moody's church-autonomy defense. Like in *Herx*, "[t]he district court has not ordered a religious question submitted to the jury for decision. To the contrary, the judge promised to instruct the jury *not* to weigh or evaluate the Church's doctrine." 772 F.3d at 1091. Moody argues that the district court conclusively denied its religious autonomy guaranteed by the First Amendment by second-guessing its determination that Garrick was not in doctrinal good standing. But the district court did no such thing. As in *Herx*, the district court here emphasized that any dispute over doctrinal prohibitions against women serving as clergy would not be up for debate. *Garrick*

*II*, 494 F. Supp. 3d at 578. The court also made clear that while an inference that something other than Garrick's beliefs led to her firing may be reasonable for now, Garrick will have to do more "to demonstrate that a reasonable factfinder could disbelieve Moody's stated reason for firing her" at later stages of litigation, including summary judgment. *Id.* at 577.

## 2. Separateness from the Merits

Nor is Moody's church-autonomy defense separate from the merits of Garrick's claim as pled in the Second Amended Complaint. This requirement "means that review *now* is less likely to force the appellate court to consider approximately the same (or a very similar) matter more than once." *Johnson*, 515 U.S. at 311. The asserted interest on appeal must be "'conceptually distinct'… rather than literally 'completely separate'" from the merits of the plaintiff's claim. *McCarthy*, 714 F.3d at 975 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985)). In fact, "if 'any factual overlap between a collateral issue and the merits of the plaintiff's claim is fatal to a claim of immediate appealability, none of these matters could be appealed, for all of them require an inquiry into whether the plaintiff's … factual allegations state a claim that falls outside the scope of the defendant's immunity.'" *Id.* (quoting *Mitchell*, 472 U.S. at 529 n.10).

The viability of Moody's defense depends upon the veracity of Garrick's factual allegations related to pretext, so the defense is not separate from the merits of her claim. An inquiry into the merits of Garrick's claim will determine whether Moody is able to assert the church-autonomy defense. *See Montano v. City of Chicago*, 375 F.3d 593, 598–99 (7th Cir. 2004) (noting that the second requirement for interlocutory review asks whether the order at issue "resolves issues that are

capable of review without extensive examination of the underlying merits of the case"). For example, if an examination of the facts reveals that, in fact, both men and women are denied reduced teaching loads, asked to design courses from scratch as non-tenure instructors, subjected to peer reviews, or disciplined for speaking out against perceived sexism on campus, Garrick's claim of pretext may fail. For now, key facts are in dispute. Because the availability of Moody's defense depends upon undeveloped facts related to the merits of Garrick's claims, its defense is not conceptually separate from the merits.

### 3. Effective Unreviewability

Finally, the district court's decision is not effectively unreviewable on appeal from a final order. Here, the "crucial question … is not whether [the asserted] interest is important in the abstract; it is whether deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders." *Herx*, 772 F.3d at 1090 (quoting *Mohawk*, 558 U.S. at 108). An imperfectly reparable burden to litigants will not suffice. *Id.* (citing *Mohawk*, 558 U.S. at 107; *Digit. Equip.*, 511 U.S. at 872). Instead, "the decisive consideration is whether delaying review until the entry of a final judgment would imperil a substantial public interest or some particular value of a high order." *Id.* (cleaned up). The higher interest must implicate immunity *from trial*, "not just an interest in avoiding an adverse judgment." *Id.* (citing *Will*, 546 U.S. at 352). What higher interests ought to be protected? Citing the Supreme Court, we have listed "honoring the separation of powers, preserving the efficiency of government and the initiative of officials, respecting a State's dignitary interest, and mitigating the

government's advantage over the individual." *Id.* (quoting *Will*, 546 U.S. at 352–53).

This suit implicates only private parties. No public officials or unit of government is involved, "so delaying appellate review until final judgment does not 'imperil a substantial public interest' grounded in the separation of powers, the dignity interest of a State, the efficient operation of the government, or any other public interest." *Herx*, 772 F.3d at 1090.[8]

Nor does the doctrine of church autonomy confer immunity from trial in every employment discrimination suit. The dissent relies on *Korte v. Sebelius*, which described Title VII's religious exemptions as "operat[ing] as a complete immunity, or very nearly so." *Korte*, 735 F.3d at 678. This circuit already rejected that same argument in *Herx*. 772 F.3d at 1090. A right to complete immunity from trial, and therefore a right to immediate review by a court of appeals, we explained, is "much more than this passage in *Korte* can bear." *Id.* at 1091. After all, "[w]ords like 'immunity,' sometimes conjoined with 'absolute,' are often used interchangeably with 'privilege,' … without meaning to resolve issues of [immediate] appealability." *Id.* (quoting *Segni v. Com. Off. of Spain*, 816 F.2d 344, 346 (7th Cir. 1987)).

No court has ever held that the First Amendment doctrine of church autonomy establishes a constitutional right to immunity from trial in cases where non-ministerial employees allege non-religious discrimination. In fact, the Second Circuit

---

[8] The dissent attempts to dismiss this analysis by contending that the collateral order doctrine is not limited to disputes involving a government entity. But this is only one factor the Supreme Court has highlighted, as the rest of this section explains.

rejected a similar petition for interlocutory review under the collateral order doctrine, holding that the church autonomy doctrine does not automatically bar litigation nor does it permit interlocutory appeal where the *Cohen* factors are not satisfied. *Belya*, 45 F.4th at 625, *reh'g en banc denied*, 59 F.4th 570, *cert. denied sub nom. Synod of Bishops of the Russian Orthodox Church Outside of Russ. v. Belya*, 143 S. Ct. 2609 (2023). Commenting on church autonomy and the collateral order doctrine, the Second Circuit concluded that "[w]hen a case can be resolved by applying well-established law to secular components of a dispute, such resolution by a secular court presents no infringement upon a religious association's independence. Thus, simply having a religious association on one side of the 'v' does not automatically mean a district court must dismiss the case or limit discovery." *Id*. at 630. *Cf. Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1032, 1036 (10th Cir. 2022), *reh'g en banc denied*, 53 F.4th 620, *cert. denied*, 143 S. Ct. 2608 (2023) (holding that a district court order rejecting the ministerial exception defense cannot be appealed under the collateral order doctrine, but noting that the defendant had not "adequately developed a factual record for asserting the church autonomy defense").[9]

