No. 21-2683

# In the United States Court of Appeals for the Seventh Circuit

JANAY E. GARRICK,

*Plaintiff-Appellee*,

v.

MOODY BIBLE INSTITUTE,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
Case No. 1:18-cv-00573

**BRIEF OF *AMICI CURIAE*
FORMER EEOC GENERAL COUNSEL AND
REGLIGIOUS NONDISCRIMINATION EXPERT
IN SUPPORT OF DEFENDANT-APPELLANT
PETITIONING FOR REHEARING EN BANC**

Robert K. Kelner
MaKade C. Claypool
  *Counsel of Record*
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
mclaypool@cov.com

*Counsel for Amici Curiae*

Save As    Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-2683

Short Caption: Garrick v. Moody Bible Institute

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Sharon Fast Gustafson; Rachel N. Morrison

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Covington & Burling LLP

(3) If the party, amicus or intervenor is a corporation:

    i) Identify all its parent corporations, if any; and
N/A

    ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ MaKade C. Claypool    Date: April 22, 2024

Attorney's Printed Name: MaKade C. Claypool

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]    No [ ]

Address: 850 Tenth Street, NW

Washington, DC 20001-4956

Phone Number: 1(202) 662-6000    Fax Number:

E-Mail Address: mclaypool@cov.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... ii

INTEREST OF *AMICI CURIAE* ............................................................1

ARGUMENT ...........................................................................................1

    I.    The panel's decision will encourage greater EEOC involvement in religious employment disputes at the expense of constitutional protections. ....................................3

    II.   Greater EEOC involvement will impose heavy (and unnecessary) burdens on religious organizations. ................5

    III.  Greater EEOC involvement will inevitably lead to greater governmental entanglement with religion. ...............8

CONCLUSION .....................................................................................13

CERTIFICATE OF COMPLIANCE.......................................................14

CERTIFICATE OF SERVICE...............................................................14

# TABLE OF AUTHORITIES

**Cases**

*Belya v. Kapral*,
    59 F.4th 570 (2d Cir. 2023) ............................................................... 11

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ......................................................................... 9

*Carroll Coll. v. NLRB*,
    558 F.3d 568 (D.C. Cir. 2009) ........................................................ 9

*Cath. Bishop v. NLRB*,
    559 F.2d 1112 (7th Cir. 1977) ....................................................... 11

*Conlon v. InterVarsity Christian Fellowship*,
    777 F.3d 829 (6th Cir. 2015) .......................................................... 4

*Corp. of Presiding Bishop of Church of Jesus Christ of
    Latter-day Saints v. Amos*,
    483 U.S. 327 (1987) ....................................................................... 12

*Demkovich v. St. Andrew the Apostle Parish*,
    3 F.4th 968 (7th Cir. 2021) (en banc) ............................................. 4

*EEOC v. Cath. Univ. of Am.*,
    83 F.3d 455 (D.C. Cir. 1996) .......................................................... 7

*EEOC v. Cath. Univ. of Am.*,
    856 F. Supp. 1 (D.D.C. 1994) ......................................................... 6

*EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*,
    582 F. Supp. 2d 881 (E.D. Mich. 2008) .......................................... 6

*EEOC v. Roman Cath. Diocese*,
    213 F.3d 795 (2000) ........................................................................ 6

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) ............................................................. 1, 3, 9, 10

*Kedroff v. St. Nicholas Cathedral*,
    344 U.S. 94 (1952) ........................................................................... 2

*NLRB v. Cath. Bishop of Chi.*,
    440 U.S. 490 (1979) ............................................................... 2, 9, 12

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) ....................................... 1, 9, 10, 11

*Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*,
    450 U.S. 707 (1981) ................................................................ 8, 11

*VF Jeanswear LP v. EEOC*,
    140 S. Ct. 1202 (2020) ............................................................ 6, 7

**Statutes**

42 U.S.C. § 2000e-5 ............................................................................ 6

**Regulations**

29 C.F.R. § 1601.16 ............................................................................ 6

**Other Authorities**

Asma T. Uddin, *When Islam Is Not a Religion: Inside
    America's Fight for Religious Freedom* 132 (2019) ............................. 10

David P. King et al., Lake Inst. on Faith & Giving, *Nat'l
    Study of Congregations' Economic Practices* (2019) ........................... 8

EEOC, *Commission Votes: September 2023* ............................................. 4

EEOC Compliance Manual § 12-I.C.2 (2008) ........................................ 4

EEOC Compliance Manual § 12-I.C.2 (2021) .......................................... 4