---

[9] The Fifth Circuit's decision in *Whole Woman's Health v. Smith* is not to the contrary. In that case, the Fifth Circuit granted interlocutory review to a nonparty religious organization, finding *Cohen*'s requirements satisfied. The district court had ordered the religious organization to submit to extensive and intrusive document production of its internal communications. 896 F.3d 362, 364, 367 (5th Cir. 2018). An order conclusively determining that a nonparty religious organization must be subjected to extensive discovery, whatever the merits of that argument under *Cohen*, is not comparable to the class of order at issue here.

Even where a religious justification is given, if the plaintiff plausibly asserts that justification is pretextual, the First Amendment does not automatically bar judicial examination of that claim. *See Sterlinski*, 934 F.3d at 570–72. Just as in *Herx*, neither Title VII's religious exemptions nor First Amendment religious-liberty interests confer immunity from trial such that immediate review is warranted.

Finally, Moody's argument that it will experience irreparable harm without immediate review and reversal of the district court's order is unavailing. Religious autonomy to shape and control doctrine will not be threatened. Within its discretion to manage discovery, the district court should limit discovery to instances of discriminatory treatment in situations not implicated by Moody's complementarian beliefs. We are sympathetic to Moody's concerns that its beliefs might be put under a microscope, but the district court should safeguard against such infringement. To be clear, discovery may not explore the sincerity or significance of complementarianism in Moody's religious doctrine, question the validity of that belief, or challenge policies related to it. Similarly, jury instructions will establish appropriate guardrails at trial. The district court should manage discovery and the case to focus on differential treatment based on sex without intruding on Moody's religious beliefs.

### III. Conclusion

Because Moody's appeal falls outside of the collateral order doctrine's narrow and selective class of claims subject to interlocutory review, we DISMISS the appeal for lack of jurisdiction without reaching the merits of Moody's Title VII and First Amendment defenses.

BRENNAN, *Circuit Judge*, dissenting. The First Amendment's protection of church autonomy provides immunity precluding litigation of religious questions. Court orders implicating those questions can impose legal proceedings on religious organizations. Practically construed, this category of decisions meets the requirements for a collateral order subject to interlocutory review.

This employment litigation between a teacher and a school concerns claims and defenses tethered to religious beliefs. The district court orders here fall into the category of decisions that implicate immunity under the church autonomy doctrine. So, I part ways with my colleagues and conclude that appellate jurisdiction exists here under the collateral order doctrine.

**I**

The First Amendment's Religion Clauses bar court entanglement in matters of religious belief, doctrine, and governance. "Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law." *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940). This applies to religious institutions, whether Christian, Jewish, Muslim, or any other faith tradition.

The Supreme Court has interpreted those clauses to recognize a "general principle of church autonomy." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. ——, 140 S. Ct. 2049, 2061 (2020). "[C]hurch autonomy 'means what it says: churches must have 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,

41 F.4th 931, 942 (7th Cir. 2022) (quoting *Demkovich v. St. Andrew the Apostle Par. Calumet City*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc) (quoting *Our Lady of Guadalupe*, 140 S. Ct. at 2061)). Religious groups can "define their own doctrine, membership, organization, and internal requirements without state interference." *Demkovich*, 3 F.4th at 975. This autonomy protects religious groups in the conduct of their internal affairs and the state from "entangle[ment] in essentially religious controversies." *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976).

Under the principle of church autonomy, "[r]eligious organizations come before [civil courts] in the same attitude as other voluntary associations." *Watson v. Jones*, 80 U.S. 679, 714 (1871). But courts leave fundamentally religious questions to religious bodies, then apply the law just as they do to nonreligious entities. *See Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 303–05 (1985). Courts need not—and cannot—dismiss a case simply because a defendant declares religious questions or defenses are involved. *Id.*; *see also Seshadri v. Kasraian*, 130 F.3d 798, 800 (7th Cir. 1997).

Questions about religious education are protected by church autonomy. "[T]he very core of the mission" of religious education is inculcating faith. *Starkey*, 41 F.4th at 939. Given the role of teachers, for example, the National Labor Relations Board cannot interfere with teacher-school employment relationships at religious schools. *See Cath. Bishop of Chicago v. N.L.R.B.*, 559 F.2d 1112, 1120, 1124 (7th Cir. 1977), *aff'd*, 440 U.S. 490 (1979). Why? Because litigation could harm the school's religious autonomy as the government would "becom[e] entangled in doctrinal matters." *Id.* at 1125. After dismissing a teacher for "teaching a doctrine" contrary to the

school's faith, the NLRB would have to ask if religion was "merely a pretextual reason" for discharge. *Id.* In response, the bishop "would have to eliminate the pretextual aspect," which would require proving up the validity and credibility of "the claimed doctrinal position" for termination. *Id.* at 1129. This would require "explanation and analysis, and probably verification and justification, of the doctrinal precept involved," which "would itself erode the protective wall afforded by the constitutional right." *Id.*[1]

As the Supreme Court explained in *Our Lady of Guadalupe*, "the general principle of church autonomy" protects "internal management decisions that are essential to [a religious group's] central mission." *Id.* at 2060–61. Together, the cases above hold that courts cannot adjudicate employment claims involving decisions that turn on matters of faith, doctrine, and internal governance.