EEOC, *Religious Discrimination in Employment: General
    Counsel Listening Sessions Final Report* (2021) ................................. 10

EEOC, *What You Can Expect After You File A Charge* ............................ 6

Richard W. Garnett & John M. Robinson, Hosanna-Tabor*,
    Religious Freedom, and the Constitutional Structure*,
    2012 Cato S. Ct. Rev. 307 ..................................................................... 7

# INTEREST OF *AMICI CURIAE*[1]

*Amici* Sharon Fast Gustafson, former General Counsel of the Equal Employment Opportunity Commission ("EEOC" or "Commission"), and Rachel N. Morrison, former attorney advisor to General Counsel Gustafson, are experts in religion-related employment discrimination. *Amici* seek to provide the Court with insights as to how the panel's legal errors will create perverse incentives for government enforcement agencies at the expense of religious employers' constitutional rights. This is an important issue that warrants en banc review.

# ARGUMENT

The First Amendment provides complementary protections for the rights of religious organizations: the Free Exercise Clause guarantees "independence in matters of faith and doctrine and in closely linked matters of internal government," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020), and the Establishment Clause "prohibits government involvement in such ecclesiastical decisions," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188-89 (2012). In practice, these protections—often referred to as the "church autonomy doctrine"—ensure that "religious organizations" can "decide … matters of church gover[nance,] … faith

---

[1] Pursuant to Federal Rule of Appellate 29(b), *amici curiae* have sought leave from the Court to file this brief. No party's counsel authored this brief in whole or in part; and no party, party's counsel, or any person other than *amici* or their counsel contributed money intended to fund the preparation or submission of this brief.

and doctrine" "free from state interference." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952).

The only way to effectuate these protections in the litigation context is by giving religious organizations the opportunity to immediately appeal church autonomy determinations. If unable to do so, religious organizations will be forced to wade through costly, time-consuming, and intrusive district court litigation before vindicating their rights on appeal—a "very process of inquiry" that would "impinge on rights guaranteed by the Religion Clauses." *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979). As Moody Bible Institute ("Moody") correctly explains in its petition for rehearing (ECF 127), the panel's decision flatly contradicts these protections and should be vacated.

In particular, the panel held that "[t]his suit implicates only private parties" because "[n]o … unit of government is involved," and thus it "does not imperil a substantial public interest." Op. 21 (cleaned up). That is wrong. Setting aside the fact that the panel's decision will lead to greater *judicial* intrusion into religious affairs through discovery and trial, *amici* write to highlight how the panel's erroneous treatment of the church autonomy doctrine will also encourage federal agencies to ignore religious freedom protections and insert themselves into religious employment disputes where they have no place. Indeed, the EEOC has already actively advocated *against* church autonomy protections in this case. *See* ECF 86 ("EEOC Br."). Not only will increased EEOC

2

involvement immensely burden the limited resources of religious organizations trying to fulfill sincere missions, but it will inevitably lead to greater entanglement in religious affairs. Granting rehearing and vacating the panel's decision will not only protect religious employers in court, but will also encourage their continued protection during agency investigations.

I. **The panel's decision will encourage greater EEOC involvement in religious employment disputes at the expense of constitutional protections.**

Rather than allow Moody and other religious employers to vindicate their constitutional rights from the outset, the panel's decision delays review until after costly and potentially invasive district court proceedings. *See* Op. 18-23. By imposing such a delay, the panel's decision will encourage agencies like the EEOC to similarly delay resolution of church autonomy issues in their respective investigations of religious employers.

For years, the EEOC was less solicitous of the First Amendment, with the staff often aggressively pursuing perceived Title VII violations by religious employers regardless of church autonomy protections. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 189 (rejecting EEOC's "remarkable view[s]" and "extreme position[s]" trying to limit the Religion Clauses' protection of religious employers). The EEOC's guidance did not instruct staff to address constitutional protections first and omitted any warning that church autonomy questions should be resolved early. *See* EEOC

Compliance Manual § 12-I.C.2 (2008). Even after the Supreme Court's landmark *Hosana-Tabor* decision, it took the EEOC nearly a *decade* to update that guidance and give church autonomy issues their constitutionally deserved recognition.