## II

Under the collateral order doctrine, appellate courts need not wait for a final decision in all cases. This court has not decided whether the collateral order doctrine categorically

---

[1] A "component" of church autonomy is a religious institution's "selection of individuals who play certain key roles." *Our Lady of Guadalupe*, 140 S. Ct. at 2160. What follows is the "ministerial exception" to antidiscrimination laws, which dictates that "courts are bound to stay out of employment disputes involving those holding certain important positions" within religious groups. *Starkey*, 41 F.4th at 939 (quoting *Our Lady of Guadalupe*, 140 S. Ct. at 2060). The ministerial exception shares its rationale (and much interpreting case law) with "the general principle of church autonomy." *Our Lady of Guadalupe*, 140 S. Ct. at 2061; *Demkovich*, 3 F.4th at 975. Appellant Moody Bible Institute does not raise the ministerial exception in this appeal.

applies to cases involving church autonomy. It does. A pre-judgment order implicating immunity under church autonomy is reviewable on interlocutory appeal. Orders denying immunity in other contexts are similarly reviewable on interlocutory appeal, and other avenues of review are insufficient.

## A

We are generally limited to review of "final decisions." 28 U.S.C. § 1291. But per *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949), § 1291 permits immediate appeal of a "small class" of orders that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." 337 U.S. at 546. This limited review of certain categories of orders, known as the collateral order doctrine, applies when: (1) a district court order has "conclusively decided a contested issue"; (2) "the issue decided is important and separate from the merits of the action"; and (3) the order "would be effectively unreviewable later in the litigation." *Osborn v. Haley*, 549 U.S. 225, 238 (2007) (citing *Cohen*, 337 U.S. at 546).

If a category of orders satisfies the collateral order doctrine, every order in that category is immediately appealable, *see Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994), regardless of a given order's strengths or the record's completeness. *Cohen* does not permit case-by-case analysis; we are to look to the "entire category to which a claim belongs, without regard to the chance that the litigation at hand might be speeded, or a 'particular injustice' averted." *Id.* (quoting *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988) (cleaned up)).

Expanding the collateral order doctrine to new areas of law is disfavored. *See, e.g.*, *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 114 (2009); *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 48 (1995) (insisting that Congress's determination of jurisdictional rules "warrants the Judiciary's full respect"). The doctrine has been interpreted narrowly, for if it was not, it could "swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Digit. Equip. Corp.*, 511 U.S. at 868; *see also Will v. Hallock*, 546 U.S. 345, 350 (2006).

But acknowledging that the collateral order doctrine is narrow does not preclude us from recognizing a category of cases that falls within it.[2] Applying the collateral order doctrine is not expanding it. *Contra supra* at 13. The Supreme Court has counseled caution when expanding the collateral order doctrine. The majority opinion here presses *Swint*'s 1995 caution against such expansion. But two years after *Swint*, in *Clinton v. Jones*, 520 U.S. 681, 707 n.41 (1997), the Court explicitly referenced *Swint* and recognized a new

---

[2] Indeed, this circuit's Rule 28(a)(3)(ii) recognizes this and requires litigants to provide the information to determine whether the collateral order doctrine applies to their case:

> (3) If an appeal is from an order other than a final judgment which adjudicates all of the claims with respect to all parties, counsel shall provide information necessary to enable the court to determine whether the order is immediately appealable. Elaboration will be necessary in the following cases …

> (ii) If the ground of jurisdiction is the "collateral order doctrine," describe how the order meets each of the criteria of the doctrine … .

Cɪʀ. R. 28(a)(3)(ii).

category of the collateral order doctrine to encompass immunity from trial.

The Supreme Court and our court have not conclusively addressed whether a decision implicating immunity under church autonomy is categorically a collateral order. Other circuits have struggled mightily with this question.[3] With no clear answer, close review of precedent is required.

**B**

The parties wrangle over whether this court's previous decision in *McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013), or in *Herx v. Diocese of Fort Wayne-S. Bend, Inc.*, 772 F.3d 1085 (7th Cir. 2014), resolves this question. Neither does.

Garrick points to *Herx* and contends we lack jurisdiction. But *Herx* is distinguishable. There, a former teacher at a Catholic school sued under Title VII after she was fired for undergoing in vitro fertilization. 772 F.3d at 1086. The diocese argued that it should prevail because of its important interests under Title VII's religious exemption as well as church autonomy. *Id.* at 1087–88. When the district court denied summary judgment as to both defenses, the diocese immediately appealed. *Id*. at 1088.

---

[3] The Second Circuit in *Belya v. Kapral*, 59 F.4th 570 (2d Cir. 2023), *denying rehearing en banc of* 45 F.4th 621 (2d Cir. 2022), *cert. denied* 143 S. Ct. 2609 (2023), by a 6–6 vote declined to rehear a panel decision holding that a religious autonomy decision is not a collateral order. 59 F.4th at 571. The Tenth Circuit in *Tucker v. Faith Bible Chapel Int'l*, 53 F.4th 620 (10th Cir. 2022), *denying rehearing en banc of* 36 F.4th 1021 (10th Cir. 2022), *cert. denied* 143 S. Ct. 2608 (2023), by a 6–4 vote declined to rehear a similar decision. 53 F.4th at 621–22.

This court ruled that it did not have jurisdiction to review either order. *Id.* at 1090–91. "[O]nly a few sentences" in the diocese's briefing were even "addressed to the criteria for collateral-order review." *Id*. at 1090. The diocese "cite[d] no authority" for the proposition that its defenses "provide an immunity from the burdens of trial rather than an ordinary defense to liability." *Id*. at 1091. Despite "the importance of the interests" the diocese asserted, it did not satisfy the collateral-order doctrine. *Id.*

*Herx* left open the possibility that if the diocese had shown immunity from the judicial process, an interlocutory appeal may have been warranted. In *Herx*, this court "h[e]ld only that the Diocese has not made a persuasive case for expanding the scope of the collateral-order doctrine to cover the interlocutory decision rendered here." 772 F.3d at 1091. That holding does not apply here. Extensive authority—including more recent precedent from the Supreme Court (*Our Lady of Guadalupe*, 140 S. Ct. at 2061) and this court (*Sterlinski v. Cath. Bishop of Chicago*, 934 F.3d 568, 570 (7th Cir. 2019); *Demkovich*, 3 F.4th at 975)—confirms the importance of church autonomy. *Herx* was a procedural dismissal. *See Tucker*, 36 F.4th at 1056 n.8 (Bacharach, J., dissenting).[4] So, I disagree with my colleagues that *Herx* controls the jurisdictional question here.