Under that revised guidance, EEOC staff are now instructed to "resolv[e]" church autonomy questions "at the earliest possible stage *before* reaching [an] underlying discrimination claim." EEOC Compliance Manual § 12-I.C.2 (2021) (emphasis added). These adjustments are explicitly based on the premise that the church autonomy doctrine is "not just a legal defense," but a "'structural limitation imposed on the government by the Religion Clauses'" and "a constitutionally-based guarantee that obligates the government and the courts to refrain from interfering or entangling themselves with religion." *Id.* (quoting *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015)).[2]

In a stark reversal here, however, the Commission—by a divided 3-2 vote[3]—filed a brief as *amicus curiae* before the panel, omitting any mention of the positions reflected in the agency's guidance. Instead, the

---

[2] The guidance deals specifically with the "ministerial exception," highlighting that doctrine's deep roots in "the general principle of church autonomy." EEOC Compliance Manual § 12-I.C.2. The guidance thus applies to church autonomy issues more broadly. *See also Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc) ("The ministerial exception follows naturally from the church autonomy doctrine.").

[3] *See* EEOC, *Commission Votes: September 2023*, https://www.eeoc.gov/commission-votes-september-2023.

EEOC advocated for delayed review because it views "religious autonomy [a]s an affirmative defense" that can be addressed "at later stages in the litigation," "in tandem with the merits of Garrick's claims," and only to prevent "scrutinizing the validity or reasonableness of religious doctrine." EEOC Br. 8, 27, 32, 34. The Commission's departure from its guidance could not be clearer.

And its reason for doing so? To assert what it now thinks is "the *proper* interpretation of Title VII and the process for its enforcement." *Id.* at 1 (emphasis added). One can only assume that the Commission's departure reveals a return to prior practice where the agency gave less solicitude to religious protections. And now that the panel has essentially affirmed the EEOC's requested approach, it will come as no surprise if the emboldened agency reinserts itself into more religious matters during pending and future investigations.

## II. Greater EEOC involvement will impose heavy (and unnecessary) burdens on religious organizations.

If not required to resolve church autonomy questions at the outset, Commission staff will have free rein to launch long and onerous investigations into religious organizations, with all of their attendant costs. A brief overview of the Commission's investigative process demonstrates this point.

Investigations begin when an aggrieved person, the person's representative, or a Commission member files a discrimination charge.

5

42 U.S.C. § 2000e-5(b). After serving the employer with notice, Commission staff investigate the charge, *id.*, using their authority to issue and compel compliance with subpoenas for witnesses and evidence, 29 C.F.R. § 1601.16. The Commission must then decide whether there is "reasonable cause" to believe the charge within 120 days if "practicable." 42 U.S.C. § 2000e-5(b). If it finds cause, the Commission uses "informal methods of conference, conciliation, and persuasion" to resolve the matter, filing suit if that process fails. *Id.* § 2000e-5(b), (f)(1). If the conciliation process takes more than 180 days (or if the Commission dismisses the charge or decides not to file suit), the Commission may provide the aggrieved person a right-to-sue letter. *Id.* § 2000e-5(b), (f)(1).

In practice, investigations are much more "time-consuming" than 120 or 180 days, *VF Jeanswear LP v. EEOC*, 140 S. Ct. 1202, 1202 (2020) (mem.) (Thomas, J., dissenting from denial of certiorari). They take *ten* months on average,[4] and often draw on for years.[5] Investigations also often sprawl well beyond a charge's initial allegations, and even after the agency issues a right-to-sue letter. *See id.* (EEOC "continued with its

---

[4] EEOC, *What You Can Expect After You File A Charge*, https://www.eeoc.gov/what-you-can-expect-after-you-file-charge (accessed Apr. 19, 2024).

[5] *See, e.g., EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 582 F. Supp. 2d 881, 883–84 (E.D. Mich. 2008) (EEOC filed suit over two years after charge); *EEOC v. Roman Cath. Diocese*, 213 F.3d 795, 799 (2000) (EEOC filed suit almost four years after charge); *EEOC v. Cath. Univ. of Am.*, 856 F. Supp. 1, 2 (D.D.C. 1994) (EEOC concluded investigation over two years after charge).

own, far broader investigation" through "a subpoena covering material that departed significantly" from original allegations).

Unless the church autonomy doctrine is rightly considered to confer on religious organizations immunity from suit, Commission staff will see no need to resolve these questions at the outset of their investigations, and religious employers will be subject to the steep costs and indeterminate end associated with an EEOC investigation. Even if "ultimately vindicated" in court, the employer will still have spent years in "expensive and costly" proceedings, defending its religious decisions that deserved no scrutiny in the first place. Richard W. Garnett & John M. Robinson, Hosanna-Tabor*, Religious Freedom, and the Constitutional Structure*, 2012 Cato S. Ct. Rev. 307, 329. Those costs are "not only financia[l], but also" consist of "the distraction" investigation or litigation poses for organizations "simply seeking to return to their ministry." *Id.* In *EEOC v. Catholic University of America*, for example, it took *six years* of defense costs—a two-year investigation and four-year court proceedings—before the D.C. Circuit ultimately concluded that the EEOC's "investigation, … extensive pre-trial inquiries and the trial itself, constituted an impermissible entanglement" with religion—time and money that could have been spent furthering Catholic University's religious mission. *See* 83 F.3d 455, 467 (D.C. Cir. 1996).