---

[4] As the dissent stated in *Tucker*:

*Herx* lacks any persuasive value because it relied only on the religious body's failure to present "a persuasive case" that the ministerial exception satisfied the collateral-order doctrine. For this conclusion, the Seventh Circuit relied on deficiencies in the briefing, stating that the religious body had focused "mainly on the merits," spent "only a few sentences" on jurisdiction, and failed to cite relevant authority.

Moody points to *McCarthy*, a decision addressing a defamation claim over calling a woman a "fake nun." 714 F.3d at 974. The district court had denied a motion to take judicial notice of an archbishop's determination that the woman was not a nun in good standing, ruling instead that a jury would decide that disputed factual question. *Id.* This court reversed, holding that a pretrial order denying the Religion Clauses' protection for church autonomy—specifically, the order submitting an explicitly religious question to a jury—was appealable under the collateral order doctrine. *Id.* Such an order is "closely akin to a denial of official immunity," this court ruled, the archetype of an appealable interlocutory order. *Id.* at 975–76. Like official immunity, allowing a claim barred by the Religion Clauses to proceed to discovery and trial conclusively forecloses constitutional protections against "commingling of religious and secular justice." *Id.* This immunity against "governmental intrusion into religious affairs" is "'conceptually distinct' from the merits" of the underlying claim. *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985)). And the Religion Clauses prevent not just "an adverse judgment," but also the "irreparable" harm caused by judicial proceedings where a "secular court [will] take sides on issues of religious doctrine." *Id.* No mention was ever made in *McCarthy* of a writ of mandamus.

This case is closer to *McCarthy* than to *Herx*. Still, *McCarthy* does not necessarily control. There, the court concluded that a decision was immediately appealable because the First Amendment "forbids the government to make religious judgments" at all. *McCarthy*, 714 F.3d at 976. This is a somewhat

---

36 F.4th at 1056 n.8 (Bacharach, J., dissenting) (citations omitted).

different question than the one raised here, which is whether the Religion Clauses of the First Amendment confer an immunity from adjudication generally.

Because this court's precedent does not establish whether a church autonomy decision qualifies as an order subject to interlocutory review, this question should be answered by looking to 28 U.S.C. § 1291 and the test the Supreme Court set in *Cohen*.

## C

The collateral order doctrine is a "practical rather than technical construction" of 28 U.S.C. § 1291. *Cohen*, 337 U.S. at 1226. Practically construed, a decision impacting church autonomy meets each of the three collateral order requirements.

*1. Order has conclusively decided a contested issue.* "The most basic element of collateral order finality is that the district court must have decided the matter offered for appeal." 15A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3911.1 (3d ed. Apr. 2023 update).

A claim concerning a religious organization's faith, doctrine, or internal governance opens up that organization to litigation. A district court's decision on such a claim implicates church autonomy. And "where it applies, the church-autonomy principle operates as a complete immunity, or very nearly so." *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013).

When a district court conclusively decides a contested issue—whether a religious organization is entitled to immunity from litigation under church autonomy, or whether the suit continues—the first requirement of the collateral order doctrine has been satisfied. A critical component of immunity is "an entitlement not to stand trial or face the other burdens of

litigation," which is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526. In other words, when immunity is taken off the table, a conclusive decision has been made that we can review.

*2. Issue decided is important and separate from the merits.* A key condition of the collateral order doctrine is that "the issue decided is important and separate from the merits of the action." *Osborn*, 549 U.S. at 238 (citing *Cohen*, 337 U.S. at 546).

An order resolving a church autonomy defense under the Religion Clauses presents an important First Amendment question. Because religious autonomy "lies at the foundation of our political principles," *Watson*, 80 U.S. at 728, a decision on a claim implicating church autonomy involves an important question. "When a policy is embodied in a constitutional or statutory provision entitling a party to immunity from suit (a rare form of protection), there is little room for the judiciary to gainsay its 'importance.'" *Digit. Equip. Corp.*, 511 U.S. at 879 (quotations omitted). "Where statutory and constitutional rights are concerned, irretrievabl[e] los[s] can hardly be trivial… ." *Id.*

We also consider whether the issue is separate from the merits of a plaintiff's claim. The Court has recognized that "a question of immunity is separate from the merits of the underlying action for purposes of the *Cohen* test even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue." *Mitchell*, 472 U.S. at 528–29. Whether a case turns on a religious question can be "conceptually distinct from the merits of the plaintiff's claim." *Id.* at 527; *see id.* at 527-29 (issue of qualified immunity purely legal; question on appeal is—assuming truth of allegations and assuming without deciding that those facts state a

claim—whether the law was clearly established when the defendant acted); *see also* 15A WRIGHT & MILLER at § 3911.2. A decision as to whether a case turns on a religious question is not a step toward a final judgment and is separate from the merits of the action, satisfying the second element of the collateral order doctrine. *See Cohen*, 337 U.S. at 546.[5]

*3. Order is effectively unreviewable later in litigation.* Last, to satisfy the collateral order doctrine "[t]here must be a risk that the order will evade review on appeal from a final judgment, and the evasion of review must create a significant hardship." 15A WRIGHT & MILLER at § 3911.3. Appeals of collateral orders are appropriate "only where the order at issue involves 'an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial.'" *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (quotation omitted).

An appeal from a final judgment would do no good to address a pre-judgment order about whether the immunity conferred by church autonomy applies, as "it will be too late effectively to review" the order. 15A WRIGHT & MILLER at § 3911.3. The question of immunity from suit under the church autonomy doctrine, after litigation and the court's decision, would be automatically answered to the contrary.