Small and minority religious organizations will face even greater challenges as they often lack the funds to mount a full-fledged defense in

an EEOC investigation or subsequent trial. In 2017, 61% of American congregations reported receiving less than $250,000 annually from all sources, and 28% reported less than $100,000. David P. King et al., Lake Inst. on Faith & Giving, *Nat'l Study of Congregations' Economic Practices* 11 (2019). Minority congregations face even greater challenges as they are often "smaller," "[w]ith fewer adherents and more limited resources." Br. of *Amici Curiae* Jewish Coalition for Religious Liberty et al. 20, ECF 52. Without resources to outlast the government, these organizations will be left to capitulate and structure their employment decisions around avoiding employment charges, rather than on their sincerely held beliefs.

There is no reason to think that the Commission—if permitted to operate under the Seventh Circuit's understanding of the church autonomy doctrine—will spare religious employers from these sorts of far-reaching, costly, and unnecessarily intrusive investigations and subsequent litigation.

### III. Greater EEOC involvement will inevitably lead to greater governmental entanglement with religion.

The Supreme Court has affirmed time and again that "[t]he determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task" that "is not to turn upon a judicial perception of the particular belief or practice in question." *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981); *see also Our Lady*, 140 S. Ct. at 2066. For that reason, courts can play only the

8

"narrow function" of "determin[ing] whether [a belief] reflects an honest conviction." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) (cleaned up). Courts have *no* place "inquir[ing] into the good faith of a [religious organization's] position," *Cath. Bishop*, 440 U.S. at 502, as the "mere adjudication" of a "pretext inquiry … would pose grave problems for religious autonomy," *Hosanna-Tabor*, 565 U.S. at 205-06 (Alito, J, joined by Kagan, J., concurring).

Garrick's suit epitomizes these concerns. She does not dispute Moody's sincere religious beliefs or her open and unyielding lobbying against those beliefs that led to her termination. Instead, she alleges pretext and asks the court to invasively rummage through those beliefs to determine why she was "actually fired"—an inquiry that "will unavoidably" lead to "delv[ing] into many religious topics" and "scour[ing] for evidence … of pretext." Dissent 43, 48.

As with courts, Commission staff should not wade through religious determinations either. Investigators will not be familiar with the roles, doctrines, and internal governance of "every religious tradition," and thus are ill-suited to navigate these nuances. *Our Lady*, 140 S. Ct. at 2066. Instead, investigators are more likely to approach discrimination claims against religious employers like any other case, tap dancing through a minefield of doctrine all the while. *Cf. Carroll Coll. v. NLRB*, 558 F.3d 568 (D.C. Cir. 2009) (agency may not "trol[l] through the beliefs of schools, making determinations about their religious mission, and that

9

mission's centrality to the 'primary purpose' of the school").[6] These risks become even greater when investigators deal with minority faiths, as several Justices have warned.[7] *See also* Asma T. Uddin, *When Islam Is Not a Religion: Inside America's Fight for Religious Freedom* 132 (2019) ("The practices of religious minorities can seem foreign," leaving "religious practices that conform to [majority] culture … protected more often than practices that don't.").

The panel tries to sidestep entanglement issues by allowing investigation into only the "*secular* components of a dispute" and "situations *not implicated* by Moody's complementarian beliefs." Op. 22-23 (emphases added). But it fails to acknowledge that the very determination of what an organization considers secular or religious lies at the heart of the church autonomy doctrine. *See Thomas*, 450 U.S. at 714. Judge Brennan noted this in dissent (at 48) when he identified

---

[6] For example, in dialogue sessions involving then-General Counsel Gustafson, Religious Discrimination Work Group member Morrison, and others, participants expressed concern about "how far Title VII allows investigators and courts to pursue a charge" once the employer claims a religious exemption, while others "shared that their members do not view the EEOC as friendly to their religious beliefs." *See* EEOC, *Religious Discrimination in Employment: General Counsel Listening Sessions Final Report* 11 (2021), https://eppc.org/wp-content/uploads/2023/02/Religious-Discrimination-in-Employment-General-Counsel-Listening-Sessions-Final-Report.pdf.