Litigation and its related costs create a hardship that the church autonomy doctrine was meant to avoid—an adversity

---

[5] For example, in *Belya* the majority opinion, 45 F.4th at 632, and the dissent from the denial of rehearing en banc, 59 F.4th at 578, effectively agreed that this second element was satisfied when litigating a church autonomy defense. *See also Tucker*, 36 F.4th at 1036 (majority explaining that *Cohen*'s second requirement satisfied).

that is effectively unreviewable later in a case. Avoiding that harm is why immunity-related issues should be decided at the earliest opportunity.

The Supreme Court has explained that the Religion Clauses limit the process of litigation, not merely liability. This is because "[i]t is not only the conclusions that may be reached by [the government] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *Cath. Bishop*, 440 U.S. at 502. Indeed, the Religion Clauses bar "any attempt" by courts "even to influence" matters of faith, doctrine, or governance. *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

This court has also stressed that the Religion Clauses protect religious organizations from the harm caused by a trial, not just an adverse judgment. Sitting en banc, this Court echoed the Supreme Court's admonition that "'the very process of inquiry'" can "impinge on rights guaranteed by the Religion Clauses," warning those rights can be harmed by the "protracted legal process" of Title VII adjudication and the ensuing "prejudicial effects of incremental litigation." *Demkovich*, 3 F.4th at 982–83 (quoting *Cath. Bishop*, 440 U.S. at 502 and *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)).

In *Catholic Bishop of Chicago v. NLRB*, this court rejected the NLRB's attempt to exercise jurisdiction over Catholic schools in part because of the "chilling aspect" that a "protracted and expensive unfair labor practice proceeding" would have on the schools' religious freedom. 559 F.2d at 1124. Similarly, in *Sterlinski*, this court ruled that a purpose of the church autonomy doctrine is "to avoid such judicial entanglement" as "subjecting religious doctrine to discovery and, if necessary,

jury trial." 934 F.3d at 570. In sum, where "the course of adjudication" will cause religious entanglement, judicial involvement is barred. *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006).[6] The process is part of the injury against which the First Amendment protects.

## D

The church autonomy doctrine is similar to other immunity doctrines on which collateral orders may warrant immediate appeal. *See, e.g., P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993) (Eleventh Amendment immunity); *Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982) (absolute immunity); *Abney v. United States*, 431 U.S. 651, 662 (1977) (double jeopardy immunity);[7] *see also* Lael D. Weinberger, *Is Church Autonomy Jurisdictional?*, 54 LOY. U. CHI. L.J. 471, 503–05 (2023). Chief among these is qualified immunity,

---

[6] *See also* Amicus Brief of Federal Courts Professor Derek T. Muller at 4–5, *Garrick v. Moody Bible Inst.*, No. 21-2683 (7th Cir. Aug. 7, 2023) ("When a district court denies a pretrial motion (1) asserting a defense against the burdens of litigation itself (2) that is rooted in constitutional principles, its order is immediately appealable under Section 1291. … [T]he church autonomy defense meets both those criteria … .")

[7] The majority opinion attempts to distinguish the church autonomy doctrine by saying, "this suit implicates only private parties." *Supra* at 21. But the collateral order doctrine is not limited to government officials or entities. Private parties' interests are regularly protected. *See, e.g., Abney*, 431 U.S. at 659, 662 (holding that a "pretrial order denying a motion to dismiss an indictment on double jeopardy grounds" satisfies *Cohen* and "the jurisdictional prerequisites" of 28 U.S.C. § 1291); *Sell v. United States*, 539 U.S. 166, 173, 177 (2003) (holding that an "order authorizing the involuntary administration of antipsychotic drugs" to a criminal defendant "was an appealable 'collateral order'" under 28 U.S.C. § 1291).

recognized in *Mitchell* as providing the basis for appeal of a collateral order. 472 U.S. at 527–29.

Several courts, including this one, *see McCarthy*, 714 F.3d at 975, have recognized the similarities between church autonomy and qualified immunity. *See Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238, 1242 (10th Cir. 2010); *Petruska v. Gannon Univ.*, 462 F.3d 294, 302–03 (3d Cir. 2006); *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 (10th Cir. 2002) ("[T]he assertion that the First Amendment precludes [a lawsuit challenging church decision-making] is similar to a government official's defense of qualified immunity.").

Both immunities are rooted in foundational constitutional interests—the former the interest in precluding governmental intervention in religious disputes, and the latter in separation of powers concerns. *See Belya*, 59 F.4th at 578–79 (Park, J., dissenting from the order denying rehearing en banc). Both are protections against the burdens of litigation. *Id.* at 579. And both involve legal questions that must be decided at the threshold. *See Mitchell*, 472 U.S. at 525–26 (holding qualified immunity defense should be decided early); *Tucker*, 36 F.4th at 1056–57 (Bacharach, J., dissenting) (noting value of early judicial review for ministerial exception and how ministerial exception is analogous to qualified immunity); *Tucker*, 53 F.4th at 627 (Bacharach, J., dissenting from denial of en banc consideration). (discussing negative impact of delayed judicial review); Weinberger at 501–02 (stating reason for early resolution of immunity claims applies to church autonomy cases).

Church autonomy cases implicating immunity are even better candidates for interlocutory appeal than qualified immunity cases. Both immunities should be addressed at the

threshold of litigation, but for different reasons. Qualified immunity is resolved early to avoid excessive disruption of government, and it is a judicially-crafted doctrine. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Yet, early resolution of immunity under the church autonomy doctrine is essential to protect a religious organization's First Amendment rights and to avoid excessive entanglement of the government in religious affairs. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188–89 (2012).

### E

There are other paths to appellate review of a case before judgment without recognizing a new appeal as of right. A district court can certify a question of law for interlocutory review under 28 U.S.C. § 1292(b). *See Demkovich*, 3 F.4th at 974. And a party may petition for relief under the All Writs Act, 28 U.S.C. § 1651(a). But those alternative routes do not preclude the collateral order doctrine from applying to church autonomy decisions, and the Rules Enabling Act, 28 U.S.C. § 2072(c), does not change that.