[7] *See, e.g.*, *Our Lady*, 140 S. Ct. at 2064 (noting the danger of "privileging religious traditions with formal organizational structures over those that are less formal"); *Hosanna-Tabor*, 565 U.S. at 197 (Thomas, J., concurring) (government must use extra caution when engaging with "religious groups whose beliefs, practices, and membership are outside of the 'mainstream'"); *id.* at 198 (Alito, J., joined by Kagan, J., concurring) (stressing the importance of a functional analysis because "the concept of ordination as understood by most Christian churches and by Judaism has no clear counterpart" in some other religions).

10

"religious topics and questions" that further litigation would inevitably implicate. As this Court previously noted, agencies investigating pretext in religious employment disputes will be "unable to … avoid becoming entangled in doctrinal matters" as "[t]he scope of this examination would necessarily include the validity as a part of church doctrine of the reason given for the discharge." *See Cath. Bishop v. NLRB*, 559 F.2d 1112, 1125 (7th Cir. 1977), *aff'd*, 440 U.S. 490 (1979). Should the Commission follow the panel's decision and take as its prerogative to determine "the preliminary question of whether" a justification is sufficiently religious, *see* EEOC Br. 30, increased entanglement will ensue.

Perhaps most alarmingly, the panel's decision opens the door to Commission staff converting religious disputes into secular ones. As Judge Brennan pointed out, Garrick's supposedly secular arguments were not based on "new material facts" or "new claims," but merely a new "narrative" "sanitized of some religious terms." Dissent 42, 49. The panel's decision sanctioned such pleading maneuvers designed to avoid religious protections, ultimately paving the way for other parties to recast religious disputes as well. *See* Op. 5-8; Dissent 49-50. The problem is that "[a]lmost any [religious] dispute could be pled to avoid questions of religious doctrine." *Belya v. Kapral*, 59 F.4th 570, 582 (2d Cir. 2023) (Park, J., dissenting from denial of rehearing en banc). This is especially so where deeply religious practices have clear secular analogs, e.g., feeding the hungry, caring for children, tending the sick, or providing

education.  It takes no leap of logic to see how enterprising EEOC staff—experienced in finding secular discrimination—will similarly be able to locate what they are used to looking for.  *See, e.g.*, EEOC Br. 21 (arguing Garrick should prevail if, despite religious disagreements, secular factors could be considered a "but-for cause of her termination").

Even assuming the staff have good intentions and manage to accurately distinguish between religious and secular issues, the investigative process alone creates constitutional concerns.  *See Cath. Bishop*, 440 U.S. at 502 ("[g]ood intentions" cannot "avoid entanglement with [an organization's] religious mission").  "It is not only the conclusions that may be reached by [an agency] which may impinge on rights guaranteed by the Religion Clauses, but also the *very process of inquiry* leading to findings and conclusions."  *Id.* (emphasis added).  Indeed, "the prospects" of EEOC investigation and litigation can themselves create impermissible entanglement because a religious group's "process of self-definition would be shaped" by a fear of those prospects.  *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 343-44 (1987) (Brennan, J., concurring in judgment).

# CONCLUSION

Under the panel's erroneous decision, Moody and other religious organizations will not only find inadequate protection in federal court, but they will almost certainly find greater intrusions from an agency already indicating its eagerness to investigate beneath every altar and behind every veil. To prevent these harms, the Court must correct the panel's errors and recognize that church autonomy issues need to be decided first and be made immediately appealable. Doing so will keep courts out of ecclesiastical matters (encouraging EEOC staff to do the same), and spare religious organizations from the very intrusions against which the Constitution was designed to protect. The Court should grant the petition for rehearing en banc and vacate the panel's decision.

Dated: April 22, 2024

Respectfully submitted,

*/s/ MaKade C. Claypool*

Robert K. Kelner
MaKade C. Claypool
  *Counsel of Record*
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
mclaypool@cov.com

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume requirements of Federal Rule of Appellate Procedure 29(b)(4) because it contains 2593 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Circuit Rule 32(b) as it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: April 22, 2024         /s/ *MaKade C. Claypool*

                                                MaKade C. Claypool
                                                *Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that, on April 22, 2024, an electronic copy of the foregoing brief was served on all counsel for all parties by means of the Court's CM/ECF system. In compliance with Circuit Rule 31(b), fifteen copies of this brief will be served upon the Office of the Clerk of Court via U.S. Mail within seven days of electronic filing.

                                                /s/ *MaKade C. Claypool*

                                                MaKade C. Claypool
                                                *Counsel for Amici Curiae*