Section 1292(b) is too arbitrary of a vehicle for review when constitutional rights are at stake. "The fundamental purpose of § 1292(b) is to permit discretionary avoidance of the finality requirement." 16 WRIGHT & MILLER at § 3929.1. Church autonomy cases derive their immunity from the Religion Clauses of the First Amendment, a constitutional protection that is not discretionary. An interlocutory appeal under § 1292(b) may result in capricious outcomes. Consider two cases with similar facts in the same procedural posture presenting the same issue implicating church autonomy. They could result in identical rulings, yet one district court may

certify its order for interlocutory appeal under § 1292(b) while another may not (more on this later).

A writ of mandamus under 28 U.S.C. § 1651(a) is an extraordinary vehicle that cannot substitute for appellate review of a category of collateral orders. "[I]t is regularly stated that a writ must not be used as a mere substitute for appeal." 16 WRIGHT & MILLER at § 3932; *see also id.*, at § 3929.1. The burden to secure a writ is much greater: the challenged order "must so far exceed proper bounds of judicial discretion as to be legitimately considered usurpative in character, or in violation of a clear and indisputable legal right, or, at the very least, patently erroneous." *In re LimitNone, LLC*, 551 F.3d 572, 575 (7th Cir. 2008) (citation omitted).

These two paths may allow oversight of an individual case. But they are no match for the review of the category of claims implicating church autonomy.

The Rules Enabling Act, 28 U.S.C. § 2072(c), also is not a valid alternative when immunity under the First Amendment's church autonomy is implicated. That Act gives the Supreme Court authority to issue rules defining which orders should be considered final and appealable under 28 U.S.C. § 1291, and which categories of nonfinal, interlocutory orders should be immediately appealable under 28 U.S.C. § 1292. *See id.* § 1292(e). But Congress cannot create a rule to limit a constitutional right; that would require constitutional amendment.

\*     \*     \*

For these reasons, we have jurisdiction to review a district court's order on a claim implicating immunity under the

church autonomy doctrine. Such an order qualifies as a "final decision" and should be immediately appealable.[8]

This does not mean that decisions on all claims involving a religious organization would satisfy the collateral order requirements. Many types of litigation involving religious organizations fail to implicate church autonomy, from civil tort, to breach of contract, to real and personal property disputes. A chasm may exist between such claims and a cause of action implicating church autonomy. But just because the former claims do not qualify for interlocutory review, it does not follow that the latter should not qualify under the collateral order doctrine.

### III

The district court's decisions here fall into a category of orders subject to interlocutory review. This case's facts and history, considered under the requirements of the collateral order doctrine, show why.

### A

*1. Garrick alleges religious discrimination, and her claims are dismissed.* Garrick filed an EEOC charge in January 2018 alleging sex, religion, and retaliatory discrimination in violation of Title VII. She claimed Moody terminated her "because of [her] gender and [her] religion (egalitarian Christian)." The EEOC

---

[8] *See, e.g.,* Adam R. Moore, *A Textualist Defense of a New Collateral Order Doctrine*, 99 NOTRE DAME L. REV. REFLECTION 1, 39–45 (2023) (denial of motion to dismiss on religious autonomy defense is "final decision[]" and can be immediately appealed under § 1291).

investigated, was unable to find a violation, and issued her a right-to-sue letter.

Garrick sued, and her first amended complaint included several employment-related discrimination claims. In that pleading, Garrick asserted that Moody's religious discrimination was in part pretext. But in that same complaint, she also alleged that Moody had "created a hostile workplace by discriminating against egalitarian Christians repeatedly." Garrick expressly claimed that "Moody discriminated against [her] on the basis of religion (egalitarian Christian) in violation of [Title VII]."

The district court granted Moody's motion to dismiss. The court considered Moody's defense of church autonomy and concluded that "Moody's alleged reasons for firing Garrick were rooted firmly in its religious beliefs." If the court "were to delve into the disputes posed by Garrick, it would impermissibly inject the auspices of government into religious doctrine and governance." The court also dismissed Garrick's other claims, but it did so without prejudice and allowed Garrick to replead. 412 F. Supp. 859 (N.D. Ill. 2019).

*2. Garrick amends her pleading, limiting religious references.* In her second amended complaint, Garrick claimed that Moody committed sex discrimination and engaged in disparate treatment and retaliation, all in violation of Title VII. The second amended complaint left unchanged the numerous allegations describing how Garrick advocated against Moody's beliefs and practices related to gender roles in pastoral ministry. She continued to claim that Moody told her verbally and in writing that her contract was not renewed because she "was not aligned with [Moody's] doctrinal statement as it related to gender roles in ministry."

In this pleading, Garrick alleged no new material facts and raised no new claims. In some instances, she simply deleted doctrinal words like "Bible" and "Theology" that she had previously pleaded. The second amended complaint again alleged that Moody required all faculty members to affirm its doctrinal statements as part of their employment contract, and that Garrick openly rejected the doctrinal statement's position on the role of women in the ministry. She also repeated verbatim her allegation that the stated reason for her termination—that she "held an egalitarian view"—was "pretext for [Moody's] true motives—discrimination and retaliation."

Despite not including new material facts and not raising new claims, Garrick adjusted her narrative to support a new theory. Now, she said, Moody's given explanation for her termination was pretext for discrimination, which arose only after she advocated for full inclusion of female students.

But the record is directly to the contrary. Garrick lays out the parties' disagreement about religious beliefs in her EEOC charge and first amended complaint. Those religious beliefs permeate her employment at this faith-based school and her various claims.[9] The same holds true for Moody's defenses.

---

[9] For example, Garrick claims Moody relied on religious disagreement as pretext for sex discrimination, as shown in her 2017 termination letter in which Moody claims that Garrick is a "poor fit" at the school. But this termination letter was not the first time Moody had shared its concern about the differing religious beliefs between Garrick and the school. Throughout 2016 the parties disagreed about gender participation in the ordained ministry. And Moody "announced that it intended to … open the Pastoral Ministry program to women" in April 2016. Several months later, in September 2016, Garrick told a story about a transgender student who felt excluded at Moody. The next day a Moody administrator told Garrick she was "not a Moody fit." So, the religious disagreement—and

Questions about those beliefs would inevitably arise during litigation, and again lead to the district court's original conclusion of judicial entanglement in religious questions. So, Moody again moved to dismiss, raising the church autonomy defense.

*3. Garrick's second amended complaint is allowed to proceed.* This time, though, the district court denied Moody's motion to dismiss, and Garrick's second amended complaint survived. 494 F. Supp. 570 (N.D. Ill. 2020).

The district court acknowledged that "the religious autonomy doctrine turns on the substance of a plaintiff's claims, not the label she chooses to attach to them" and that much of Garrick's complaint continued to revolve around her disagreement with Moody's religious "complementarian creed." Nevertheless, the court ruled that Garrick's sex discrimination claim could proceed because, although the first amended complaint alleged "she was actually fired because of her advocacy in favor of female students joining the Pastoral Ministry Program," "the present complaint portrays Moody's religious justification as a pretext for gender discrimination." According to the district court, the case could proceed without the court "sit[ting] in judgment as to what Moody's complementarian doctrine entails or whether it represents a reasonable basis for firing Garrick." Rather, at issue is "whether Moody terminated her because of its religious beliefs or whether its invocation of its religious beliefs was, in fact, a cover to discriminate against Garrick because of her gender."

---

the "poor fit"—stemmed from the meeting where Garrick told the story, which was after the inclusion of female students was resolved.

To the district court, church autonomy prohibits courts from determining the validity or plausibility of a religious rationale, not whether the supposed religious rationale was the actual motivation for a decision. Because Garrick plausibly alleged that Moody's true reason for firing her was sex discrimination, the church autonomy doctrine did not "entirely foreclose[] Garrick's claims." But to the extent Garrick's allegations challenged Moody's complementarian beliefs, the district court again explicitly rejected them. In so concluding, the court did not acknowledge that both complaints contained identical language regarding pretext. Nor did the court address Garrick's EEOC charge, attached to both complaints, with its sworn admission that Moody declined to renew Garrick's contract because she rejected Moody's religious beliefs.

Moody moved for reconsideration, again relying on church autonomy principles as barring Garrick's claims, but the district court denied the motion. In the alternative, Moody sought certification to appeal under 28 U.S.C. § 1292(b). The district court denied this request in one sentence of reasoning: Moody had not cited a decision showing "that the First Amendment bars any inquiry into whether a religious employer's proffered doctrinal reason for an adverse employment action was the actual reason … ."

**B**

Moody, as the appellant, bears the burden to show that a decision meets the collateral order doctrine's requirements. Garrick contends that Moody cannot carry its burden, but that is not correct. Each of the three collateral order doctrine requirements are met because the district court's decisions on Moody's second motion to dismiss and motion for reconsideration directly implicate church autonomy.

*1. Order has conclusively decided a contested issue.* The district court's decisions allowing this suit to continue are conclusive because they take immunity off the table.

The decisions will subject Moody to invasive civil adjudication, including depositions of school leaders about sensitive religious matters. Garrick will ask a jury to attribute secular, sex-based motivations to Moody, even while admitting that Moody had religious motivations and that the parties had a religious dispute about sex-based religious distinctions for religious leadership roles. Her claims will thus entangle the courts and a jury in questions over the development, meaning, and strength of Moody's church-leadership doctrines; its internal religious deliberations regarding Garrick's rejection of its doctrine; and its religious decisions involving other professors and students that violated its doctrine. Likewise, to persuade a jury of the credibility of its religious motivations, Moody will have to show the importance of its religious doctrine—and the importance of all its teachers agreeing with it—as that doctrine relates to Moody's religious mission. *See Cath. Bishop*, 559 F.2d at 1120, 1124. Thus, a "civil factfinder" will "sit[] in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission." *Hosanna-Tabor*, 565 U.S. at 206 (Alito, J., concurring). The district court's decisions on Moody's motions to dismiss directly impact the religious school's claim of church autonomy in shaping its own religious doctrine and internal governance.

The majority opinion frames the district court's decisions as "den[ying] [Moody's] religious autonomy guaranteed by the First Amendment by second-guessing its determination that Garrick was not in doctrinal good standing." *Supra* at 18.

But that is not quite accurate. Yes, Moody explains that the district court "ordered that the judiciary must second-guess [its] determination that Garrick was not in doctrinal good standing … ." And Moody says that, because of that order, the school will be subject "to invasive civil adjudication." But that litigation is what Moody claims violates its religious autonomy guaranteed by the First Amendment.

The district court conclusively denied Moody's religious autonomy guaranteed by the First Amendment. It did so not by second-guessing its decision that Garrick was not in doctrinal good standing, but by making Moody continue legal proceedings when a faith-based school is immune from litigation about religious issues. It engaged with this question several times, initially granting the motion to dismiss, and then denying the second motion to dismiss as well as the motion for reconsideration. The court decided between ending the litigation or letting it continue. That is the conclusive decision which Moody says should not stand.

*2. Issue decided is important and separate from the merits.* The First Amendment right against government intrusion and entanglement in religion is undoubtedly important and is "conceptually distinct" from Garrick's Title VII claims. Not only is the right "capable of review without extensive examination of the underlying merits of the case," *Montano v. City of Chicago*, 375 F.3d 593, 598–99 (7th Cir. 2004), it seeks to prevent such entangling merits examination. That is because the church autonomy doctrine is a "broad principle" that both guarantees a religious group's "independence in matters of faith and doctrine and in closely linked matters of internal government," *Our Lady of Guadalupe*, 140 S. Ct. at 2061, and sets the federal

judiciary's "independent" obligation to avoid entanglement in "religious controversy." *Tomic*, 442 F.3d at 1042.

Once again, Garrick and my colleagues misunderstand the issue that is separate from the merits of the action. As explained above, the conclusive decision is whether Moody's First Amendment right to church autonomy applies to Garrick's second amended complaint, not whether Moody's stated reason for firing Garrick is pretext. I agree that the latter is not separate from the merits of a Title VII claim—it *is* the merits of such a claim. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (explaining methods of proof for discrimination claim, including role of pretext evidence). But that is not the question presented to us here.

*3. Order is effectively unreviewable later in litigation.* Moody correctly concludes that its First Amendment rights will be lost forever if appellate review is postponed. Adjudication will result in "onerous" burdens on church autonomy rights, including "depositions of fellow ministers and the search for a subjective motive behind the alleged hostility," all of which "impermissibly requires 'intrusion into a religious thicket.'" *Demkovich*, 3 F.4th at 981, 983 (quoting *Milivojevich*, 426 U.S. at 719). The church autonomy doctrine provides religious organizations immunity from not only an adverse adjudication, but from the judicial process. If this court does not hear this issue on interlocutory appeal, Moody will be irreparably harmed. This court should exercise jurisdiction under the collateral order doctrine.

## C

We should see this case for what it is—Garrick and Moody profess different views of Christianity and how that faith

should be taught. Even before she filed suit, Garrick claimed that is why Moody fired her. And on that ground, Moody must defend itself and its decisions.

Written and oral discovery will unavoidably implicate the parties' religious differences. Their beliefs will be scoured for evidence on the topic of pretext. To properly represent their clients, attorneys for each party will have to delve into many religious topics:

- Garrick's beliefs as to Moody's doctrinal statement on complementarian Christianity, which was incorporated into the faculty contract she signed three times;

- Moody's knowledge about Garrick's egalitarian religious beliefs and her disagreements with the school's complementarian religious beliefs, including before hiring her;

- Whether Moody appropriately relied on Garrick's affirmation of the school's doctrinal statement as proof of complementarian beliefs;

- Garrick's advocacy at the school for egalitarian rather than complementarian Christianity;

- Garrick's view of the gender roles in Christian ministry;

- Whether Moody's complementarian religious beliefs have changed before, during, or after Garrick's employment at the school;

as well as other matters evincing religious differences between the parties. It is not possible to litigate this case without touching religious topics and questions.

After the parties explain and defend their differing views of Christianity during discovery, summary judgment motions will follow. Then the courts will face the dispositive question: can Moody end the employment of a teacher whose religious views differ from those of the school?

The district court thought that whether Moody's religious beliefs supplied a reasonable basis to terminate Garrick need not be reached. Discovery would merely examine whether Moody's religious beliefs were a pretext for sex discrimination. 494 F. Supp. 3d at 576–79. But there is no way to decide whether termination is based on different religious beliefs—or whether those beliefs are pretextual—without exploring what those religious beliefs are: what they entail, their contours, how they differ, and more.

A district court cannot monitor this case through its life cycle without entering the field of religious controversy. This will threaten a faith-based school's autonomy over its affairs and its authority to shape and control how and what it teaches.

The district court correctly recognized this in its first decision on Moody's motion to dismiss. Garrick's second amended complaint was sanitized of some religious terms,[10] but her claims remained essentially the same.[11] In all material respects, this is the same lawsuit before and after the district

---

[10] Even after repleading, the second amended complaint mentions egalitarian Christianity five times (Dkt. 97 ¶¶ 20, 85, 89, 93, 96) and complementarian Christianity and Garrick's Christian beliefs once each (Dkt. 97 ¶ 96 and ¶ 20).

[11] Eleven of Garrick's thirteen allegations of discrimination in the second amended complaint were in her first amended complaint.

court's decision on Moody's first motion to dismiss. Regardless of how Garrick attempts to purge religious language from her complaint, the record shows how her claims implicate church autonomy, and thus why an interlocutory appeal here is proper. A fundamental right like church autonomy, as found in the First Amendment Religion Clauses, should not turn on a pleading game.

For my colleagues, "[c]ourts may exercise authority when the resolution does not require inquiry into doctrinal disputes." *Supra* at 13. This begs the question, though, as to when and how the court inquires into religious doctrine. The majority opinion says the district court "rightly noted" that the second amended complaint alleges gender discrimination "apart from any doctrinal disagreements." *Supra* at 15 n.6. But as demonstrated above, the factual background and procedural history here evidence a deep and abiding religious disagreement between Garrick and her avowed egalitarian Christianity and Moody's institutional complementarian Christianity. That fundamental dispute underpins Garrick's complaints about her employment and Moody's defense of its decisions and actions. Why she was terminated—the subject of discovery and trial—turns on this disagreement.

It follows that we have jurisdiction here to review the district court's collateral orders implicating church autonomy. Like with qualified immunity, interlocutory review on questions of church autonomy should not depend on a district court's discretionary call on whether to certify its order for interlocutory appeal under § 1292(b). Notwithstanding similar employment disputes, in *Demkovich* the district court allowed an interlocutory appeal under § 1292(b). 3 F.4th at 974. Yet here, the district court did not. This stark contrast shows the

need for categorical review of church autonomy decisions, including in this case.

Moody and other religious entities and organizations are not entitled to complete immunity from suit. Rather, they may be entitled to immunity when church autonomy questions about religious doctrine are at issue. If Garrick fell on school property, or a car crashed into her vehicle in the school parking lot, nothing would prevent her from suing the school in tort. Or if Garrick bought personal property from Moody and they disputed that transaction, she could certainly sue the school for breach of contract. Church autonomy is not implicated in any of those types of actions. But when Garrick sues a religious school claiming she was fired because she and Moody profess different Christian tenets, that places how the parties understand and live out their faiths—including their religious differences—at the center of that lawsuit and subject to discovery and trial.

Appellate jurisdiction exists here under the collateral order doctrine. Because the majority opinion concludes it does not and declines to reach the merits, I do not reach the merits either.

For the reasons given above, I respectfully dissent from the dismissal of this appeal for lack of jurisdiction.